## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| PLANNED PARENTHOOD GULF COAST, INC.; PLANNED PARENTHOOD CENTER FOR CHOICE; JANE DOE #1; JANE DOE #2; and JANE DOE #3, <br><br>            Plaintiffs, <br><br>     v. <br><br> REBEKAH GEE, in her official capacity as Secretary of the Louisiana Department of Health, <br><br>           Defendant. | No. 3:18-CV-00176-JWD-RLB |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their attorneys, bring this Complaint against the above-named Defendant, her employees, agents, delegates, and successors in office, and in support thereof state the following:

## INTRODUCTORY STATEMENT

1.     This civil action is brought pursuant to 42 U.S.C. § 1983 and the United States Constitution to vindicate rights secured by the federal Medicaid statute, 42 U.S.C. § 1396a(a)(23), as well as the Equal Protection and Due Process Clauses of the United States Constitution.  Plaintiffs Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood Center for Choice ("PPCfC"), and the Patient Plaintiffs challenge the State of Louisiana's unconstitutional attempts to prevent PPGC and PPCfC from providing comprehensive reproductive health care services, including abortion, to their patients in Louisiana who need that care.

2.      For over thirty years, PPGC or its predecessor organizations have operated two health centers in Louisiana, specifically in Baton Rouge and New Orleans.  At these health centers, PPGC has provided critically needed family planning and preventive health services to underserved women and men, including patients enrolled in the Louisiana Medicaid Program.

3.      Starting over a decade ago, PPGC and its affiliated entity, PPCfC, began making plans to build a new and expanded health center in New Orleans ("New Orleans Health Center") that would provide comprehensive reproductive health care services, including abortion.

4.      The New Orleans Health Center will be the *first* Planned Parenthood health center in Louisiana that provides abortion.

5.      Facing an increasingly hostile government environment, the number of abortion clinics in Louisiana has decreased drastically in recent years.  As recently as 2010, Louisiana had seven abortion clinics.  Now just three remain: one in Shreveport, one in Baton Rouge, and one in New Orleans.  There is a dire need for additional clinics.

6.      Despite this overwhelming need, PPCfC's plans to provide abortion at the New Orleans Health Center have been met with an unprecedented level of opposition at every turn, causing setback after setback in Plaintiffs' efforts to serve the women of New Orleans.

7.      After years of delays, caused by, *inter alia*, intimidation and harassment of workers both on and off the job site, an arson attack, and a sham requirement that any new abortion facility receive "Facility Need Review" approval from the Louisiana Department of Health ("LDH") as a prerequisite to licensure (a requirement that was ultimately withdrawn before it could face judicial scrutiny), the New Orleans Health Center finally opened its doors to patients on June 30, 2016, and began providing a range of family planning and other critical health care services (except abortions) to patients at its state-of-the-art facility.

2

8.      Nearly simultaneously with the opening of the New Orleans Health Center, Louisiana Governor John Bel Edwards signed into law yet another obstacle to PPGC's and PPCfC's efforts to provide comprehensive reproductive health care to their patients at the New Orleans Health Center: Louisiana House Bill 606, 1st Regular Session (2016), *codified at* La. Rev. Stat. §§ 40-1061.6(A) & 36:21 ("Act") (attached hereto as Exhibit A).

9.      The Act prohibits the State, or any local political subdivisions, from entering into any contracts with, or otherwise bestowing any funding upon, not only abortion providers and entities, but also organizations that merely contract with abortion providers.  In effect, the Act bars abortion providers and those that contract with abortion providers from participating in Louisiana's Medicaid Program, or otherwise receiving state funds, solely because of their exercise of constitutionally protected activity.

10.     At the direction of the Governor, the Act was drafted with the express purpose of excluding PPGC from Louisiana's Medicaid Program once its affiliated entity, PPCfC, begins providing abortions at the New Orleans Health Center.

11.     Despite the Act, and all of the obstacles and setbacks placed in their path, Plaintiffs have held strong in their commitment to provide needed abortion services to the women of Louisiana.  Accordingly, on September 29, 2016, PPCfC submitted its application to LDH for licensure as an outpatient abortion facility.  The application guidelines recommend that a licensee apply six weeks in advance of an intended opening date, but LDH has processed PPCfC's application on a drastically different timeline.  In June 2017, nearly nine months after the application was filed, Defendant sent PPCfC a letter claiming that LDH is unable to act on PPCfC's application because LDH needs to conduct an investigation of PPCfC.

12.     In fact, the "investigation" referenced in the June 2017 letter is a sham.  LDH has been conducting politically-motivated "investigations" of Plaintiffs for years, each time without finding *any* legitimate evidence of wrongdoing, never mind evidence that would justify the denial of PPCfC's license to operate an abortion facility in New Orleans.[1]  This latest requirement of an "investigation" is designed only to impose an indeterminate delay on PPCfC's licensing application and to thereby deny Louisiana women their right to access abortion.  There is no legitimate reason for the investigation, only LDH's express animus toward Plaintiffs and/or abortion.

13.     LDH's June 2017 letter, purporting to require a sham investigation that is nowhere required in the application procedures, constructively denied PPCfC's licensing application.  Indeed, in the *eight months* since the letter, PPCfC has received no further communications from LDH regarding its licensing application or the "investigation" that LDH is purportedly conducting.  LDH's past course of conduct and the ensuing months of silence demonstrate that LDH intends *never* to make a formal decision on PPCfC's application.

14.     The denial of PPCfC's abortion license application violates PPCfC's and PPCfC's patients' rights to (1) substantive due process, because this denial has the purpose and/or effect of imposing a substantial obstacle on access to abortion, without sufficient justification; (2) equal protection, because it treats PPCfC differently than similarly situated licensing applicants, without sufficient justification; and (3) procedural due process, because it denies PPCfC's

---

[1] Daryl Purpera, Legis. Auditor, *Response to Senate Concurrent Resolution No. 57 & House Resolution No. 105, 2013 Regular Sess.* (Feb. 19, 2014), https://app.lla.state.la.us/PublicReports.nsf/5256EC014378E02E86257D57005363A0/$FILE/000 37C6C.pdf; *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 468 (5th Cir. 2017); *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 989-90 (W.D. Tex. 2017).

abortion license without sufficient procedural protections.  PPCfC intends to perform abortions as soon as LDH authorizes it to do so.

15.     In addition, the Act violates 42 U.S.C. § 1396a(a)(23), which is known as the Medicaid "free choice of provider" requirement, for the same reason the courts enjoined Louisiana's prior effort to exclude PPGC from Medicaid.  *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017).  The Act will effectively prevent PPGC's Louisiana Medicaid patients, including the Patient Plaintiffs, from receiving any services through the Medicaid Program from the qualified, willing provider of their choice (i.e., PPGC), solely because PPGC contracts with PPCfC, which intends to provide abortions.

16.     The Act also violates the due process rights of PPGC and its patients, and the First Amendment rights of PPGC, by imposing an unconstitutional condition on PPGC's eligibility to participate in Medicaid, i.e., disqualifying PPGC from Medicaid based on Plaintiffs' and its patients' constitutionally protected activities.  The Act further violates the equal protection rights of PPGC, PPGC's patients, PPCfC, and PPCfC's patients (including the Patient Plaintiffs) because it singles them out for disfavorable treatment without a constitutionally sufficient justification.

17.     Absent relief from this Court, the State's actions will impose irreparable harm on Plaintiffs and their patients.  The denial of PPCfC's license deprives the women of Louisiana of access to high quality, timely, and safe abortion care, without a corresponding medical benefit. Similarly, the Act either disqualifies PPGC from providing critical services to the over 4,700 Louisiana Medicaid patients who depend on PPGC annually for that care or prevents Louisiana women from accessing abortions at the New Orleans Health Center.

## JURISDICTION AND VENUE

18.     Subject-matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

19.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

20.     Venue in this judicial district is proper under 28 U.S.C. § 1391.

## THE PARTIES

I.     **Plaintiffs**

21.     Plaintiff PPGC is a not-for-profit corporation organized under the laws of Texas and licensed to do business in Louisiana.  PPGC brings this action on behalf of itself and its Louisiana patients.  PPGC (and its predecessor organizations) have provided high quality reproductive health care in Louisiana for more than thirty years.  PPGC operates two health centers in Louisiana, one in New Orleans and one in Baton Rouge.  It participates in the Medicaid Program, providing medical services to low-income enrollees.  The family planning and other preventive health services provided by PPGC at these health centers include physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treatment for certain sexually transmitted infections ("STIs"), pregnancy testing and counseling, and other procedures, including colposcopy.

22.     Plaintiff Jane Doe #1, a Louisiana resident and Medicaid patient, obtains her reproductive health care at PPGC's New Orleans Health Center and desires to continue to do so.

23.     Plaintiff Jane Doe #2, a Louisiana resident and Medicaid patient, obtains her reproductive health care at PPGC's New Orleans Health Center and desires to continue to do so.

24.     Plaintiff Jane Doe #3, a Louisiana resident and Medicaid patient, obtains her reproductive health care at PPGC's Baton Rouge health center and desires to continue to do so.

25.     Plaintiffs Jane Doe #1, Jane Doe #2, and Jane Doe #3 appear pseudonymously because of the private and personal nature of the medical care that they receive at PPGC and their desire not to have that information become public in order for them to assert their legal rights.

26.     Plaintiff PPCfC is a not-for-profit corporation organized under the laws of Texas and licensed to do business in Louisiana.  PPCfC brings this action on behalf of itself and its Louisiana patients.  PPCfC has a facilities and services agreement with PPGC that allows PPCfC to lease space, services, and staff from PPGC in order for PPCfC to provide abortions at health centers owned by PPGC.  PPCfC has applied to the Defendant for a license to provide abortions at the New Orleans Health Center.

## II.     Defendant

27.     Defendant Rebekah Gee is the Secretary of LDH.  LDH is the agency that is responsible for licensing abortion facilities in Louisiana.  La. Rev. Stat. § 40:2175.6.  LDH is also the agency that administers the Louisiana Medicaid Program that, in the absence of the Act, would disburse the funds at issue to PPGC.  La. Rev. Stat. § 46:437.11.  Defendant Gee is sued in her official capacity, as are her employees, agents, and successors in office.

## BACKGROUND ON ABORTION

28.     Abortion is one of the safest and most common medical procedures performed in the United States.  Less than 0.3% of abortion patients experience a complication that requires hospitalization.

29.     Nationwide, roughly three out of every ten women will have had an abortion by the age of 45.

30.     In the United States, approximately 39% of women who obtain abortions are white; 28% are black; 25% are Hispanic; and 9% come from other racial or ethnic backgrounds. Three-fourths of all abortion patients are low-income (i.e., have incomes less than 199% of the federal poverty level).[2]   The limited publicly available data for Louisiana shows that approximately 70% of the women obtaining abortions in Louisiana are non-white.[3]

31.     The reasons women give for having an abortion overwhelmingly relate to concerns about their ability to care for family members.  Three-fourths of women cite responsibility to other individuals (such as children or elderly parents).  Most also say they cannot afford to become a parent or add to their family and that having a baby would interfere with work, school, or their ability to care for dependents.  Half of all abortion patients say they do not want to be a single parent or are not in a stable relationship.[4]

32.     Nearly 60% of women having abortions already have at least one child.[5]  Most also report plans to have children (or additional children) when they are older, financially able to

---

[2] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, N.Y.: Guttmacher Instit. (2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.
[3] La. Dep't of Health, *Induced Terminations of Pregnancy by Weeks of Gestations, Race, Age, and Marital Status Reported Occurring in Louisiana, 2014*, http://new.dhh.louisiana.gov/assets/oph/Center-RS/healthstats/New_Website/ITOP/Ap14_T21.pdf.
[4] Lawrence Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Persp. on Sexual and Reprod. Health, 2005, No. 3, 110-118, https://www.guttmacher.org/journals/psrh/2005/reasons-us-women-have-abortions-quantitative-and-qualitative-perspectives.
[5] Jerman et al., *supra* note 2.

provide for children, and/or in a supportive relationship with a partner so the children will have

two parents.[6]

## PLAINTIFFS' DECADE-LONG EFFORT TO PROVIDE WOMEN'S HEALTH SERVICES IN NEW ORLEANS

33.     PPGC and PPCfC have been engaged in a decade-long effort to provide the New

Orleans community with a new, expanded health center that will provide patients with

comprehensive reproductive health services, including abortion.  Throughout repeated setbacks

and delays they have held steadfast in their commitment to open the New Orleans Health Center,

which will be the first Planned Parenthood health center in Louisiana that offers abortions.

34.     Anti-choice leaders and politicians in Louisiana, however, have also been

engaged in a lengthy, organized effort to stop the New Orleans Health Center from opening, and

more specifically, to stop it from offering abortions.

35.     Plaintiffs have faced obstacles at every stage of the process.  Just getting the

building constructed was a herculean feat.

36.     Workers on the project were subjected to routine harassment and threats, not just

while working on the job-site, but also in their communities and even at their homes.  One

subcontractor received death threats because of his work on the project, prompting an FBI

investigation.  A security firm was needed at the job-site in order to ensure the safety of the

workers.

37.     The harassment of Plaintiffs was not limited to the job-site.  Plaintiffs have also

been subject to politically-motivated "investigations" of their practices since at least 2013 as a

result of their plans to provide abortions at the New Orleans Health Center.  In that year, the

---

[6] Stanley K. Henshaw & Kathryn Kost, *Abortion Patients in 1994-1995: Characteristics and Contraceptive Use*, 28(4) Fam. Plan. Persp., 140, 144 (1996), https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/2814096.pdf.

Louisiana Legislature directed LDH, the Division of Administration, the legislative auditor, and the Office of State Inspector General to "review and monitor" the practices of PPGC in order to "determine whether the organization is in compliance with all state and federal laws and regulations." Exhibit B at 3. The Legislature was motivated by PPGC's "plans to build a four million two hundred thousand dollar, seven thousand square foot facility where they intend to perform abortions." *Id.* at 1. These investigations uncovered no evidence of any wrongdoing.

38.    Efforts to prevent the New Orleans Health Center from opening also included LDH's bogus requirement that any new abortion clinics in the state receive "facility need review" approval ("FNR") before obtaining a license to perform abortions.

39.    Upon information and belief, LDH promulgated in 2012 the FNR requirement for abortion facilities for the specific purpose of preventing PPCfC from providing abortions at the New Orleans Health Center. LDH imposed this requirement even though there was no legitimate state purpose served by the FNR requirement for abortion facilities and even though such a requirement was beyond LDH's statutory authority.

40.    In spite of the improper purpose of the FNR requirement, PPCfC attempted to comply with the FNR requirement in good faith. PPCfC first submitted a 79-page application for FNR approval on October 16, 2014, demonstrating in the application and supporting reports from experts in the field that the New Orleans Health Center would satisfy an unmet need for abortion services for thousands of women. LDH denied the FNR application on January 8, 2015. PPCfC promptly appealed and, in the midst of that administrative appeal of the FNR denial, LDH offered PPCfC an opportunity to "supplement" its FNR application. PPCfC then submitted a 131-page supplemental FNR application on April 22, 2015, again including reports from experts in the field on the need for PPCfC's services. Instead of acting on PPCfC's application,

LDH informed PPCfC on June 19, 2015 that it had instead "decided to rescind its facility need review ("FNR") requirements for outpatient abortion facilities effective immediately." LDH thereafter adopted an emergency regulation purporting to rescind the requirement that an applicant for an outpatient abortion facility license receive facility need review approval. 41 La. Reg. 1238 (July 20, 2015).

41.     Given LDH's representation that the FNR requirement had been rescinded and was no longer applicable to abortion clinics (though the requirement remains in the abortion facility licensing regulations, La. Admin. Code tit. 48, pt. I, § 4405), PPCfC did not resubmit its request for FNR approval. Instead PPCfC moved forward with its plans to finish construction on the long-awaited New Orleans Health Center and apply for licensure as an abortion facility.

42.     But many obstacles still stood in Plaintiffs' path. First, in July 2015, a radical anti-abortion group with ties to violent extremists began to release misleading and deceptively edited YouTube videos purporting to depict Planned Parenthood's practices related to fetal tissue donation.

43.     Soon thereafter, in August 2015, the New Orleans Health Center was the subject of an arson attack: In the middle of the night, an arsonist attempted to set fire to the building structure. Unsuccessful at these efforts, the arsonist instead set fire to a car parked inside the locked gate at the construction site. This arson is still the subject of an FBI investigation.

44.     In response to the deceptive YouTube "fetal tissue" videos, LDH launched yet another "investigation" into PPCfC's fetal tissue disposal practices and then tried, on two separate occasions, to terminate PPGC's Medicaid provider agreements for reasons wholly unrelated to PPGC's competence to provide care in the Louisiana Medicaid Program. Those

efforts were instead part and parcel of the State's campaign to oppose abortion and punish Plaintiffs for attempting to provide abortions in Louisiana.

45.     Litigation challenging the Medicaid terminations ensued, *see Planned Parenthood of Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604 (M.D. La. 2015), and Defendant's efforts to kick PPGC out of Louisiana Medicaid failed every time.  The Fifth Circuit upheld a preliminary injunction of the termination of PPGC's provider agreements, holding that Plaintiffs are substantially likely to succeed in showing that Defendant's attempt "to terminate PPGC's Medicaid provider agreements for reasons unrelated to its qualifications" violates the free choice of provider requirement.  *Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 470.

46.     Unsuccessful in its attempts to kick PPGC out of the Louisiana Medicaid Program through a termination of its provider contracts, anti-choice forces took yet another tactic: a legislative 'fix' that would bar PPGC from participating in Medicaid if PPCfC provides abortion at the New Orleans Health Center.

47.     The Act provides that "[n]o institution, board, commission, department, agency, official, or employee of the state, or of any local political subdivision thereof, shall contract with, award any grant to, or otherwise bestow any funding upon an entity or organization that performs abortions, or contracts with an entity or organization that performs abortions, in this state."  The Act goes on to exempt those entities that may "from time to time" perform abortions in extremely limited circumstances: abortions that are "medically necessary to prevent the death of the mother" and abortions where "the mother is a victim of rape or incest."  Louisiana House Bill 606, 1st Regular Session (2016), *codified at* La. Rev. Stat. §§ 40:1061.6(A) & 36:21.

48.     The Act discriminates against abortion providers and stigmatizes the provision of abortion care.

49.     Because of the contractual relationship between PPGC and PPCfC, the Act means that PPGC will be disqualified from participating in Louisiana's Medicaid Program once PPCfC begins providing constitutionally protected abortions at the New Orleans Health Center.  On information and belief, the Act was specifically drafted with the intent of making it impossible for PPGC to continue participating in the Louisiana Medicaid Program once its contractually affiliated entity, PPCfC, begins performing abortions in Louisiana.

50.     In addition, the Act's broad language forces every business in the State of Louisiana into the dilemma of being eligible to do business with the entire state and local public sector or contracting with abortion clinics.  Accordingly, it threatens abortion clinics' business relationships with all of their vendors, on whom they depend on for a vast array of essential services.  If vendors refuse to contract with abortion clinics, including PPCfC, because they wish to remain eligible to work with the public sector in Louisiana, it will be impossible for abortion clinics to operate.

51.     During legislative deliberations, the Act's intended effect on PPGC was front and center.  One legislator asked PPGC whether the Act's effect on the ability of abortion providers to receive Medicaid reimbursement would impact PPCfC's provision of abortion in New Orleans, apparently attempting to figure out whether the Act would deter PPCfC from providing abortion: "Does the decision of the state to give or not give you Medicaid reimbursement factor in your decision to provide abortions?"  Exhibit C at 21:17-21 (Transcript of Hearing on H.B. 606, La. House Reps., Health & Welfare Comm., Apr. 20, 2016).  Yet another legislator asked why more representatives from PPGC were not at the committee hearing on the Act to "defend why they think women should get abortions in Louisiana."  *Id.* at 34:17-18.

52.     Similarly, the Act's sponsor asked the legislative director for Louisiana Right to Life to present the Act in the Senate committee.  The legislative director's testimony made clear that the Act was targeted at PPGC's efforts to provide abortion at the New Orleans Health Center:  She testified that the Act was designed to affect those organizations that "willingly and knowingly change their current practice in order to begin performing elective abortion procedures . . . . [T]he Act puts the decision in the hands of that organization or business; do they want to be continue to be funded at current levels and provide services to our citizens, or is it more important for them to become an abortion business?  It's entirely up to them once this legislation goes into effect."  La. S. Health & Welfare Comm., Hearing on H.B. 606 (May 11, 2106), http://senate.la.gov/video/videoarchive.asp? v=senate/ 2016/05/051116H~W_0 at 3:39:15-3:39:40 (Statement of Deanna Wallace).

53.     Similarly, Louisiana Right to Life's executive director publicly heralded the Act for its effect on PPGC, stating that "[b]usinesses that sell abortions, like Planned Parenthood Gulf Coast plans to do at the facility under construction in New Orleans, should never receive the tax dollars of American citizens."[7]

54.     Other discussion during legislative deliberations on the Act made clear that the Act was also motivated by opposition to abortion, with one legislator stating that the Act sought to prevent "our state dollars funding a procedure that we object to" and another stating that the Act is about "defunding the [abortion] procedure," *see* Exhibit C at 40:6-7, even though

---

[7] La. Right to Life, *Louisiana Senate Committee Passes Bill to Defund Planned Parenthood Abortion Company*, LifeNews.com (May 11, 2016), http://www.lifenews.com/2016/05/11/louisiana-senate-committee-passes-bill-to-defund-planned-parenthood-abortion-company/.

Louisiana law already prohibits the use of state funds for abortions, except in extremely narrow circumstances, La. Rev. Stat. § 40:1061.6(A)(1).

55.     The Act was signed into law on June 2, 2016, and became effective on that date.

56.     The Act violates federal Medicaid law for the same reason that Louisiana's prior two attempts to kick PPGC out of the Medicaid Program violated this law:  The Act attempts to kick PPGC out of the Louisiana Medicaid Program for reasons unrelated to its qualifications as a Medicaid provider.

57.     Under federal law, a state's Medicaid plan must provide that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."  42 U.S.C. § 1396a(a)(23)(A).[8]

58.     For years, courts consistently have interpreted the "qualified" language in Section 1396a(a)(23) to prohibit states from denying access to a provider for reasons unrelated to the ability of that provider to perform and properly bill for Medicaid-covered services.

59.     For example, when two states, Arizona and Indiana, passed statutes nearly identical to the Act that barred abortion providers, or those who operate or maintain a facility where abortions are performed, from participating in each state's Medicaid Program, the Ninth and Seventh Circuits enjoined them, reasoning that they either violated, or were likely to violate, the Medicaid free choice of provider requirement.  *Planned Parenthood Ariz., Inc. v. Betlach*,

---

[8] Congress has singled out family planning services for special additional protections to ensure freedom of choice, specifically providing that, with respect to these services and with certain limited exceptions not applicable here, "enrollment of an individual eligible for medical assistance in a primary care case-management system . . . , a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services . . . ."  42 U.S.C. § 1396a(a)(23)(B); 42 C.F.R. § 431.51(b)(2) (implementing regulations requiring the same).

727 F.3d 960 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013).

60.    Thus, when Defendant previously tried to terminate PPGC's Medicaid provider agreements, the Fifth Circuit made clear that it agreed with the reasoning of the Ninth and Seventh Circuits and that a "state may not exclude a provider simply based on the scope of the services it provides." *Planned Parenthood of Gulf Coast, Inc.*, 862 F.3d at 469.

61.    The New Orleans Health Center finally opened its doors to patients on June 30, 2016, and currently provides compassionate reproductive health care to its patients in its state-of-the-art-facility.

62.    But Plaintiffs have yet to begin providing abortion care at the New Orleans Health Center because of yet another barrier:  Louisiana law requires any outpatient abortion facility in the state to first obtain a license from LDH.  *See* La. Rev. Stat. § 40:2175.4(A) ("An outpatient abortion facility may not be established or operated in this state without an appropriate license issued under this Part.").

63.    On September 29, 2016, PPCfC applied to LDH for licensure as an outpatient abortion facility, following the Department's recommendation to apply for licensing approval approximately six weeks before the abortion facility is ready to provide abortion services.[9]

64.    But the licensing application process for PPCfC has lasted far beyond this six-week time frame.  PPCfC's licensing application was filed nearly *seventeen months* ago.

---

[9] Dep't Health & Hosp., Health Standards Section Initial Licensing Process: Abortion Facility, http://dhh.louisiana.gov/index.cfm/page/1171.

65.     On November 16, 2016, LDH requested additional information related to PPCfC's application for licensure, which PPCfC promptly submitted.  After dutifully complying with every single one of LDH's requests for follow-up information and clarification, PPCfC expected that the next step on its licensing application would be LDH *finally* scheduling an inspection of the New Orleans Health Center.  *See* La. Rev. Stat. 40:2175.6(C) ("Following receipt of the application and licensing fee, the licensing agency shall issue a license if, after an on-site inspection, it finds that the outpatient abortion facility meets the requirements established under this Part and the licensing standards adopted in pursuance thereof."); La. Admin. Code tit. 48, pt. I, § 4405(F) ("Upon receipt of a complete initial licensing application packet, the department *shall* conduct an on-site initial licensing survey prior to issuing a full initial license.") (emphasis added).

66.     But the licensing process did not proceed in the ordinary course.  Instead, nearly *nine months* after PPCfC submitted its licensing application, PPCfC received a letter, dated June 13, 2017, indicating that the Department has taken the position that it cannot make a determination on PPCfC's license application because the Department needs to first "conduct[] an investigation to determine if Planned Parenthood Center for Choice, either in its own name or through the actions of Planned Parenthood Gulf Coast, is in violation of any federal or state law or regulation."  Exhibit D.

67.     This "investigation" is a complete sham.  The letter references the Report of the U.S. House of Representatives Select Investigative Panel of the Energy & Commerce Committee, which was issued on December 30, 2016, as providing a reason for the "investigation" of PPGC, and it broadly states that the "investigation will include, among other things, interfacing with the Louisiana Attorney General, the Texas Attorney General, and other

17

federal entities."  But the Select Investigative Panel Report, which was issued over six months

before the Department's letter, relates to the *same* deceptively edited YouTube videos that LDH

already investigated, beginning over two years ago.  These videos, which have been widely

debunked, do not show any evidence that any members of PPGC's staff violated *any* laws or

other applicable standards.

68.    Multiple state investigations have found that the videos provide no evidence of

wrongdoing by Planned Parenthood affiliates,[10] including a grand jury in Texas that cleared

PPGC of any wrongdoing and instead indicted two anti-abortion activists who made the videos.[11]

69.    Similarly, a federal district court in Texas has already determined that the state of

Texas had no legitimate basis for terminating PPGC's Texas Medicaid provider contracts based

on the same concerns about PPGC's fetal tissue donation practices, including the purported

findings of the Select Investigative Panel Report.  *See Planned Parenthood of Greater Tex.*

*Family Planning & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 990 (W.D.

---

[10] *See, e.g.*, *Indiana Clears Planned Parenthood of Wrongdoing After Videos*, Associated Press, July 30, 2015, http://bigstory.ap.org/article/14e6280c406a4d21920c5594107dfdc4/indiana-clears-planned-parenthood-wrongdoing-after-videos; David Scharfenberg, *Planned Parenthood 'Fully Compliant' with Law, Healey Says*, Bos. Globe, July 29, 2015, http://www.bostonglobe.com/metro/2015/07/29/healey-mass-planned-parenthood-fully-compliant-with-law/Fc6pYYrY1ONGQvRTEqkWHK/story.html; *Health Department: No Evidence of Fetal Tissue Sale In State*, KDLT News, Aug. 12, 2015, http://www.kdlt.com/news/local-news/Health-Department-No-Evidence-Of-Fetal-Tissue-Sale-In-State/34668964; Virginia Anderson, *Georgia Abortion Clinics Follow Law on Fetal Remains, State Says*, Atlanta J.-Const., Aug. 12, 2015, http://www.ajc.com/news/news/local/georgia-abortion-clinics-follow-law-fetal-remains-/nnJSk/; Marie McCullough, *Pa. Inquiry Clears Planned Parenthood*, Phila. Inquirer, Aug. 22, 2015, http://www.philly.com/philly/hp/news_update/20150822_Pa__inquiry_clears_Planned_Parenthood.html.
[11] Manny Fernandez*, 2 Abortion Foes Behind Planned Parenthood Videos Are Indicted*, N.Y. Times, Jan. 25, 2017, https://www.nytimes.com/2016/01/26/us/2-abortion-foes-behind-planned-parenthood-videos-are-indicted.html.

Tex. 2017) ("[T]here is no evidence in the record PPGC violated any medical or ethical

standard.").

70.     In fact, there is no legitimate basis for LDH's continued investigation of

Plaintiffs.  LDH's "investigation" of Plaintiffs based on these deceptive videos has been ongoing

for over two and a half years, without any legitimate finding that they have committed any legal

or regulatory violations.

71.     LDH's "investigation" of Plaintiffs has not been limited to Plaintiffs' fetal tissue

disposal practices.  LDH has been conducting politically-motivated investigations of PPGC's

practices since at least 2013, with no findings of any wrongdoing.

72.     Since receiving the letter, Plaintiffs have received no further communication from

LDH related to the licensing application.  LDH has not requested any information from Plaintiffs

related to the "investigation" that LDH is purportedly conducting.

73.     The basis for the continued "investigation" of PPGC is LDH's express animus

toward abortion or Plaintiffs and its corresponding desire to prevent Plaintiffs from providing

abortions at the New Orleans Health Center.

74.     By indicating that LDH will not rule on PPCfC's application until this sham

"investigation" is complete, LDH has constructively denied PPCfC's abortion license

application.  Indeed, the June 2017 letter and the ensuing eight months of silence show that LDH

intends to never schedule an inspection of the New Orleans Health Center and to never act on

PPCfC's application.

## THE IMPACT OF DEFENDANT'S ACTIONS ON PPGC, PPCfC, AND THEIR PATIENTS

75.     Both the Act and the denial of PPCfC's license application impose significant

burdens on Plaintiffs and their patients.

19

76.     If PPCfC is unable to provide abortions at the New Orleans Health Center, the consequences for Louisiana women will be dire.  And if PPGC is unable to continue participating in the Louisiana Medicaid Program, PPGC's Medicaid patients will be irretrievably harmed.

I.     **Impact if Plaintiffs Cannot Provide Abortions at the New Orleans Health Center**

77.     The number of abortion clinics in Louisiana is drastically declining.  In 2010, there were seven abortion clinics in the state.  Currently, just three clinics remain—one in Shreveport, one in Baton Rouge, and one in New Orleans—for the 940,000 women of reproductive age in the state.  This ranks Louisiana among the worst states for abortion access in the country, with over 310,000 women of reproductive age per clinic in the state.

78.     Moreover, because of the myriad of restrictions on abortion in Louisiana, these remaining clinics' ability to continue operating in such a hostile climate for abortion access is far from clear.  *See, e.g.*, *June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27 (M.D. La. 2017) (permanently enjoining Louisiana law requiring physicians providing abortions to have admitting privileges), *appeal filed* May, 12, 2017; *June Med. Servs. LLC v. Gee*, No. CV 16-00444-BAJ-RLB, 2017 WL 5505536 (M.D. La. Nov. 16, 2017) (challenging, *inter alia*, ban on a method of second trimester abortion, 72-hour waiting period, and requirement that physicians who perform abortions be board certified in family medicine, obstetrics, or gynecology); Complaint, *June Med. Servs. LLC v. Gee*, No. 3:17-cv-00404-JJB-RLB (M.D. La. June 27, 2017) (challenging Louisiana's targeted regulation of abortion providers "with a series of onerous regulations that do little or nothing to promote women's health and serve only to impede access to abortion care").

79.     If any one of the three remaining clinics were to shut down, the situation would become even more dire.

80.     The New Orleans area itself used to be served by four abortion clinics as recently as 2010.  LDH revoked the license of one New Orleans abortion clinic in 2010 and that of a second New Orleans abortion clinic in 2012.  Since that time, two abortion clinics had continued to serve the women of New Orleans until Causeway Medical Clinic was forced to shut down in February 2016 after a requirement that its physicians obtain admitting privileges at a nearby hospital came briefly into effect.  (It was ultimately declared unconstitutional.)

81.     Thus, since February 2016, only *one* abortion clinic remains in New Orleans serving the entire southeastern portion of the State.  That means that the approximately 250,000 women of reproductive age in the New Orleans metropolitan area must now rely on a single abortion clinic.

82.     If PPCfC were permitted to provide abortion care at the New Orleans Health Center, current barriers to abortion access in New Orleans would be alleviated, allowing more women to access early and safe abortion care from their trusted health care provider.

83.     Currently, abortion care is only reliably available in New Orleans during weekday business hours.  No regular evening, early morning, or weekend appointments are offered.  This poses a significant barrier to patients with inflexible work schedules, child care responsibilities, and other scheduling difficulties that make it impossible, or exceedingly difficult, to attend weekday medical appointments.  Moreover, because Louisiana requires patients to make two separate trips to obtain an abortion—one visit to receive state-mandated (and biased) counseling and a scripted ultrasound, and a second visit for the actual abortion, La. Rev. Stat. § 40:1061.17(B)(3)—patients must find a way to attend two separate weekday appointments.[12]

---

[12] The 72-hour waiting period between appointments required by statute is not currently being enforced due to a stipulation of non-enforcement entered in *June Med. Servs. LLC v. Gee*, No.

84.     Needing to take time off from work or find alternative child care arrangements for two separate weekday appointments delays some women in accessing abortion care, decreases the likelihood they can keep the abortion confidential, and may prevent some women from accessing abortion altogether.

85.     Delay in accessing abortion care is problematic because while abortion is an incredibly safe procedure, its risks increase with gestational age.

86.     In addition, on information and belief, poor and low-income women seeking abortion in New Orleans currently have access to very limited financial assistance to help cover the cost of the procedure.

87.     A significant number of women needing abortions in New Orleans are poor or low-income.  On a national level, approximately 49% of women having abortions in 2014 were below the federal poverty line, and 75% of women having abortions were below 200% of the federal poverty level.  Thus, the vast majority of women seeking abortions are poor or low-income.  Given that Louisiana is the third poorest state in the country, these statistics likely underestimate the need for abortions among the state's poor and low-income population.

88.     The cost for a surgical abortion in New Orleans begins at approximately $500, and increases with gestational age.  This is a significant amount of money for a poor or low-income woman to come up with on short notice.  And this amount does not include the indirect costs of an abortion that many women must pay in the form of lost wages, childcare costs, and transportation costs.

---

3:16-cv-00444-BAJ-RLB (M.D. La. July 1, 2016), ECF No. 14-1.  Instead, state law currently requires women to wait at least 24 hours between the appointments.

89.     Poor and low-income women currently have few sources they can rely on to assist them in covering the cost of the procedure.  Medicaid funding for abortion in Louisiana is not available, except for very limited exceptions (life endangerment, rape, or incest).  La. Rev. Stat. § 40:1299.34.5.  In addition, in Louisiana, all private insurance companies participating in the Affordable Care Act-created marketplaces are prohibited from providing coverage for abortion services in any circumstance.  La. Rev. Stat. § 22:1014.  Thus, most women must pay for the abortion out-of-pocket.

90.     Upon information and belief, the only significant charitable organization providing financial assistance for abortions to women in New Orleans is the New Orleans Abortion Fund.  But the New Orleans Abortion Fund can provide only limited financial assistance.  In 2013, for example, it was able to provide financial assistance to 103 women, with an average pledge of $64.[13]  While this assistance is important, it covers just a small fraction of the overall cost of the abortion and is provided to just a small fraction of the women who need financial assistance in order to access an abortion.

91.     As a result, poor and low-income women seeking abortions in New Orleans must struggle to put together the necessary funds by attempting to borrow money from friends or family members or by sacrificing payments for bills, food, or other necessities.

92.     The time spent gathering together these various sources of funding delays women in accessing care.  In a vicious cycle, this delay in turn increases the cost of the abortion, making it even more difficult for poor women to access abortion and increasing the related health risks.

93.     The New Orleans Health Center will alleviate these burdens.

---

[13] New Orleans Abortion Fund, Inc., *Breaking Barriers, Providing Access, Funding Her Choice* (Feb. 2014), http://media.virbcdn.com/files/ff/9648fc904a506042-February2014Vol3Issue2.pdf.

94.     First, PPCfC will offer abortion appointments on Saturdays and will offer evening and early morning hours.  These flexible hours are critical to ensuring that women with inflexible schedules can access abortion as early in a pregnancy as possible and can maintain the abortion's confidentiality.

95.     Second, PPCfC can offer substantial financial assistance for abortion services to poor and low-income women.  This funding will allow PPCfC to offer financial assistance to all women with incomes below 110% of the federal poverty level.  This financial assistance, which is more expansive than the financial assistance currently available to women seeking abortions in New Orleans, will allow some women to access abortions earlier in pregnancy and will permit others to obtain abortions that they otherwise could not have obtained.

96.     Moreover, while there is currently one abortion clinic in New Orleans, as noted above, the ability of the remaining abortion clinics in Louisiana to continue operating is far from clear.  If the sole remaining provider in New Orleans were to shut down, which could happen at any time, New Orleans would be left without *any* abortion providers.

97.     PPCfC's provision of abortion will significantly improve access in the New Orleans region.  Patients already routinely visit the New Orleans Health Center seeking abortion care.  In fact, this happens nearly every single day.  Once PPCfC obtains its abortion license, Planned Parenthood will no longer have to refer patients elsewhere.  Instead, Planned Parenthood's patients in New Orleans will finally be able to obtain abortion care from their trusted, comprehensive reproductive health care provider, without the additional delays and hurdles that accompany seeking care from another provider.

## II.   Impact if PPGC Can No Longer Participate in Louisiana Medicaid Program

98.   If PPGC were terminated from the Louisiana Medicaid Program, the impact on PPGC's patients in both New Orleans and Baton Rouge would also be devastating.

99.   The need for publicly supported family planning services is great in Louisiana, as it regularly ranks among the worst states for reproductive care.  In 2010, 60% of pregnancies in Louisiana were unintended.[14]  The state ranks fourth highest among 50 states in teen pregnancy rates.[15]  Nearly 80% of Louisiana's unplanned births are publicly funded, higher than the national average of 68%.[16]  Moreover, Louisiana has high rates of STIs:  The state ranks first in congenital syphilis and gonorrhea, second in chlamydia, and third in primary and secondary syphilis.[17]

100.   As LDH has recognized, "[i]n Louisiana, for 2002, there were an estimated 515,960 women, ages 13 to 44 years, needing contraceptive services and supplies.  Of those, 59

---

[14] Guttmacher Inst., State Facts About Unintended Pregnancy: Louisiana (2017), https://www.guttmacher.org/fact-sheet/state-facts-about-unintended-pregnancy-louisiana (hereafter "*State Facts: Louisiana*").

[15] Kathryn Kost & Isaac Maddow-Zimet, Guttmacher Inst., U.S. Teenage Pregnancies, Births and Abortions, 2011: National and State Trends by Age, Race and Ethnicity 8 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/us-teen-pregnancy-state-trends-2011_4.pdf.

[16] *State Facts: Louisiana*, *supra* note 14.

[17] Ctrs. for Disease Control & Prevention, *2015 Sexually Transmitted Diseases Surveillance, Table 40. Congenital Syphilis - Reported Cases and Rates of Reported Cases by State, Ranked by Rates* (2015), https://www.cdc.gov/std/stats15/tables/40.htm; Ctrs. for Disease Control & Prevention, *2015 Sexually Transmitted Diseases Surveillance, Table 13. Gonorrhea - Reported Cases and Rates of Reported Cases by State, Ranked by Rates* (2015), https://www.cdc.gov/std/stats15/tables/13.htm; Ctrs. for Disease Control & Prevention, *2015 Sexually Transmitted Diseases Surveillance,* Table 2. Chlamydia - Reported Cases and Rates of Reported Cases by State, Ranked by Rates (2015), https://www.cdc.gov/std/stats15 /tables/2.htm; Ctrs. for Disease Control & Prevention, *2015 Sexually Transmitted Diseases Surveillance, Table 26. Primary and Secondary Syphilis - Reported Cases and Rates of Reported Cases by State, Ranked by Rates* (2015), https://www.cdc.gov/std/stats15/tables/26.htm.

percent needed publicly supported services."[18]  In East Baton Rouge Parish alone, LDH estimated in 2005 that of the 54,980 women needing contraceptive services and supplies, 31,770 (58%) were in need of publicly supported services and supplies.[19]

101.    In spite of the great needs, there are simply not enough providers of the critical care PPGC provides.  PPGC's New Orleans Health Center is in an area that the federal government has classified as "medically underserved" based on four variables: (1) the ratio of primary medical care physicians per 1,000 population, (2) the infant mortality rate, (3) the percentage of the population with incomes below the poverty level, and (4) the percentage of the population age 65 or over.[20]  Both of PPGC's health centers are in areas classified as a "Primary Care Health Professional Shortage Area," a designation for areas with a population to full-time primary care physician ratio of 3500:1, or a ratio between 3000-3500:1 in areas with unusually high demand for primary care services and in which primary care professionals in contiguous areas are practically inaccessible.[21]

102.    With these significant provider shortages, PPGC plays a key role in providing needed care to Louisiana's low-income population, treating over 4,700 Louisiana Medicaid patients annually.  In East Baton Rouge Parish alone, 6,580 female contraceptive clients were

---

[18] La. Dep't of Health, East Baton Rouge Parish Health Profile 30 (2005), http://dhh.louisiana.gov/assets/docs/SurveillanceReports/php/PHP2005/PDF/EastBatonRouge/PHPEastBatonRouge.pdf (hereinafter "LDH, *East Baton Rouge Parish Health Profile*").
[19] *Id*.
[20] U.S. Dep't of Health & Hum. Servs., Health Resources & Servs. Admin., *Medically Underserved Areas and Population* (2016), https://bhw.hrsa.gov/shortage-designation/muap.
[21] *See* U.S. Dep't of Health & Hum. Servs., *Find Shortage Areas*, http://datawarehouse.hrsa.gov/GeoAdvisor/ShortageDesignationAdvisor.aspx (enter each clinic address and click "submit"); U.S. Dep't of Health & Hum. Servs., Health Resources & Servs. Admin, *Health Professional Shortage Areas (HPSAs)*, https://bhw.hrsa.gov/shortage-designation/hpsas.

served by publicly funded health clinics in 2015, the latest year that data is available; Planned Parenthood—by far the largest provider—served two-thirds (4,380) of these women.[22]

103.   Many of PPGC's patients come only to PPGC for their health care.  As LDH has itself recognized, "[w]ith the high rate of people living without health insurance in Louisiana, a family planning visit may be the only time that a woman ever has a preventive health clinic visit."[23]

104.   If PPGC were to be excluded from Medicaid, many of PPGC's Medicaid patients in Baton Rouge and New Orleans, who already have few or no alternative options, would find it difficult or impossible to access the reproductive health care services they need.  Those who could find other providers would often have to wait unacceptable periods of time for an appointment.

105.   Other Medicaid providers in Baton Rouge and New Orleans are already stretched to the breaking point, even with PPGC providing care.  It is virtually impossible to locate a private OB/GYN who will take a Medicaid patient who is not pregnant.  At community health clinics, it is often difficult for low-income patients to connect with a scheduler to make an appointment.  Even if a patient can obtain an appointment, she may be unable to obtain (either at all or without significant delays) the services she seeks, such as long-acting reversible contraceptives, which are the most effective forms of birth control, or lifesaving cancer screening procedures, such as colposcopies.  Some other clinics abide by the Catholic health directives and do not provide birth control at all.  Indeed, other Medicaid providers sometimes refer their

---

[22] Guttmacher Inst., *Publicly Funded Contraceptive Services at U.S. Clinics, 2015 State- and County-level Family Planning Clinic Data* (2017), https://www.guttmacher.org/report/publicly-funded-contraceptive-services-us-clinics-2015 (to download, click on orange link with the title of report on the right-hand side).
[23] LDH, *East Baton Rouge Parish Health Profile, supra* note 18, at 28.

patients to PPGC's health center for those services.  Other clinics are difficult for PPGC's low-income patients to reach.  And with cuts and closures at local public hospitals and clinics, it is difficult for low-income patients in need of medical care to obtain it.

106.    As just one example, LDH's East Baton Rouge Health Unit stopped accepting *any* new patients for family planning or STI services in May 2017, and then shut down completely in September 2017, making the health care access situation in Baton Rouge even worse than it already was.  Importantly, LDH itself is referring its Baton Rouge patients to PPGC as an alternative provider, and PPGC is doing its best to accommodate LDH's former patients in Baton Rouge.

107.    If PPGC were terminated from the Medicaid Program, a dire situation would become a critical one.  The remaining Medicaid providers in New Orleans and Baton Rouge would be simply unable to absorb PPGC's patients, leaving those patients without access to critical medical services.

108.    Even if other providers were available, patients insured through Medicaid choose PPGC based on a number of factors that are generally not available at other providers.  With its evidence-based practices and up-to-date technology, PPGC is known as a provider of high quality medical care.  Many individuals who receive other health care through community care providers or other Medicaid providers choose to have a separate provider, such as PPGC, for their reproductive health care because they are concerned about their privacy and because they fear being judged by other providers.

109.    In addition, many low-income patients have unique scheduling constraints because they are juggling inflexible work schedules, transportation challenges, and lack of childcare resources.  To ensure that these patients have access to family planning services, PPGC

offers extended hours.  In addition, PPGC spaces patient appointments so as to minimize wait times.  PPGC also offers the birth control shot, the birth control implant, and IUDs same-day, so that patients only need to make one trip to a PPGC health center to obtain their choice of contraceptive.  PPGC has, at all times, either a full-time Spanish speaker on staff or translator services available to non-English speaking patients.

110.    Thus, if PPGC is eliminated from the Louisiana Medicaid Program, PPGC's Medicaid patients, including the Patient Plaintiffs, would be deprived of access to the high quality, specialized care that PPGC provides.

111.    All three Patient Plaintiffs rely on PPGC as the place they can turn to for critical medical care and for prompt, efficient, and compassionate services.  If PPGC is eliminated from Medicaid, the Patient Plaintiffs would be prevented from receiving services from their provider of choice, would have their health care interrupted, and would encounter difficulties finding alternative care.

112.    If PPGC is unable to provide services through the Medicaid Program, it would fundamentally defeat the core of its mission: to provide the comprehensive reproductive health care and information people need to plan their families and their futures, with a special concern for patients living near the poverty line, and to promote patients' health, safety, and well-being.

113.    In FY 2016, PPGC's Medicaid reimbursements for providing these critical health services to low-income patients totaled nearly $1,400,000.  If PPGC were to lose this revenue, PPGC would be unable to continue to provide services in the same manner and might be forced to lay off staff members, reduce hours, or even close the Baton Rouge health center, as Medicaid reimbursements amount to nearly 70% of the revenue at that health center.  If PPGC were to close its Baton Rouge health center, it would be very expensive, if not impossible, for PPGC to

resume operations as they are today, should PPGC ever be allowed back as a Medicaid provider. Further, if PPGC closes its Baton Rouge health center, this will affect not only the Medicaid patients at the health center, but all of the patients who seek care at that health center.

114.    Women and men who are unable to obtain family planning care, or encounter delays in obtaining it, may face devastating consequences, including undetected cancers and diseases.  Delays in obtaining contraception will result in unintended pregnancies, many of which may end in abortion.

115.    In addition to the imminent loss of Medicaid reimbursement, PPGC presently faces a concrete dilemma that frustrates its mission:  It is being forced to choose between abandoning its effort to provide the women of New Orleans with access to abortion services, or being prohibited from providing desperately needed Medicaid services to its Medicaid patients. This choice is not a choice because either option would have disastrous consequences for public health.

116.    Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

## CLAIM I—FOURTEENTH AMENDMENT DUE PROCESS—UNDUE BURDEN

### (Denial/The Act)

117.    Plaintiffs hereby incorporate Paragraphs 1 through 116, above.

118.    The denial and the Act violate PPCfC's patients' right to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution because they each have the unlawful purpose and/or effect of imposing an undue burden on women's right to choose abortion before viability.

## CLAIM II—FOURTEENTH AMENDMENT EQUAL PROTECTION

### (Denial/The Act)

119.     Plaintiffs hereby incorporate Paragraphs 1 through 118, above.

120.     The denial violates the equal protection rights of PPCfC and its patients, and the Act violates the equal protection rights of PPGC, PPCfC, and their respective patients (including the Patient Plaintiffs), by singling them out for unfavorable treatment without adequate justification.

## CLAIM III—MEDICAID ACT (TITLE XIX OF SOCIAL SECURITY ACT)

### (The Act)

121.     Plaintiffs hereby incorporate Paragraphs 1 through 120, above.

122.     The Act violates Section 1396a(a)(23) of Title 42 of the United States Code by denying PPGC's Louisiana Medicaid patients, including the Patient Plaintiffs, the right to choose any willing, qualified health care provider in the Medicaid Program.

## CLAIM IV—FIRST AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS—UNCONSTITUTIONAL CONDITIONS

### (The Act)

123.     Plaintiffs hereby incorporate Paragraphs 1 through 122, above.

124.     The Act violates the due process and/or First Amendment rights of PPGC, PPCfC, and their patients by imposing an unconstitutional condition on PPGC's eligibility to participate in Medicaid based on PPGC's and/or PPCfC's exercise, and their patients' exercise, of constitutionally protected activity.

## CLAIM V—FOURTEENTH AMENDMENT DUE PROCESS—PROCEDURAL DUE PROCESS

### (The Denial)

125.     Plaintiffs hereby incorporate Paragraphs 1 through 124, above.

126.    Defendant's actions violate PPCfC's right to procedural due process by denying

PPCfC's license to provide abortions without adequate procedural protections.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

127.    Issue a declaratory judgment that the denial of PPCfC's license violates the Due

Process Clause and Equal Protection Clause of the Fourteenth Amendment and is therefore void

and of no effect;

128.    Issue preliminary and permanent injunctive relief, without bond:

a.  enjoining Defendant, her agents, employees, appointees delegates, or

   successors from withholding approval of PPCfC's application for licensure for

   the New Orleans Health Center; or

b.  directing Defendant to promptly rule upon PPCfC's application for licensure

   as an outpatient abortion facility in accordance with all applicable

   constitutional requirements; or

c.  directing Defendant to grant PPCfC's application for licensure as an

   outpatient abortion facility;

129.    Issue a declaratory judgment that the Act violates the Due Process Clause of the

Fourteenth Amendment and is therefore void and of no effect;

130.    Issue a declaratory judgment that the Act violates the Equal Protection Clause of

the Fourteenth Amendment and is therefore void and of no effect;

131.    Issue a declaratory judgment that the Act violates federal Medicaid law and is

therefore void and of no effect;

132.    Issue a declaratory judgment that the Act violates the First Amendment and is therefore void and of no effect;

133.    Issue preliminary and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Act by enjoining Defendant, her agents, employees, appointees, delegates, or successors from enforcing, threatening to enforce, or otherwise applying the provisions of the Act to PPGC;

134.    Grant Plaintiffs' attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and,

135.    Grant such further relief as this Court deems just and proper.

Respectfully submitted this 23rd day of February, 2018.

*/s/ Brandon H. Robb*
Brandon H. Robb, Bar # 31942 (Lead Attorney)
Andrea L. Rubin, Bar #31950
DELANEY, ROBB & RUBIN ATTORNEYS AT
LAW, LLC
2800 Veterans Blvd., Suite 213
Metairie, Louisiana 70005
(504) 267-9700
brandon@delaneyrobb.com
andrea@delaneyrobb.com

Carrie Y. Flaxman (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Ave., NW, Suite 300
Washington, DC 20005
(202) 973-4830
carrie.flaxman@ppfa.org

Jennifer Keighley (*pro hac vice* pending)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
123 William Street, 9th Floor
New York, NY 10038
(212) 261-4749
jennifer.keighley@ppfa.org

Amy Van Zant (*pro hac vice* pending)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Blvd.
Menlo Park, CA 94025
(650) 614-7403
avanzant@orrick.com

Mark P. Wine (*pro hac vice* pending)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main St., Suite 1100
Irvine, CA 92614
(949) 852-7704
mwine@orrick.com

*Attorneys for Plaintiffs Planned Parenthood*
*Gulf Coast, Inc., Planned Parenthood Center for*
*Choice, Jane Doe #1, Jane Doe #2, and Jane*
*Doe #3*

# EXHIBIT A

<u>**ENROLLED**</u>

2016 Regular Session

HOUSE BILL NO. 606

BY REPRESENTATIVES HOFFMANN, ABRAHAM, AMEDEE, ARMES, BAGLEY,
BARRAS, BERTHELOT, BISHOP, CARMODY, STEVE CARTER, CHANEY,
COUSSAN, COX, DEVILLIER, DWIGHT, EDMONDS, EMERSON, FALCONER,
GAROFALO, GISCLAIR, LANCE HARRIS, HENSGENS, HILFERTY, HILL,
HODGES, HOLLIS, HORTON, HOWARD, HUVAL, IVEY, JACKSON, MIKE
JOHNSON, NANCY LANDRY, LEBAS, LEOPOLD, MACK, MCFARLAND,
MIGUEZ, JAY MORRIS, JIM MORRIS, PEARSON, POPE, PUGH, PYLANT,
REYNOLDS, RICHARD, SCHEXNAYDER, SCHRODER, SIMON, THIBAUT,
WILLMOTT, AND ZERINGUE AND SENATOR WALSWORTH

1      AN ACT

2  To amend and reenact R.S. 40:1061.6(A) and to enact Chapter 1-A of Title 36 of the

3      Louisiana Revised Statutes of 1950, to be comprised of R.S. 36:21, relative to

4      authorized uses of public funds; to prohibit certain uses of public funds by

5      institutions, boards, commissions, departments, agencies, officials, and employees

6      of the state or its political subdivisions; to prohibit entities that perform abortions

7      from receiving public funding for any purpose; to provide for construction of the

8      prohibition; and to provide for related matters.

9  Be it enacted by the Legislature of Louisiana:

10      Section 1.  Chapter 1-A of Title 36 of the Louisiana Revised Statutes of 1950,

11  comprised of R.S. 36:21, is hereby enacted to read as follows:

12          <u>CHAPTER 1-A.  ELIGIBILITY OF ABORTION PROVIDERS</u>

13              <u>FOR PUBLIC FUNDING</u>

14      <u>§21.  Public funding for abortion providers; prohibition</u>

15          <u>A.  For purposes of this Chapter, the term "abortion" shall have the meaning</u>

16  <u>ascribed in R.S. 40:1061.9.</u>

17          <u>B.(1)  No institution, board, commission, department, agency, official, or</u>

18  <u>employee of the state, or of any local political subdivision thereof, shall contract</u>

19  <u>with, award any grant to, or otherwise bestow any funding upon, an entity or</u>

20  <u>organization that performs abortions, or that contracts with an entity or organization</u>

CODING:  Words in ~~struck through~~ type are deletions from existing law; words <u>underscored</u>
are additions.

HB NO. 606                                                              **ENROLLED**

1    that performs abortions, in this state.  The prohibition provided in this Section shall

2    apply to state funds, federal funds, and any other funds that may be used for purposes

3    of contracting for services, providing reimbursements, or grant issuance.

4         (2)  The prohibition provided in this Section shall not be construed to restrict

5    funding to an entity that may perform the following types of abortions, exclusively:

6         (a)  An abortion which is medically necessary to prevent the death of the

7    mother.

8         (b)  An abortion in a case when the mother is a victim of rape or incest.

9         (c)  An abortion performed when the pregnancy is diagnosed as medically

10   futile.  For purposes of this Subparagraph, "medically futile" means that, in

11   reasonable medical judgment, the unborn child has a profound and irremediable

12   congenital or chromosomal anomaly that is incompatible with sustaining life after

13   birth.  This diagnosis shall be a medical judgment certified in the pregnant woman's

14   medical record by a reasonably prudent physician who is knowledgeable about the

15   case and the treatment possibilities with respect to the medical conditions involved.

16   Section 2.  R.S. 40:1061.6(A) is hereby amended and reenacted to read as follows:

17   §1061.6.  Use of public funds

18        A.(1)  Notwithstanding any other provision of law to the contrary, no public

19   funds, made available to any institution, board, commission, department, agency,

20   official, or employee of the state of Louisiana, or of any local political subdivision

21   thereof, whether such funds are made available by the government of the United

22   States, the state of Louisiana, or of a local governmental subdivision, or from any

23   other public source shall be used in any way for, to assist in, or to provide facilities

24   for an abortion, except when the abortion is medically necessary to prevent the death

25   of the mother.

26        (2)  No institution, board, commission, department, agency, official, or

27   employee of the state, or of any local political subdivision thereof, shall contract

28   with, award any grant to, or otherwise bestow any funding upon, an entity or

29   organization that performs abortions, or that contracts with an entity or organization

CODING:  Words in struck through type are deletions from existing law; words underscored are additions.

HB NO. 606                                                                    **ENROLLED**

1    that performs abortions, in this state, as more specifically provided in Chapter 1-A

2    of Title 36 of the Louisiana Revised Statutes of 1950.

3         Section 3.  This Act shall become effective upon signature by the governor or, if not

4    signed by the governor, upon expiration of the time for bills to become law without signature

5    by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana.  If

6    vetoed by the governor and subsequently approved by the legislature, this Act shall become

7    effective on the day following such approval.


                                    _____
                                    SPEAKER OF THE HOUSE OF REPRESENTATIVES


                                    _____
                                    PRESIDENT OF THE SENATE


                                    _____
                                    GOVERNOR OF THE STATE OF LOUISIANA


APPROVED: _____

CODING:  Words in ~~struck through~~ type are deletions from existing law; words underscored
are additions.

# EXHIBIT B

Regular Session, 2013                                           **ENROLLED**

SENATE CONCURRENT RESOLUTION NO. 57

BY SENATORS MARTINY, APPEL, CORTEZ, CROWE, GUILLORY, JOHNS, LONG,
        MILLS, NEVERS, PEACOCK, PERRY, THOMPSON, WALSWORTH,
        WARD AND WHITE AND REPRESENTATIVES STUART BISHOP,
        BROADWATER, BURFORD, HENRY BURNS, CARMODY,
        CHANEY, CONNICK, CROMER, DOVE, FANNIN, GUINN, HARRIS,
        HENRY, HILL, HODGES, HOFFMANN, HOWARD, IVEY, GIROD
        JACKSON, KLECKLEY, LOPINTO, LORUSSO, MACK, JAY
        MORRIS, ORTEGO, PEARSON, PONTI, POPE, PUGH, PYLANT,
        RICHARD, SCHRODER, SEABAUGH, SIMON, ST. GERMAIN,
        STOKES, TALBOT, THOMPSON, WHITNEY AND WILLMOTT

A CONCURRENT RESOLUTION

To urge and request the various departments to take certain actions regarding the
    commercial construction and operation by Planned Parenthood Gulf Coast of a
    facility to provide abortions in Louisiana.

    WHEREAS, Planned Parenthood Federation of America is a private, nonprofit
organization that provides sexual and reproductive health services and is the largest provider
of abortions in the United States; and

    WHEREAS, the affiliate Planned Parenthood facilities in Louisiana provide sexual
and reproductive health services but currently do not provide abortions; and

    WHEREAS, in 2010, the non-abortion providing Planned Parenthood affiliates in
Louisiana merged with the abortion providing affiliates of Planned Parenthood Houston and
Southeast Texas, Inc., to form the new umbrella organization headquartered in Houston
known as Planned Parenthood Gulf Coast, which operates the largest Planned Parenthood
abortion facility in the United States; and

    WHEREAS, Planned Parenthood Gulf Coast has purchased three parcels of land on
Claiborne Avenue in New Orleans and plans to build a four million two hundred thousand
dollar, seven thousand square foot facility where they intend to perform abortions, according
to their own legislative testimony and fundraising materials; and

    WHEREAS, the state of Louisiana has various economic incentive programs for
commercial construction and labor for certain businesses; and

SCR NO. 57                                                          **ENROLLED**

WHEREAS, permits for the construction of the abortion facility to be built with private funds raised by Planned Parenthood Gulf Coast on Claiborne Avenue should include plans for the sanitary disposal of human remains for the safety and welfare of Louisiana residents; and

WHEREAS, Planned Parenthood Gulf Coast also intends to provide other services including contraception and sexually transmitted disease testing that are available at public health units and at nonprofit facilities throughout Louisiana under the same Medicaid pricing structure used by Planned Parenthood; and

WHEREAS, the two current Planned Parenthood Gulf Coast clinics in New Orleans and Baton Rouge receive state and federal funding in the amount of "approximately one million dollars a year in fee-for-service Medicaid reimbursement" for non-abortion reproductive health services, according to testimony given by a Planned Parenthood Gulf Coast representative in the House Committee on Health and Welfare on May 4, 2011; and

WHEREAS, federal and Louisiana laws regulate which services are reimbursable under Medicaid and provide for the practice of employees of public or private social service agencies with regard to abortion; and

WHEREAS, R.S. 40:1299.34.5 provides that no public funds shall be used in any way for, to assist in, or to provide facilities for an abortion, except when the abortion is medically necessary to prevent the death of the mother; and

WHEREAS, R.S. 40:1299.34 provides that no person employed in any public or private social service agency, by contract or otherwise, which is a recipient of any form of government assistance shall require or recommend that any woman have an abortion; and

WHEREAS, in the Senate Committee on Health and Welfare on June 8, 2011, the Planned Parenthood Gulf Coast representative was asked, "Do the two Planned Parenthood facilities recommend abortion to any of their clients?"   The Planned Parenthood representative responded, "We do.  It's part of our comprehensive pregnancy counseling. We provide options for all available resources including . . . abortion referral if that's requested"; and

WHEREAS, two lawsuits by former employees are pending against Planned Parenthood Gulf Coast, the same organization building the New Orleans complex, alleging

SCR NO. 57                                                                    **ENROLLED**

up to five million dollars in Medicaid fraud pursuant to the federal "False Claims Act"; and

WHEREAS, Abby Johnson, a former Planned Parenthood employee, alleges in her false claims lawsuit that members of Planned Parenthood's key management team instructed Planned Parenthood Gulf Coast staff to provide auditors with charts that had been "fixed" regarding abortion on minor girls to ensure that "required documentation, especially with regard to parental consent and non-coercion, was included in each client file"; and

WHEREAS, disregard for parental involvement for minors and non-coercion laws endangers the health and safety of Louisiana's women and young girls and facilitates sex-trafficking, sexual tourism, and prostitution of minors; and

WHEREAS, there is a responsibility of the state of Louisiana to ensure that organizations operate in compliance with all laws, and if laws are being violated, take appropriate actions against such organizations.

THEREFORE, BE IT RESOLVED that the Legislature of Louisiana does hereby urge and request the Department of Health and Hospitals, the Division of Administration, the legislative auditor, and the office of the Inspector General to review and monitor the practices of Planned Parenthood Gulf Coast to determine whether the organization is in compliance with all state and federal laws and regulations, including but not limited to provisions concerning public funding of abortion facilities, R.S. 40:1299.34.5; the counseling or recommendation of abortion by state contractors, R.S. 40:1299.34; the mandatory reporting of child sexual abuse pursuant to Louisiana Children's Code Articles 603, 609, and 610 and R.S. 14:80, regarding felony carnal knowledge of a juvenile; parental consent for minors seeking abortion requirements, R.S. 40:1299.35.5; and the informed consent and signage requirements of R.S. 40:1299.35.5.1 and 1299.35.6.

BE IT FURTHER RESOLVED that the Legislature of Louisiana does hereby urge and request that any application for economic incentives of any kind filed by Planned Parenthood Gulf Coast or any of its abortion-providing affiliates to construct, purchase, or operate any facility, or to employ any individuals therein, be denied by the Louisiana Department of Economic Development, the Louisiana Department of Labor, or any other department, and that any application for any economic incentive filed by Planned Parenthood Gulf Coast be reported to the Senate Committee on Commerce, Consumer

**SCR NO. 57**                                                          <u>**ENROLLED**</u>

Protection and International Affairs and the House Committee on Commerce by the department receiving such application.

BE IT FURTHER RESOLVED that the Legislature of Louisiana does hereby urge and request that the City of New Orleans Department of Safety and Permits and the permitting authority of any other city in which Planned Parenthood Gulf Coast seeks to construct or operate an outpatient abortion facility require plans for the sanitary disposal of human remains for the safety and welfare of Louisiana residents.

BE IT FURTHER RESOLVED that a copy of this Resolution be transmitted to the commissioner of the Division of Administration, the secretary of the Department of Health and Hospitals, the secretary of the Department of Economic Development, the secretary of the Department of Labor, the legislative auditor, the state inspector general, and the city of New Orleans Department of Safety and Permits.


_____
PRESIDENT OF THE SENATE


_____
SPEAKER OF THE HOUSE OF REPRESENTATIVES

# EXHIBIT C

1

2

3

4

5

6

7

8

9

10

11

12  Louisiana House of Representatives

13  Health & Welfare Committee

14  HB 606

15  April 20, 2016

16

17

18

19

20

21

22

23

24

25

1    REP. ROBERT JOHNSON: Is there a

2  representative of Planned Parenthood here that

3  would like to testify? Because I would really,

4  really like to ask you some questions at the

5  table.

6    CHAIRMAN FRANK HOFFMAN: Okay, yeah, we

7  do have folks from Planned Parenthood.

8    REP. ROBERT JOHNSON: Is it appropriate-

9  -

10    CHAIRMAN FRANK HOFFMAN: We have two red

11  cards. Yeah, if you want to do so.

12    RAEGAN CARTER: Hi, Representative

13  Johnson.

14    REP. ROBERT JOHNSON: How are you?

15    RAEGAN CARTER: Great. How are you?

16    REP. ROBERT JOHNSON: I guess you need

17  to identify yourself for the record.

18    RAEGAN CARTER: I'm Raegan Carter,

19  Senior Director of Public Affairs and Government

20  Relations for Planned Parenthood.

21    REP. ROBERT JOHNSON: Is that Planned

22  Parenthood, the national organization?

23    RAEGAN CARTER: That is Planned

24  Parenthood of Gulf Coast that covers the state of

25  Louisiana and the Houston, Texas area.

1    REP. ROBERT JOHNSON: Could you tell us

2  about your plans for the supercenter in New

3  Orleans?

4    RAEGAN CARTER: There is no plan for a

5  supercenter in New Orleans.  Planned Parenthood

6  in Louisiana--Planned Parenthood of Gulf Coast is

7  building a new health care facility on South

8  Claiborne.

9    REP. ROBERT JOHNSON: How large is that

10  facility going to be?

11    RAEGAN CARTER: I am not the medical

12  director, so I do not have the specifics of that

13  facility. But I can talk with you about the

14  health care services that Planned Parenthood has

15  provided in Louisiana.

16    REP. ROBERT JOHNSON: Well, I want to

17  talk about the size of the clinic, because you

18  may not know the precise square footage--it is

19  public record--but it's a large facility,

20  correct, right, in relation to others around the

21  country?

22    RAEGAN CARTER: I have no idea of the

23  size of other facilities around the country.

24    REP. ROBERT JOHNSON: You're the

25  Director of Planned Parenthood for the Gulf

Page 4

1   South? You don't know how large your facilities

2   are?

3                   RAEGAN CARTER: I am not the Director of

4   Planned Parenthood for the Gulf South.

5                   REP. ROBERT JOHNSON: Okay.

6                   RAEGAN CARTER: I'm the Senior Director

7   of Public Affairs and Government Relations.

8                   REP. ROBERT JOHNSON: Okay. What is the

9   projected volume of abortions that would be

10  provided at the New Orleans facility? Do you know

11  that?

12                  RAEGAN CARTER: In Louisiana, we do not

13  currently have an abortions license, so I guess

14  the answer to that would be zero.

15                  REP. ROBERT JOHNSON: But you have--

16  Planned Parenthood has done some projections on

17  how many abortions they would provide at the new

18  facility in New Orleans if and when they're

19  licensed to do so, correct?

20                  RAEGAN CARTER: I think someone has read

21  that figure to be around 2,000, yes.

22                  REP. ROBERT JOHNSON: Around 2,000

23  abortions at this new facility in New Orleans, if

24  and when you license to do so. Is that right?

25                  RAEGAN CARTER: If we are licensed to do

Page 5

1   so. I think that that figure was based upon

2   national calculations around need for services,

3   and not a projected model that I think you're

4   getting at, around a business model for profit.

5   It was based upon need for services.

6                    REP. ROBERT JOHNSON: So, since you

7   brought up profits--so, is it your testimony

8   today that Planned Parenthood will not profit off

9   of the 2,000 projected abortions that it will do

10  in the New Orleans facility?

11                   RAEGAN CARTER: It is my testimony today

12  that I was under the impression that I was being

13  called to the table to talk about family planning

14  services, which is what someone asked a question

15  about, the data on family planning.

16                   REP. ROBERT JOHNSON: Yes, but this bill

17  and a number of others today--I mean this bill

18  specifically is about funding for abortion. It

19  directly involves the facility that's planned for

20  New Orleans, so it's certainly relevant to the

21  testimony today, isn't it?

22                   RAEGAN CARTER: This bill is actually

23  about defunding Planned Parenthood out of

24  Medicaid services and we also--someone also

25  provided testimony already that the Hyde

1  Amendment prevents any Medicaid funding from

2  going to abortion services.

3             REP. ROBERT JOHNSON: But again, back to

4  that question, are you saying you're not willing

5  to answer the question of whether or not Planned

6  Parenthood will profit from the 2,000 projected

7  abortions in New Orleans?

8             RAEGAN CARTER: No, sir, that is not

9  what I said.

10            REP. ROBERT JOHNSON: Okay.

11            RAEGAN CARTER: What I said is I'm not

12 the appropriate person to respond to that

13 question based upon my job at Planned Parenthood.

14            REP. ROBERT JOHNSON: Well, I'm not

15 asking you for a figure, I'm just asking you for

16 a yes or no. Are they going to profit or not?

17            RAEGAN CARTER: I don't have that

18 answer.

19            REP. ROBERT JOHNSON: You're familiar

20 with the video expose that made all the national

21 news, international news, several months ago

22 concerning Planned Parented and their abortion

23 provisions. Isn't that right?

24            RAEGAN CARTER: Yes, last summer.

25            REP. ROBERT JOHNSON: And what was your

1    reaction to that video? Do you defend what

2    Planned Parenthood has done and said that's been

3    taped and made national news on video? Do you

4    disclaim it in some way? I mean it's a serious

5    question because--

6                    RAEGAN CARTER: It's a very serious

7    question and I actually appreciate the question

8    because I appreciate the opportunity to mention

9    that that video and those videos launched many,

10   many investigations, and Planned Parenthood has

11   been cleared of all wrongdoing in those

12   investigations. The company has been deemed to be

13   a fake company and they have been indicted in

14   Texas and on multiple federal investigations and

15   counts for those videos.

16                    REP. ROBERT JOHNSON: And they'll be

17   cleared of all those investigations. But let's

18   not talk about the people who made the video.

19   Let's talk about the people who are in the video

20   and testifying that they were profiting off the

21   sale of baby body parts. Isn't that right?

22                    RAEGAN CARTER: That is what the videos

23   tried to say. The reality of what the videos

24   have--all of the information and the

25   investigations have talked about is that those

1  videos we're talking about, fetal tissue

2  donation, which is legal in this country. Many

3  research groups, many hospitals have participated

4  in fetal tissue research. Fetal tissue research

5  has been known to find treatments for cancer,

6  other immunizations. And so those videos were

7  about that. The videos were edited to demonstrate

8  things that we were not talking about as an

9  organization.

10            The fees that were mentioned were fees

11 for transportation of fetal tissue donation, and

12 those fees are legal in this country. And after

13 those videos, Planned Parenthood also made a

14 decision to no longer accept reimbursement for

15 transportation. Planned Parenthood national

16 organization or across the state has never

17 profited from the sale of baby body parts.

18            REP. ROBERT JOHNSON: But--okay, say

19 that last part again?

20            RAEGAN CARTER: Planned Parenthood in

21 this country has never profited from, in your

22 words, baby body parts--

23            REP. ROBERT JOHNSON: Mm hmm.

24            RAEGAN CARTER: --has never profited

25 from fetal tissue donation.

1          REP. ROBERT JOHNSON: Well, I'm not

2  talking about fetal tissue donation. I'm talking

3  about baby body parts--

4          RAEGAN CARTER: But the answer to the

5  question is no. Planned Parenthood has never

6  profited from that because Planned Parenthood

7  does not do that.

8          REP. ROBERT JOHNSON: So, you're

9  disclaiming all of the video--

10          RAEGAN CARTER: I am.

11          REP. ROBERT JOHNSON: --that was made

12  public, and that all of us watched play out on

13  the national news, that was all made up and

14  manufactured?

15          RAEGAN CARTER: They were highly edited

16  and those guys have been indicted. With all due

17  respect, Representative Johnson, I would really

18  like to ask the questions that I thought you

19  called me to the table--

20          REP. ROBERT JOHNSON: These are very--

21          RAEGAN CARTER: --and that is about

22  Planned Parenthood services.

23          REP. ROBERT JOHNSON: We ask the

24  questions here. These are very relevant to us as

25  lawmakers because we're talking about inviting

1   your organization into our state, and I have

2   serious concerns about your organization,

3   nationally and in the Gulf Coast region because

4   of the very clear evidence, to all of us, of

5   their past practices. I don't think that that is

6   something we need in Louisiana, and this bill is

7   seeking to defund that organization for what I

8   think is very valid reasons.

9                    Now, you can disclaim all the videos

10  and say that they were over-edited, but I think

11  everyone can make up their own minds. Have you

12  seen all the videos that were released yourself?

13  Have you watched those videos?

14                    RAEGAN CARTER: Yes.

15                    REP. ROBERT JOHNSON: You've seen every

16  one of them?

17                    RAEGAN CARTER: Not every one of them,

18  but I've watched some of them.

19                    REP. ROBERT JOHNSON: Well I've seen

20  them all and it's very compelling and, to me,

21  very frightening that we might have that kind of

22  thing going on in Louisiana. Well, we could do

23  this all day. I don't mean to beat up on you,

24  okay?

25                    RAEGAN CARTER: No, it's okay.

1      REP. ROBERT JOHNSON: I appreciate you

2   for--

3      RAEGAN CARTER: Mm hmm.

4      REP. ROBERT JOHNSON: --for coming in.

5   But I don't personally regard Planned Parenthood

6   to be a good corporate citizen, based upon their

7   practices. I don't think we need that in

8   Louisiana and that's one of the reasons I support

9   this bill. But I'll yield to questions because

10  I'm sure every light is lit.

11     RAEGAN CARTER: May I respond to you,

12  Representative Johnson?

13     REP. ROBERT JOHNSON: Please.

14     RAEGAN CARTER: I am not trying to say

15  that if those videos were true that there should

16  not be concern. But I'm saying that the videos

17  were highly edited, that they have been deemed

18  fake. The organizations have been indicted. And

19  in the state of Louisiana, Planned Parenthood is

20  a highly trusted, qualified healthcare provider.

21  We have been passed, we've been audited, we have

22  been found of no wrongdoings for Medicaid. And

23  this bill is about defunding Planned Parenthood

24  out of Medicaid. The Center for Medicare and

25  Medicare services sent a letter yesterday,

1 talking about this exact type bills that are

2 popping up in other parts of this country are

3 unlawful.

4                 And so, I wanted to be really clear

5 what this bill is about. It is about defunding

6 Planned Parenthood from Medicaid services. CMS

7 also said that this is taking away choice for

8 women to be able to go to the provider of their

9 choice. And right now, we have about 9,000

10 Medicaid patients that have chosen to come to

11 Planned Parenthood for the services that we

12 provide.

13                 I think it was Representative Cox that

14 also mentioned the rates of HIV and STDs in this

15 state. And I think that removing any provider

16 that is taking care of those needs for people in

17 this state will only put Louisiana at a higher

18 healthcare crisis than we are right now.

19                 REP. ROBERT JOHNSON: If you're doing

20 all that wonderful work in Louisiana, why do you

21 need a new abortion supercenter in New Orleans?

22                 RAEGAN CARTER: I think I responded to

23 that. We're building a healthcare facility in--

24                 REP. ROBERT JOHNSON: Okay.

25                 RAEGAN CARTER: --in New Orleans.

1    REP. ROBERT JOHNSON: But to provide

2    2,000 projected abortions per year in our state.

3    RAEGAN CARTER: We're building a

4    healthcare center in New Orleans to be able to

5    provide more services than we're currently

6    providing, because right now there is a limited

7    capacity for healthcare services for people in

8    this state.

9    REP. ROBERT JOHNSON: Fair enough.

10   RAEGAN CARTER: Thank you.

11   CHAIRMAN FRANK HOFFMAN: Next up, we do

12   have Mr. Hunt. If you'll identify yourself, and

13   you said that you do want to make comment.

14   DARRYL HUNT: I'm Darryl Hunt. I'm here

15   today on behalf of the Louisiana Progress Action

16   Committee, and I also represent Planned

17   Parenthood.

18   My, my, my, what a difference a day

19   makes. I heard some really stirring rhetoric and

20   lofty sentiments expressed yesterday afternoon

21   about respect of religious differences, tolerance

22   for differences in religious convictions. I was

23   stirred. It was great.

24   This issue's not about healthcare

25   today. That's not what we're talking about. We

1    talking about differences of opinion and

2    religious convictions. What a difference a day

3    makes. Thank you.

4                    CHAIRMAN FRANK HOFFMAN: Representative

5    Jackson [UNINTEL] question.

6                    REP. KATRINA JACKSON: Mr. Hunt?

7                    DARRYL HUNT: Yes, ma'am.

8                    REP. KATRINA JACKSON: I'll start with

9    you first. You made somewhat of a challenging,

10   yet--I guess it may be a compelling--argument

11   about religious liberties. But there are a lot of

12   atheists in the state of Louisiana who had babies

13   out of wedlock. And so, I'm not sure of whether

14   or not to have an abortion is solely based on

15   someone's religious belief. I mean we would have

16   to--and tell me if I'm wrong--we would have to

17   jump over and just accept the theory that

18   everyone who decides not to have an abortion

19   doesn't respect life. I mean we would have to say

20   that atheists and others who are not Christians

21   don't respect life.

22                    So, I'm not sure how this becomes a

23   religious liberty argument. Unless we're saying--

24   are we saying now that the committee is to

25   assume...

1        DARRYL HUNT: Are you saying there's a

2   lot of atheists in Louisiana, Representative?

3        REP. KATRINA JACKSON: There are some

4   atheists in Louisiana.

5        DARRYL HUNT: Are there many?

6        REP. KATRINA JACKSON: Fortunately,

7   they're not in my district. I only know of one.

8   But he has a child and I talk to him and I open

9   my doors to him. And he has a family, and that

10  says to me that he respects life.

11        I'm saying that we would have to make

12  the assumption that in order to support abortion,

13  or in order to respect life, you would have to be

14  a Christian. In order to not respect life, you

15  would have to be an atheist to make this into a

16  religious liberty argument. And I've seen

17  atheists--I've at least known one who has a

18  family and has kids and he's raising them and

19  paying for them, who respects life. He had his

20  child.

21        And I'm confused on how we jump to a

22  religious liberty argument because there has to

23  be a whole lot of assumptions made in between

24  that to say this is about religious liberty. And

25  one assumption would be that atheists don't

1  respect life. I've not heard testimony in any

2  committee that states that.

3           DARRYL HUNT: Representative, may I

4  suggest that you do a quick survey of the room

5  and ask who's here in opposition or in support of

6  this bill based on their religious convictions?

7           REP. KATRINA JACKSON: I'm sure there

8  are some. And then I'm sure there are others are

9  here in support of this bill who probably don't

10 have religious convictions. They just respect

11 life.

12           DARRYL HUNT: Ask?

13           REP. KATRINA JACKSON: And I'm sure--I

14 know at least one atheist in the state of

15 Louisiana that respects life. And so I'm just

16 curious how we jump to that because I don't think

17 the issue of abortion--for some it's about

18 religious beliefs. For some it's about just the

19 respect for life. For some it's about that it's

20 some--it's a child they created and they could

21 never think of giving it away.

22           For some it's about the right to

23 adoption. There are a lot of couples in the state

24 of Louisiana who can't have a child, regardless

25 if they're Christian or not, who would love to

1  have an opportunity to adopt a child. So, some

2  are advocates of adoption. There are a variety of

3  reasons why people either support or don't

4  support abortion. And your broad statement would

5  make us jump over all of those reasons and say

6  you have to be a Christian to support life.

7          DARRYL HUNT: I didn't say that.

8          REP. KATRINA JACKSON: Well, when you

9  say that it's a religious liberty argument, there

10 are Christians and there are non-Christians.

11         DARRYL HUNT: Are you denying that it is

12 a religious liberty argument for many people?

13         REP. KATRINA JACKSON: For some it is.

14         DARRYL HUNT: For most people?

15         REP. KATRINA JACKSON: I stated that it

16 is.

17         DARRYL HUNT: For most people?

18         REP. KATRINA JACKSON: I don't know if

19 for most. For me it is, and I'm not ashamed to

20 say that. I've never been ashamed to say that. I

21 really haven't.

22         CHAIRMAN FRANK HOFFMAN: Please hold

23 your applause. Please hold your applause.

24         REP. KATRINA JACKSON: Never been

25 ashamed to say that. But I know for others there

1    are other reasons why they don't support

2    abortion. And when I'm representing constituents,

3    I have to take all of that into consideration,

4    and a number of people on this committee do as

5    well. And it just concerned me that it came down

6    to a religious liberty argument. I think we would

7    have to ask every individual that supports or

8    doesn't support abortion why they don't to come

9    to--we may have to do a survey.

10              What I'm saying to you is that without

11   a survey being done, a state-wide survey, your

12   testimony to this committee--and you represent

13   Planned Parenthood--is erroneous and not fact-

14   based, not evidence-based.

15              DARRYL HUNT: Really?

16              REP. KATRINA JACKSON: Unless you've

17   done a survey. Did Planned Parenthood do a survey

18   that we don't know about? And I can only speak

19   for Katrina Jackson. For Katrina Jackson, it is a

20   religious liberty argument. But for others, it's

21   the child's right to life. It's the ability to

22   adopt.

23              DARRYL HUNT: And that's not a religious

24   conviction.

25              REP. KATRINA JACKSON: The child's right

1   to life may not be. Some atheists believe in

2   life. They just believe it was created in another

3   way.

4               DARRYL HUNT: Right.

5               REP. KATRINA JACKSON: They don't

6   believe in creationism.

7               DARRYL HUNT: Right. And I have respect

8   for those opinions and convictions.

9               REP. KATRINA JACKSON: Right. And so

10  some of it is not a religious--

11              DARRYL HUNT: And tolerance for them

12  too.

13              REP. KATRINA JACKSON: Right. And some

14  of it is not a religious conviction. But my

15  questions--

16              DARRYL HUNT: And I respect that as

17  well.

18              REP. KATRINA JACKSON: Yes. But my

19  questions now are going to point toward the bill.

20  I asked the young ladies who talked about an

21  access to healthcare issue and my question is

22  this. If you do not--I understand that Planned

23  Parenthood is building a facility that would,

24  amongst other things, as the testimony has been

25  stated today, provide abortions. If you are not

1    receiving Medicaid dollars in this state, would

2    you still provide abortions in this state?

3                    RAEGAN CARTER: Representative Jackson,

4    may I correct something in your question first?

5                    REP. KATRINA JACKSON: Oh, yeah.

6                    RAEGAN CARTER: Planned Parenthood

7    receives Medicaid reimbursement based on the

8    patients that come to us for the services that

9    receive. So, we are not receiving state funding

10   as like a blanket state funding--

11                   REP. KATRINA JACKSON: Right.

12                   RAEGAN CARTER: --per month. So, I just

13   wanted to say that it's Medicaid reimbursement.

14                   REP. KATRINA JACKSON: Yes.

15                   RAEGAN CARTER: In terms of our plans

16   for the facility in New Orleans, I also want to

17   say that right now, Planned Parenthood has no

18   abortion license in this state, so we are not an

19   abortion provider in the state of Louisiana.

20                   REP. KATRINA JACKSON: I know that--

21                   RAEGAN CARTER: I'm not sure what the--

22                   REP. KATRINA JACKSON: --they're

23   currently not, but isn't that the plan to be?

24                   RAEGAN CARTER: That is something that

25   is being discussed, yes.

1      REP. KATRINA JACKSON: So you guys never

2  applied for a license with the state?

3      RAEGAN CARTER: Yes, we did.

4      REP. KATRINA JACKSON: Okay, so that's

5  what I'm saying. So you plan to have abortions.

6  You were denied a license but--

7      RAEGAN CARTER: [UNINTEL]--

8      REP. KATRINA JACKSON: --or it's on hold

9  or something, is that it?

10      RAEGAN CARTER: What I'm think you right

11  now is I cannot say definitively yes or no that

12  we would reapply for an abortion license in this

13  state. And I think that's what you're asking me,

14  so I cannot say definitively yes or no to that

15  question.

16      REP. KATRINA JACKSON: And my question

17  is this. If you did not receive Medicaid

18  reimbursement for patients who receive other

19  services, would that factor into whether or not

20  Planned Parenthood would provide abortions in the

21  state? Does the decision of the state to give or

22  not give you Medicaid reimbursement factor in

23  your decision to provide abortions?

24      RAEGAN CARTER: With all due respect,

25  Representative Jackson, the state of Louisiana

1  cannot determine whether or not Planned

2  Parenthood receives Medicaid reimbursement. The

3  federal government makes those decisions and the

4  federal government has also said that it is

5  unlawful to remove a provider.

6                    REP. KATRINA JACKSON: I understand.

7                    RAEGAN CARTER: In terms of how Planned

8  Parenthood operates, our family planning services

9  and abortion services are provided by two

10 different entities. And so those services would

11 not be connected and the Medicaid reimbursement

12 would not apply to any abortion licenses or

13 services because federal government already

14 prohibits that.

15                    REP. KATRINA JACKSON: All right. But

16 it's your testimony that Medicaid--whether you

17 receive Medicaid reimbursement are not, does not

18 hinge upon whether you provide abortion services

19 or not?

20                    RAEGAN CARTER: My testimony is that I

21 cannot answer any questions at this time relative

22 to whether or not we will or will not apply for

23 an abortion license or reapply in this state.

24                    REP. KATRINA JACKSON: And that's what

25 my question--I understand that you've applied

1   once.

2                   RAEGAN CARTER: Mm hmm.

3                   REP. KATRINA JACKSON: My question is

4   this--this is from an operational standpoint--

5   does whether or not you receive Medicaid

6   reimbursement bear on your decision to provide

7   abortions?

8                   RAEGAN CARTER: The reason why I'm

9   having difficulty answering your question--I

10  certainly don't want any member of this committee

11  or anyone in this room to think that I'm trying

12  to avoid the question--your question is implying

13  to me-- unless I'm misunderstanding--that

14  Medicaid reimbursement is connected to abortion

15  services. And they're not connected, and so I

16  cannot answer that question.

17                  REP. KATRINA JACKSON: I'm not implying

18  that. We've heard testimony that taking Medicaid

19  reimbursement funds or suggesting that Medicaid

20  reimbursement funds should not be given to any

21  abortion provider hinders access to care as it

22  relates to abortions. And from what I'm hearing

23  today from your testimony--you're representing

24  Planned Parenthood--that that is not the case.

25                  RAEGAN CARTER: That is correct because-

1    -

2              REP. KATRINA JACKSON: Okay.

3              RAEGAN CARTER: --Medicaid reimbursement

4    applies to family planning services. They apply

5    to contraceptive services, HIV testing, STD

6    testing. They do not apply to abortion services.

7              REP. KATRINA JACKSON: Thank you.

8              CHAIRMAN FRANK HOFFMAN: And I would

9    like to remind the audience that we need to

10   maintain decorum and the need to prohibit from

11   applause or excessive noise in the audience.

12   Thank you.

13             And next, ma'am, identify yourself,

14   please?

15             MICHELLE ERENBERG: Thank you. Thank

16   you Chairman Hoffman. My name's Michelle Erenberg

17   and I'm within National Council of Jewish Women.

18   I put in a card in opposition to this bill and

19   checked the box that I did not intend to speak.

20   However, the line of questioning about religious

21   freedom and religious point of views and how they

22   play into this really compelled me to come to

23   this table.

24                  This bill and several of the bills that

25   are on the agenda today are based on model

1  legislation by Americans United for Life, which

2  is very clearly an organization that is motivated

3  by and organized by the religious community in

4  opposition to abortion services, and in many

5  cases, birth control access.

6              So, I--you know, I'm sad that

7  Representative Jackson had to get up from her

8  seat to hear what I had to say about that. But

9  fundamentally, many of us that are religious are

10 from the faith-based community, that do oppose

11 this bill. We oppose it because we fundamentally

12 believe that legislation dictating how women can

13 or can't access healthcare should not be drafted,

14 introduced, discussed and passed by people that

15 have one religious point of view, because it

16 discounts the religious point of view of other

17 people. And these decisions about healthcare

18 access should be based on an individual's point

19 of view.

20              When we pass legislation and enshrine

21 it into law, we are imposing one particular

22 religious point of view onto every single woman

23 in the state of Louisiana. And fundamentally, we,

24 the National Council of Jewish Women and the more

25 than 1,000 women in Louisiana, women and men from

1  the Jewish community in Louisiana that we

2  represent--we fundamentally believe that the

3  state has no business imposing one religious

4  point of view, especially on healthcare

5  decisions, on all of the women in Louisiana. And

6  that's all I wanted to say about that.

7              CHAIRMAN FRANK HOFFMAN: Representative

8  LeBas, do you have a question? Okay.

9              REP. H. BERNARD LEBAS: Thank you Mr.

10  Chairman. First of all, I'd asked earlier if

11  somebody from Planned Parenthood was here and

12  would be able to answer questions and no one came

13  down. I'm glad you all did.

14              In your respect with your organization

15  to say that it's one group of religious people

16  that are making this decision, the ones who are

17  making this decision are people who were elected

18  from across the state. It's not one group. It's

19  like all of the decisions we made are made by

20  people elected individually. It has nothing to do

21  with we're just going to elect one group of

22  religious people. We had some of all faiths, I

23  believe, serving in this building. So, that's not

24  what you're getting is one point of view. You're

25  getting the same thing that we have to vote on

1  every day individually, not as a group.

2                   MICHELLE ERENBERG: I understand,

3  Representative LeBas. And let me just clarify. I

4  did not mean--I'm sorry if I misspoke or was

5  misunderstood. I did not mean that it was one

6  religion. I meant a point of view that was

7  grounded in a religious belief.

8                   REP. H. BERNARD LEBAS: I believe all of

9  us live with that every day. Our religious

10  beliefs reflect how we live.

11                   MICHELLE ERENBERG: Exactly. And those

12  are individual decisions that we make. They guide

13  our individual behavior. They should not be part

14  of government policy dictating whether or not we

15  actually have the ability to make a decision

16  based on our own religious point of view.

17                   REP. H. BERNARD LEBAS: I believe in the

18  Constitution of the United States we have freedom

19  of religion. And I believe that's part of it. And

20  it's just that's the people who are elected are

21  the ones expressing their points of view, and a

22  lot of it does have to do with a religious

23  upbringing. And I can't help that. But it's not

24  just that that's making decisions over here. That

25  I wanted to make clear. It's not strictly a

1  religious decision for a lot of people.

2              Now I'd like to ask another question

3  that I was interested in. Do you know what is the

4  cost that you're charged for abortions?

5              RAEGAN CARTER: Representative LeBas,

6  first, before I speak on behalf of Planned

7  Parenthood, since we're having the conversation

8  about religion and faith, my personal privilege

9  is to acknowledge to this committee that I am a

10 Christian. And so, I share in a religious belief.

11 My religious belief also carries a step further

12 in that I do believe that a part of caring for

13 people in this state is to ensure that they have

14 access to the health care that they need. That is

15 my personal statement and not a Planned

16 Parenthood statement.

17              In terms of Planned Parenthood, we are

18 not currently an abortion provider in the state

19 of Louisiana, so there is no cost associated

20 because we don't provide that service.

21              REP. H. BERNARD LEBAS: All right. What

22 about in other states, what do you all charge

23 where you do perform abortions?

24              RAEGAN CARTER: I honestly have no idea.

25 I'm sure we can look that up somewhere, but I

1    don't have that information in front of me today.

2                    REP. H. BERNARD LEBAS: Can you get that

3    for me please?

4                    RAEGAN CARTER: I can. Would you like

5    for me to email it to you or...

6                    REP. H. BERNARD LEBAS: Send it.

7                    RAEGAN CARTER: Okay. I will do my very

8    best to get that information.

9                    REP. H. BERNARD LEBAS: I would

10   appreciate that. And in line of using the

11   Medicaid funding for it--and you say anyway it

12   doesn't pay for abortions--the funding does give

13   a cash flow, a stream, to operate a business and

14   pay its bills on where abortions are being

15   performed. Although they're not being paid for by

16   Medicaid for a particular item, saying submit a

17   bill to Medicaid if on abortion, that's not what

18   you're doing. But the overhead that allows the

19   business to operate is being paid from Medicaid

20   funding. So, to me, in some respects that means

21   Medicaid funding is going towards helping these

22   abortions.

23                   RAEGAN CARTER: I can certainly see how

24   you would assume and interpret it that way. There

25   is national research out there and research in

1    this state that talks about how the current

2    Medicaid reimbursement rates actually barely pay

3    for the services that the women are receiving.

4                    REP. H. BERNARD LEBAS: That's why I

5    want to know the cost of the abortions because

6    when we had this discussion previous times before

7    this committee, I'd asked the same question and

8    it came out that looked like the profit margin

9    was gotten all from the abortions. So it was in

10   their favor to encourage, I was afraid, people to

11   have abortions instead of discourage them and to

12   work with other items such as adoption.

13                    RAEGAN CARTER: Well, I--

14                    REP. H. BERNARD LEBAS: That is good

15   women's health.

16                    RAEGAN CARTER: I cannot speak to the

17   data that you're speaking of, but I will

18   certainly get whatever information that I can to

19   you. I can speak to that at Planned Parenthood

20   health centers, we are talking with women about

21   all of the options that are available to them and

22   adoption, maintaining a healthy pregnancy, all of

23   those things are a part of reproductive health

24   care.

25                    REP. H. BERNARD LEBAS: Yes, ma'am. And

1   I understand that. But if you're using the profit

2   from the abortion to keep the clinic open,

3   sometime they'd lend--I'm afraid they may tend to

4   tell the people that that's the way to go.

5                RAEGAN CARTER: In Louisiana, since were

6   not an abortion provider, again, I can't speak to

7   that. But I can speak that as a national

8   organization, Planned Parenthood is not

9   encouraging women to make any decisions. We are

10  encouraging women to make their own decisions

11  because those decisions are personal and should

12  be between that woman, her family, her doctor,

13  and her own faith.

14                REP. H. BERNARD LEBAS: If you're saying

15  that, I understand that, but previous testimony

16  in other times we had someone who worked there

17  and they said they were encouraged to recommend

18  that they get abortions.

19                RAEGAN CARTER: As long as we're clear

20  that that was not me.

21                REP. H. BERNARD LEBAS: I got--

22                RAEGAN CARTER: And that was not

23  official testimony from Planned Parenthood.

24                REP. H. BERNARD LEBAS: Yes, ma'am.

25  Thank you.

1          RAEGAN CARTER: Thank you.

2          CHAIRMAN FRANK HOFFMAN: We have a

3  question from Representative Miller, and it's

4  going to be his first opportunity, so if you

5  will, Representative Miller.

6          REP. DUSTIN MILLER: Thank you, Mr.

7  Chairman. Ms. Raegan, what is your position at

8  Planned Parenthood?

9          RAEGAN CARTER: I'm the Senior Director

10  of Public Affairs and Government Relations.

11          REP. DUSTIN MILLER: Okay. Who's the

12  owners of Planned Parenthood in Louisiana?

13          RAEGAN CARTER: I'm not sure of your

14  question. Who is the...

15          REP. DUSTIN MILLER: Owns--is this a

16  private entity? Is this--

17          RAEGAN CARTER: Planned Parenthood is a

18  nonprofit organization. We are a part--in

19  Louisiana we are part of the Planned Parenthood

20  Gulf Coast affiliate, and our CEO is Melanie

21  Linton, and she's in Houston.

22          REP. DUSTIN MILLER: But she didn't

23  think it was important for her to be here today

24  to answer our questions?

25          RAEGAN CARTER: I certainly would think

1  that she--I can't even say that I think--I

2  certainly know that she knows that these

3  processes are important. She is the CEO of our

4  affiliate. She was not aware that she would be

5  needed to call to the table today.

6            REP. DUSTIN MILLER: She was opposing

7  the bill?

8            RAEGAN CARTER: I'm sorry?

9            REP. DUSTIN MILLER: What she opposing

10  this bill?

11            RAEGAN CARTER: I am representing the

12  organization today, so the organization is

13  opposing this bill.

14            REP. DUSTIN MILLER: My concern is you

15  have hundreds of people here in support of this

16  bill. This company is the company that would like

17  to do abortions, but yet they could not come to

18  the table and answer our questions and voice

19  their concerns. But they're okay. You came

20  towards the end, but we had to ask several times

21  were there representatives here before we can get

22  our questions answered.

23            I do--I'm against abortions, but I do

24  believe you guys offer a lot of services that are

25  in need in this area. I do believe that.

1       RAEGAN CARTER: Thank you for that.

2       REP. DUSTIN MILLER: But you can't even

3   answer some questions about the business model.

4   Representative here asked about abortions in New

5   Orleans. Some things, you said, well, you

6   couldn't answer. So, my question and my concern

7   is why aren't they at the table if they want to

8   do abortions here in Louisiana?

9       RAEGAN CARTER: So--

10      REP. DUSTIN MILLER: Where are the

11  providers--I'm sorry. I don't mean to cut you

12  off.

13      RAEGAN CARTER: No, that's okay.

14      REP. DUSTIN MILLER: Where are the

15  providers, where are the doctors, where are the--

16  whoever is going to be doing this care, where are

17  they? Why can't they defend why they think women

18  should get abortions in Louisiana?

19      RAEGAN CARTER: So, I have multiple

20  answers if that's okay.

21      REP. DUSTIN MILLER: Yes.

22      RAEGAN CARTER: The first answer on

23  where are our providers, our providers are

24  currently in the clinic providing care and so

25  they were not off today because they're in the

1    health center providing services.

2                    In terms of our CEO, she certainly sees

3    all of these processes as important because this

4    bill was around defunding Planned Parenthood from

5    Medicaid and speaking to the Medicaid services

6    that we provide, I was unaware that there would

7    be questions about abortion licensing and

8    abortion services because those things are not in

9    this bill. And so certainly, if we thought that

10   those questions would come up, we would have been

11   prepared to answer those questions.

12                   REP. DUSTIN MILLER: But you didn't

13   think abortion questions were going to come up

14   today?

15                   RAEGAN CARTER: I am not saying that I

16   didn't think abortion questions would come up,

17   because certainly, this is a defunding attack

18   against Planned Parenthood. But we were under the

19   impression that we would stick to the bill, and

20   this bill is about Medicaid funding.

21                   REP. DUSTIN MILLER: Can you--

22                   RAEGAN CARTER: And since Medicaid

23   funding cannot pay for abortion services, we're

24   not thinking that abortion would come up in this

25   bill.

1          REP. DUSTIN MILLER: Can you explain to

2    everyone what other services Planned Parenthood

3    offers besides--let's get off of abortion.

4          RAEGAN CARTER: I would appreciate that,

5    Representative Miller.

6          REP. DUSTIN MILLER: Please, yes. Tell

7    us all the things you offer.

8          RAEGAN CARTER: Certainly. Currently, in

9    Louisiana, Planned Parenthood provides well-woman

10   exams. That includes pap smears and cervical

11   cancer screenings. We provide family planning

12   services that include contraceptive care, HIV

13   testing, and if you test positive for HIV, we'll

14   make sure that you're referred to the next step

15   in the process to receive your treatment. And we

16   also provide STD testing. And if you test

17   positive for STDs, you are treated in our

18   facility.

19          REP. DUSTIN MILLER: And did say you

20   treat over 9,000 patients I think I heard you say

21   earlier?

22          RAEGAN CARTER: We had about 16,000

23   visits to our health centers last year. Some of

24   those patients came back to us multiple times for

25   multiple services. Unfortunately, sometimes in

1  this state, people are diagnosed with STDs more

2  than one time, because they're not receiving

3  proper sex education. And so as a whole, we had

4  about 9,000 patients, but about 6,000 visits.

5              REP. DUSTIN MILLER: Two more questions.

6              RAEGAN CARTER: Yes, sir.

7              REP. DUSTIN MILLER: You said the

8  federal government say something about this bill

9  is unlawful.

10             RAEGAN CARTER: Yes.

11             REP. DUSTIN MILLER: Is that proven? Has

12 that been to court already?

13             RAEGAN CARTER: Yes. And I have the

14 direct letters from the Center for Medicaid

15 Services if I can stand up and hand it to you.

16             RAEGAN CARTER: Yes, that would be--you

17 can give it to me after. I guess my final

18 question is, you guys are undecided if you're all

19 going to do the abortion. Well, you all applied

20 for the license. Did it get approved?

21             RAEGAN CARTER: The license was denied

22 and we have not made any full decisions on

23 whether or not we would reapply at this moment. I

24 cannot speak to that.

25             REP. DUSTIN MILLER: Well, the license

1   was denied, but you guys are going to still

2   practice in Louisiana, minus doing abortions?

3                    RAEGAN CARTER: Right now, in Louisiana

4   we are going to continue to provide all of the

5   family planning and healthcare services that I

6   mentioned. Yes, sir.

7                    REP. DUSTIN MILLER: Okay. Darryl, you

8   came back. You have something to say?

9                    DARRYL HUNT: Darryl Hunt again, Mr.

10  Chairman and members of the Committee.

11                   You know, I can't recall the last time

12  it was stated in this Committee when debating a

13  bill relating to this issue that we need to

14  remind ourselves that this is not just a personal

15  preference or even a matter of religious

16  conviction. This is something that has been

17  regarded as a constitutional right for 43 years.

18  And Representative Johnson often says he's a

19  legal scholar of religious liberty and what have

20  you, so I know he knows that regardless of

21  whether or not that is in our Constitution,

22  written in our Constitution, that the Supreme

23  Court is the final arbiter of this. Is that not

24  correct, Representative?

25                   REP. DUSTIN MILLER: I'm not an

1  attorney. I'm going to turn my light off and you

2  and him can talk.

3            DARRYL HUNT: And you know, perhaps

4  there will come a day when the Supreme Court

5  changes its mind on this issue, but until then,

6  this is no different than your right to bear

7  arms, your right to free speech, your right to

8  practice the religion of your choice. It's no

9  different. And that just needs to be said. We may

10 disagree with it, but it must be said.

11            And so, no one should have to be down

12 here defending whether or not abortion is right

13 or legal. It is regarded as a constitutional

14 right.

15            CHAIRMAN FRANK HOFFMAN: Thank you, Mr.

16 Hunt. And Representative Horton, do you have a

17 question?

18            REPRESENTATIVE DODIE HORTON: When you

19 mentioned the bill that was carried--the Pastor

20 Protection Act that was carried yesterday,

21 Representative Johnson, that passed the house, 80

22 ayes and 18 nays, is totally separate from this

23 today.

24            What we're talking about is whether we

25 choose--our districts that we represent choose to

1  use our state dollars to fund something that the

2  majority of our citizens don't believe in. I'm

3  here to represent District 9, Bossier Parish. We

4  support this bill that our Governor has brought

5  to the table. I support his efforts. And that's

6  what we need to stay focused on, our state

7  dollars funding a procedure that we object to. My

8  parish objects. That's why I support this bill.

9  Thank you, sir.

10            CHAIRMAN FRANK HOFFMAN: Thank you. And

11  Representative Johnson, we're going to

12  acknowledge you again, if you can wrap it up.

13            REP. ROBERT JOHNSON: I'll be very

14  brief. No one here--if you listen to the

15  testimony and the exchanges earlier, no one is

16  saying that this bill would make abortion illegal

17  in Louisiana. That's not what the legislation is.

18  It's about defunding the procedure because that's

19  the right and the will of the people of the

20  state, through their elected representatives and

21  a constitutional republic. That's how that works.

22  If you don't like it, elect people who agree with

23  you. But we're going to advance the public policy

24  of this state.

25            I have one more question for Planned

Page 41

1   Parenthood. How many facilities does Planned

2   Parenthood operate in the state of Louisiana?

3                   RAEGAN CARTER: Two.

4                   REP. ROBERT JOHNSON: And how many in

5   Texas? Do you know?

6                   RAEGAN CARTER: I don't. I'm sorry.

7                   REP. ROBERT JOHNSON: More than two?

8                   RAEGAN CARTER: Yes.

9                   REP. ROBERT JOHNSON: Planned Parenthood

10  Golf Coast covers how many states?

11                  RAEGAN CARTER: Portions of Houston,

12  Texas area and Louisiana, so two.

13                  REP. ROBERT JOHNSON: Just two states?

14                  RAEGAN CARTER: Mm hmm.

15                  REP. ROBERT JOHNSON: So--

16                  RAEGAN CARTER: And not the entire state

17  of Texas.

18                  REP. ROBERT JOHNSON: Okay. Has Planned

19  Parenthood ever been investigated for Medicaid

20  fraud in the state of Texas or Louisiana?

21                  RAEGAN CARTER: In both.

22                  REP. ROBERT JOHNSON: And how did that

23  turn out?

24                  RAEGAN CARTER: In Louisiana, which is

25  the only state that I can speak to, there were no

1  findings.

2             REP. ROBERT JOHNSON: I thought you said

3  you were the Director for Public Affairs and

4  Government Relations for Planned Parenthood Gulf

5  Coast, which covers Texas and Louisiana, right?

6             RAEGAN CARTER: I'm the Senior Director

7  of Public Affairs and Government Relations for

8  Planned Parenthood Golf Coast, but only in

9  Louisiana.

10            REP. ROBERT JOHNSON: Okay. Are you

11 aware--

12            RAEGAN CARTER: I have a counterpart in

13 Texas.

14            REP. ROBERT JOHNSON: Okay. Well,

15 they're not here today, but are you aware--I'm

16 sure you are--that in Texas they had to pay a

17 $1.4 million settlement for Medicaid fraud,

18 taxpayer funded Medicaid dollars that were

19 fraudulently obtained by Planned Parenthood in

20 Texas? Is that right?

21            RAEGAN CARTER: Correct. And

22 Representative Johnson, may I add something to

23 that?

24            REP. ROBERT JOHNSON: Sure.

25            RAEGAN CARTER: I am sure, since you are

1  an attorney, that you are also aware that a

2  settlement is not an admission of guilt.

3          REP. ROBERT JOHNSON: And I'm sure that

4  was made a part of the documentation. But are you

5  aware that Karen Reynolds, who was the

6  whistleblower in that case, claims that the

7  fraudulent practices were present at all the

8  Planned Parenthood Golf Coast clinics, including

9  the two facilities in Louisiana?

10          RAEGAN CARTER: I can honestly say I was

11  not aware that she said that. But I can also

12  honestly say that we were audited in the state of

13  Louisiana and there were no findings.

14          REP. ROBERT JOHNSON: Are you aware of

15  how many matters of fraud Planned Parenthood has

16  been investigated for around the country?

17          RAEGAN CARTER: I am not.

18          REP. ROBERT JOHNSON: I'll get you that

19  information.

20          RAEGAN CARTER: Thank you. Is there such

21  thing as closing arguments at this table?

22          REP. ROBERT JOHNSON: No.

23          CHAIRMAN FRANK HOFFMAN: Thank you,

24  Representative Johnson. We do have numerous red

25  cards in opposition. I'm not going to read them

1   in the record. They're too voluminous. But we

2   will make them a part of the records for the

3   public's consideration.

4              And also we do, if--and thank you for

5   your testimony ladies.

6              RAEGAN CARTER: Thank you.

7              MICHELLE ERENBERG: Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Gotham Transcription states that the preceding

2    transcript was created by one of its employees

3    using standard electronic transcription equipment

4    and is a true and accurate record of the audio on

5    the provided media to the best of that employee's

6    ability. The media from which we worked was

7    provided to us. We can make no statement as to

8    its authenticity.

9

10                   Attested to by:

11

12

13                   Sonya Ledanski Hyde

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D



**John Bel Edwards**
GOVERNOR

**Rebekah E. Gee MD, MPH**
SECRETARY

# State of Louisiana
## Louisiana Department of Health
### Health Standards Section

June 13, 2017

Ms. Melaney A. Linton, President & CEO
Ms. Jacqueline Krugler, Administrator
Planned Parenthood Center for Choice
4600 Gulf Freeway, Suite 300
Houston, Texas 77023

RE: License Application, Abortion Facilities

Dear Ms. Linton and Ms. Krugler:

As you are aware, the Louisiana Department of Health (LDH), Health Standards Section (HSS), is in receipt of your application for licensure related to an Outpatient Abortion Facility in New Orleans, Louisiana. Licensure for this facility type is controlled by La. R.S. 40:2175.6. According to Section G of that statute, the Secretary of the Department may deny a license if an investigation or survey determines that the applicant is in violation of any federal or state law or regulation.

As you may be aware, a United States House of Representatives, Select Investigative Panel, Final Report, was issued on December 30, 2016. One of the many outcomes of that report was a criminal and regulatory referral to the Texas Attorney General related to the operations of Planned Parenthood Gulf Coast.

Prior to making a decision on your license application, LDH is conducting an investigation to determine if Planned Parenthood Center for Choice, either in its own name or through the actions of Planned Parenthood Gulf Coast, is in violation of any federal or state law or regulation. This investigation will include, among other things, interfacing with the Louisiana Attorney General, the Texas Attorney General, and other federal entities. After the conclusion of this investigation, LDH will be in a position to make a determination on your license application. At this time, LDH is neither approving nor denying your application.

If you have any questions, please feel free to contact my office at 225-342-0415.

Respectfully

Cecile Castello, Health Standards Section Director

9004

**STATE OF LOUISIANA**
**DEPARTMENT OF HEALTH AND HOSPITALS**
Bureau of Health Services Financing
Health Standards Section
P. O. Box 3767
Baton Rouge, Louisiana 70821-3767



CERTIFIED MAIL®

7015 3010 0001 9972 0009



**Ms.  Melaney A. Linton, President & CEO**
**Ms. Jacqueline Krugler, Administrator**
**Planned Parenthood Center for Choice**
**4600 Gulf Freeway, Suite 300**
**Houston, Texas 77023**

77023-354899