# Exhibit B



# Final Report

# Select Investigative Panel

of the Energy & Commerce Committee
December 30, 2016

# Select Investigative Panel

## of the Energy & Commerce Committee

_____



Select Investigative Panel

# Final Report

Rep. Marsha Blackburn (TN-7)
Chairman

Rep. Joseph Pitts (PA-16)
Rep. Diane Black (TN-6)
Rep. Larry Bucshon (IN-8)
Rep. Sean Duffy (WI-7)
Rep. Andy Harris (MD-1)
Rep. Vicky Hartzler (MO-4)
Rep. Mia Love (UT-4)

# Table of Contents

Executive Summaries........................................................................... xviii

Preface................................................................................................. xliv

Acknowledgments................................................................................ lvi

**I.  Congress Establishes the Select Investigative Panel** ...................................1

   **A.  Summary** ................................................................................................1

   **B.  Center for Medical Progress Videos Raise Serious Issues** ............................3

      1.  "Planned Parenthood Orange County Changes Abortions to Harvest Intact Fetuses for Local Company's 'Fetal Products' sales" .................................3

      2.  "Planned Parenthood Ally National Abortion Federation Suggests 'Group Purchasing Program' for Fetal Parts, Payments 'A Win-Win' for Clinics"..................4

      3.  "Planned Parenthood Houston Admits Accounting Gimmicks Hide Baby Parts Sales, Invoices Charge Thousands of Dollars"...........................4

      4.  "Planned Parenthood TX Abortion Apprentice Taught Partial-Birth Abortions to 'Strive For' Intact Baby Brains" ......................................4

      5.  "Top Planned Parenthood Exec Agrees Baby Parts Sales 'A Valid Exchange,' Some Clinics 'Generate a Fair Amount of Income Doing This'" ...............4

      6.  "Planned Parenthood Baby Parts Vendor Advanced Bioscience Resources Pays Off Clinics, Intact Fetuses 'Just Fell Out'" ...................5

      7.  "Planned Parenthood Baby Parts Buyer StemExpress Wants 'Another 50 Livers/Weeks,' Financial Benefits for Abortion Clinics"...............5

      8.  "Intact Fetuses 'Just a Matter of Line Items' for Planned Parenthood TX Mega-Center" ...............................................................6

      9.  "Planned Parenthood VP Says Fetuses May Come Out Intact, Agrees Payments Specific to the Specimen" ...............................................6

     10.  "Second Planned Parenthood Senior Executive Haggles Over Baby Parts Prices, Changes Abortion Methods"..........................................6

     11.  "Planned Parenthood Uses Partial-Birth Abortions to Sell Baby Parts" .....................7

**C.  The Panel Forms an Investigative Plan** ........................................................7

**D.  Middleman Investigative Work Plan Overview**.............................................11

**II. <u>Applicable Laws, Regulations, and Commissions</u>** .............................................13

   **A.  Laws Protecting Human Research Subjects and Patient Privacy**............................13

      1.  The Belmont Report.................................................................13

      2.  The Common Rule and IRB Regulations .................................................15

      3.  Presidential Commissions.............................................................16

      4.  HIPAA Privacy Rule..................................................................17

   **B.  Laws Regulating Anatomical Gifts for Transplantation, Therapy, Research, and Education** ........................................................................................19

      1.  National Organ Transplant Act ........................................................19

      2.  Uniform Anatomical Gift Act ........................................................19

      3.  NIH Revitalization Act of 1993 .......................................................20

   **C.  Laws Protecting Late-Term and Born-Alive Infants** ...................................21

      1.  Born-Alive Infants Protection Act (BAIPA) .............................................21

      2.  Partial-Birth Abortion Ban Act (PBA) ................................................23

   **D.  Laws Related to Public Funding of Fetal Tissue Research and Abortion Providers** 23

      1.  NIH Grants..........................................................................23

      2.  Federal Funding for Abortion Providers.................................................24

         a)  Medicaid ......................................................................24

         b)  Title X ........................................................................27

**III.  <u>Panel Hearings</u>**...........................................................................28

   **A.  Bioethics and Fetal Tissue** ....................................................28

**B.  The Pricing of Fetal Tissue** .................................................................31

**IV. <u>Criminal and Regulatory Referrals</u>** ...............................................33

**A.  Referral to New Mexico Attorney General concerning University of New Mexico** ...35

**B.  Referrals to U.S. Department of Justice and El Dorado, CA District Attorney concerning StemExpress's limited production and possible profit from fetal tissue procurement** ...........................................................37

**C.  Referral to U.S. Department of Health and Human Services concerning the possible violation of HIPAA by StemExpress and several abortion clinics** ...........47

**D.  Referral to U.S. Department of Health and Human Services concerning a possible violation of IRB regulations by StemExpress** .............................54

**E.  Referral to the Arkansas Attorney General concerning the possible profit from fetal donations by an Arkansas abortion clinic** .................................71

**F.  Referral to Orange County, CA District Attorney concerning the possible profit from fetal tissue procurement by DV Biologics** ..........................73

**G.  Referral to the Texas Attorney General concerning the possible profit from fetal tissue donations by Planned Parenthood Gulf Coast** .......................79

**H.  Referral to the Riverside County, CA District Attorney concerning Advanced Bioscience Resources's possible profit from fetal tissue sales to universities** ...........90

**I.  Referral to the Florida Attorney General concerning the possible profit from fetal tissue donations by a Florida abortion clinic** ...........................93

**J.  Referrals to the U.S. Department of Justice and the Texas Attorney General concerning a late-term abortionist in Texas** ...............................104

**K.  Referral to the Attorney General of New Mexico concerning Southwestern Women's Options and the University of New Mexico** ..........................118

**L.  Referral to the U.S. Department of Justice concerning the destruction of documents by StemExpress** ...............................................124

**M.  Referral to the U.S. Department of Justice concerning violations of 42 U.S.C. § 289g-2 by Novogenix and four Planned Parenthood clinics** ..................134

**V. <u>Case Studies of the Fetal Tissue Industry—The Middleman Model</u>** .............................136

iii

**A. StemExpress, LLC: A Case Study** ...........................................................137

  1. Summary ...........................................................................................137

    a) Background of StemExpress ..........................................................137

    b) History of the Panel's Interactions with StemExpress .......................138

  2. StemExpress Business Model .............................................................141

    a) Marketing Activities ....................................................................141

    b) StemExpress Seeks a Nationwide Network of Abortion Clinics.........148

    c) StemExpress Seeks Partnership Agreement with Planned Parenthood
       Federation of America ..................................................................152

    d) StemExpress' Contracts with Abortion Clinics ...............................153

    e) Impact of StemExpress Contracts on Clinical Practices.....................155

  3. StemExpress Revenue Grows from $156,312 to $4.5 Million .................155

    a) StemExpress' Estimated Costs and Expenses Indicates That It May Have
       Made a Profit..............................................................................157

    b) StemExpress Used Deceptive Trade Practices to Obtain Maternal Blood at
       Zero Cost...................................................................................160

  4. StemExpress Tissue Technicians Embedded in Planned Parenthood Affiliates: A
    Typical Day.......................................................................................161

    a) How Researchers Placed an Order..................................................162

    b) Embedded Tissue Technicians Learn of Next Day's Scheduled Abortions ........164

    c) Clinic Personnel Gave Tissue Technicians Access to Patients' Private
       Medical Information .....................................................................164

    d) Embedded Tissue Technicians Obtained Consent from Women to Donate
       Fetal Tissue ................................................................................165

       i) When it obtained consent from PPFA affiliates, StemExpress used PPFA's
         consent form ..........................................................................166

ii) StemExpress used its own consent form when it obtained consent from patients at independent women's clinics........................................166

e) StemExpress Tissue Technicians Procured the Fetal Tissue ..............................167

i) After they procured the body parts and tissue, StemExpress employees packaged and shipped them directly to StemExpress customers ..................168

ii) StemExpress' tissue technicians had a financial incentive to procure the most body parts and fetal tissue possible........................................169

5. StemExpress' Due Diligence ......................................................172

6. Payments Received by Clinics....................................................173

7. Payments Received by StemExpress for Its Resale of Fetal Tissue ........................174

8. The Select Panel Recommends that the House Find StemExpress in Contempt of Congress.............................................................................177

9. StemExpress May Have Violated Federal Laws and Regulations.............................179

a) 18 U.S.C. § 1519..............................................................180

b) 42 U.S.C. § 289g-2 ...........................................................180

c) California Health and Safety Code Section 125320................................181

d) HIPAA .......................................................................181

e) HHS Regulations on Informed Consent ...........................................181

f) HHS Regulations on Coercion...................................................182

g) HHS Regulations on Institutional Review Boards................................183

h) California Revenue and Tax Code................................................184

10. The Panel Makes Criminal Referrals Based on StemExpress' Apparent Violations of Law and Federal Regulations .............................................185

**B. DaVinci Biosciences, LLC/DaVinci Biologics, LLC: A Case Study** .........................186

1. Summary.......................................................................186

      a)  Background of DaVinci and DVB ....................................................186

      b)  History of the Panel's Interactions with DaVinci and DVB ..............187

   2.  Business Model of DaVinci and DVB ..........................................................189

      a)  Marketing Activities ........................................................................189

      b)  DaVinci and DVB's Relationship with Planned Parenthood of Orange and San Bernardino Counties ..........................................................192

      c)  Revenue Growth ..............................................................................194

   3.  Consent & Procurement During the Abortion Procedure .........................194

   4.  Post-Procedure Practices..............................................................................195

   5.  Customers that Received Fetal Tissue from DaVinci and DVB.................195

   6.  Potential Violations of Law .........................................................................198

      a)  Applicable Laws ..............................................................................198

         a)  42 U.S.C. § 289g-2 ....................................................................198

         b) California Health and Safety Code Section 125320 .........................198

         c)  California Revenue and Tax Code ................................................198

      b)  Findings............................................................................................200

         i)  42 U.S.C. § 289g-2 & California Health and Safety Code Section 125320 ..200

         ii)  California Revenue and Tax Code ............................................201

   7. Conclusion ..................................................................................................202

**C. Novogenix Laboratories, LLC: A Case Study** ...........................................203

   1.  Summary .......................................................................................................203

      a)  Background of Novogenix..................................................................203

      b)  History of the Panel's Interactions with Novogenix...........................203

2.   Novogenix Business Model ..................................................................205

     a)  Marketing Activities ................................................................205

     b)  Novogenix's Relationship with Abortion Clinics..................................206

     c)  Revenue Growth ...................................................................206

3.   Consent .............................................................................207

4.   Procurement .........................................................................209

5.   Post-Procurement Practices ..........................................................210

6.   Clinics .............................................................................211

     a)  Payments received by clinic.....................................................211

7.   Customers that Received Fetal Tissue from Novogenix................................212

8.   Potential Violations of Law .........................................................212

     a)  Applicable Laws & Regulations ..................................................212

          i)   42 U.S.C. § 289g-2 .......................................................213

          ii)  California Health and Safety Code Section 125320 .........................213

          iii) HHS Regulations on Informed Consent .....................................213

          iv)  HHS Regulations on Institutional Review Boards (IRBs) .....................215

          v)   California Revenue and Tax Code ..........................................215

     b)  Findings.........................................................................216

          i)   42 U.S.C. § 289g-2 & California Health and Safety Code Section 125320 ..216

          ii)  HHS Regulations on Informed Consent ......................................217

          iii) HHS Regulations on IRBs...................................................218

          iv)  California Revenue and Tax Code ..........................................218

vii

    9.   Conclusions ................................................................................................220

   D.  **Advanced Bioscience Resources, Inc.** ...............................................220

      1.   Summary ...............................................................................................220

         a)  Background of ABR ....................................................................220

         b)  History of the Panel's Interactions with ABR ...................................220

      2.   ABR's Business Model .............................................................................221

      3.   ABR Payments to Abortion Clinics ..........................................................222

      4.   ABR Revenue from Customers ................................................................223

      5.   ABR May Have Violated Federal and State Laws and Regulations .......................225

   E.  **Human Fetal Tissue Repository** ...........................................................226

      1.   Summary ...............................................................................................226

         a)  Background of the Human Fetal Tissue Repository .............................226

         b)  History of the Panel's Interactions with HFTR .................................227

      2.   Hospitals from which HFTR Procured Fetal Tissue ...................................228

      3.   Procurement Process ...............................................................................228

      4.   Researchers that Received Fetal Tissue from HFTR ...................................229

      5.   Conclusions ............................................................................................230

VI.  <u>**Case Studies of the Fetal Tissue Industry—The University/Clinic Model**</u> ...............231

   A.  **Summary** ................................................................................................234

   B.  **The University of New Mexico, Southwestern Women's Options, and Planned Parenthood** ........................................................................................235

      1.   Summary ...............................................................................................235

      2.   The University of New Mexico Becomes an Abortion Provider ...............236

3.  UNM Provides Doctors to Southwestern Women's Options and Planned Parenthood .................................................................238

4.  UNM Confers Faculty Status and Benefits upon SWWO Personnel ......................240

5.  UNM Performs Research Using Tissue from Infants Aborted at SWWO and Shares the Tissue with Other Research Entities ......................................242

6.  UNM and SWWO's Failure to Properly Obtain Consent...........................................246

7.  The Panel's Criminal Referrals of UNM and SWWO...........................................248

    a)  The June 2016 Referral .................................................................248

    b)  The December 2016 Referrals .........................................................250

C.  **The University of Washington and the Nation's Largest Fetal Tissue Bank**...........253

1.  Summary ...............................................................................253

2.  The University of Washington, in Conjunction with Numerous Clinics, Establishes the Nation's Largest Fetal Tissue Bank ...................................253

3.  The Sharing of Personnel Between UW and Outside Clinics That Supply Tissue ...255

4.  Fetal Tissue Research at UW BDRL .......................................................258

5.  UW's Productions Were Insufficient for the Panel to Conduct a Full Analysis of UW's Fetal Tissue Transactions ......................................................258

D.  **Planned Parenthood Gulf Coast: A University Case Study**.....................................260

1.  Summary ...............................................................................260

    a)  Background on Planned Parenthood Gulf Coast ....................................260

    b)  History of Panel's Interactions with PPGC and Related Entities ......................261

2.  PPFA Policy on Reimbursement for Fetal Tissue Donation Programs ....................262

    a)  April 2001 PPFA memorandum .......................................................262

    b)  January 2011 redistribution of PPFA memo...........................................263

3.  PPGC Relationship with University of Texas Medical Branch................................263

ix

a) PPGC Procures Fetal Tissue for UTMB ................................................264

4. PPGC's Relationship with Baylor College of Medicine................................268

5. Potential Violations of Law ..............................................................270

    a) Applicable Laws ........................................................................270

        i) 42 U.S.C. § 289g-2 ..............................................................270

        ii) Texas Penal Code § 48.02 ....................................................270

        iii) Texas Penal Code § 37.08 ..................................................270

6. Findings.........................................................................................271

    a) 42 U.S.C. § 289g-2 & Texas Penal Code § 48.02 ..............................271

    b) Texas Penal Code § 37.08 ..........................................................271

**E. The University of Minnesota** ....................................................................272

**F. Colorado State University** ......................................................................273

**G. University of California at San Francisco** ..................................................274

**H. Washington University and Planned Parenthood of St. Louis** .........................275

**I. University of Wisconsin** .........................................................................276

**J. University of Michigan** ..........................................................................277

**VII. <u>Case Studies of Late-Term Abortion Clinics</u>**..........................................280

**A. Summary**..............................................................................................281

**B. [Abortion Doctor #1]** ............................................................................282

1. Background on [Abortion Doctor #1] .................................................282

2. The Panel Issues a Subpoena to [Abortion Doctor #1] ..........................282

3. The Panel's Investigation into the Clinic in Maryland .............................283

**C. [Abortion Doctor # 2]** ...................................................................................284

    1.  Background on [Abortion Doctor #2]...................................................284

    2.  The Panel's Investigation into [Abortion Doctor #2] ................................285

**D. [Abortion Doctor #3]** ..................................................................................285

    1.  Summary ..............................................................................................285

    2.  Allegations Against [Abortion Doctor #3] ..........................................286

    3.  Violations of Applicable Laws ............................................................289

**E. University of New Mexico and Southwestern Women's Options** .............................292

**VIII.** <u>**Case Studies of the Fetal Tissue Industry – Planned Parenthood**</u> .............................297

**A. Summary** ...........................................................................................298

**B. Planned Parenthood: A Corrupt Founding** ...................................................298

**C. Planned Parenthood: Problems with the Business Model** ........................................301

**D. PPFA – Affiliate Relationship** ..................................................................306

**E. Planned Parenthood Federation Failure to Ensure Compliance by Affiliates with Legal Billing Practices; Federal Law Governing Fetal Tissue Donation Projects; Federally Required Affirmation about Changing Abortion Procedures; Patient Consent; and HIPAA Regulations** ...........................................................309

    1.  Summary..............................................................................................309

    2.  Planned Parenthood: Failure to Properly Steward Federal Funds ............................310

    3.  Recent History of Planned Parenthood Audits ...........................................311

    4.  Summary Details of the Known Audits of Planned Parenthood Affiliates ...............314

        a)  California Audits ......................................................................314

            i)  California Audit I – San Diego and Riverside Counties, 2004.......................314

            ii)  California Audit II – Golden Gate, 2010................................................314

b) Connecticut Audit ................................................................................................314

c) Illinois Audit .....................................................................................................315

d) Louisiana Audit..................................................................................................315

    i) Louisiana Audit I ...........................................................................................315

    ii) Louisiana Audit II – 2014.............................................................................315

e) Maine Audit .......................................................................................................315

f) Nebraska Audit ..................................................................................................316

g) New York Audits................................................................................................316

    i) New York Audit I – New York City, January 2009....................................316

    ii) New York Audit II – Hudson Peconic, June 2009 ....................................316

    iii) New York Audit III – New York City, June 2009 ....................................316

    iv) New York Audit IV – New York City, December 2009 ...........................316

    v) New York Audits V-VII – February/May 2010 .........................................317

h) Oklahoma Audits ...............................................................................................317

i) Texas Audits ......................................................................................................317

    i) Texas Audit I .................................................................................................317

    ii) Texas Audit II ..............................................................................................317

j) Washington State Audits....................................................................................318

    i) Washington Audit I.......................................................................................318

    ii) Washington Audit II – Inland Northwest, 2007-2009 ..............................318

    iii) Washington Audit III – Great Northwest ................................................318

k) Wisconsin Audits ...............................................................................................318

5. Conclusion ..............................................................................................................319

6.  Compliance with Federal Law Governing Fetal Tissue Donation Programs ............319

7.  Planned Parenthood Clinics Profited from the Sale of Fetal Tissue .......................322

8.  The Panel Investigates Planned Parenthood Affiliate Clinics ...................................323

9.  PPFA Affiliates and StemExpress Claim the Same Expenses...................................327

10. Planned Parenthood Production Schedule of their Costs Associated with Fetal Tissue Donation ........................................................................................................330

11. The Planned Parenthood Cost Documents Are Unsupported ...................................332

12. Comparison of Costs Claimed by Planned Parenthood Affiliates and Expenses Claimed by Fetal Tissue Middleman StemExpress ...................................................336

13. Planned Parenthood Affiliates' Cost Schedules Compared to the Defined Allowable Costs in 42 U.S.C. § 289g-2....................................................................337

14. Job Descriptions of Planned Parenthood Staff *do not* Include any Reference to Tasks or Responsibilities Associated with Fetal Tissue ...........................................348

F.  **Changing the Method of Abortion Procedure to Obtain More Fetal Tissue** ............352

1.  Changing the Presentation of the Baby to Harvest a Calverium ..............................353

2.  Abortion Doctor and Contract Tissue Technician Communicate Prior to the Abortion Procedure ...............................................................................................355

3.  Training of Clinic Personnel and Doctors is Required to Improve the Likelihood of Intact Tissue from an Abortion..........................................................................355

4.  Panel Interviews Consistent with the CMP Undercover Videos ..............................356

G. **Planned Parenthood Affiliates Violated the Federal Guidelines on Patient Consent**.................................................................................................................360

1.  Summary .................................................................................................................360

2.  Legal Background ....................................................................................................360

3.  The Panel asks experts to evaluate Planned Parenthood's consent form...................361

xiii

4. Planned Parenthood's consent form is inadequate compared to other entities' consent forms ...................................................................................................362

5. The Planned Parenthood consent form does not indicate whether the tissue will be used for education, research, or treatment, including transplantation..................363

6. PPFA Executive suggests that the middleman obtain the consent to donate tissue...364

**E. StemExpress and Planned Parenthood abortion clinics appear to have committed systematic violation of HIPAA** ...................................................................365

1. Summary .....................................................................................................365

2. Legal Background ........................................................................................366

3. Factual Background .....................................................................................366

4. The Contracts between StemExpress and the Planned Parenthood abortion clinics ........................................................................................................368

5. Violations of the HIPAA Privacy Rule by StemExpress and the Planned Parenthood Abortion Clinics................................................................................368

6. The disclosures of patients' PHI made by the Planned Parenthood abortion clinics, and received by StemExpress, were neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye, or tissue transplantation, or for research .........................................................369

    a) Cadaveric organ, eye, or tissue transplantation....................................369

    b) Research.................................................................................................369

    c) Violations Preceding "Consent" .........................................................369

7. The consent for fetal tissue donation obtained by StemExpress from the Planned Parenthood abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI ..........................................................................370

8. The disclosures of patients' PHI made by the Planned Parenthood abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants ............................................371

9. StemExpress is not a *Business Associate* of the Planned Parenthood abortion clinics under HIPAA................................................................................372

xiv

**IX. <u>Biomedical Research and Human Fetal Tissue</u>** ............................................................373

   **A. Success of the United States Biomedical Research Enterprise** ...............................373

   **B. Response to the misleading and false arguments made by scientific societies, medical, societies and universities** ........................................................................374

     1. Concerns regarding the privacy and safety of researchers involved in human fetal tissue research ............................................................................................375

     2. The false claim that human fetal tissue was used in the last century to produce vaccines for polio and other diseases ..............................................................376

       a) Early vaccine research did not rely in any way on human fetal tissue ...............376

       b) The polio vaccine was not produced using human fetal tissue ..........................376

       c) The Nobel Prize was not awarded for curing polio using fetal tissue .................377

       d) The vaccine for Measles was not produced using human fetal tissue ...............377

       e) The vaccine for Mumps was not produced using human fetal tissue ................378

       f) The vaccine for Rubella; an isolated case ...........................................................378

     3. False claims that the production of modern vaccines depends on human fetal tissue ................................................................................................................379

       a) Historic use of fetal cell lines in vaccine production by pharmaceutical companies .............................................................................................................379

       b) Modern vaccine production and research ...........................................................380

     4. Assertions that fetal tissue is necessary for the study of diseases that affect human brain development, including Zika and Down syndrome ..........................................380

     5. Assertions that human fetal tissue is vital for a wide range of life-saving research. 383

     6. Claims that human fetal tissue is required for clinical trials and cures ....................385

       a) Fetal tissue is used in only a tiny fraction of clinical trials..................................386

       b) Non-fetal stem cells have consistently shown much greater clinical promise than fetal stem cells..............................................................................................386

xv

c) Conclusion.............................................................................................387

7. Assertions that human fetal tissue is required for production of humanized mice that provide a model for human diseases with a restricted host range.......................387

8. Assertions that human fetal tissue is required to "validate" scientific findings obtained with human embryonic stem cells (hESCs) or human induced pluripotent stem cells (hiPSCs).................................................................388

**C. Response to the claim that "The Select Panel Has Thwarted Life-Saving Research"**........................................................................................388

1. Alzheimer's.......................................................................................389

2. Amyotrophic lateral sclerosis (ALS) ..............................................390

3. Diabetes Mellitus (DM) ...................................................................390

4. HIV/AIDS .........................................................................................391

5. Infant and Childhood Leukemia ......................................................392

6. Age-related Macular degeneration (AMD) ......................................393

7. Preterm birth ....................................................................................393

8. Spinal cord injury.............................................................................393

9. Vaccine research ..............................................................................393

10. Zika research ....................................................................................394

11. Objective Data on the contribution of fetal tissue to basic research, clinical research, and peer-reviewed scientific publications .................................394

12. Conclusion .......................................................................................396

**D. Analysis of currently funded long-standing human fetal-tissue research** ................396

1. Goals of This Analysis.....................................................................396

2. Criterion for Grant Selection...........................................................396

3. Grant Classification .........................................................................397

4. Class 1 Grant Analysis ........................................................................................ 398

5. Productivity of Human Fetal Tissue Research and Impact on the Field ................... 399

E. **Recommendations for improving access to ethical and appropriate scientific models** ................................................................................................................. 400

X. <u>**Recommendations**</u> ............................................................................................ 406

A. **Recommendations for Direct Protection of Women and Infants** ........................ 406

B. **Recommendations for Stewardship of Taxpayer Funds** ................................... 407

C. **Recommendations to Improve Biomedical Research** ...................................... 408

# Executive Summaries

## I.    Congress Establishes the Select Investigative Panel

- David Daleiden, an investigative journalist, released undercover videos beginning in July 2015, recorded while posing as the head of a company interested in the fetal tissue procurement business. In numerous meetings with abortion providers and companies involved in the transfer of fetal tissue, Daleiden recorded doctors, executives, and staff-level employees discussing various aspects of the fetal tissue procurement industry.

- The videos and other materials that Daleiden acquired detailed the relationship between fetal tissue procurement companies, including Advanced Bioscience Resources, DaVinci Biologics, and StemExpress, and several abortion clinics.

- The exposé followed an investigation Daleiden conducted through a not-for-profit group he founded, the Center for Medical Progress (CMP). CMP's first project, the "Human Capital" investigation, took almost three years. Working under the guise of a tissue procurement business in order to gain access to the top levels of Planned Parenthood, Daleiden, Susan Merritt, and other activists recorded numerous videos documenting conversations in which Planned Parenthood executives discussed the procurement of fetal tissue from aborted fetuses.

- The investigation culminated with the release of eleven videos documenting the practices of local abortion clinics and groups affiliated with the fetal tissue procurement industry. Daleiden and his colleagues filmed hundreds of hours of meetings and conversations. According to the *Washington Post*, they filmed 500 hours of footage at two conferences alone.

- Multiple clips show abortion providers and executives admitting that their fetal tissue procurement agreements are profitable for clinics and help keep their bottom line healthy. Multiple clips also show them admitting that they sometimes changed the abortion procedure in order to obtain a more intact specimen, and some use the illegal partial birth abortion procedure.

- Planned Parenthood Federation of America (PPFA) also revealed that they intentionally had not set a policy about "remuneration" for fetal tissue because "the headlines would be a disaster."  While the organization's executives told affiliates to "think, 'New York Times headline'" if this went badly, at the end of the day, they thought "[selling fetal tissue] is a good idea."

- Congress responded to the videos by holding hearings and initiating investigations. The Energy and Commerce Subcommittee on Oversight and Investigations initiated an investigation of fetal tissue transfers. The Committee on Oversight and Government Reform and the Judiciary Committee conducted hearings and also initiated investigations.

- On October 7, 2015, Rep. Virginia Foxx (NC-5) managed the floor debate for H. Res. 461, a proposal for a centralized and comprehensive congressional investigation. During debate, Rep. Mimi Walters (CA-45) noted, "This resolution would create a select panel to investigate a number of claims related to Planned Parenthood's activities involving abortion and fetal tissue procurement. Like many Americans, I was horrified by the recent videos which depicted Planned Parenthood employees callously discussing the trafficking and sale of aborted babies' tissues and organs." Rep. Marsha Blackburn (TN-7) summarized:

    > I want to clearly state this is about getting answers of how we treat and protect life in this country. The select panel will act to centralize the investigations that are at the Energy and Commerce Committee, Judiciary and Oversight Committees, and bring it all under one umbrella. Over the past several weeks, we have had lots of serious questions. They are troubling questions that have been asked. I think that the investigations we have had have raised a lot of those questions. It is imperative that we centralize these operations and bring it together under one umbrella.

- Congress passed H. Res. 461 by a recorded vote of 242 yeas and 184 nays. Rep. Blackburn was named Chairman of the Panel.

- The Panel did not design its investigation to prove or disprove the credibility of tapes released by the Center for Medical Progress (CMP); however, the Panel viewed the videos as a series of serious claims made by a citizen advocacy group.

- The Panel's investigation identified four business models involving fetal tissue procurement:

    o *The Middleman Model.* This model comprises a middleman and tissue procurer who obtains tissue directly from a source such as an abortion clinic or hospital and then transfers the tissue to a customer, usually a university researcher.

    o *The University/Clinic Model.* This model comprises a particular university that has formed a close relationship with a nearby abortion clinic and regularly acquires tissue from that clinic for research purposes.

    o *The Biotech Company/Clinic Model.* This model comprises a close relationship between a particular biotech company and one or more nearby clinics.

    o *The Late-Term Clinic Model.* This model is of particular concern due to the intersection of late-term abortions, the potential for live births during the abortion procedure, and the transfer of tissues or whole cadavers from that clinic to research entities.

xix

- The Panel designed an investigative work plan based on these business models.

# II. <u>Applicable Laws, Regulations, and Commissions</u>

- Federal and state laws germane to the Panel's investigation can be grouped into four broad categories, with some overlap: (1) laws protecting human research subjects and patient privacy; (2) laws regulating anatomical gifts for transplantation, therapy, research, and education; (3) laws protecting late-term and born-alive infants; and (4) laws pertaining to public funding for fetal tissue research and abortion providers.

## A.  Laws protecting human research subjects and patient privacy

- Laws protecting human research subjects and privacy are rooted in the principles set forth in the Belmont Report.

- Research subjects must be respected as autonomous persons, researchers must adhere to the Hippocratic ideal, and the benefits of research must outweigh the risks to human research subjects.

- The Panel examined the legal and ethical importance of informed consent under the Belmont principles. During the Panel's hearing on *Bioethics and Fetal Tissue*. Rep. Vicky Hartzler (MO-4) addressed an important statement in the Belmont Report regarding informed consent—that "inducements [to consent] that would ordinarily be acceptable may become undue influences if the [research] subject is especially vulnerable."

- Mrs. Hartzler asked an ethics expert if a form known to be widely used by abortion clinics to obtain a mother's consent to donate fetal tissue complied with "HHS's mandate against inducement." The form stated that "[r]esearch using the blood from pregnant women and tissue that has been aborted has been used to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS."

- The witness agreed that this was an important question, because the "idea of the promise of cures" found in the form was a "very powerful motivator." The witness also indicated that the "consent" form was deficient in other ways: "The concern I have is that the standards that we have typically for fetal tissue donation are just absent here. And so in addition to the voluntariness, there is just the thoroughness of the consent [that] seems to be missing in this form."

- The testimony provided by witnesses invited by both the majority and minority raised concerns that the principles embodied in the Belmont Report, and later incorporated into

xx

federal regulations, are not being followed by abortion providers seeking consent for the donation of human fetal tissue.

- In response to the Belmont Report, HHS and the FDA significantly revised their human subjects regulations in 1981. The Common Rule applies to research projects that receive funding from federal agencies, requiring three steps to be fulfilled before the research can take place: 1) the human subject must give informed consent; 2) an Institutional Review Board (IRB) must review the proposed research project; and 3) the institution conducting the research must file an assurance of compliance with the federal agency that is providing the funding.

- The Panel's investigation revealed evidence that the IRB process used by some fetal tissue procurement businesses is often grossly insufficient. For instance, on March 29, 2016, the Panel issued a subpoena to BioMed IRB which required it to produce documents sufficient to show BioMed IRB's ongoing oversight, within the definition of federal regulations, of any entity involved with fetal research or transplantation of fetal tissue for which it issued an IRB approval. BioMed IRB's executive director informed the Panel on April 4, 2016, that in regards to those records, "there are none." This is an apparent direct violation of federal regulations.

- The Health Insurance Portability and Accountability Act of 1996 (HIPAA) privacy rule (Privacy Rule) protects all individually identifiable health information held or transmitted by a covered entity or its business associate and calls this information protected health information (PHI). PHI identifies an individual, or can reasonably be believed to be useful in identifying an individual, and includes demographic data relating to an individual's health condition, provision of health care, or payment for the provision of health care to the individual.

- The Panel's investigation indicates that StemExpress and Planned Parenthood Mar Monte (PPMM), Planned Parenthood Shasta Pacific (PPSP), and Family Planning Specialists Medical Group (FPS) committed systematic violations of the HIPAA Privacy Rule from about 2010 to 2015. These violations occurred when the abortion clinics disclosed patients' individually identifiable health information to StemExpress to facilitate the TPB's efforts to procure human fetal tissue for resale.

**B. Laws regulating anatomical gifts for transplantation, therapy, research, and education**

- Laws regulating anatomical gifts are also heavily centered on the need for informed consent. Additionally, federal and many state laws explicitly prohibit the sale of human body parts.

- The National Organ Transplant Act (NOTA) provides that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human organ for valuable consideration for use in human transplantation if the transfer affects interstate commerce. . . . Any person who violates [] this section shall be fined not more than $50,000 or

imprisoned not more than five years, or both." The term "human organ" is defined to include fetal organs and subparts of organs.

- The Uniform Anatomical Gift Act (UAGA), a model statute first available in 1968 and most recently amended in 2009, was written to facilitate organ donation for transplantation, therapy, research, and education by ensuring that state laws are consistent across the country.

- The UAGA, adopted in every state in some form, includes stillborn babies and fetuses in the definition of "decedent" for purposes of obtaining consent from a relative before the deceased infant's body is donated for experimentation or transplantation. In the UAGA's official notes, the drafters explain that the inclusion of stillborn babies and fetuses ensures that they "receive the statutory protections conferred by this [act]; namely that their bodies or parts cannot be used for transplantation, therapy, research, or education without the *same appropriate consents* afforded other prospective donors."

- The Panel learned that the University of New Mexico (UNM) and the late-term abortion clinic Southwestern Women's Options (SWWO) have an extensive history in which SWWO provided fetal tissue to UNM researchers. SWWO's provision and UNM's acquisition of and research using aborted infant remains appear to violate New Mexico's anatomical gift act, the Spradling Act.

- Under the NIH Revitalization Act of 1993, it is unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce."

- Laws regulating the donation of human organs, including human fetal organs, are relevant for the Panel's investigation, given the possibility that both tissue procurement businesses (TPB's) and abortion providers are profiting from fetal tissue procurement.

- During the Panel's April 20, 2016 hearing, *The Pricing of Fetal Tissue*, Panel members asked witnesses to examine evidence that payments paid by customers to a TPB for fetal tissue exceeded costs incurred by the business by a factor of 300 to 700 percent. Further, the evidence *did not* demonstrate that in many instances the "compensated" abortion clinics incurred any actual costs.

## C. Laws protecting late-term and born-alive infants

- Laws protecting late-term unborn infants and infants born alive during abortion procedures recognize that the "right to an abortion" does not equal the right to a dead child. Federal laws prohibit a specific abortion procedure that occurs seconds before livebirth, and explicitly provide that infants born alive enjoy all of the constitutional rights available to other Americans.

- During the Panel's investigation, staff reviewed tissue procurement notes, email exchanges among researchers, TPB's and abortion clinics, invoices, and more—all indicating that researchers want fetal tissue from late-gestation infants that has not been tainted by feticidal agents (*e.g.*, digoxin).

- The Panel also learned that abortion providers may modify abortion procedures, in apparent violation of the law, to increase the odds of getting an intact infant cadaver (*e.g.*, increase the number of laminaria placed in a patient's cervix to achieve greater dilation). Clearly, these factors increase the likelihood that unborn infants are born alive during late second-trimester abortions, and raise the question whether these infants' civil rights are recognized by abortion providers.

**D. Laws pertaining to public funding for fetal tissue research and abortion providers**

- Finally, laws pertaining to public funding for fetal tissue research and abortion providers need reforming. In particular, while federal law contains numerous restrictions on public funding for abortion, abortion providers receive millions of federal dollars ostensibly for other purposes.

- Government investigations and whistleblower testimonies have revealed that abortion providers often fail to separate public funding from abortion-related costs.

- The Charlotte Lozier Institute and Alliance Defending Freedom have documented that— based on 51 known external audits or other reviews of Planned Parenthood affiliates' financial data and practices, and 61 federal audits of state family planning programs by HHS-OIG—Planned Parenthood affiliates have overbilled $132.4 million in Medicaid and other healthcare funding programs. These audit results are troubling, given their limitations in scope, detail, and timeframe; in fact, of 57 U.S. Planned Parenthood affiliates, only 19 have been audited.

- The Obama administration has denied or threatened to deny federal Medicaid funding to states that have attempted to withhold Medicaid reimbursement from abortion providers. Further, the Seventh and Ninth Circuits have interpreted Medicaid's "free choice of provider" provision—guaranteeing Medicaid recipients' freedom to choose their family planning providers—as a legal impediment to prohibiting abortion providers from receiving federal Medicaid funding.

- However, in *Planned Parenthood v. Indiana* the Seventh Circuit *upheld* Indiana's prohibition on abortion providers receiving funding through the federal Disease Intervention Services agency (DIS), for the diagnosis and monitoring of sexually transmitted diseases. The Seventh Circuit explained that the key difference between the provision upheld and the provision struck down was that the DIS program did *not* have a federal statutory limitation (similar to Medicaid's "free choice of provider" provision) on how states could determine eligibility.

xxiii

- Title X is the only federal grant program dedicated solely to providing family planning and related preventive care and is viewed as setting the standard for publicly funded family planning services. Priority is given to low-income families. Title X provides that "none of the funds appropriated … shall be used in programs where abortion is a method of family planning." Public and private entities may obtain grants.

- Since 2011, numerous states have enacted laws requiring subrecipients of Title X funds to provide comprehensive healthcare to patients and/or refrain from performing abortions. In response, the federal government is actively circumventing the Title X prioritization laws in at least eight states by directly contracting with private entities such as Planned Parenthood.

- Further, on Sept. 9, 2016, HHS issued a proposed rule stating that "[n]o recipient making sub awards for the provision of services as part of its Title X project may prohibit an entity from participating for reasons unrelated to its ability to provide services effectively." In the proposed rule background, HHS states that "13 states have placed restrictions on or eliminated sub awards with specific types of providers. . . ."

# Chapter III. <u>Panel Hearings</u>

- The Panel held two public hearings to examine critical issues within its jurisdiction. In the first hearing on *Bioethics and Fetal Tissue*, the Panel noted that there have been several government-sponsored discussions on bioethics, but none directly on the transfer of fetal tissue since the 1980s.

- The hearing revealed substantial concern about the consent process for the donation of human fetal tissue used by abortion clinics and tissue procurement businesses (TPBs). Evidence revealed that self-interested staff, whose pay depends on the numbers of specimens donated, were assigned to obtain consent from patients.

- Additional evidence showed that tissue technicians and the abortion clinics violated the patient's privacy rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Still other evidence revealed that some TPBs misrepresented that the consent forms and methods of tissue harvesting comply with federal regulations regarding Institutional Review Boards (IRBs). This evidence points toward conduct focused on profit and not on patient welfare.

- The Panel's next hearing, *The Pricing of Fetal Tissue*, sought the judgment of seasoned federal prosecutors to compare the federal statute prohibiting profit from fetal tissue sales with the first tranche of materials from the investigation.

- Two former U.S. attorneys and a senior federal litigator agreed that based on the materials presented to them, they would open a case against a TPB. The former

prosecutors also suggested that accounting and bank records would be critical to understanding whether there was a violation of federal law. Minority witnesses agreed with this approach and urged the panel to obtain such records.

# Chapter IV. <u>The Criminal Referrals</u>

The Select Investigative Panel has made numerous criminal and regulatory referrals and investigations are underway around the nation.

**1)** The Panel learned that StemExpress and certain abortion clinics may have violated the HIPAA privacy rights of vulnerable women for the sole purpose of increasing the harvesting of fetal tissue to make money. Referred to the U.S. Department of Health and Human Services.

**2)** The Panel uncovered evidence showing that StemExpress may have violated federal regulations governing Institutional Review Boards (IRBs). Referred to the U.S. Department of Health and Human Services.

**3)** The Panel discovered that the University of New Mexico may have been violating its state's Anatomical Gift Act by receiving tissue from a late-term abortion clinic (Southwestern Women's Options). Referred to the Attorney General of New Mexico.

**4 & 5)** The Panel conducted a forensic accounting analysis of StemExpress' limited production and determined that it may have been profiting from the sale of baby body parts. Referral sent to El Dorado, California District Attorney, and the U.S. Department of Justice.

**6)** The Panel discovered that an abortion clinic in Arkansas may have violated the law when it sent tissue to StemExpress. Referred to the Attorney General of Arkansas.

**7)** The Panel discovered that DV Biologics, another tissue procurement company, may have been profiting from the sale of fetal tissue, and was not collecting California sales tax from purchasers of the baby body parts. The Orange County District Attorney has filed a lawsuit and the Panel sent a supplemental referral.

**8)** The Panel learned that Advanced Bioscience Resources appeared to have made a profit when it sold tissue to various universities. Referred to the District Attorney for Riverside County, California.

**9)** The Panel discovered that an abortion clinic in Florida, at least in part through its relationship with StemExpress, may have violated various provisions of federal and state law by profiting from the sale of fetal tissue. Referred to the Attorney General of Florida.

**10)** The Panel learned that Planned Parenthood Gulf Coast may have violated both Texas law and U.S. law when it sold fetal tissue to the University of Texas. Referred to the Texas Attorney General.

**11 & 12)** The Panel has uncovered evidence from former employees and a patient of a late-term abortionist in Texas alleging numerous violations of federal and state law at one or more of the practitioner's clinics. The allegations include eyewitness accounts of the doctor killing infants who show signs of life both when partially outside the birth canal, in violation of the Partial-Birth Abortion Ban Act, and after they are completely outside the birth canal, in violation of the Born-Alive Infants Protection Act and Texas murder statutes. Referred to the Texas Attorney General, and the U.S. Department of Justice.

**13)** The Panel has discovered information that StemExpress may have destroyed documents that were the subject of congressional inquiries, document request letters, and subpoenas, in violation of 18 U.S.C. § 1519. Referred to the U.S. Department of Justice.

**14)** The Panel made a supplemental referral to the Attorney General of New Mexico based on information produced in document productions by the University of New Mexico (UNM) and Southwestern Women's Options (SWWO), deposition testimony by *Doctor #5*, and a complaint and affidavit with supporting documents submitted by a former patient at SWWO. It details the alleged failure of SWWO and UNM to provide informed consent to women prior to using tissue from abortions for research at the university.

**15)** Over the course of its investigation, the Panel has uncovered documents and received testimony from confidential informants indicating that several entities, including four Planned Parenthood clinics and Novogenix, may have violated federal law, specifically Title 42 U.S.C. § 289g-2, which forbids the transfer of fetal tissue for valuable consideration. Referred to the U.S. Department of Justice.

# Chapter V. <u>Case Studies of the Fetal Tissue Industry – The Middleman Model</u>

### A.  StemExpress

- StemExpress' business model was designed to obtain fresh fetal tissue from a large number of abortion clinics and provide on-demand fetal tissue to researchers around the world. StemExpress sought to sell fetal tissue "on demand" through an online procurement application.

- In 2010, StemExpress' revenue was $156,312. During 2011, that figure more than doubled to $380,000, and a year later, in 2012, StemExpress' revenue nearly tripled to $910,000. By 2013, its revenue was $2.20 million, and in 2014 the revenue had once again more than doubled to $4.50 million.

- In an attempt to expand the number of abortion clinics from which it procured fetal tissue and provide fetal tissue to a larger number of researchers, StemExpress developed and distributed a brochure aimed at abortion clinics nationwide. Further, they attempted to enter partnership agreements with the National Abortion Federation and Planned Parenthood Federation of America. If those agreements had been consummated, StemExpress would have had access to virtually every abortion clinic in the nation.

- The Panel learned that StemExpress embedded its tissue technicians at the Planned Parenthood facilities. StemExpress' embedded tissue technicians had advance knowledge of the abortions scheduled at PPFA clinics. The Panel determined that clinic personnel gave StemExpress' tissue technicians access to patients' personal medical information, in violation of federal law. The Panel determined that StemExpress' tissue technicians obtained consent to donate fetal tissue from women scheduled to undergo an abortion, procured the fetal tissue, packaged it, and shipped it directly to StemExpress' customers.

- When they obtained consent to donate fetal tissue at Planned Parenthood affiliates, the StemExpress tissue technicians used Planned Parenthood's consent form. A Planned Parenthood executive testified that the Planned Parenthood consent form was misleading and could possibly be coercive. Federal regulations bar such coercion.

- StemExpress used a consent form similar to Planned Parenthood's form at the independent abortion clinics. That form purportedly was approved by BioMed IRB, a commercial IRB that was sanctioned by the federal government for multiple violations of federal regulations. The Panel issued a subpoena to BioMed IRB; however, they produced no documents and told the Panel they had no records reflecting supervision of StemExpress' procurement activities.

- StemExpress entered contracts to procure fetal tissue from three Planned Parenthood affiliates and five independent abortion clinics. StemExpress paid those abortion clinics a total of $152,640 for fetal tissue. The Panel determined that the Planned Parenthood affiliates at which StemExpress procured fetal tissue had no legally reimbursable costs.

- The Panel sought to determine whether the doctors working at the abortion clinics changed their abortion procedures in order to increase the amount of fetal tissue StemExpress could obtain and thereby generate more revenue for the clinics. The director of one independent women's clinic from which StemExpress procured fetal tissue admitted that the abortion clinic changed its clinical practices to procure more liver. A Planned Parenthood executive acknowledged making changes to obtain tissue as well.

- The Panel uncovered evidence that StemExpress may have violated 18 U.S.C. § 1519 through StemExpress' potential destruction of documents that were the subject of congressional inquiries, document request letters, and subpoenas. The Panel made a criminal referral to the U.S. Attorney General.

- The Panel uncovered evidence that StemExpress may have violated 42 U.S.C. § 289g-2, and Cal. Health & Safety Code § 125320(a) by the receipt of valuable consideration in the form of a profit on its procurement and sale of fetal tissue. The Panel made a criminal referral to the U.S. Attorney General and the El Dorado, California District Attorney.

- The Panel uncovered evidence that StemExpress may have violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA) by accessing women's private health information. StemExpress did not have a medically valid reason to see that information. The Panel made a referral to the U.S. Department of Health and Human Services.

- The Panel found evidence that StemExpress may have violated federal regulations on informed consent and Institutional Review Boards. The Panel made a referral to the U.S. Department of Health and Human Services.

- The Panel issued a subpoena to StemExpress that required the production of its banking and accounting records. StemExpress refused to produce any of those records. Due to StemExpress' refusal to comply with repeated subpoenas, the Panel recommended that the House of Representatives hold StemExpress in contempt of Congress.

## B. DaVinci Biosciences, LLC/DaVinci Biologics, LLC

- The Panel sought to determine whether DaVinci Biosciences, LLC (DaVinci), and DaVinci Biologics, LLC (DVB) may have violated 42 U.S.C. § 289g-2 and an equivalent provision of the California Health and Safety Code.

- The Panel determined that DaVinci and DVB appeared to operate a profit-driven business.

- The Orange County, California District Attorney filed a lawsuit that alleged DaVinci and DVB appeared to operate a profit-driven business and thus violated 42 U.S.C. § 289g-2.

- DaVinci and DVB charged considerably more for fetal tissue and cell lines derived from that tissue than the costs it incurs.

- The firms' business and marketing plans show that officers and directors pushed their employees to sell more and more tissue, and thus increase DaVinci and DVB's bottom line.

- The company's sole source of fetal tissue was Planned Parenthood of Orange and San Bernardino Counties (PPOSBC).

- DVB senior executives made charitable contributions to PPOSBC before the company's contract to procure fetal tissue from PPOSBC was signed.

- The DVB executives made further contributions to PPOSBC before the first procurement, and those contributions continued.

- The Panel uncovered evidence that DaVinci and DVB may have violated provisions of the California Tax Revenue and Tax Code. The Panel made a referral to the Orange County (California) District Attorney.

## C.  Novogenix Laboratories, LLC

- The Panel sought to determine whether Novogenix Laboratories, LLC (Novogenix) complied with all applicable federal and state laws.

- The Panel determined that Novogenix may have violated 42 U.S.C. § 289g-2, provisions of the California Health & Safety Code and the California Revenue and Tax Code, and federal regulations.

- Novogenix had a contract to procure fetal tissue from Planned Parenthood Los Angeles (PPLA). The contract provided that Novogenix would reimburse $45 per donated specimen.

- Invoices produced to the Panel by some of Novogenix's customers show that it received a total of $170,980.59 from seven research institutions between June 2011 and December 2015. The Panel cannot determine either the total number of Novogenix' customers, nor its revenue.

- Novogenix represented that it lost a total of $160,540.03 on its fetal tissue operations, but conceded that its counsel created the firm's expenses and revenue document. The Panel cannot rely on the expenses and revenue document to determine whether Novogenix actually lost money on its fetal tissue operations, because it was created by Novogenix's counsel, and Novogenix produced no primary source accounting records.

- The list of expenses included an unknown amount for attorney fees. Such fees are not included under the list of allowable reimbursements under 42 U.S.C. § 289g-2. The list of expenses also included minimal amounts for delivery to researchers. Invoices produced to the Panel by Novogenix customers show the firm charged delivery fees of up to $122.43 per shipment, raising further questions about the reliability of the attorney-created cost document.

- PPLA personnel obtained consent from patients to donate tissue from their aborted fetuses using the standard Planned Parenthood Federation of America (PPFA) consent form. That form contends that fetal tissue has been used to find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS. There is no cure for those diseases.

- Numerous witnesses, including senior PPFA officials, testified that the consent form is misleading and unethical due to its contention that fetal tissue has been used to find a cure for diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS.

- Federal regulations provide that entities cannot coerce pregnant women into the donation of fetal tissue. PPFA officials acknowledged to the Panel that the language in the PPFA consent form may be coercive. Therefore, Novogenix may have violated federal regulations.

- The California Revenue and Tax Code requires entities that collect sales tax on transactions made over the Internet within the state of California. The Panel has determined that Novogenix sold its services to customers in California; it should have collected tax on some of those transactions.

## D. Advanced Bioscience Resources, Inc.

- Advanced Bioscience Resources (ABR), a non-profit corporate foundation, was started in 1989 as a resource for "biomedical, scientific, and educational purposes." It obtains fetal tissue from abortion clinics and offers it to researchers for a fee. ABR generally pays abortion clinics a flat per-tissue fee regardless of the type or amount of tissue procured. The tissue is obtained by tissue technicians embedded by ABR in abortion clinics. The technicians harvest, package, and ship the tissue to the researchers. The abortion clinic staff obtains consent from the patients for fetal tissue donations. ABR's business model is similar to that of StemExpress.

- The Panel conducted an investigation of ABR and uncovered evidence that ABR may have violated 42 U.S.C. § 289g-2 and the California Health and Safety Law. Therefore, the Panel sent criminal referrals to U.S. Attorney General Loretta Lynch and the District Attorney of Riverside County, California, urging both to investigate whether ABR violated federal and state statutes and regulations, and to take appropriate action if the investigations reveal criminal behavior.

## E. Human Fetal Tissue Repository (Albert Einstein College of Medicine)

- The Panel sought to determine whether the Human Fetal Tissue Repository (HFTR) fully complied with applicable federal law and regulations. HFTR only produced a partial list to the Panel of the entities from which it received and to which it distributed fetal tissue. The Panel had insufficient evidence to determine whether HFTR complied with the applicable federal law.

- The Panel sought to determine how HFTR disposed of its stored fetal tissue after its closure. The Panel had insufficient evidence to make that determination; however, there are indications that Albert Einstein College of Medicine (Einstein) offered the tissue to the Planned Parenthood Federation of America (PPFA).

- HFTR received fetal tissue from three New York City hospitals and distributed the tissue to researchers at Einstein and fourteen other educational and research institutions.

- The Panel sought to determine HFTR's procurement procedures, including whether it had contracts with the hospitals from which it procured fetal tissue. Due to the lack of records provided by Einstein, the Panel had insufficient evidence to determine whether HFTR had contracts with those medical facilities; how much, if anything, HFTR paid for the tissue; whether the hospitals or HFTR obtained consent; how the consent was obtained; and the content of the consent form.

- The Panel sought to determine the number of women from which HFTR obtained fetal tissue, and the number of fetal tissue samples HFTR obtained. Documents produced by Einstein to the Panel show that a total of 2,701 subjects were "enrolled" in HFTR studies. The Panel had insufficient evidence to determine the number of fetal tissue samples HFTR obtained.

- The Panel sought to determine whether HFTR complied with the applicable federal regulations on research. HFTR required researchers to do the following: submit summaries of their IRB-approved protocol; provide a copy of their IRB approval letters; state what tissues they will use for their study and why they must use human tissue generally and fetal tissue in particular; and agree to use the samples in compliance with all applicable laws and regulations.

- Based solely on HFTR's limited productions, The Panel determined that it appeared HFTR complied or at least attempted to comply with the applicable HHS regulations. The Panel has insufficient evidence to make a conclusive determination whether HFTR and the research institutions to which it supplied fetal tissue fully complied with the applicable federal regulations.

# Chapter VI. <u>Case Studies of the Fetal Tissue Industry—The University/Clinic Model</u>

- The Panel identified several research institutions across the United States, mostly state universities and virtually all recipients of federal as well as state funding, that have formed a close relationship with one or more abortion clinics.

- These institutions regularly acquire tissue from those clinics for research purposes and in some cases disseminate fetal tissue to other research institutions. Typically, the research institution requests specific human fetal organs or tissue, of a specific gestational age, from an abortion clinic, and the clinic informs the research institution when they have abortions scheduled that may produce the desired fetal body parts. Over time, the clinic thus learns which human fetal organs and tissue are useful to the research institution and often alerts the research institution to their availability without prior solicitation. Once

xxxi

available, the research entities make arrangements to transfer the fetal organs and tissue from the clinic.

- In some cases, the research institutions also have relationships with tissue procurement companies. In still other cases, partnerships do not involve the transfer of fetal tissue between the clinics and universities, but they share medical school faculty and residents in common, raising additional issues about the role of government-funded institutions in driving demand for fetal tissue.

- The Panel sought to understand these and other factors relevant to its analysis of fetal tissue transactions under 42 U.S.C. § 289g-2 and to determine what role, if any, government funding plays in the transactions between abortion clinics and universities.

- The Panel examined the relationship between the University of New Mexico (UNM) and Southwestern Women's Options (SWWO), a late-term abortion clinic near the university that performs abortions through the third trimester. A tissue technician employed by UNM traveled to SWWO to procure human fetal organs or tissue an average of 39 times a year since 2010.

- The transfer of fetal tissue from SWWO to UNM was one part of an aggressive campaign under which leadership personnel at UNM medical school: (1) expanded UNM's role both in providing abortions and in training new abortion providers; (2) expanded UNM's referral for abortion services to outside clinics, including the clinic from which it obtained fetal tissue; (3) supplied residents and fellows to perform abortions for SWWO during the period that UNM was obtaining fetal tissue from that clinic; (4) expanded the faculty of UNM by providing "volunteer faculty" status to local abortionists; (5) provided staff physicians for the Planned Parenthood in Albuquerque from UNM faculty after that clinic transitioned from one owner to another; and (6) leveraged their status to organize UNM employees and students for partisan political activities.

- The close relationship between UNM and SWWO led to allegations of shoddy clinical practices, including failure to utilize a consent form for fetal tissue donation and improperly combining consent for tissue donation with consent for the underlying abortion procedure. The Panel found the consent practices appeared to violate both federal and state law governing informed consent. It also found that the transfer of fetal tissue from SWWO to UNM for research purposes is a systematic violation of New Mexico's Spradling Act, under which tissue from aborted infants cannot be anatomical gifts.

- While UNM may not have made direct payments to SWWO for the fetal tissue it received, UNM did provide the clinic a substantial value in the form of personnel offered to the clinic, in addition to conferring upon at least three staff physicians at SWWO faculty positions. Those positions gave them numerous benefits—including professional liability insurance coverage for UNM activities, access to university facilities, and

discounts. Because they did not have teaching responsibilities, these faculty members provided UNM no apparent benefit apart from the fetal tissue that came from SWWO, giving their relationship the components of an exchange of fetal tissue for valuable consideration.

- At a minimum, this arrangement violates the intent and spirit of 42 U.S.C. § 289g-2. Additionally, SWWO made a statement to the Panel that it "does not participate 'in research, study, or other work involving fetal tissue,'" which appears to be belied by both the internal and published documents that constitute evidence that the clinic and its personnel did in fact participate in fetal tissue research beyond supplying the tissue to UNM.

- The Panel's investigation into the nation's largest fetal tissue bank, the University of Washington's Birth Defects Research Laboratory (UW BDRL), and outside abortion clinics provides another example of the interdependence of clinics and public research institutions. UW BDRL received over $600,000 from the NIH for FY 2015. Over the last five years, over a dozen clinics have provided UW BDRL fetal tissue, and 40 universities or other public research institutions have been recipients of fetal tissue. UW BDRL claims that recipients of tissue are charged a flat fee of $200 regardless of the nature of the tissue researched and that the only payments it makes to clinics are to cover costs.

- The university failed to make a complete production, however. The Panel's independent research found that UW BDRL deploys doctors to outside abortion clinics and that numerous physicians on the staffs of those clinics hold faculty positions at UW BDRL. The invoices produced by UW BDRL are heavily redacted, rendering it impossible without more information to conduct a full forensic analysis under 42 U.S.C. § 289g-2 of payments made to and by UW in connection with transfers of fetal tissue.

- The Panel conducted an investigation of Planned Parenthood Gulf Coast (PPGC), a Planned Parenthood Federation of America (PPFA) affiliate that had its own research department. The Panel uncovered evidence that PPGC may have violated 42 U.S.C. § 289g-2 and Texas Penal Code § 48.02, which bar the offer to sell or transfer fetal tissue in its procurement of fetal tissue for the University of Texas Medical Branch (UTMB) and Baylor College of Medicine (BCM). The Panel also uncovered evidence that PPGC may have violated Texas Penal Code § 37.08, which makes it a crime to lie to a law enforcement officer during the course of an investigation. The Panel referred those potential violations of state law to the Texas Attorney General.

- The Panel determined that PPGC may have violated PPFA's own guidelines on programs for the donation of fetal tissue. PPFA required its affiliates that engage in fetal tissue donation to document their actual costs through an independent accountant, or accept no reimbursement. A PPGC official testified that PPGC determined its reimbursement from UTMB and BCM by back of the envelope calculations. PPGC thus had no actual knowledge of its costs.

xxxiii

- The Panel determined that PPGC charged UTMB $150 per executed consent, $50 if the UTMB technician did not transport the tissue, $2,000 a year in administrative and training fees, and $1,500 in staff time. Had PPGC obtained 500 patient consents for UTMB, as specified in an unexecuted contract, UTMB would have paid PPGC $75,000 for consents alone. PPGC sought to enter into a contract with BCM that contained similar payment terms. The Panel determined that BCM's Institutional Review Board (IRB) had approved the contract to procurement fetal tissue from PPGC.

- The BCM-PPGC contract negotiations terminated after a PPGC official told BCM the affiliate would not commit to the procurement or provision of fetal tissue, and stated that Texas academic institutions "cannot remain publicly silent" about their need for human fetal tissue, yet expect that "research collaboration with Planned Parenthood will remain intact." Those comments were made after the Center for Medical Progress videos were made public. A PPGC official testified that the videos were the reason for the statement.

- Nearly a year later, PPGC's attorney told Texas law enforcement officials that the reason the BCM arrangement never came to fruition was that BCM's IRB did not approve it. The Panel determined that comment was false. PPGC officials knew that BCM's IRB had approved the research project, despite the representations of PPGC's attorney to Texas law enforcement officials.

- The University of Minnesota (UM) is an example of a university that obtains fetal tissue from procurement companies—in this case, Advanced Bioscience Resources (ABR) and StemExpress—in addition to an area clinic. UM disclosed that "approximately 10 researchers at the University of Minnesota" have used such tissue "currently or in the recent past" and that UM was the recipient of well over $1 million in NIH grants for projects that used fetal tissue. UM's produced invoices from ABR show charges ranging from $275 to $2,675 that reflected ABR's varying fee schedule for different types of fetal tissue, raising questions of liability under 42 U.S.C. § 289g-2 that have been examined in the above analysis of ABR and StemExpress.

- UM's underlying fetal tissue practices potentially violate Minnesota's Anatomical Gift Act, which does not permit the donation of fetal tissue resulting from induced abortions, and another law requiring disposal of fetal remains by cremation or burial. Following disclosure of its practices, UM changed its policy to require such tissue to come from sources outside Minnesota, raising the question of whether Congress should pass legislation that would prohibit the crossing of state lines to evade state restrictions on fetal tissue use.

- Between 2010 and 2015, Colorado State University (CSU) received $3.5 million in NIH grants to support projects using fetal tissue, and it had a contractual relationship with Planned Parenthood of the Rocky Mountains (PPRM) under which CSU personnel were permitted to collect tissue from the PPRM clinic. The contract permitted reimbursement by CSU to PPRM for its "reasonable expenses incurred during the tissue process," but questions surround the actual charges, including a $1,500 charge to the University for

"Administrative Start Up" and $1,600 for consent and processing for 10 specimens. Amid the public scrutiny surrounding fetal tissue practices, CSU halted acquisition of fetal tissue from any vendors implicated in the investigation.

- Two university training programs for abortion providers, the Ryan Residency Training Program in Abortion and Contraception and the Fellowship in Family Planning, began at the University of California San Francisco (UCSF)'s Bixby Center for Global Reproductive Health. Funded by the Susan Thompson Buffett Foundation, both programs deploy and pay doctors to provide abortion and contraception services. The Fellowship in Family Planning spread to around 30 other universities and presently has 246 graduated fellows. The Ryan Program now claims 80 sites in the U.S. and Canada. UCSF is also directly involved in fetal tissue research, a component of research projects for which the university received $17.5 million from the NIH.

- Planned Parenthood of the St. Louis Region and Southwest Missouri (PPSLR), reportedly the only clinic in Missouri that provides abortions, was referenced in one of the undercover CMP videos as extensively involved in fetal tissue research, a matter that merits further inquiry. In a separate investigation, the Majority Caucus of the Missouri State Senate concluded, PPSLR "may very well have violated both state statute and Department of Health regulations in their [fetal] disposal practices."

- The Panel's investigation found that five PPSLR physicians also hold faculty positions at the Washington University School of Medicine, which offers the Ryan Fellowship as a vehicle to deploy medical residents to perform abortions at PPSLR. Further investigation is warranted into whether monetary payments or other value is exchanged among the entities' shared personnel.

- The University of Wisconsin, School of Medicine and Public Health (UW SMPH) has deployed both faculty members of its Ob/Gyn department and medical residents (by way of the Ryan Fellowship) to work at a clinic designated by Planned Parenthood of Wisconsin (PPWI). This relationship appears to have been part of a broader plan that included the procurement and transfer of fetal tissue to UW SMPH for research. The school maintains it has not obtained fetal tissue from PPWI since November 2010. The deployments continue, however. UW SMPH has more recently obtained fetal tissue for research from the Albert Einstein College of Medicine, UW, and ABR. The average charge in a UW invoice produced to the Panel, which is under $300, is lower than the lowest charge by ABR in its invoices, which range from $310 to $2,200. Given the problematical nature of ABR's practices under 42 U.S.C. § 289g-2, further investigation is warranted.

- The University of Michigan (UMich) conducts research using fetal tissue obtained from tissue procurement businesses and universities. Physicians from UMich's Health System staff a Planned Parenthood clinic in Ann Arbor, Michigan, and medical students are eligible to provide abortions there through the Ryan Fellowship. One doctor who is both medical director for Planned Parenthood and an associate professor in UMich's Ob/Gyn

xxxv

department told a Center for Medical Progress journalist that the "University of Michigan IRB . . . tend to be pretty easy about stuff and actually not require informed consent." She also claimed research projects involving fetal tissue involve "grants to the agency to cover my time," raising the question of whether the grants she refers to cover more than the permissible reimbursements for costs under 42 U.S.C. § 289g-2.

# Chapter VII. Case Studies of Late-Term Abortion Clinics

- The business practices and procedures of late-term clinics implicate numerous legal and ethical concerns. When human infants are born alive in late-term abortion clinics or hospitals, abortion providers are obligated to ensure that these infants are afforded all of the protections guaranteed by federal and state law. A careful investigation of late-term abortion providers is necessary to ensure that entities are complying with the federal Born-Alive Infants Protection Act, Partial-Birth Abortion Ban Act, 42 U.S.C.§ 289g, *et seq.*, federal regulations pertaining to human fetal tissue research, and state laws, including anatomical gift laws.

- The significance of this inquiry includes the issue of the taxpayers' indirect support of late-term abortion. In fact, most of the doctors west of the Mississippi who openly perform third-trimester abortions have faculty positions at either the University of New Mexico or the University of Colorado. The broad public disapproval of such practices raises the question of why institutions that receive public funds should carry the tacit imprimatur imparted by institutional affiliation.

- The Panel investigated several abortion providers and clinics across the country: [Abortion Doctor #1], [Abortion Doctor #2], [Abortion Doctor #3], the University of New Mexico, and Southwestern Women's Options. Due to the gravity of the allegations against [Abortion Doctor #3], the Panel made a criminal referral forthwith to both the United States Attorney General and the Texas Attorney General on December 7, 2016.

# Chapter VIII. Case Studies of the Fetal Tissue Industry – Planned Parenthood

- Planned Parenthood executives who spoke with the Panel noted that 2016 is the 100th anniversary of the founding of Planned Parenthood. A closer look at the history of the organization, however, leaves little to celebrate. The organization was founded by eugenicists who believed in limiting the rights of people to form families and have children if they had mental or physical disabilities or were of the "wrong" race.

- Harvard studies about Planned Parenthood's business model have pointed out financial struggles the organization has faced in recent years, including smaller margins and lower revenues. Substantial evidence exists that Planned Parenthood clinics—at least 51

times—have overbilled Medicaid and improperly billed items to cover the costs of abortion services, in violation of the Hyde Amendment.

- During some of Planned Parenthood's difficult financial years, tissue procurement companies like StemExpress saw an opportunity to market their services to Planned Parenthood affiliate clinics and even the entire Federation. This move was welcomed by top Planned Parenthood executives, some of whom were remarkably candid about the revenue possibilities for clinics.

- However, the relationships that have formed between tissue procurement companies, abortion clinics, and universities are fraught with questionable practices, including the possible use of illegal, late-term abortion practices to procure fetal tissues and organs, violations of federal laws and regulations on patient consent, and systematic violations of patients' HIPAA rights.

- PPFA doctors have failed to comply with their own requirement obligating abortionists to certify in writing that they have not changed the method of the abortion to facilitate fetal tissue donation. The PPFA executive in charge of this requirement admitted to Panel staff that she has never signed a document certifying this. She additionally admitted that she regularly changed the method of abortion to facilitate intact fetal specimens.

- The Panel found no compliance with an additional PPFA requirement in a memorandum sent to affiliates by PPFA's legal department. That requirement obligated affiliates to rely on an auditor before entering into a fetal tissue donation program to ensure that fees covering allowable costs did not exceed valuable consideration. In fact, one executive told Panel staff she only uses "back of the envelope" methods to determine costs associated with the donations.

- Not only did the Panel find a shocking lack of compliance with both internal and federal regulations, but executives admitted to undercover journalists that the PPFA exercises very little control of their affiliated clinics. One even said that if clinics wanted to profit from the transfer of fetal tissue, "We can't stop them. We only have carrots and sticks."

- Accounting documents from a tissue procurement company, StemExpress, and its bank reveal substantial payments to Planned Parenthood clinics. Some expenses associated with fetal tissue donation—like storage and preservation—are allowed under federal regulations, but the Panel's analysis of these accounting records found that *both StemExpress and Planned Parenthood* claimed the same expenses.

- One of the expenses Planned Parenthood frequently claimed was "staff time" related to fetal tissue donation. However, the Panel's analysis of hundreds of Planned Parenthood job descriptions revealed that none mention the acquisition, handling or transfer of fetal tissue.

- Planned Parenthood claims it made no profit. The Panel, therefore, asked for accounting documents to prove this. Instead of turning over the records that could have proved them innocent, PPFA refused. Its lawyers wrote that "[t]he affiliates have each performed a good-faith accounting of their costs associated with facilitating fetal tissue donation, and have demonstrated conclusively that those costs exceeded the payments they received."

- "We didn't profit because we say we didn't profit" is not compliance with congressional requests for documents. Because Planned Parenthood refused to provide actual documents supporting their claim, the Panel resorted to analyzing accounting documents from middlemen companies who contracted with Planned Parenthood affiliates.

# Chapter IX: <u>Biomedical Research and Human Fetal Tissue</u>

**A.  The United States Biomedical Research Enterprise is a Success:**  The Select Panel recognizes and supports the success of the United States biomedical research enterprise.

- The 2014 gross expenditure on Research and Development (R&D) in the United States exceeded $485 billion, or nearly 27% of the global R&D budget.

- The 2012 biomedical research expenditures in the United States exceeded $119 billion, with the next largest national investment being made by Japan, at just over $37 billion

- Between 2000-2013, the Unites States published approximately 40% of all papers in the area of stem cell research, with the next closest contributor (the United Kingdom) producing less than 10% of all published research in this rapidly advancing field.

**B.  Scientific societies and universities have made misleading claims about fetal tissue research:** The Select Panel has received letters from 21 institutions that claim to provide evidence for the value of human fetal tissue research.  The assertions of these letters fall into 8 general classes and have been uncritically repeated in the Minority report.  In reality, **not a single responding institution provided substantive evidence for the value of fetal tissue research.**

- **Claim:  The activities of the House Select Panel have identified scientists using fetal tissue, thereby putting them at risk:**

  False. The names, institutions and collaborators of individuals conducting human fetal research are made publicly available by the NIH.

- **Claim:  Fetal tissue was used to produce vaccines for polio, measles, mumps and rubella.**

  False. These vaccines were all first produced using animal cells, not fetal tissue.

- **Claim: Fetal tissue is used for modern vaccine manufacture.**

  False. Not a single vaccine licensed in the United States is manufactured using fetal tissue.

- **Claim: We need fetal tissue to cure Zika and other brain diseases.**

  False. Fetal tissue is not widely used for Zika research and vaccines for similar viruses have not been based on human fetal tissue research.

- **Claim: Fetal tissue is important for a wide range of research.**

  False. Human fetal tissue is used in a tiny fraction of all NIH-funded research: 0.2% of the over 76 thousand NIH-funded projects.

- **Claim: Fetal tissue is important for clinical trials**.

  False. In over 100 years of unrestricted clinical research, human fetal tissue has failed to provide a single medical treatment: Human fetal tissue is used for only 0.01% of the over 230 thousand FDA-approved clinical trials—and thus far, no trials using human fetal tissue have reported positive results for patients.

- **Claim: Fetal tissue is required for scientific models such as the "humanized mouse."**

  False. Alternatives exist and are widely used.

- **Claim: Human fetal tissue is "necessary" to validate adult and induced-pluripotent stem (iPS) cells.**

  False. Almost no papers using adult and iPS cells also use fetal tissue.

**C. Response to the claim that "The Select Panel Has Thwarted Life-Saving Research:"** The Minority report asserts that human fetal tissue is important for research on many diseases. In reality, human fetal tissue research makes a vanishingly small contribution to clinical and research efforts, if it contributes at all (Table 1, below).

**D. Analysis of "successful," long-standing human fetal-tissue research:** Over the last five years (2010-14), the NIH has awarded 329 grants using human fetal tissue. **This represents 0.2% of all grants.** The Panel selected 34 "successful" fetal tissue grants that have been funded for over ten years and analyzed them in detail to objectively answer three important questions:

1. How many successful grants actually require human fetal tissue to perform the proposed experiments (*i.e.*, there are no alternatives proposed by the investigator or used in the literature)? **Answer - Eight grants of 34 (24%) actually require fetal tissue.**

2. How productive are projects involving human fetal tissue compared to non-fetal research?  **Answer - Non-fetal projects produce 2.3x as many papers as fetal projects.**

3. What is the importance/impact of papers using human fetal tissue compared to non-fetal papers?  **Answer - Non-fetal papers receive 2.1x more citations than fetal tissue papers.**

**Conclusion**:  Human fetal tissue constitutes only a tiny fraction of the overall research effort. Moreover, research involving human fetal tissue is <u>less productive</u> and has <u>lower importance/impact</u> when compared to non-fetal research from the same laboratories.

**E.   Recommendations for improving access to ethical and appropriate scientific models**

- **Recommendation 1:**  Congress will appropriate funding to the NIH for a trial of expanding the organ-donation network to included preterm and stillborn infant donors, *excluding* tissue from elective termination of pregnancy.

- **Recommendation 2**:   The NIH will undertake a study of research demand for adult human tissue and possible methods for facilitating the acquisition of this tissue for research.

- **Recommendation 3:**  The NIH will establish guidelines for the use of human fetal tissue (modeled on the guidelines for animal research) and will mandate that these guidelines be applied to all grants proposing the use of human fetal tissue.

- **Recommendation 4**: The NIH will adopt a three-tiered classification system for proposals involving human fetal tissue as indicated below:

  **Class 1:**   Fetal tissue is required for the proposed study. There are no reasonable alternatives.

  **Class 2:**   Fetal tissue is not essential for the study. There are some scientific advantages to the use of fetal tissue, but alternatives exist.

  **Class 3:**   Fetal tissue is not essential for the study. There are no scientific advantages to the use of fetal tissue, and alternatives exist.

- **Recommendation 5:** The NIH will report to Congress on the use of parent-donated tissue from natural demise of preterm children, anticipated by Recommendation 1 above, and Congress shall appropriate funds for an expansion of this program and disallow grants funded by federal dollars to utilize human fetal tissue obtained from induced abortion.

xl

**Table 1:** Contribution of human fetal tissue to disease research.

| Diseases Identified in the Minority Report | Grants Awarded 2015 | | | Clinical trials | | | Peer Reviewed Papers | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fetal | Total | % | Fetal | Total | % | "Fetus" | Total | % |
| Alzheimer's | 0 | 1362 | 0.0% | 0 | 1956 | 0.0% | 109 | 75704 | 0.1% |
| Amyotrophic lateral sclerosis | 0 | 152 | 0.0% | 3 | 360 | 0.8% | 33 | 14859 | 0.1% |
| Diabetes Mellitus | 6 | 2382 | 0.3% | 1 | 14807 | 0.01% | 1486 | 353110 | 0.4% |
| HIV/AIDS | 74 | 4935 | 1.5% | 0 | 7950 | 0.0% | 372 | 87756 | 0.4% |
| Infant and Childhood Leukemia | 0 | 339 | 0.0% | 0 | 750 | 0.0% | 21 | 1996 | 1.1% |
| Age-related Macular degeneration | 5 | 187 | 2.7% | 10 | 1371 | 0.7% | 15 | 18826 | 0.1% |
| Preterm birth* | 4 | 355 | 1.1% | 0 | 3375 | 0.0% | 503 | 9006 | 5.6% |
| Spinal cord injury | 0 | 249 | 0.0% | 8 | 907 | 0.9% | 49 | 41461 | 0.1% |
| Vaccine research | 28 | 2509 | 1.1% | 0 | 7024 | 0.0% | 509 | 280174 | 0.2% |
| Zika/Brain Disorders** | 158 | 52338 | 0.3% | 0 | 18 | 0.0% | 6 | 1926 | 0.3% |
| **Diseases Arising in the Fetus and/or Affecting Children** | **Grants Awarded 2015** | | | **Current clinical trials** | | | **Peer Reviewed Papers** | | |
| | **Fetal** | **Total** | **%** | **Fetal** | **Total** | **%** | **"Fetus"** | **Total** | **%** |
| Attention Deficit Disorder | 0 | 121 | 0.0% | 0 | 1277 | 0.0% | 23 | 23079 | 0.1% |
| Autism | 2 | 506 | 0.4% | 0 | 741 | 0.0% | 43 | 17711 | 0.2% |
| Batten Disease | 0 | 15 | 0.0% | 0 | 23 | 0.0% | 7 | 1761 | 0.4% |
| Epilepsy | 2 | 397 | 0.5% | 0 | 1404 | 0.0% | 289 | 141397 | 0.2% |
| Hydrocephalus | 0 | 15 | 0.0% | 0 | 135 | 0.0% | 275 | 21192 | 1.3% |
| Intellectual disabilities | 10 | 1025 | 1.0% | 0 | 541 | 0.0% | 1255 | 86516 | 1.5% |
| Pediatric AIDS | 0 | 467 | 0.0% | 0 | 350 | 0.0% | 8 | 1586 | 0.5% |
| Pediatric cancer | 0 | 760 | 0.0% | 0 | 1642 | 0.0% | 302 | 56854 | 0.5% |
| Spinal muscular atrophy | 0 | 34 | 0.0% | 0 | 157 | 0.0% | 15 | 1050 | 1.4% |
| Sudden Infant Death Syndrome | 1 | 31 | 3.2% | 0 | 89 | 0.0% | 78 | 7094 | 1.1% |

Grant data is from the NIH project reporter database. Clinical data is from the clinical trials database. Publication data is from the PubMed database (queried for disease name, "fetus" and "humans" as MeSH terms.)

* The NIH does not have a spending category for preterm birth; grant data is for the broader category "Conditions affecting the embryonic and fetal periods," many of which result in preterm birth or fetal demise.

**The NIH does not have a spending category for Zika; grant data is for the broader category "Brain Disorders"

# Chapter X. <u>Recommendations</u>

- The Panel recommends that Congress take numerous actions to provide direct protections for women and infants, including:

  - Ensuring that all donations of fetal tissue are made with informed consent;

  - Clarifying the law to ensure that abortion providers do not harm women in order to procure fetal tissue;

- o Directing the Department of Health and Human Services to conduct greater oversight over misleading consent forms, IRBs, HIPAA violations, and abortion provider competence to care for infants born alive during abortion procedures;

- o Ensuring that the Department of Justice allocates resources to prosecute persons or entities that profit from the sale of fetal tissue;

- o Enacting a law to protect unborn infants after 20 weeks gestation;

- o Directing the Department of Health and Human Services to establish protocols for abortion providers to provide emergency care to infants born alive during abortions;

- o Establishing criminal penalties to enforce the Born-Alive Infants Protection Act, and;

- o Establishing an office in the Criminal Division of the Department of Justice to ensure the enforcement of the Partial-Birth Abortion Ban Act, the Born-Alive Infants Protection Act, and other measures recommended in this report.

- The Panel also recommends that Congress take actions to ensure good stewardship of taxpayer funds, including:

  - o Defunding Planned Parenthood and ensuring that grants no longer available to Planned Parenthood are awarded to healthcare providers that provide comprehensive preventive healthcare for their patients and that do not perform abortions (that are not covered by Medicaid under the Hyde Amendment);

  - o Providing greater flexibility to states to enact laws prohibiting abortion providers form receiving Medicaid reimbursement and giving states discretion to choose subrecipients of Title X funding consistent with state policy, and;

  - o Prohibiting federal funding of research involving tissue derived from induced abortions in conjunction with the establishment of a program that would fund sources of ethically obtained fetal tissue (*i.e.*, fetal tissue from *spontaneous* abortions (miscarriages) or stillbirths) for research.

- The Panel recommends that Congress take actions to improve biomedical research, including:

  - o Appropriating funding to the NIH for a trial of expanding the organ-donation network to include preterm and stillborn infant donors, ***excluding*** tissue from elective termination of pregnancy.

- o Directing NIH to undertake a study of research demand for adult human tissue and possible methods for facilitating the acquisition of this tissue for research.

- o Directing NIH to establish guidelines for the use of human fetal tissue (modeled on the guidelines for animal research) and mandating that these guidelines be applied to all grants proposing the use of human fetal tissue.

- o Directing NIH to adopt a three-tiered classification system for proposals involving human fetal tissue as indicated below:

   **Class 1:**  Fetal tissue is required for the proposed study. There are no reasonable alternatives.

   **Class 2:**  Fetal tissue is not essential for the study. There are some scientific advantages to the use of fetal tissue, but alternatives exist.

   **Class 3:**  Fetal tissue is not essential for the study. There are no scientific advantages to the use of fetal tissue, and alternatives exist.

- o Directing NIH to report to Congress on the use of parent-donated tissue from natural demise of preterm children, anticipated by Recommendation 1 above, and Congress shall appropriate funds for an expansion of this program and disallow grants funded by federal dollars to utilize human fetal tissue obtained from induced abortion.

# Chapter XI: Compliance with Congressional Subpoenas

- Virtually every entity and individual from whom the Panel sought documents did not fully comply, regardless of whether the documents were required to be produced pursuant to a subpoena, or were requested via a letter.

- The chart below graphically demonstrates the level of non-compliance by entities and individuals with the Panel's document request letters and subpoenas.

# __Preface__

The Select Investigative Panel prepared the following *Final Report* for the U.S. House of Representatives and the general public. H. Res. 461 established the Panel on October 7, 2015. The Resolution charged the Panel to investigate and report on the following:

(1) medical procedures and business practices by entities involved in fetal tissue procurement;
(2) any other relevant matters with respect to fetal tissue procurement;
(3) Federal funding and support for abortion providers;
(4) the practices of providers of second and third trimester abortions, including partial birth abortion and procedures that may lead to a child born alive as a result of an attempted abortion;
(5) medical procedures for the care of a child born alive as a result of an attempted abortion; and
(6) any changes in law or regulation necessary as a result of any findings made under this subsection.

The Panel's duties included completing a final, formal report to Congress no later than December 31, 2016.

Chairman Blackburn set the priorities of the Panel, directing that the interests of vulnerable women and children always inform the investigation and that the investigation encompass the nation's entire fetal tissue industry. The Chairman's direction was clear from the beginning: We must investigate alleged wrongdoing and then propose solutions to the problems we uncover. Recognizing that the transfer of fetal tissue for profit is a federal criminal offense, the Chairman focused the investigation on exacting detail, including bank and accounting records, all with a perspective that the motive for illicit profit could contaminate collateral activities in four important ways.

First, the sale of fetal tissue for profit could have a corrupting effect on the treatment of women facing an abortion decision. The Panel's work has revealed that this corruption extends to the method of obtaining consent from the patient, which is both deceptive and unlawful. Also, those entrusted with patient medical information may violate Health Insurance Portability and Accountability Act (HIPAA) privacy rights in order to enable businesses to match their customer orders for human fetal tissue with particular patients.

Second, the Panel was concerned with a history of babies being born alive and the sale of fetal tissue at some late-term abortion clinics. The Panel's investigation has revealed that whole baby cadavers of a viable age are transferred from some abortion clinics to researchers. The induction abortion procedure has increased the likelihood that infants will be born alive during abortions, even while the gestational age of viability has lowered due to medical advancements.

This intersection, coupled with a profit motive, became part of the Panel's focus throughout its tenure.

Third, the Panel found evidence that some abortion providers altered abortion procedures in a manner that substitutes patient welfare with a financial benefit for both the abortion clinic and the procurement business. Since this conduct violates federal law, a thorough investigation of the practice was critical to understanding the effectiveness of the current statute.

Fourth, the Panel discovered that profit motives taint the integrity of the nation's celebrated history of voluntary organ donation. In recent decades, much work has been done to create the highest ethical and moral standards, both in law and practice, while making progress toward healing and curing disease. Selling human fetal tissue for a profit endangers this system and threatens the future of finding cures. Thus, the Panel made recommendations that improve the tissue and organ donor system in an ethical way.

The Chairman weighed these four areas of inquiry and held the Panel's first hearing on *Bioethics and Fetal Tissue*. There have been several government-sponsored discussions on bioethics, but none directly on the transfer of fetal tissue since the 1980s. The hearing revealed substantial concern about the consent process for the donation of human fetal tissue used by abortion clinics and procurement businesses. Evidence revealed that self-interested staff, whose pay depends on the numbers of specimens donated, were assigned to obtain consent from patients. Additional evidence showed that tissue technicians and the abortion clinics violated the patient's HIPAA rights. Still other evidence revealed that some middleman companies misrepresented that the consent forms and methods of tissue harvesting comply with federal regulations regarding Institutional Review Boards (IRBs). This evidence points toward conduct focused on profit and not on patient welfare.

The Panel's next hearing, *The Pricing of Fetal Tissue*, sought the judgment of seasoned federal prosecutors to compare the federal statute prohibiting profit from fetal tissue sales with the first tranche of materials from the investigation. Two former U.S. attorneys and a senior federal litigator agreed that, based on the materials presented to them, they would open a case against a middleman company. The former prosecutors also suggested that accounting and bank records would be critical to understanding whether there was a violation of federal law. Minority witnesses agreed with this approach and urged the Panel to obtain such records.

Although the Panel has made significant progress using heavily redacted subpoenaed documents, the Minority has publicly advocated that the Panel be disbanded and has privately attempted to obstruct the Panel's fact-finding mission. At every turn, the minority has urged that the Panel's requests for information be ignored and even urged noncompliance with congressional subpoenas. At the behest of the minority, many individuals who have received congressional subpoenas have heavily redacted critical information, and some have refused to comply at all. Still others have communicated in writing that they have relied upon Minority memoranda to support their noncompliance.

**A. Understanding the Final Report with Redacted Names**

From the beginning of the Panel's investigation, the Chairman directed that the work focus on the transactions described in H. Res. 461, in particular the transfer of fetal tissue, the methods of abortion, and the stewardship of federal taxpayer dollars. The Legislative Branch passes and evaluates laws that govern all Americans and thus, in its Final Report, the Panel has redacted the names of individuals who engaged in those transactions and substituted descriptive nouns in their place. This allows the reader to understand the role played by an individual without disclosing the actual name of the individual.

During the Panel's investigation, several persons sought to make themselves publicly known by making personal comments in the press, including a university researcher, a late-term abortion doctor, and the CEO of a tissue procurement company. These names are also redacted from the report and replaced by descriptive nouns. The names of other individuals who perform more functionary roles, such as tissue procurement technicians or medical assistants, are also redacted and substituted with descriptive nouns. The Panel received information from confidential whistleblowers, such as former abortion clinic managers or former employees of fetal tissue procurement companies. These names are also redacted. The names of university researchers and medical students whose names appeared on the documents that were part of the transactions examined by the Panel are also redacted. Individuals abortion doctors' names are redacted. The Panel has also redacted addresses and telephone numbers where they identify particular individuals.

The Panel conducted depositions and transcribed interviews of several individuals. Those individuals' names and titles are redacted, and the transcript of their testimony before the Panel is used to explain their role.

Finally, the Panel has not redacted that names of staff of the U.S. House of Representatives, the names of lawyers who represented particular individuals or entities, the names of persons who testified before the Panel in open congressional hearings, and the non-transactional names on academic papers that the Panel relied upon to understand the role of human fetal tissue in research.

The redaction key is outlined below. The Report's exhibits, which number 3,647 pages, are also redacted. They can be found at: https://energycommerce.house.gov/news-center/letters/select-investigative-panel-final-report. Additionally, the redaction key is repeated in each individual Chapter. The Minority proposed and the Majority accepted a set of redaction placeholders for the witnesses who were deposed by the Panel and persons who volunteered to be interviewed by the Panel with a written transcript of their interview. Each attorney for the person deposed or interviewed was invited to suggest edits for the transcripts. The consensus placeholders are listed first below followed by the Report's additional redaction placeholders.

**Redaction placeholders for depositions and interviews:**

May 6, 2016 deponent: [Clinic A Dr. #1] Testified that she was an OBGYN abortion provider, a faculty member of University of New Mexico, and an employee of Southwestern Women's Options clinic.

May 11, 2016 deponent: [Dr. Administrator] Testified the she was an OBGYN abortion provider, a faculty Member at the University of New Mexico.

July 21, 2016 interview witnesses:

> [Clinic B Staff #1] Testified that she was a medical worker at an abortion clinic in Maryland.

> [Clinic B Staff #2] Testified that she was a medical worker at an abortion clinic in Maryland.

> [Clinic B Staff# 3] Testified that she was a medical worker at an abortion clinic in Maryland.

> [Clinic B Staff #4] Testified that she was a medical worker at an abortion clinic in Maryland.

October 6, 2016 interview witness: [PP Witness #1] Testified that she is an OBGYN abortion provider in Los Angeles, California, an executive with Planned Parenthood Federation of America (PPFA) who is in charge of the PPFA Manual of Medical Standard and Guidelines.

October 19, 2016 interview witness: [PP Witness #2] Testified that she is a manager of research projects at Planned Parenthood Gulf Coast.

November 1, 2016 interview witness: [PP Witness #3] Testified that she is a university professor, an OBGYN abortion provider, and serves on the PPFA National Medical Committee.

November 17, 2016 interview witness: [PP Witness #4] Testified that she works for the Consortium of Abortion Provider Services at PPFA, which provides technical assistance to PPFA affiliate clinics.


Additionally, each individual Chapter contains a redaction key with additional names:

**Chapter I Redaction Key:**       No redactions

**Chapter II Redaction Key:**

> [PP Witness #1] is an abortion provider in Los Angeles, California, an executive with Planned Parenthood Federation of America (PPFA)

who is in charge of the PPFA Manual of Medical Standard and
Guidelines.

[PP Doctor #1] is an abortion provider in Los Angeles, California, who
also works for the Medical Directors' Council

**Chapter III Redaction Key:**     No Redactions

**Chapter IV Redaction Key:**     Names Redacted from Referral Letters

**Chapter V Redaction Key:**

### StemExpress, LLC:

[PP Witness #1] is an abortion provider in Los Angeles, California, an
executive with Planned Parenthood Federation of America (PPFA)
who is in charge of the PPFA Manual of Medical Standards and
Guidelines.

[PP Doctor #1] is an abortion provider in Los Angeles, California,
who also works for the Medical Directors' Council.

[the Founder and CEO] is the founder and CEO of StemExpress, LLC
(StemExpress).

[ABR's Procurement Manager] is the procurement manager at
Advanced Bioscience Resources, Inc.

[FDA Consumer Safety Officer # 1] is a consumer safety officer at the
U.S. Food and Drug Administration.

[FDA Consumer Safety Officer # 2] is a consumer safety officer at the
U.S. Food and Drug Administration.

### Novogenix Laboratories, LLC:

[PP Witness #1] Testified that she is an OBGYN abortion provider in
Los Angeles, California, an executive with Planned Parenthood
Federation of America (PPFA) who is in charge of the PPFA Manual
of Medical Standard and Guidelines.

[PP Doctor #1] is an abortion provider in Los Angeles, California,
who also works for the Medical Directors' Council

[Founder and Executive Director] is the founder and executive
director of Novogenix Laboratories, LLC (Novogenix).

[Supervisor Consumer Safety Officer] is a supervisor consumer safety officer at the U.S. Food and Drug Administration.

[Consumer Safety Officer] is a consumer safety officer at the U.S. Food and Drug Administration.

### DaVinci Biosciences, LLC / DaVinci Biologics, LLC:

[DVB Executives] are the owners and managers of DaVinci Biosciences, LLC (DaVinci) and DaVinci Biologics, LLC (DVB).

[DVB Executive # 1] is the president of DaVinci and DVB.

[DVB Executives # 2 and 3] are founding members and officers of DaVinci and DVB.

### Human Fetal Tissue Repository:

[Einstein Executive #1] is an Einstein Executive Dean

[Einstein Executive #2] is an Einstein Vice-President, Government and Community Relations

[Einstein Executive #3] is an Einstein Vice-President, External Affairs

**Chapter VI Redaction Key:**

[Clinic A Dr. #1] is an employee of Southwestern Women's Options and a faculty member of the University of New Mexico.

[Dr. Administrator] is a faculty member of the University of New Mexico.

[NM Doctor #2] is a faculty member of the University of New Mexico.

[NM Doctor #3] is a director of Southwestern Women's Options and a faculty member of the University of New Mexico.

[NM Doctor #4] is a faculty member of the University of New Mexico.

[NM Doctor #5] is an employee of Southwestern Women's Options and a faculty member of the University of New Mexico.

[NM Doctor #6] is an employee of Southwestern Women's Options.

[Dr. Administrator #2] is a faculty member of the University of New Mexico.

[NM Research Doctor] is a faculty member of the University of New Mexico.

[NM Patient] was a patient at Southwestern Women's Options.

[WA Clinic Director] is Executive Director and co-founder of the Cedar River Clinics.

[WA Doctor #1] is a faculty member at the University of Washington and also works at the Cedar River Clinics.

[WA Doctor #2] is a physician who works at the Cedar River Clinics.

[WA Doctor #3] is a faculty member at the University of Washington and also works at the Cedar River Clinics.

[WA Doctor #4] is a faculty member at the University of Washington and also works at the Cedar River Clinics.

[WA Doctor #5] previously worked at the Cedar River Clinics while a faculty member at the University of Washington.

[WA Doctor #6] is a former University of Washington resident who worked at the Cedar River Clinics and currently works at the Swedish Medical Center.

[WA Doctor #7] is a former University of Washington resident who worked at the Cedar River Clinics and currently works at Northwest Women's Healthcare.

[WA Doctor #8] is a faculty member at both the University of Washington and Northwestern University and owner and operator of All Women's Health-North.

[WA Doctor #9] is a physician who formerly worked at the Cedar River Clinics and now works at All Women's Health-North.

[WA Patient] was a patient at the Cedar River Clinics who filed a medical malpractice suit against [WA Doctor #2] for injuries alleged following an abortion performed at 25+ weeks.

1

[WA Doctor #10] is a former resident and current faculty member at the University of Washington who served as medical director of the Planned Parenthood of Greater Washington and North Idaho.

[WA Doctor #11] is a faculty member at the University of Washington and also works at the Planned Parenthood of Greater Washington and North Idaho.

[WA Research Doctor #1] is a faculty member at the University of Washington and the author of the university's Birth Defects Research Laboratory's NIH grant proposals.

[WA Research Doctor #2] is a research scientist at the University of Washington who has participated in fetal tissue research studies.

[WA Research Doctor #3] is a former resident at the University of Washington who has participated in fetal tissue research studies.

[WA Research Staff] is a technical operations manager at the University of Washington School of Medicine's WWAMI Institution for Simulation in Healthcare. He has participated in fetal tissue research studies.

[WA Administrator] is an administrator in the University of Washington's government relations office.

[PP Witness #1] is an abortion provider in Los Angeles, California, an executive with Planned Parenthood Federation of America (PPFA) who is in charge of the PPFA Manual of Medical Standard and Guidelines.

[PP Witness #2] is a manager of research projects at Planned Parenthood Gulf Coast (PPGC).

[PPFA Lawyer] is a legal official at PPFA.

[PPFA Medical Officer #1] is a PPFA official who was responsible for medical issues.

[PPFA Medical Officer #2] is a PPFA official who was responsible for medical issues.

[PPGC Abortion Doctor] is a doctor who performed abortions at PPGC.

[PPGC Staff] is a PPGC staff worker who assisted in the abortion clinic.

[UTMB Researcher # 1] is a researcher at the University of Texas Medical Branch who worked with PPGC on fetal tissue procurement.

[PPGC Abortion Services Official] is a manager of abortion services at PPGC.

[PPGC Executive] is the director of abortion services and medical director at PPGC.

[UTMB Researcher # 2] is a second researcher at the University of Texas Medical Branch who worked with PPGC on fetal tissue procurement.

[UTMB Staff] is a UTMB staff worker who administers contracts for researchers.

[BCM Researcher] is a researcher at the Baylor College of Medicine who worked with PPGC on fetal tissue procurement.

[BCM Staff] is a staff employee at the Baylor College of Medicine who worked with PPGC on fetal tissue procurement.

[BCM Contract Manager] is an employee of the Baylor College of Medicine who manages contracts.

[MO Doctor #1] is a faculty member of the Ob/Gyn department of the Washington University School of Medicine and also works at Planned Parenthood of the St. Louis Region and Southwest Missouri.

[MO Doctor #2] is Planned Parenthood of the St. Louis Region and Southwest Missouri's pathologist and the owner of Pathology Services, Inc.

[MO Doctor #3] is a faculty member of the Ob/Gyn department of the Washington University School of Medicine and also works at Planned Parenthood of the St. Louis Region and Southwest Missouri.

[MO Doctor #4] is a faculty member of the Ob/Gyn department of the Washington University School of Medicine and also works at Planned Parenthood of the St. Louis Region and Southwest Missouri.

[MO Doctor #5] is a faculty member of the Ob/Gyn department of the Washington University School of Medicine and also works at Planned Parenthood of the St. Louis Region and Southwest Missouri.

[MO Doctor #6] is or was a clinical fellow in the Ob/Gyn department of

the Washington University School of Medicine and also works at Planned Parenthood of the St. Louis Region and Southwest Missouri.

[WI Doctor #1] was an assistant professor of Ob/Gyn at the University of Wisconsin, School of Medicine and Public Health, while serving as the associate medical director of Planned Parenthood of Wisconsin.

[WI Doctor #2] is the director of the Ryan Fellowship and a member of the Ob/Gyn faculty at the University of Wisconsin, School of Medicine and Public Health, and also works at Planned Parenthood of Wisconsin.

[MI Doctor] is both an associate professor in University of Michigan's Ob/Gyn department and medical director for Planned Parenthood in Ann Arbor.

**Chapter VII Redaction Key:**

[Abortion Doctor #1] is an abortion provider in Nebraska and Maryland.

[Abortion Doctor #2] is an abortion provider in Colorado.

[Abortion Doctor #3] is an abortion provider in Texas.

[Dr. Administrator] is a faculty member at the University of New Mexico.

[Doctor #1] is an employee of Southwestern Women's Options and a faculty member of the University of New Mexico.

[Clinic B Staff #1] is an employee of a late-term abortion clinic in Maryland for [Abortion Doctor #1].

[Clinic B Staff #2] is an employee of a late-term abortion clinic in Maryland for [Abortion Doctor #1].

[Clinic B Staff #3] is an employee of a late-term abortion clinic in Maryland for [Abortion Doctor #1].

[Clinic B Staff #4] is an employee of a late-term abortion clinic in Maryland for [Abortion Doctor #1].

[Employee #1] is an employee of a late-term abortion clinic in Texas for [Abortion Doctor #3].

[Employee #2] is an employee of a late-term abortion clinic in Texas for [Abortion Doctor #3].

[Employee #3] is an employee of a late-term abortion clinic in Texas for [Abortion Doctor #3].

[Employee #4] is an employee of a late-term abortion clinic in Texas for [Abortion Doctor #3].

[Patient #1] is a former patient of [Abortion Doctor #3].

**Chapter VIII Redaction Key:**

[PP Witness #1] is an abortion provider in Los Angeles, California, an executive with Planned Parenthood Federation of America (PPFA) who is in charge of the PPFA Manual of Medical Standard and Guidelines.

[PP Witness #2] is a manager of research projects at Planned Parenthood Gulf Coast.

[PP Witness #3] is a university professor, an abortion provider and serves on the PPFA National Medical Committee.

[PP Witness #4] works for the Consortium of Abortion Provider Services at PPFA which provides technical assistance to PPFA affiliate clinics.

[PP Doctor #1] is an abortion provider in Los Angeles, California, who also works for the Medical Directors' Council.

[PPGC Abortion Services Official] is a manager of abortion services at PPGC.

[PPFA Executive] works for the Medical Standards Department at PPFA.

[PPFA Medical Officer #1] is a PPFA official who was responsible for medical issues

[PPFA Medical Officer #2] is a PPFA official who was responsible for medical issues

[PPFA Lawyer] is a legal official at PPFA.

[CRR lawyer] works for the Center for Reproductive Rights.

[ANSIRH lawyer] works for Advancing New Standards in Reproductive Health.

[NARAL executive] works for the Policy department at the National Abortion and Reproductive Rights Action League.

[StemExpress Founder and CEO] refers to the founder and CEO of StemExpress.

[Abortion Doctor] is any doctor who provides abortions.

[Researcher FT] refers to any person who is involved in fetal tissue transactions.

[Procurement Technician] refers to any person who procures fetal tissue.

# <u>Acknowledgments</u>

The Chairman wishes to acknowledge important contributions made to the Panel's work. The General Accounting Office was very generous in providing a detailee, Pierre Kamga, a Senior Auditor who provided extraordinary guidance on all matters related to forensic accounting. Dr. David Prentice of the Charlotte Lozier Institute tutored the Members and Staff alike on the latest trends in biomedical research and helped us sharpen our thinking about the ethical issues associated with the use of abortive fetal tissue. Lastly, the Members of the Panel and their staffs performed beyond the normal, intense work-load of the House of Representatives.

# I.    Congress Establishes the Select Investigative Panel

## A.  Summary

David Daleiden, an investigative journalist, released undercover videos beginning in July 2015, recorded while posing as the head of a company interested in the fetal tissue procurement business. In numerous meetings with abortion providers and companies involved in the transfer of fetal tissue, Daleiden recorded doctors, executives, and staff-level employees discussing various aspects of the fetal tissue procurement industry. The videos and other materials that Daleiden acquired, detailed the relationship between fetal tissue procurement companies, such as Advanced Bioscience Resources, DaVinci Biologics, and StemExpress, and several abortion clinics.

The exposé followed an investigation Daleiden conducted through a not-for-profit group he founded, the Center for Medical Progress (CMP), identified on its website as "a group of citizen journalists dedicated to monitoring and reporting on medical ethics and advances."[1] CMP's first project, the "Human Capital" investigation, took almost three years—30 months. Working under the guise of a tissue procurement business in order to gain access to the top levels of the abortion giant Planned Parenthood, Daleiden, Susan Merritt, and other activists on the investigation recorded numerous videos documenting conversations in which Planned Parenthood executives discussed the procurement of fetal tissue (the body parts of aborted fetuses).[2]

The investigation culminated with the release of eleven videos documenting the practices of local abortion clinics and groups affiliated with the fetal tissue procurement industry. While most are familiar with the clips, Daleiden and his colleagues filmed hundreds of hours of meetings and conversations. According to the *Washington Post*, they filmed 500 hours of footage at two conferences alone.[3]

Multiple clips show abortion clinic doctors and executives admitting that their fetal tissue procurement agreements are profitable for clinics and help keep their bottom line healthy. Multiple clips also show them admitting that they sometimes changed the abortion procedure in order to obtain a more intact specimen,[4] including relying on the illegal partial-birth abortion procedure.[5] Planned Parenthood Federation of America (PPFA) also revealed that they intentionally had not set a policy about "remuneration" for fetal tissue because "the headlines

---

[1] Center for Medical Progress, About Us, http://www.centerformedicalprogress.org/about-us/.

[2] Center for Medical Progress, Human Capital, http://www.centerformedicalprogress.org/human-capital.

[3] Sandhya Somashekhar, *Meet the Millennial Who Infiltrated the Guarded World of Abortion Providers*, Wash. Post, Oct. 14, 2015, *available at* https://www.washingtonpost.com/national/meet-the-millennial-who-infiltrated-the-guarded-world-of-abortion-providers/2015/10/14/25aaf862-678b-11e5-9223-70cb36460919_story.html.

[4] Center for Medical Progress, Human Capital—Episode 3, http://www.centerformedicalprogress.org/blog/page/5/.

[5] Center for Medical Progress, CMP Reply to PPFA Cecile Richards Video Statement, http://www.centerformedicalprogress.org/blog/page/6/.

would be a disaster."[6]  While the organization's executives told affiliates to "think, 'New York Times headline'" if this went badly,[7] at the end of the day, they thought "this is a good idea."[8]

Congress responded to the videos by holding hearings and initiating investigations. In particular, the Energy and Commerce Subcommittee on Oversight and Investigations initiated an investigation of fetal tissue transfers. The Committee on Oversight and Government Reform and the Judiciary Committee conducted hearings and also initiated investigations.

On October 7, 2015, Rep. Virginia Foxx (NC-5) managed the floor debate for H. Res. 461, a proposal for a centralized and comprehensive congressional investigation. During debate, Rep. Mimi Walters (CA-45) noted, "This resolution would create a select panel to investigate a number of claims related to Planned Parenthood's activities involving abortion and fetal tissue procurement. Like many Americans, I was horrified by the recent videos which depicted Planned Parenthood employees callously discussing the trafficking and sale of aborted babies' tissues and organs." Rep. Marsha Blackburn (TN-7) summarized:

> I want to clearly state this is about getting answers of how we treat and protect life in this country. The select panel will act to centralize the investigations that are at the Energy and Commerce Committee, Judiciary and Oversight Committees, and bring it all under one umbrella. Over the past several weeks, we have had lots of serious questions. They are troubling questions that have been asked. I think that the investigations we have had have raised a lot of those questions. It is imperative that we centralize these operations and bring it together under one umbrella.[9]

---

[6] Center for Medical Progress, Press Release, *Top Planned Parenthood Exec Agrees Baby Parts Sales "A Valid Exchange," Some Clinics "Generate a Fair Amount of Income Doing This,"* http://www.centerformedicalprogress.org/2015/09/top-planned-parenthood-exec-agrees-baby-parts-sales-a-valid-exchange-some-clinics-generate-a-fair-amount-of-income-doing-this/.

[7] Center for Medical Progress, Transcript, 13, (Feb. 27, 2015), http://www.centerformedicalprogress.org/wp-content/uploads/2015/05/PPCAPSDVDfinal.pdf.

[8] Center for Medical Progress, Transcript, 12-13, 15, (Mar. 18, 2015) http://www.centerformedicalprogress.org/wp-content/uploads/2015/05/PPCAPSDVDVRfinal.pdf.

[9] 161 Cong. Rec. H6869-6872 (daily ed. Oct. 7, 2015).

Congress passed H. Res 461 by a recorded vote of 242 yeas and 184 nays.[10] Rep. Blackburn was named Chairman of the Panel. The Panel's membership is as follows:

**Select Investigative Panel**

Marsha Blackburn (Tennessee - 07)
**Chairman**

| **Republican Members** | **Democratic Members** |
| --- | --- |
| Joseph Pitts (Pennsylvania - 16) | Janice Schakowsky (Illinois - 09), Ranking Member |
| Diane Black (Tennessee - 06) | Jerrold Nadler (New York - 10) |
| Larry Bucshon (Indiana - 08) | Diana DeGette (Colorado - 01) |
| Sean Duffy (Wisconsin - 07) | Jackie Speier (California - 14) |
| Andy Harris (Maryland - 01) | Suzan DelBene (Washington - 01) |
| Vicky Hartzler (Missouri - 04) | Bonnie Watson Coleman (New Jersey - 12) |
| Mia Love (Utah - 04) | |

## B. Center for Medical Progress Videos Raise Serious Issues

The Panel did not design its investigation to prove or disprove the credibility of tapes released by the Center for Medical Progress (CMP).  The CMP engaged in a multi-year series of investigations that involved journalists posing as persons interested in growing a fetal tissue procurement business. The journalists attended conferences, befriended numerous persons in the abortion industry, and obtained documents from existing companies involved in fetal tissue procurement. During much of this undercover activity, the journalists wore unseen video recording equipment. Beginning on July 14, 2015, the CMP began to release compilations of these videos to the public. The content was alarming and troubling to many. Some said the videos were "doctored" or "highly edited." The Panel viewed the videos as a series of serious claims made by a citizen advocacy group. Thus, the Panel obtained and viewed hours of unedited footage of the CMP videos and took notice of the issues they raised.  Below are the Panel's summaries of eleven videos released by CMP. The titles of each video are the CMP title for the video.

1. "Planned Parenthood Orange County Changes Abortions to Harvest Intact Fetuses for Local Company's 'Fetal Products' sales"

The Panel took notice that this video raised the issue of infants born alive during late-term abortion procedures. The video showed a discussion between the medical director of Planned Parenthood of Orange and San Bernardino Counties and undercover journalists during which the medical director admitted that her affiliate does not use digoxin. This chemical is used to kill the fetus in later 2nd-trimester abortions *and prevent a live birth*. Middleman companies

---

[10] *Id.* at H6879.

such as Da Vinci Biologics, LLC (who gave large donations to this Planned Parenthood affiliate), can only harvest organs from fetuses who were aborted *without* digoxin because of the poisonous effect of the chemical on fetal cells. This video prompted us to investigate late-term abortion practices in the United States and what care is provided to infants who *are* born alive during late-term abortion procedures. See Chapter VII.

2. "Planned Parenthood Ally National Abortion Federation Suggests 'Group Purchasing Program' for Fetal Parts, Payments 'A Win-Win' for Clinics"

The Panel took notice that this video raised the issue of profiting from the sale of fetal parts, a violation of 42 U.S.C. § 289g-2. In this video, an employee of the National Abortion Federation (NAF), a network of abortion clinics, suggested a "group-purchasing program" for fetal tissue and that payments from middleman companies to NAF affiliated clinics would be a "win-win." This video prompted the Panel to seek accounting records from clinics and middleman companies in order to discover if the statute preventing profit needed further examination. See Chapter V.

3. "Planned Parenthood Houston Admits Accounting Gimmicks Hide Baby Parts Sales, Invoices Charge Thousands of Dollars"

The Panel took notice that this video again raised the issue of illegal profiting from the sale of fetal parts. In this video, the director of research at Planned Parenthood Gulf Coast tells undercover journalists about accounting gimmicks which can be used to hide the sale of fetal parts. The director of research even admitted that her department **"contributes so much to the bottom line of our organization here."** Again, this prompted the Panel to seek accounting records in order to analyze the transactions that were taking place between abortion clinics, middleman companies, and buyers—usually universities. See Chapter VI.

4. "Planned Parenthood TX Abortion Apprentice Taught Partial-Birth Abortions to 'Strive For' Intact Baby Brains"

The Panel took notice that this video raised the issue of changing abortion procedures in order to harvest the most intact fetal parts. Changing the timing or method of the abortion procedure is illegal under U.S.C. § 289g. A Planned Parenthood doctor, who admitted she was trained by PPFA's senior medical advisor, described using a partial-birth abortion technique to harvest fetal organs. She told undercover journalists that she will sometimes use ultrasound guidance to convert a 2nd-trimester fetus to a feet-first breech presentation: "That's what [PP Doctor] was telling us, was it really makes a difference for tissue collection at PPLA." This prompted the Panel to interview and depose abortion providers who it thought might be involved with fetal tissue collection, as well as subpoena and examine clinic manuals and procedure guides that relate to fetal tissue procurement methods. See Chapter VIII.

5. "Top Planned Parenthood Exec Agrees Baby Parts Sales 'A Valid Exchange,' Some Clinics 'Generate a Fair Amount of Income Doing This'"

The Panel took notice that this video again raised the issue of illegal profiting from the donation of fetal parts, as well as the apparent endorsement of these practices by senior Planned

4

Parenthood executives. In this video, the National Director for the Consortium of Abortion Providers (a key committee within PPFA that shapes abortion policy) referred to fetal tissue payments as "donation remuneration." She also admitted that she had been "talking to the executive director of the National Abortion Federation, we're trying to figure this out as an industry, about how we're going to manage remuneration, because the headlines would be a disaster." This prompted the Panel to interview top Planned Parenthood executives in order to ascertain their understanding of federal and state regulations, as well as their protocols of compliance surrounding the transfer of fetal tissue, in addition to seeking accounting information.  See Chapter VIII.

6. "Planned Parenthood Baby Parts Vendor Advanced Bioscience Resources Pays Off Clinics, Intact Fetuses 'Just Fell Out'"

The Panel took notice that this video raised the issue of illegal profiting and born-alive infants. The former director of Planned Parenthood of the Pacific Southwest seems to affirm undercover journalists' offer to pay for tissue. When they say, "We return a portion of our fees to the clinics," the director responds eagerly, "**Right, get a toe in and make it, make a pro–alright.**" The video also featured the Procurement Manager at ABR, who described situations where enough dilation occurred to procure an intact fetus. "**I literally have had women come in and they'll go in the O.R. and they're back out in 3 minutes, and I'm going, 'What's going on?' Oh yeah, the fetus was already in the vaginal canal whenever we put her in the stirrups, it just fell out**."  This prompted the Panel to investigate late-term abortion practices. See Chapters V and VII.

7. "Planned Parenthood Baby Parts Buyer StemExpress Wants 'Another 50 Livers/Weeks,' Financial Benefits for Abortion Clinics"

The Panel took notice that this video raised the issue of a callous tone and unethical behavior towards scientific research, late-term abortions, and fetal tissue procurement. CEO of StemExpress told undercover journalists about shipping aborted fetal cadavers to researchers after abortions and the reactions of scientists:

> …Tell the lab it's coming! So they don't open the box and go, "Oh God!" [laughter] So yeah, so many of the academic labs cannot fly like that, they're not capable…It's almost like they don't want to know where it comes from. I can see that. Where they're like, "We need limbs, **but no hands and feet need to be attached**." And you're like, ? Or they want long bones, and they want you to take it all off, like, make it so that we don't know what it is…But we know what it is. I mean, [laughter], but their lab… **And their lab techs freak out, and have meltdowns.**

The CEO was also asked what would "make her lab happy," to which she responded, "**Another 50 livers a week…We're working with almost like triple digit number clinics,**" she explains, "**and we still need more.**" She later noted, "**Planned Parenthood has volume, because they are a volume institution.**" She also suggested that abortion clinics profit from fetal tissue

donation. This prompted the Panel to examine the attitude towards fetal tissue donation.  See Chapter V.

8.  "Intact Fetuses 'Just a Matter of Line Items' for Planned Parenthood TX Mega-Center"

The Panel took notice that this video raised the issue of Planned Parenthood affiliate clinics breaking their own protocols in order to contract and conduct business with fetal tissue procurement companies. The director of research at Planned Parenthood Gulf Coast told undercover journalists: "**Where we probably have an edge over other organizations, our organization has been doing research for many many years.**" When researchers need a specific part from the aborted fetus, she says, "**We bake that into our contract, and our protocol, that we follow this, so we deviate from our standard in order to do that.**" She also admitted that some doctors change their procedure in order to procure the most intact specimen. This prompted the Panel to study the regulations around fetal tissue procurement and examine how closely those regulations are being followed. She also said of budgeting for fetal tissue, "**It's all just a matter of line items.**" This prompted the Panel to see how well Planned Parenthood executives understand the federal regulations surrounding fetal tissue. See Chapter VI.

9.  "Planned Parenthood VP Says Fetuses May Come Out Intact, Agrees Payments Specific to the Specimen"

The Panel took notice that this video again raised the issue of born-alive infants because Planned Parenthood employees discussed delivering intact fetuses after an abortion. At Planned Parenthood of the Rocky Mountains, [Abortion Doctor] said, "**Sometimes, if we get, if someone delivers before we get to see them for a procedure, then we are intact.**" Again, because this affiliate does not use the feticide digoxin in 2nd trimester procedures, there is the potential that "intact deliveries" are born alive. This prompted the Panel to investigate late-term abortion procedures. She also said she would need to train doctors to change the abortion procedure in order to harvest the most intact brains if PPRM were to partner with the fake tissue procurement company. And finally, [Abortion Doctor] said, "**I think a per-item thing works a little better, just because we can see how much we can get out of it.**" This prompted the Panel to see if clinics were profiting from the transfer of fetal tissue, a violation of federal law. See Chapters VII and VIII.

10.  "Second Planned Parenthood Senior Executive Haggles Over Baby Parts Prices, Changes Abortion Methods"

The Panel took notice that this video again raised the issue of illegal profit. Another Planned Parenthood executive, the President of the Medical Directors' Council, bargained with undercover journalists over the price of fetal tissue. **"You know, in negotiations whoever throws out the figure first is at a loss, right?"** She explains, "**I just don't want to lowball.**" If Planned Parenthood loses money as they say they do by participating in fetal tissue programs, then "lowballing" wouldn't be a factor in contract negotiations. And even though she insists, "We're not in it for the money," she says, "**But it has to be big enough that it's worthwhile for me.**" This again prompted the Panel to seek accounting records and other records relating to Planned Parenthood's fetal tissue programs. See Chapter VIII.

11. "Planned Parenthood Uses Partial-Birth Abortions to Sell Baby Parts"

The Panel took notice that this video raised multiple issues: illegal profiting, changing the abortion procedure in order to procure a better specimen, the possible use of partial birth abortion, and the disregard of federal regulations. In the video, the Senior Medical Advisor to Planned Parenthood, discusses how she changes the abortion procedure to procure an intact calvarium (upper skull): **"We've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm gonna basically crush below, I'm gonna crush above, and I'm gonna see if I can get it all intact." "But I will tell you that behind closed doors these conversations are happening with the affiliates.** When asked about Planned Parenthood's position on fetal tissue procurement, she tells the journalists, "**behind closed doors these conversations are happening with the affiliates."** She stressed that Planned Parenthood is treading very carefully around the issue in order to "avoid headlines," a frequently repeated phrase in conversations among executives. This prompted the Panel to investigate late-term abortion practices to see if they were being modified to procure tissue, as well as to interview multiple Planned Parenthood executives. See Chapters VII and VIII.

**C. The Panel Forms an Investigative Plan**

On March 10, 1993, the House debated two competing amendments to H.R. 4, the National Institutes of Health Revitalization Act of 1993. The amendments, one offered by Rep. Bliley and one by Rep. Waxman, focused on safeguards governing the donation of fetal tissue for transplantation and for research. The House passed the Waxman Amendment to H.R. 4, the National Institutes of Health Revitalization Act of 1993. That Amendment includes the provisions codified as 42 U.S.C. §§ 289g-2(a) and (e)(3):

> **42 U.S.C. § 289g-2(a) states "It shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce."**

> **42 U.S.C. § 289g-2(e)(3) "The term "valuable consideration" does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue."**

During floor debate it was repeated over and over by supporters of the Waxman Amendment that "fetal tissue may not be sold."[11] Rep. Morella expressed her support for the legislation because "fetal tissue could not be sold."[12] Rep. Waxman himself said:

> This amendment that I am offering as a substitute would enact the most important safeguards, and those are the safeguards to prevent any sale of fetal tissue for any purpose, just not for the purpose of

---

[11] 139 Cong. Rec. H1099 (1993) (statement of Rep. John Edward Porter in support of the Waxman Amendment).
[12] *Id.* (statement of Rep. Connie Morella in support of H.R. 4 and the Waxman Amendment).

research. It would be abhorrent to allow for a sale of fetal tissue and a market to be created for that sale.[13]

The floor debate corroborates the Committee Report language. The Report from the Committee on Energy and Commerce stated, "Section 498B prohibits the purchase of human fetal tissue as well as the solicitation or acceptance of directed fetal tissue donations."[14] The Committee prohibition on the sale of fetal tissue is described as making the transfer of fetal tissue parallel with donation of other organs under the Organ Procurement and Transplantation Act.[15] The Committee Report adds, however, "Indeed the Committee has dealt with fetal tissue more restrictively . . . ."[16] The Committee intent is to disallow payment for procurement of any organs.

The intent of the statute is best understood through a simple contrast between two modes of transferring fetal tissue from one entity to another. With the first, an abortion clinic or middleman Procurement Business transfers tissue to a researcher, and the researcher may reimburse the abortion clinic or Procurement Business for its reasonable costs incurred by the transportation, processing, preservation, and quality control of the tissue. With the second, the payment from the researcher exceeds those reasonable costs, enabling the abortion clinic or Procurement Business to make a profit, and thus violates the statute.



The congressional intent of the Waxman Amendment served as a guide for the Panel's investigative plan. The core question became the following: If fetal tissue is transferred from one entity to another, does the transfer violate the intent of § 289g-2? To answer this question, the panel identified four business. These are:

(1) *The Middleman Model.* This model comprises a middleman and tissue procurer who obtains tissue directly from a source such as an abortion clinic or hospital and then transfers the tissue to a customer, usually a university researcher.

---

[13] *Id.* (statement of Rep. Waxman).
[14] H.R. Rep. No. 103-28 at 76 (1993).
[15] Pub. L. No. 98-507, 98 Stat. 2339 (1984).
[16] H.R. Rep. No. 103-28 at 76 (1993).

(2) *The University/Clinic Model*. This model comprises a particular university that has formed a close relationship with a nearby abortion clinic and regularly acquires tissue from that clinic for research purposes.

(3) *The Biotech Company/Clinic Model*. This model comprises a close relationship between a particular biotech company and one or more nearby clinics.

(4) *The Late-Term Clinic Model*. This model is of particular concern due to the intersection of late-term abortions, the potential for live births during the abortion procedure, and the transfer of tissues or whole cadavers from that clinic to research entities.

The Panel sought information from the following entities. Scientists from Harvard University and Pfizer provided bipartisan, off-the-record informational briefings for staff which gave a candid view into their view of fetal tissue research.

1. Advanced Bioscience Resources, Inc.
2. Albert Einstein College of Medicine
3. American Academy of Pediatrics
4. American Association for the Advancement of Science
5. American College of Obstetricians and Gynecologists
6. American Type Culture Collection
7. Anatomic Gift Foundation
8. Association of American Medical Colleges
9. Baylor
10. Bioarray Therapeutics
11. Buffalo Biosciences
12. Butler Medical Transport
13. Camelback Family Planning
14. Capital Biosciences
15. CEO StemExpress
16. Cedar River Clinics
17. Colorado State University
18. [Dr. Administrator] University of New Mexico
19. [MO Doctor #2]
20. [NM Research Doctor]
21. Dv Biologics
22. Family Planning Specialists Medical Group
23. Five Star
Bancorp – StemExpress' bank
24. Germantown Reproductive Health Services
25. Harvard University – Provided Briefing
26. HHS
27. Holy Cross Germantown Hospital
28. InVivo Therapeutics
29. [Abortion Doctor #1] (Document Production and Deposition)
30. Life Technologies
31. Maryland Board of Physicians
32. Montgomery County Department of Fire and Rescue Services
33. Montgomery County Emergency Communications Center
34. Montgomery County Police Department
35. NAF
36. Neuralstem
37. NIH
38. Northland Family Planning
39. Novartis
40. Novogenix Labs
41. Oregon Health Sciences
42. Pfizer – Provided Briefing
43. Presidential Women's Center
44. Q Therapeutics
45. Saneron CCel Therapeutics, Inc.
46. Former Accountant StemExpress

9

47. SciKon
48. Scinto Group, LLP – StemExpress' accountant
49. Shady Grove Adventist Hospital
50. Southwestern Women's Options
51. Stem Cell Innovations
52. StemCells, Inc.
53. StemExpress
54. The Center for Medical Progress (CMP)
55. CEO and Chairman, AOL, Inc.
56. County of Orange, State of California
57. University of Colorado
58. University of Michigan
59. University of Minnesota
60. University of Texas
61. University of Wisconsin
62. University of California, San Diego
63. University of New Mexico
64. University of Washington Birth Defects Research Laboratory
65. U.S. Department of Justice
66. University of Southern California – Keck
67. Women's Health Specialists
68. Yale University

The Panel started its inquiry into the middleman or tissue broker model, the primary business model for the transfer of human fetal tissue. The statute raises several fundamental questions about this model as displayed by the graphic below.



**Abortion Clinic**

(1) Receives payment for fetal tissue. How much?

(2) Reasonable costs? How much?

**Middleman Procurement Business**

(1) Pays abortion clinic for fetal tissue? How much?

(2) Receives payment from researcher? How much?

(3) Reasonable costs? How much?

**Researcher**

Pays Procurement Business for fetal tissue? How much?

$$$          $$$

**D. Middleman Investigative Work Plan Overview**

The Panel relied upon the advice of a forensic accountant to formulate an investigative work plan. The statute (Section 289g-2) states that the term "valuable consideration" does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue. The Panel relied on generally accepted accounting standards, which defined payments made (including costs incurred) that are reflected as expenses, and payments received that are reflected as revenue (or income, from selling a product or service). Together these formed the Panel's basis for seeking accounting records of the business transactions of the fetal tissue procurement middleman companies, the abortion clinics from which they harvested fetal tissue, and the customers that purchased fetal tissue. The Panel sought to understand the transactional data, reflected on income statements and balance sheets. Also, the Panel relied upon the requirement that nonprofit entities comply with Internal Revenue Service (IRS) requirements to keep records that clearly show their income and expenses in order to substantiate deductions and claims made on their tax returns.

For the Panel to complete its review and determine the extent to which an entity did not receive valuable consideration allowed by the statute (or violated the statute), a thorough examination of the accounting records is necessary. Payments made and/or received as described in the preceding paragraph are embedded in accounting records. Each time a company makes a financial transaction, a paper trail is generated, also known as a source document. These source documents include but are not limited to cancelled checks, original invoices, sales receipts, bank transaction records, leases & contracts, purchase orders, etc. These source documents form the basis to substantiate any assertions made by an entity, through its financial or accounting records (including a trial balance report, an income statement or records of profit and loss, a statement of cash flow and a balance sheet). The Panel sought such documentation, but many entities refused to comply, even with lawful congressional subpoenas.

The Panel's document requests and subpoenas reflected these accounting standards: In order to do a forensic examination of accounting and financial records, those financial records have to be completely presented and handed over to the auditors, examiners, or investigators. The responsibility to substantiate entries, deductions, claims, or other assertions made on the financial records (arising through review of the records) is on the entity providing the documentation. Without sufficient and appropriate substantiation, accounting principles view such records as inaccurate, incomplete, invalid, or unreliable.

Thus, the Panel was able to reach partial conclusions about the sufficiency of the statute that governs fetal tissue transfers. The Panel has made criminal referrals to law enforcement agencies that have additional investigative tools. The graphic chart below illustrates the Panel's work plan for an examination of accounting documentation.



# II.    Applicable Laws, Regulations, and Commissions

Chapter II Redaction Key:

1.  [PP Witness #1] is an abortion provider in Los Angeles, California, an executive with Planned Parenthood Federation of America (PPFA) who is in charge of the PPFA Manual of Medical Standards and Guidelines.

2.  [PP Doctor #1] is an abortion provider in Los Angeles, California, who also works for the Medical Directors' Council.

Given the breadth of the Select Investigative Panel's authorization, the Panel examined numerous federal and state laws which can be grouped into four broad categories, with some overlap: (1) laws protecting human research subjects and patient privacy; (2) laws regulating anatomical gifts for transplantation, therapy, research, and education; (3) laws protecting late-term and born-alive infants; and (4) laws pertaining to public funding for fetal tissue research and abortion providers.

Laws protecting human research subjects and privacy are rooted in the principles set forth in the Belmont Report. Research subjects must be respected as autonomous persons, researchers must adhere to the Hippocratic ideal, and the benefits of research must outweigh the risks to human research subjects. The Panel heavily examined the legal and ethical importance of informed consent.

Laws regulating anatomical gifts are also heavily centered on the need for informed consent. Additionally, federal and many state laws explicitly prohibit the sale of human body parts. Laws protecting late-term unborn infants and infants born alive during abortion procedures recognize that the "right to an abortion" does not equal the right to a dead child. Federal laws prohibit a specific abortion procedure that occurs seconds before live birth and explicitly provide that infants born alive enjoy all of the constitutional rights available to other Americans.

Finally, laws pertaining to public funding for fetal tissue research and abortion providers need reforming. In particular, while federal law contains numerous restrictions on public funding for abortion, abortion providers receive millions of federal dollars ostensibly for other purposes. Government investigations and whistleblower testimonies have revealed that abortion providers often fail to separate public funding from abortion-related costs.

## A.  Laws Protecting Human Research Subjects and Patient Privacy

1.  The Belmont Report

The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research was created on July 12, 1974, with the passage of the National Research Act.[17] The Act was largely a response to the reprehensible Tuskegee Syphilis study, in which

---

[17] P.L. 93-348.

13

African-American men were asked to participate without informed consent. These men were not given adequate treatment for their disease, even after penicillin became the accepted drug for treating syphilis in 1947. In 1972, an advisory panel concluded that the Tuskegee Study was "ethically unjustified."[18]

The National Commission was tasked with identifying "the basic ethical principles that should underlie the conduct of biomedical and behavioral research involving human subjects" and developing "guidelines which should be followed to assure that such research is conducted in accordance with those principles."[19] The Commission's work culminated in the issuance of the Belmont Report. This seminal report set forth three principles of biomedical research:

> (1) **Respect for persons**, with consideration given to individuals' autonomy. This principle underlies the requirement of obtaining a patient's informed consent.
>
> (2) **Beneficence**, reflecting the Hippocratic ideal of doing no harm.
>
> (3) **Justice**, with potential benefits of research balanced against the risks to subjects (*i.e.,* people).

The Belmont Report's relevance to the Panel's investigation was clear during the Panel's hearing on *Bioethics and Fetal Tissue*. Rep. Vicky Hartzler (MO-4) addressed an important statement in the Belmont Report regarding informed consent—that "inducements [to consent] that would ordinarily be acceptable may become undue influences if the [research] subject is especially vulnerable."[20] She asked an ethics expert if a form known to be widely used by abortion clinics to obtain a mother's consent to donate fetal tissue complied with "HHS's mandate against inducement."[21] The form stated that "[r]esearch using the blood from pregnant women and tissue that has been aborted has been used to treat **and find a cure** for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS."[22]

The witness agreed that this was an important question because the "idea of the promise of cures" found in the form was a "very powerful motivator."[23] The witness also

---

[18] *See* The Tuskegee Timeline, CDC, http://www.cdc.gov/tuskegee/timeline.htm.

[19] *See* The Belmont Report, Office of the Sec., Ethical Principles and Guidelines for the Protection of Human Subjects of Research, The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, Summary (1979), http://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/.

[20] The Belmont Report, Office of the Sec., Ethical Principles and Guidelines for the Protection of Human Subjects of Research, The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research (1979), http://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/.

[21] *Bioethics and Fetal Tissue: Hearing Before the Select Investigative Panel, H. Comm. on Energy and Commerce*, 114th Cong. 77 (unedited transcript) (Mar. 2, 2016), http://docs.house.gov/meetings/IF/IF04/20160302/104605/HHRG-114-IF04-Transcript-20160302.pdf.

[22] *Bioethics and Fetal Tissue: Hearing Before the Select Investigative Panel, H. Comm. on Energy and Commerce*, 114th Cong. Majority exhibit A-3 (Mar. 2, 2016), http://docs.house.gov/meetings/IF/IF04/20160302/104605/HHRG-114-IF04-20160302-SD030.pdf (emphasis added).

[23] *Id.*

indicated that the "consent" form was deficient in other ways: "The concern I have is that the standards that we have typically for fetal tissue donation are just absent here. And so in addition to the voluntariness, there is just the thoroughness of the consent [that] seems to be missing in this form."[24]

A researcher invited by the Minority during the hearing agreed, stating that the form would not have "made it past" his IRB.[25] The testimony provided by witnesses invited by both the Majority and Minority raised concerns that the principles embodied in the Belmont Report, and later incorporated into federal regulations, are not being followed by abortion providers seeking consent for the donation of human fetal tissue.

During the hearing, Rep. Mia Love (UT-4) expressed deep concern with the issue of consent and minors. She stated: "So, imagine [a] 14-year-old going into a clinic to undergo a very invasive procedure without someone there that she trusts to walk her through, to make sure that she is not being taken advantage of, to make sure that she is making the right decision."[26] She asked, "How can anyone be sure that that minor, under difficult circumstances, fully understand[s] the long-term repercussions behind [her] decision when the current law wouldn't even allow that minor to get behind the wheel of a vehicle?"[27] Dr. G. Kevin Donovan, a witness, agreed that this presented a troubling problem.[28]

2.  The Common Rule and IRB Regulations

In response to the Belmont Report, HHS and the FDA significantly revised their human subjects regulations in 1981.[29] The Common Rule[30] applies to research projects that receive funding from any one of 19 federal agencies. It requires three steps to be fulfilled before the research can take place: 1) the human subject must give informed consent; 2) an Institutional Review Board (IRB) must review the proposed research project; and 3) the institution conducting the research must file an assurance of compliance with the federal agency that is providing the funding. For fetal tissue, if the researchers would like access to the woman's medical information, then the HIPAA Privacy Rule applies, and she must give consent for that information to be shared.

The rule lists several criteria for IRB approval, including the requirement that researchers obtain the informed consent from their research subjects. There are eight basic elements of informed consent under the Common Rule that "shall be provided to each subject."[31] The HHS regulations also require an IRB to "prepare and maintain adequate documentation" of its activities.[32]

---

[24] *Id.* (testimony of Paige Cunningham).
[25] *Id.* (testimony of Lawrence Goldstein).
[26] *Id.*
[27] *Id.*
[28] *Id.* (testimony of G. Kevin Donovan).
[29] 45 C.F.R. § 46; 21 C.F.R. § 50; *See* Erin D. Williams, Cong. Research Serv., RL32909, Federal Protection for Human Research Subjects: An Analysis of the Common Rule and its Interactions with FDA Regulations and the HIPAA Privacy Rule 78 (2005).
[30] 45 C.F.R. § 46.
[31] 45 C.F.R. § 116.
[32] 45 C.F.R. § 46.115(a).

The Panel's investigation revealed evidence that the IRB process used by some fetal tissue procurement companies is often grossly insufficient. For instance, on March 29, 2016, the Panel issued a subpoena to BioMed IRB which required it to produce documents sufficient to show BioMed IRB's ongoing oversight, within the definition of federal regulations, of any entity involved with fetal research or transplantation of fetal tissue for which it issued an IRB approval.[33] BioMed IRB's executive director informed the Panel on April 4, 2016, that, in regards to those records, "there are none."[34] This is an apparent direct violation of federal regulations.

3. Presidential Commissions

Since 1974, "public national bodies" have had a role in the national debate surrounding bioethics. These groups have grappled with topics ranging from human subject research to end-of-life care to stem cell research. Their studies have most frequently been conveyed through reports, policy proposals, and hearings. Furthermore, fetal tissue research has been a topic of their conversations since the first commission.

In addition to the Belmont Report, the first group published a report called *Research on the Fetus* (1975), in which they said their primary concern was "research on the fetus . . . before, during and after induced abortion." While they recommended "that use of the dead fetus, fetal tissue and fetal material for research purposes be permitted," several members of the commission (both for and against abortion) argued that research on fetuses past viability was unethical. They also recommended that the method of abortion should not be changed for research purposes and that no financial inducements "be offered to procure an abortion for research purposes."[35]

President Reagan's **Presidential Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research** (1978-1983) added an important voice to the discussion of euthanasia with their report *Defining Death*,[36] which served as the basis for the Uniform Determination of Death Act subsequently enacted by most states. Their report *Screening and Counseling for Genetic Conditions* (1983)[37] discussed in part the ethics of having abortions based on the knowledge of the sex or various disabilities of the fetus.

---

[33] Subpoena from Select Investigative Panel to Biomedical Research Institute of America (Mar. 29, 2016).

[34] Email from Executive Director, Biomedical Research Institute of America, to Select Investigative Panel staff (Apr. 4, 2016).

[35] *See* Research on the Fetus, U.S. Dept. of Health, Ed., & Welfare, The National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research (1975), https://videocast.nih.gov/pdf/ohrp_research_on_fetus.pdf.

[36] *See* Defining Death: Medical, Legal, and Ethical Issues in the Determination of Death, President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (1981), https://repository.library.georgetown.edu/bitstream/handle/10822/559345/defining_death.pdf?sequence=1&isAllowed=y.

[37] *See* Screening and Counseling for Genetic Conditions: The Ethical, Social and Legal Implications of Genetic Screening, Counseling, and Education Programs, President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (1983), https://repository.library.georgetown.edu/bitstream/handle/10822/559349/geneticscreening.pdf?sequence=1&isAllowed=y.

The **Advisory Committee on Human Radiation Experiments** (1994-1995), created by President Clinton, investigated human radiation experiments conducted from 1944-1974, while his second commission, the **National Bioethics Advisory Commission**, set out in part to "familiarize professionals engaged in nonfederally-funded research with the ethical considerations associated with conducting research involving human subjects."[38]

President George W. Bush's **Presidential Council on Bioethics** (PCBE) is perhaps most renowned for the academic seriousness with which it approached bioethics. Guided by the belief that respect for human life and advancing biotechnology were compatible, President Bush appointed a diverse group of scientists and ethicists to the Council to advise him, particularly in regard to embryonic stem cell research. President Bush was especially concerned that research using embryonic stem cells, which he believed ended human lives, was unethical. He relied on policy recommendations from the PCBE to promote bills prohibiting biomedical practices he found morally objectionable. For example, the Fetus Farming Prohibition Act of 2006 was a response to the PCBE's report *Reproduction and Responsibility,* whose policy recommendations attempted to limit questionable practices, particularly by instituting (at least temporarily) moratoriums on those affecting reproduction.[39] The Fetus Farming bill made it a federal crime to be involved in interstate commerce to acquire "human fetal tissue knowing that a human pregnancy was deliberately initiated" to provide the tissue.[40]

The Panel's research found that—even with the material produced by these commissions—answers to many questions were out of date or nonexistent. Of particular concern are current practices in tissue and organ donation; research ethics and the revolution in biotechnology; the ability of the regulatory agencies to address misconduct; and the role of law enforcement. Many of the Panel's questions directed to the Federal Drug Administration and the National Institutes of Health could not be answered at all. The U.S. Department of Justice wrote to the Panel that it had never conducted training on the criminal statute that makes profiting from human fetal tissue sales a felony. The same letter could provide no example of attorney training or convictions under the statute.

4. HIPAA Privacy Rule

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) privacy rule (Privacy Rule) protects all individually identifiable health information held or transmitted by a covered entity or its business associate and calls this information protected health information (PHI).[41] PHI identifies an individual, or can reasonably be believed to be useful in identifying an individual (*e.g*., name, address, birth date, Social Security number), and includes demographic data relating to an individual's past, present, or future physical or mental health condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual.[42]

---

[38] *See* Exec. Order No. 12975, "Protection of Human Research Subjects and Creation of National Bioethics Advisory Commission" (1995), https://bioethicsarchive.georgetown.edu/nbac/about/eo12975.htm.
[39] *See* Reproduction and Responsibility: The Regulation of New Biotechnologies, The President's Council on Bioethics (2004), https://bioethicsarchive.georgetown.edu/pcbe/reports/reproductionandresponsibility/.
[40] Pub. L. No. 109-242; 42 U.S.C. § 289g-2.
[41] 45 C.F.R. § 160.103.
[42] *Id.*

A covered entity may not use or disclose an individual's PHI except as the Privacy Rule permits or requires[43] or as the individual or their representative authorizes in writing. HHS may impose civil penalties on covered entities that fail to comply with the Privacy Rule. Further, both a covered entity that discloses and any person who knowingly obtains PHI in violation of the Privacy Rule can face criminal fines or imprisonment.[44]

The Panel's investigation uncovered a series of business contracts between StemExpress, a tissue procurement business (TPB), and several abortion clinics. These contracts included provisions for the payment of fees by StemExpress to the abortion clinics for fetal tissue and maternal blood. StemExpress then resold the fetal tissue and blood to researchers.

The Panel's investigation indicates that StemExpress and Planned Parenthood Mar Monte (PPMM), Planned Parenthood Shasta Pacific (PPSP), and Family Planning Specialists Medical Group (FPS) (the abortion clinics) committed systematic violations of the HIPAA Privacy Rule from about 2010 to 2015. These violations occurred when the abortion clinics disclosed patients' individually identifiable health information to StemExpress to facilitate the TPB's efforts to procure human fetal tissue for resale.

From about 2010 to 2015, the abortion clinics (covered entities under HIPAA) permitted employees of StemExpress (a non-covered entity) to enter their clinics and procure human fetal tissue from aborted infants, obtain PHI about their patients, interact with patients, and seek and obtain patient consent for tissue donation.[45] StemExpress did not have a medically valid reason to see, and the abortion clinics did not have a reason to provide, patients' PHI. Instead, the abortion clinics shared patients' PHI with StemExpress in furtherance of contractual agreements that financially benefited StemExpress and the clinics.[46]

The abortion clinics and StemExpress violated the HIPAA privacy rule because: (a) the disclosures of patients' PHI made by the abortion clinics and received by StemExpress were neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research; (b) the consents for fetal tissue donation ostensibly obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI; (c) the disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants; and (d) StemExpress is not a "business associate" of the abortion clinics under HIPAA.

The abortion clinics could have directly consented their patients for tissue donation and entered an agreement with StemExpress to provide a limited data set regarding the patients they were seeing on a particular day.[47] Instead, they violated the Privacy Rule by permitting StemExpress to view the most intimate information about their patients.

---

[43] 45 C.F.R. § 164.502(a).
[44] Pub. L. No. 104-191; 42 U.S.C. §§ 1320d-5-1320d-6.
[45] *See* Clinic Procedures & Policies, produced by StemExpress, Exhibit 2.1.
[46] *See* Standard Operating Procedure, produced by StemExpress, Exhibit 2.2.
[47] *See* 45 C.F.R. § 164.514(e).

These disclosures made by the abortion clinics to StemExpress were intentional and purposeful.[48] StemExpress employees were handed a patient's medical chart by her healthcare provider in blatant violation of the HIPAA privacy rule.

## B.  Laws Regulating Anatomical Gifts for Transplantation, Therapy, Research, and Education

### 1.  National Organ Transplant Act

The National Organ Transplant Act (NOTA)[49] was enacted in 1984, providing for the establishment of the Task Force on Organ Transplantation. The Act also authorized the Secretary of Health and Human Services to make grants for organ procurement organizations, created the Organ Procurement and Transplantation Network (OPTN), created the Scientific Registry of Transplant Recipients, and created an administrative unit within HHS to administer these activities. Importantly, NOTA included a criminal prohibition against the exchange of organs for transplantation for valuable consideration.[50]

NOTA provides that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human organ for valuable consideration for use in human transplantation if the transfer affects interstate commerce. . . . Any person who violates [] this section shall be fined not more than $50,000 or imprisoned not more than five years, or both." The term "human organ" is defined to include fetal organs and subparts of organs.[51]

### 2.  Uniform Anatomical Gift Act

The Uniform Anatomical Gift Act (UAGA), a model statute first available in 1968 and most recently amended in 2009, was written to facilitate consideration organ donation for transplantation, therapy, research, and education by ensuring that state laws are consistent across the country.[52] The UAGA, adopted in every state in some form, includes stillborn babies and fetuses in the definition of "decedent" for purposes of obtaining consent from a relative before the deceased infant's body is donated for experimentation or transplantation. In the UAGA's official notes, the drafters explain that the inclusion of stillborn babies and fetuses ensures that they "receive the statutory protections conferred by this [act]; namely that their bodies or parts cannot be used for transplantation, therapy, research, or education without the *same appropriate consents* afforded other prospective donors."[53]

However, the notes also mention that states may choose to treat aborted fetuses

---

[48] *See* 45 C.F.R. § 164.502(a)(1)(iii).

[49] 98 P.L. 507; 98 Stat. 2339.

[50] *See* U.S. Dept. of Health & Human Services, Selected Statutory and Regulatory History of Organ Transplantation, http://organdonor.gov/about-dot/laws/history.html.

[51] 42 U.S.C. § 274e.

[52] *See* Revised Uniform Anatomical Gift Act (2006) (Last Revised or Amended in 2009), drafted by the National Conference of Commissioners on Uniform State Laws, http://www.uniformlaws.org/shared/docs/anatomical_gift/uaga_final_aug09.pdf.

[53] *Id.*

differently, given the "complicated legal, scientific, moral, and ethical issues which may arise."[54] To date, eight states explicitly prohibit experimentation on aborted infants: Alabama, Arizona, Idaho, Indiana, North Dakota, Ohio, Oklahoma, and South Dakota. In other states, restrictions on the use of aborted infants' remains for research are implicit.

For instance, New Mexico's Jonathan Spradling Revised Uniform Anatomical Gift Act (Spradling Act)[55] is based on the UAGA.[56] The Spradling Act was enacted in 2007 to replace the State's existing Anatomical Gift Act[57] with provisions mirroring the UAGA.[58]  In their new law, New Mexico decided to follow the suggestion in the UAGA to treat aborted fetuses differently: "'decedent' means a deceased individual whose body or part is or may be the source of an anatomical gift." It "includes a stillborn infant and . . . a fetus but [does] not includ[e] a fetus that is the subject of an induced abortion."[59]

Further, the Spradling Act provides that the Act "applies to an anatomical gift or amendment to, revocation of or refusal to make an anatomical gift, whenever made."[60]  In other words, all anatomical gifts in the State of New Mexico must comply with this act, and the bodies or body parts of aborted infants cannot be anatomical gifts.

The Panel learned, however, that the University of New Mexico (UNM) and the late-term abortion clinic Southwestern Women's Options (SWWO) have an extensive history in which SWWO provided fetal tissue to UNM researchers. SWWO's provision and UNM's acquisition of and research using aborted infant remains appear to violate the Spradling Act. Any consents ostensibly obtained by SWWO from mothers of aborted infants do not validate the donation of their infants' remains for research, because under the Spradling Act the bodies or parts of aborted infants may not be anatomical gifts.

3.  NIH Revitalization Act of 1993

Under the NIH Revitalization Act of 1993, the Secretary of the Department of Health and Human Services (HHS) is permitted "to conduct or support research on the transplantation of human fetal tissue for therapeutic purposes," including tissue from aborted infants. The law places numerous requirements on the acquisition of fetal tissue and on fetal tissue research, including a requirement that the infant's mother provide written consent. Further, when tissue is obtained from aborted infants, a mother's consent to donate her infant's remains must *follow* her consent to the abortion procedure. The law also prohibits the "alteration of the timing, method, or procedures used to terminate the pregnancy . . . solely for the purposes of obtaining the tissue," and requires abortion providers to perform the abortions in accordance with "applicable State law."[61]

---

[54] *Id.*
[55] N.M. Stat. Ann. § 24-6B-1, *et seq*.
[56] Revised Uniform Anatomical Gift Act.
[57] N.M. Stat. Ann. § 24-6A-1 *et seq.*
[58] *See* Fiscal Impact Report, Revised Uniform Anatomical Gift Act 3 (Mar. 14, 2007), https://www.nmlegis.gov/Sessions/07%20Regular/firs/HB1276.pdf.
[59] N.M. Stat. Ann. § 24-6B-2 (emphasis added).
[60] N.M. Stat. Ann. § 24-6B-3.
[61] 42 U.S.C. § 289g-1.

Additionally, the Act provides that "[i]t shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce." Further, the solicitation or acceptance of tissue as directed donation for use in transplantation is prohibited. Persons or entities "involved or engaged in interstate commerce" may not "solicit or knowingly acquire, receive, or accept a donation of human fetal tissue knowing that a human pregnancy was deliberately initiated to provide such tissue." Violations of this law can result in a fine or imprisonment for up to 10 years. "Valuable consideration" is defined to exclude "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue."[62]

Laws regulating the donation of human organs, including human fetal organs, are relevant for the Panel's investigation, given the possibility that both tissue procurement businesses (TPBs) and abortion providers are profiting from fetal tissue procurement. During the Panel's April 20, 2016, hearing, *The Pricing of Fetal Tissue*, Panel members asked witnesses to examine evidence that payments paid by customers to a TPB for fetal tissue exceeded costs incurred by the business by a factor of 300 to 700 percent. Further, the evidence *did not* demonstrate that in many instances the "compensated" abortion clinics incurred any actual costs.[63]

Witness Brian Lennon, a former federal prosecutor, stated that he "didn't see [evidence] in any of the [hearing] exhibits" that abortion clinics had reasonable costs associated with fetal tissue donation.[64]

## C. Laws Protecting Late-Term and Born-Alive Infants

House Resolution 461 provided the Panel with jurisdiction to review "[t]he practice of providers of second and third trimester abortions, including partial birth abortion procedures that may lead to a child born alive as a result of an attempted abortion," as well as "[m]edical procedures for the care of a child born alive as a result of an attempted abortion." The panel investigated these issues in the context of two federal laws—the Born-Alive Infants Protection Act and the Partial-Birth Abortion Ban Act.

### 1. Born-Alive Infants Protection Act (BAIPA)

President George W. Bush signed the Born-Alive Infants Protection Act (BAIPA)[65] in 2002, which passed by voice vote in the House of Representatives and with unanimous support in the Senate. BAIPA clarifies that for purposes of all federal laws, the terms "person," "human being," "child," and "individual" include every infant who is born alive, regardless of whether that birth is the result of labor, cesarean section, or induced abortion. BAIPA *does not* contain its own criminal penalties or any other enforcement mechanism to hold abortion providers accountable who fail to provide medical attention and care to infants born alive during an

---

[62] 42 U.S.C. § 289g-2.

[63] *See generally The Pricing of Fetal Tissue: Hearing Before the Select Investigative Panel, The Comm. on Energy and Commerce*, 114th Cong. (2016).

[64] *Id.* at 97.

[65] 1 U.S.C. § 8.

abortion or attempted abortion.

The "right to an abortion" does not equal the right to a dead child. Through the enactment of BAIPA, the United States Congress recognized that the right to abortion has limits, and is not an absolute, ever-expanding right. In particular, the right to abortion does not extend so far as to justify the denial of fundamental civil rights and protections to born, living human children.

During the Panel's investigation, staff reviewed tissue procurement notes, email exchanges among researchers, TPBs and abortion clinics, invoices, and more—all indicating that researchers want fetal tissue from late-gestation infants that has not been tainted by feticidal agents (*e.g.*, digoxin).[66] The Panel also learned that abortion providers may modify abortion procedures, in apparent violation of the law, to increase the odds of getting an intact infant cadaver (*e.g.*, increase the number of laminaria placed in a patient's cervix to achieve greater dilation).[67] Clearly, these factors increase the likelihood that unborn infants are born alive during late second trimester abortions, and raise the question whether these infants' civil rights are recognized by abortion providers.

[PP Witness #3] acknowledged that "a practitioner who does not intend to do an intact procedure could nonetheless have an intact delivery that was not intended."[68] Further, interviews with second-trimester abortion providers revealed that, while they deny delivering live infants during abortion procedures, they are inadequately prepared to care for an infant if a live birth were to occur. When asked what Planned Parenthood would do if an infant was born alive during an abortion procedure, [PP Witness #1] stated bluntly:

> I can tell you that none of our Health Centers provide obstetrics care. So they don't deliver babies. So they don't have anyone who can provide care, nor do they know what that care is. . . . We don't deliver babies at Planned Parenthood. . . . [O]ur affiliates don't provide obstetrical care. So therefore, they don't know how to manage a term infant or a premature infant.[69]

When Panel staff asked whether "the protocol [should] be to call an ambulance right away" if a premature infant were born alive during an abortion, [PP Witness #1] stated "[s]o there's no protocol for this. I'm not going to sit here and write a protocol."[70]

---

[66] *See, e.g.,* Documents produced by the University of New Mexico: procurement notes stating "clinic now uses digoxin only at 20 weeks" [UNM 00049];  procurement notes lamenting that 25-week aborted infant "treated" with digoxin: "heart mushy; GI discolored +liver; skin loose; eyes discolored red" [UNM 00004]; heavily redacted email exchange, where UNM employee states that they will try to get later gestation lung; sometimes they can get up to 20-22 weeks, but unusual "these days" to get non-digoxin-exposed samples beyond 18 weeks [UNM 00910], Exhibit 2.3.

[67] *See generally Interview of [PP Witness #1], before the Select Investigative Panel, Comm. on Energy and Commerce*, 114th Cong. (unedited transcript) (Oct. 6, 2016).

[68] *Interview of* [PP Witness #3], *before the Select Investigative Panel, Comm. on Energy and Commerce,* 114th Cong. 46 (unedited transcript) (Nov. 1, 2016).

[69] *Interview of [PP Witness #1],* at 223-24.

[70] *Interview of [PP Witness #1],* at 225-27. At that time, [PP Witness #1]'s, attorney asked for a break. Upon returning, [PP Witness #1] stated that if an infant were born with signs of life, she "would call an ambulance and

2.  Partial-Birth Abortion Ban Act (PBA)

President George W. Bush signed the **Partial-Birth Abortion Ban Act (PBA)** on November 5, 2003.[71] In 2007, the Act was upheld by the United States Supreme Court in *Gonzales v. Carhart*.[72] The PBA prohibits the abortion procedure known as "partial-birth abortion," or "intact dilation and extraction," described as when the abortion provider:

> (A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and

> (B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus. . . .

At least 19 states have laws mirroring the federal PBA.[73] Because researchers desire to obtain intact fetal cadavers and organs, as discussed above, the Panel investigated whether abortion providers may be using the partial-birth abortion procedure in violation of federal and/or state law.

**D.  Laws Related to Public Funding of Fetal Tissue Research and Abortion Providers**

1.  NIH Grants

On October 4, 2000, the U.S. GAO reported that the National Institutes of Health (NIH) is the only federal agency under the Subcommittee on Labor, Health and Human Services, and Education jurisdiction that sponsors research using human fetal tissue.[74] NIH spent $76 million on human fetal tissue research in FY2014, and will spend approximately $76 million in FY2015 and $77 million in FY2016.[75] In addition to broader reporting requirements regarding "activities conducted or supported by the NIH, the Director of NIH is required to submit to Congress an annual report that describes how NIH and its agencies "store and track human tissue samples."[76] (For a detailed examination of NIH grants, please see Chapter IX.)

---

give the fetus comfort care until the ambulance arrived if it was viable or looked like [sic] a periviable" or would "just give it comfort care and let it expire" if the infant were "nonviable."
[71] 18 U.S.C. § 1531.
[72] 550 U.S. 124 (2007).
[73] *See* Guttmacher Institute, *Bans on Specific Abortion Methods Used After the First Trimester* (Nov. 1, 2016), https://www.guttmacher.org/state-policy/explore/bans-specific-abortion-methods-used-after-first-trimester.
[74] GAO letter to Arlen Specter, Chairman, Subcomm. on Labor, Health and Human Services, and Education, Committee on Appropriations 2 (Oct. 4, 2000).
[75] Kristin Finklea, et al., Cong. Research Serv., R44129, Fetal Tissue Research: Frequently Asked Questions 1 (July 15, 2015) (based on search criteria entered at http://report.nih.gov/categorical_spending.aspx).
[76] PL 109-482.

2. Federal Funding for Abortion Providers

H. Res. 461 also gave the Panel jurisdiction to review federal funding and support for abortion providers. Congress has included restrictions on abortion funding in the HHS appropriations acts since fiscal year (FY) 1977. These restrictions, commonly known as the Hyde Amendment, prohibit the use of federal and state matching Medicaid funds[77] for most abortions. However, Congress permits abortion funding in specific circumstances that have changed periodically since enforcement began August 4, 1977, including when a pregnancy endangers a mother's life or health, and when the pregnancy resulted from rape or incest. In certain fiscal years, Congress required documentation and reporting to prove that a woman's circumstances fit the exceptions permitting abortion coverage. States may pay for abortions with state or local funds (*not* state matching Medicaid funds) allocated for health benefits or services.[78]

Other sources of federal funding may be used to pay for abortions; however, they are generally subject to restrictions mirroring the Hyde Amendment.[79] Hyde-like language exists "in the appropriations measures for foreign operations, the District of Columbia, the Treasury, and the Department of Justice."[80] Further, funds available to the Department of Defense (DOD) and the Indian Health Services (IHS) are limited by codified restrictions.[81]

While Congress has long limited the use of federal tax dollars to directly pay for abortions, abortion providers receive significant public funding ostensibly for other purposes. Sources of funding for "reproductive health services" include Medicaid (family planning), Title X of the Public Health Service Act, the Federal Health Center Program, The Ryan White HIV/AIDS program, the National Breast and Cervical Cancer Early Detection Program, Sexually Transmitted Diseases Prevention Grants, Title V Maternal and Child health Block Grant, Teen Pregnancy Prevention Program, and the Social Services Block Grant Program.[82] Additionally, many states and localities provide funding for reproductive health services.

a) Medicaid

Medicaid accounts for 75% of U.S. public expenditures for "family planning services"— up from 20% in 1980.[83] Medicaid reimburses providers for contraceptive items and procedures and related services, with the federal government paying 90% of the cost (versus 50% to 75% for

---

[77] "Medicaid provides health coverage to millions of Americans, including . . . pregnant women. . . . Medicaid is administered by states, according to federal requirements. The program is funded jointly by states and the federal government." Medicaid.gov, overview, https://www.medicaid.gov/medicaid-chip-program-information/medicaid-and-chip-program-information.html.

[78] *See generally* FY 2017 Moyer Material, Submitted by the Office of the Assistant Secretary for Financial Resources, U.S. Depart. of Health and Human Services, Addendum: Abortion-Related Reporting 1-8 (2016).

[79] *See generally* Elayne J. Heisler, et al., Cong. Research Serv., R44130, *Federal Support for Reproductive Health Services: Frequently Asked Questions* (Aug. 24, 2016).

[80] *Id.* at 2.

[81] *Id.*; 10 U.S.C. § 1093 (DOD) and 25 U.S.C. § 1676 (IHS).

[82] *See generally Federal Support for Reproductive Health Services: Frequently Asked Questions*.

[83] *See, e.g.*, Guttmacher Institute, *Publicly Funded Family Planning Services in the United States*, https://www.guttmacher.org/fact-sheet/publicly-funded-family-planning-services-united-states.

most other services) and states paying 10%, and with no out-of-pocket costs for beneficiaries.[84] Medicaid enrollees are permitted to receive family planning care from "qualified providers" of their choice, regardless of whether the providers are in their health plans' network. That family planning provider is then reimbursed by the state or by the plan.[85]

In FY 2010, federal and state[86] public expenditures for family planning services alone totaled $2.37 billion.[87] While not all recipients of this funding perform abortions,[88] the nation's largest abortion provider, Planned Parenthood, provides an excellent study of the impact of public funding on the abortion industry.[89] During fiscal year 2015, 43% of Planned Parenthood's revenue derived from "government health services grants & reimbursements," at a price tag of $553,700,000.[90]

Further, while abortion providers are not permitted to receive reimbursement *for abortion* from Medicaid, former employees of Planned Parenthood have testified that Planned Parenthood would separate out charges for services and products rendered in connection with abortions, such as office visits, ultrasounds, Rh factor tests, lab work, general counseling, and abortion aftercare, and submit those "fragmented" or "unbundled" charges as claims for Medicaid reimbursement.[91]

In fact, the Charlotte Lozier Institute and Alliance Defending Freedom have documented that—based on 51 known external audits or other reviews of Planned Parenthood affiliates' financial data and practices, and 61 federal audits of state family planning programs by HHS-OIG—Planned Parenthood affiliates have overbilled $132.4 million in Medicaid and other healthcare funding programs.[92] These audit results are troubling, given their limitations in scope,

---

[84] *See, e.g., id.; Federal Support for Reproductive Health Services: Frequently Asked Questions.*

[85] *Federal Support for Reproductive Health Services: Frequently Asked Questions.*

[86] State funding accounted for 12 percent of the total. Guttmacher Institute, *Publicly Funded Family Planning Services in the United States*, https://www.guttmacher.org/fact-sheet/publicly-funded-family-planning-services-united-states.

[87] *Publicly Funded Family Planning Services in the United States.*

[88] *Publicly Funded Family Planning Services in the United States.* In 2010, subsidized family planning services were provided at 8,409 "safety-net health centers"—38% were federally qualified health centers; 29% were health department clinics; 16% were other clinics; 10% were Planned Parenthood centers; and 8% were hospital clinics.

[89] Planned Parenthood is the largest abortion provider in the U.S., performing more than 300,000 abortions per year, or approximately 1 in 3. Americans United for Life, *The New Leviathan: The Mega-Center Report—How Planned Parenthood has Become Abortion, Inc*. 4 (2015), http://www.aul.org/wp-content/uploads/2015/06/AUL-Mega-Center-Report-06-24-2015.pdf (citing PPH Annual Reports for 2012, 2013, and 2014 at Planned Parenthood of the Heartland, Publications, http://www.plannedparenthood.org/planned-parenthood-heartland/who-we-are/publications).

[90] Planned Parenthood Federation of America, Annual Report, 2014-2015, at 32-33, https://www.plannedparenthood.org/files/2114/5089/0863/2014-2015_PPFA_Annual_Report_.pdf.

[91] Americans United for Life, *The Planned Parenthood Exhibits: The continuing case for investigating the nation's largest abortion provider* Exhibit 17 (2012).

[92] Charlotte Lozier Institute and Alliance Defending Freedom, *Profit. No Matter What.* (Nov. 1, 2016). In addition to "fragmenting" and "unbundling" abortion services in violation of the Hyde Amendment, Planned Parenthood affiliates were found by audit: "Dispensing prescription drugs, including oral contraceptives, without an authorizing order by a physician or other approved healthcare practitioner; Dispensing prescription drugs, including oral contraceptives, to patients who have moved or have not been seen by the clinic for more than a year; Billing in excess of actual acquisition cost or other statutorily approved cost for contraceptive barrier products, oral contraceptives, and emergency contraceptive-Plan B (i.e., § 340B drugs) products; Billing for services that were not medically necessary, including services for men and for women who were already pregnant, sterilized, or

detail, and timeframe; in fact, of 57 U.S. Planned Parenthood affiliates, only 19 have been audited.[93]

Under federal law, healthcare providers participating in Medicaid are required to return overpayments within sixty days of identification.[94] State Medicaid agencies are also required to return overpayments and have up to a year to make collections before they are penalized by the federal government.[95]

The United States Supreme Court has held that it is permissible for a state to engage in unequal subsidization of abortion and other medical services to encourage alternative activity deemed in the public interest.[96] However, courts and the executive branch have largely thwarted efforts to prevent abortion providers from subsidizing abortion and other services with taxpayer funding.

The Obama Administration has denied or threatened to deny federal Medicaid funding to states that have attempted to withhold Medicaid reimbursement from abortion providers. Further, the Seventh and Ninth Circuits have interpreted Medicaid's "free choice of provider"[97] provision—guaranteeing Medicaid recipients' freedom to choose their family planning providers—as a legal impediment to prohibiting abortion providers from receiving federal Medicaid funding.[98]

However, in *Planned Parenthood v. Indiana*, the Seventh Circuit *upheld* Indiana's prohibition on abortion providers receiving funding through the federal Disease Intervention Services agency ("DIS"), for the diagnosis and monitoring of sexually transmitted diseases. The Seventh Circuit explained that the key difference between the provision upheld and the provision struck down was that the DIS program did *not* have a federal statutory limitation (similar to Medicaid's "free choice of provider" provision) on how states could determine eligibility.[99]

---

postmenopausal; Billing for services that were not actually rendered; Duplicate billing for examinations and products, including billing products and services already billed as part of a service package, as fee for service; Incorrectly coding and billing services; Inadequate record-keeping, including lacking documentation to support the service billed and paid and not signing medical entries; and Failing to pay the bills for which an affiliate had already been reimbursed with taxpayer funds."

[93] *See id.*

[94] SSA Sec. 1128J(d).

[95] SSA Sec. 1903(d)(2).

[96] Further, the decision not to fund abortion places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy. *See Rust v. Sullivan*, 500 U.S. 173, 201 (1991). The Court has repeatedly affirmed the constitutionality of federal and state restrictions on public funding for abortions. *See*, *e.g.*, *Harris v. McRae*, 448 U.S. 297 (1980) (holding that the government may rationally distinguish between abortion and other medical procedures because "no other procedure involves the purposeful termination of a potential life").

[97] 42 U.S.C. § 1396a(a)(23)(B). A state may establish "reasonable standards relating to the qualifications of providers" and may exclude healthcare providers under certain circumstances: "[i]n addition to any other authority, a State may exclude an individual or entity . . . for any reason for which the Secretary [of HHS] could exclude the individual or entity from participation." 42 C.F.R. § 431.51(c)(2); 42 U.S.C. § 1396a(p)(1)).

[98] *Planned Parenthood v. Indiana*, 699 F.3d 962 (7th Cir. 2012) (invalidating an Indiana law); *Planned Parenthood v. Betlach*, 727 F.3d 960 (9th Cir. 2013) (invalidating an Arizona law).

[99] *Planned Parenthood v. Indiana*, 699 F.3d 962, 985 (7th Circ. 2012).

Legislative history demonstrates that states should have the power to exclude providers for *any reason/basis* under its state laws: "This provision is not intended to preclude a State from establishing, under State law, any other bases for excluding individuals or entities from its Medicaid program."[100] Also, the First Circuit held that the language of Medicaid's exclusion provision "was intended to permit a state to exclude an entity from its Medicaid program for *any* reason established by state law."[101]

     b) Title X

Title X is the only federal grant program dedicated solely to providing family planning and related preventive care and is viewed as setting the standard for publicly funded family planning services. Priority is given to low-income families. Title X provides that "none of the funds appropriated … shall be used in programs where abortion is a method of family planning."[102] Public and private entities may obtain grants.

Ten percent of U.S. public expenditures for family planning client services are through Title X.[103] This is a 71% drop since 1980. Title X funding is valued because it provides more flexibility than Medicaid. The grants are used to maintain a network of "family planning Centers." The Reagan administration's strict regulations on Title X funding, designed to ensure the funds were not being used to subsidize abortion, were upheld by the Supreme Court in *Rust v. Sullivan*;[104] however, they are not in effect today.

Since 2011, numerous states have enacted laws requiring subrecipients of Title X funds to provide comprehensive healthcare to patients and/or refrain from performing abortions. In response, the federal government is actively circumventing the Title X prioritization laws in at least eight states by directly contracting with private entities such as Planned Parenthood.

Further, on Sept. 9, 2016, HHS issued a proposed rule stating that "[n]o recipient making sub awards for the provision of services as part of its Title X project may prohibit an entity from participating for reasons unrelated to its ability to provide services effectively."[105] In the proposed rule background, HHS states that "13 states have placed restrictions on or eliminated sub awards with specific types of providers. . . ."[106]

---

[100] S. Rep. No. 100-109, at 20 (1987).

[101] *First Medical Health Plan v. Vega-Ramos*, 479 F.3d 46, 53 (1st Cir. 2007) (emphasis in original).

[102] 42 U.S.C. § 300a-6.

[103] *Publicly Funded Family Planning Services in the United States*. Other family planning funding: 75% - Medicaid; 12% - state-only sources; 3% - other federal sources.

[104] 500 U.S. 173 (1991).

[105] Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients, 81 Fed. Reg. 173 (proposed Sept. 7, 2016) (to be codified at 42 C.F.R. pt. 59).

[106] *Id.*

# III.  Panel Hearings

The Panel held two public hearings to examine critical issues within its jurisdiction. In the first hearing on *Bioethics and Fetal Tissue*, the Panel noted that there have been several government-sponsored discussions on bioethics, but none directly on the transfer of fetal tissue since the 1980s. The hearing revealed substantial concern about the consent process for the donation of human fetal tissue used by abortion clinics and procurement businesses. Evidence revealed that self-interested staff, whose pay depends on the numbers of specimens donated, were assigned to obtain consent from patients. Additional evidence showed that tissue technicians and the abortion clinics violated the patient's privacy rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Still other evidence revealed that some middleman companies misrepresented that the consent forms and methods of tissue harvesting comply with federal regulations regarding Institutional Review Boards (IRBs). This evidence points toward conduct focused on profit and not on patient welfare.

The Panel's next hearing, *The Pricing of Fetal Tissue*, sought the judgment of seasoned federal prosecutors to compare the federal statute prohibiting profit from fetal tissue sales with the first tranche of materials from the investigation. Two former U.S. attorneys and a senior federal litigator agreed that based on the materials presented to them, they would open a case against a middleman company. The former prosecutors also suggested that accounting and bank records would be critical to understanding whether there was a violation of federal law. Minority witnesses agreed with this approach and urged the Panel to obtain such records.

## A.  Bioethics and Fetal Tissue

On March 2, 2016, the Panel held a hearing entitled *Bioethics and Fetal Tissue*. The hearing focused on ethical issues raised as a result of information recently made public about fetal tissue donations, transfer of fetal tissue, and use of fetal tissue by research institutions. The witnesses helped the Panel understand the ethical questions, both on theoretical and practical levels, which arise when fetal tissue is acquired and used in biomedical research.

Bioethics has its origins as a field of academic inquiry in the early 1960s due to extraordinary advances and development in American medical knowledge and practice. Organ transplantation, kidney dialysis, respirators, and intensive care units made possible medical procedures never before imagined. The first heart transplant raised ethical questions relating to the sources of organs for transplantation, how they would be allocated, and payment for these procedures.

Public debates took place and, in response, scholars and academics began to think and write about these issues, and scholars began to fuse theoretical ethics with applied or practical ethics. Since that time, continuing biomedical advances have presented bioethical questions that need to be confronted and addressed by societies.

Today's headlines are full of announcements and predictions that a few short years ago were the subject of speculative fiction. Organ reconstitution, three-parent children, personalized medicine, organ cloning, chimeras, gene therapy and editing, and bioinformatics are all recent

subjects discussed by professionals and the public. The current director of the National Institutes of Health has proposed compiling DNA information to help inform medical decisions and therapies. While these therapies further knowledge of biomedical and scientific information related to medical treatments and therapies, they also present broader ethical questions.

Paige Comstock Cunningham, Executive Director for The Center for Bioethics & Human Dignity, told the Panel that "you cannot take a life and then give away the body. Participants in elective abortion, including the mother, are morally disqualified from consenting to donating the body, organs, or tissue of the now dead fetus for research purposes."[107]

Dr. Patrick Lee, a professor at the Center for Bioethics at Franciscan University of Steubenville, spoke of his concern that "governmental funding of abortion providers and the use of fetal tissue from elective abortions involve profound dehumanization of unborn human beings and are grave injustices."[108]

During the hearing, Majority and Minority Members and witnesses discussed current bioethical questions regarding the use of fetal tissue in scientific research. One concern raised by the Minority Members of the Panel and the Minority witnesses was that stopping the use of fetal tissue in scientific research, such as developing a cure for the Zika virus, would delay the finding of a cure. Rep. Jan Schakowsky (IL-9) asked Dr. Lawrence Goldstein, a minority witness, "Would not having fetal tissue as a resource in this study potentially delay finding a cure?" Dr. Goldstein replied, "It would absolutely delay it."[109]

However, later in the hearing in an exchange with Dr. Goldstein, Rep. Andy Harris (MD-1), who is also a physician, emphasized that sometimes delays occur in order to ensure that research, especially research conducted on human subjects, is done ethically and safely. Addressing Dr. Goldstein, Rep. Harris stated, "[Y]ou have suggested that anything that slows this process down is a bad thing. You kind of suggested that. . . . How long does it take your IRB to approve, normally? Mine took months. I know exactly why you are laughing. It can take months or even a year, can't it?"[110] Rep. Harris summarized their discussion by stating that the United States has already decided "that it is all right to slow down life-saving research when it involves humans for ethical reasons because we have a national policy that you have to have an IRB."[111] Furthermore, the idea that not having access to fetal tissue would delay the discovery of a cure is mere speculation, especially since fresh fetal tissue has not been successful in curing diseases. Dr. Goldstein conceded Rep. Harris' point.

Also during the hearing, Members of the Panel expressed their deep concern regarding the issue of consent and minors. Rep. Mia Love (UT-4) stated: "So imagine [a] 14-year-old going into a clinic to undergo a very invasive procedure without someone there that she trusts to walk her through, to make sure that she is not being taken advantage of, to make sure that she is making the right decision."[112] Rep. Love asked, "How can anyone be sure that a minor, under

---

[107] *Bioethics and Fetal Tissue,* at 24 (Mar. 2, 2016) (unedited transcript).
[108] *Id.* at 98.
[109] *Id.* at 120.
[110] *Id.* at 138.
[111] *Id.* at 139.
[112] *Id.* at 86-87.

difficult circumstances, fully understand[s] the long-term repercussions behind [her] decision when the current law wouldn't even allow that minor to get behind the wheel of a vehicle?"[113] Dr. Gerald Kevin Donovan, a witness at the hearing, agreed that this presented a troubling problem.[114]

Dr. Kathleen Schmainda, a Professor at the Medical College of Wisconsin, told the Panel that "the repeated assurances that proper ethical guidelines are in place to avoid the connection between abortion and subsequent research are entirely inadequate."[115]

Members and witnesses came to a bipartisan agreement on several points:

| | |
|---|---|
| Common Ground → | No one should profit from the sale of fetal tissue.[116] |
| | Inappropriate to get pregnant in order to donate fetal tissue for research.[117] |
| | A form used by an abortion clinic to obtain a woman's consent to donate fetal tissue contained inappropriate statements and should not have made it past an IRB.[118] |
| | No cures have been found that require fetal tissue.[119] |
| | Fetal tissue should not be used for cosmetics or taste testing.[120] |
| | It is a moral decision for a woman to decide whether to make the fetal tissue donation.[121] |

---

[113] *Id.*

[114] *Id.*

[115] *Bioethics and Fetal Tissue: Hearing Before the Select Investigative Panel, H. Comm. on Energy and Commerce*, 114th Cong. 105 (Mar. 2, 2016) (unedited transcript).

[116] *Id.* at 161.

[117] *Id.* at 37-38.

[118] *Id.* at 149.

[119] *Id.*

[120] *Id.* at 37, 89, 136-37, 163 (Ms. Alta Charo, a minority witness, stated, "Well, using any tissue, fetal or adult, I find the cosmetic uses in Hollywood sometimes to be so frivolous, I would be perfectly happy to see us abandon them.").

[121] *Id.* at 140.

Amazing scientific and biomedical advances are continuously being discovered and developed. Congress, research institutions, and the medical community must continue to work together to promote medical advancements while simultaneously ensuring that laws and regulations on ethics remain up to date. Whenever biomedical research is conducted on human subjects, the work must be ethical and preserve the dignity of the human beings who made these advancements possible.

## B.  The Pricing of Fetal Tissue

On April 20, 2016, the Panel held a hearing on *The Pricing of Fetal Tissue*. During the hearing, the Panel examined documents revealing that abortion clinics and Tissue Procurement Businesses (TPBs) may have violated federal law by the payments they collected from the sale of fetal tissue. At the core of the Panel's investigation is a federal statute, 42 U.S.C. § 289g-2, which prohibits the transfer of any human fetal tissue for valuable consideration. The statute states that reasonable costs include transportation, implantation, processing, preservation, quality control, and storage—none of which it appears the abortion clinics did. Documents also show that payments made by the customer to the procurement business appear to exceed the costs incurred on the procurement business by a factor of 300 to 400 percent.[122]

Witnesses at the hearing were presented with a sample of the accounting records from StemExpress and several abortion clinics. The witnesses for the hearing included three former prosecutors who all agreed that the documents made the case that 42 USC § 289g-2 may have been violated and that further investigation was warranted. All witnesses at the hearing agreed that the Panel should review all bank and accounting records in order to gain a complete understanding.

When asked by Rep. Joe Pitts (PA-16) what communications or information should be sought to learn whether the intent of the procurement business and the abortion clinic was to profit from the sale of fetal tissue, former U.S. Attorney Kenneth Sukhia said, "I would also want to know what communications occurred between – other communications, email and so forth, back and forth between those people. We would seek those items as well, and of course the accounting records."[123]

Brian Lennon told the Panel that "a competent and ethical federal prosecutor could establish probable cause that both the abortion clinics and the procurement businesses [that the Panel was investigating] violated the statute, aided and abetted one another in violating the statute, and likely conspired together to violate the statute." Lennon went on to say "in my opinion, there is proof without a reasonable doubt."[124] He told the Panel that "a forensic accounting would be essential to breaking down the company's financials."[125]

---

[122]  *See generally The Pricing of Fetal Tissue: Hearing Before the Select Investigative Panel, H. Comm. on Energy and Commerce*, 114th Cong. (Apr. 20, 2016) (unedited transcript).
[123] *Id.* at 147.
[124] *Id.* at 52-53.
[125] *Id.* at 56-57.

Fay Clayton, a lead Democrat witness, said she'd "have them [StemExpress] come in, put them under oath . . . and ask them how did you come up with this charge?"[126] Clayton said she would "ask them, in each particular case, what aspect of the actual costs does a particular clinic incur? For example, does the clinic provide space? Does the clinic, as we have seen in your charts, provide the blood draws which requires a technician, perhaps a nurse, materials? Does the clinic have to do paperwork? And, if so, how much? And, therefore, how much of the actual reasonable cost is incurred by the clinic itself as opposed to by the procurement business?"[127]

Former U.S. Attorney Michael Norton told the Panel that he "would get forensic accounting."[128] "I would get all of the financial records. I would get the profit and loss statements, the income and expense statements, and I would get people under oath before a grand jury,"[129] Norton said.

Catherine Glenn Foster told the Panel that there were two things she would specifically seek among other documents:

> First of all, financial records. That is something that must be brought to light. And, second, women of every generation are unique human beings who can speak for themselves, but the baby body parts profiteers have created a market in which their profits rise if they pressure and coerce women into signing donation consent forms.[130]

Based on the consensus reached by witnesses at the hearing, the Panel has worked to acquire and further investigate the details of accounting records, accounts payable, and cash transfers of abortion businesses, fetal tissue procurement organizations, and related entities to determine whether or not someone made a profit.

---

[126] *Id.* at 144.
[127] *Id.* at 145.
[128] *Id.* at 146.
[129] *Id.*
[130] *Id.*

# IV. Criminal and Regulatory Referrals

### 15 Criminal & Regulatory Referrals

The Select Investigative Panel has made numerous criminal and regulatory referrals and investigations are underway around the nation.

1) The Panel discovered that the University of New Mexico may have been violating its state's Anatomical Gift Act by receiving tissue from a late-term abortion clinic (Southwestern Women's Options). Referred to the Attorney General of New Mexico.

2 & 3) The Panel conducted a forensic accounting analysis of StemExpress' limited production and determined that it may have been profiting from the sale of baby body parts. Referral sent to El Dorado, California, District Attorney, and the U.S. Department of Justice.

4) The Panel learned that StemExpress and certain abortion clinics may have violated the HIPAA privacy rights of vulnerable women for the sole purpose of increasing the harvesting of fetal tissue to make money. Referred to the U.S. Department of Health and Human Services.

5) The Panel uncovered evidence showing that StemExpress may have violated federal regulations governing Institutional Review Boards (IRBs). Referred to the U.S. Department of Health and Human Services.

6) The Panel discovered that an abortion clinic in Arkansas may have violated the law when it sent tissue to StemExpress. Referred to the Attorney General of Arkansas.

7) The Panel discovered that DV Biologics, another tissue procurement company, may have been profiting from the sale of fetal tissue, and was not collecting California sales tax from purchasers of the baby body parts. The Orange County District Attorney has filed a lawsuit and the Panel sent a supplemental referral.

8) The Panel learned that Planned Parenthood Gulf Coast may have violated both Texas Law and U.S. Law when it sold fetal tissue to the University of Texas. Referred to the Texas Attorney General.

9) The Panel learned that Advanced Bioscience Resources appeared to have made a profit when it sold tissue to various universities. Referred to the District Attorney for Riverside County, California.

10) The Panel discovered that an abortion clinic in Florida, at least in part through its relationship with StemExpress, may have violated various provisions of federal and state law by profiting from the sale of fetal tissue. Referred to the Attorney General of Florida.

11 & 12) The Panel has uncovered evidence from former employees and a patient of a late-term abortionist in Texas alleging numerous violations of federal and state law at one or more of the

practitioner's clinics. The allegations include eyewitness accounts of the doctor killing infants who show signs of life both when partially outside the birth canal, in violation of the Partial-Birth Abortion Ban Act, and after they are completely outside the birth canal, in violation of the Born-Alive Infants Protection Act and Texas murder statutes. Referred to the Texas Attorney General, and the U.S. Department of Justice.

13) The Panel made a supplemental referral to the Attorney General of New Mexico based on information produced in document productions by the University of New Mexico (UNM) and Southwestern Women's Options (SWWO), deposition testimony by Doctor #5, and a complaint and affidavit with supporting documents submitted by a former patient at SWWO. It details the alleged failure of SWWO and UNM to provide informed consent to women prior to using tissue from abortions for research at the university.

14) The Panel has discovered information that StemExpress may have destroyed documents that were the subject of congressional inquiries, document request letters, and subpoenas, in violation of 18 U.S.C. § 1519. Referred to the U.S. Department of Justice.

15) Over the course of its investigation, the Panel has uncovered documents and received testimony from confidential informants indicating that several entities, including four Planned Parenthood clinics and Novogenix, may have violated federal law, specifically Title 42 U.S.C. § 289g-2, which forbids the transfer of fetal tissue for valuable consideration. Referred to the U.S. Department of Justice.

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

June 23, 2016

**<u>VIA EMAIL</u>**

The Honorable Hector H. Balderas, Jr.
Attorney General of New Mexico
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501

Dear Attorney General Balderas:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue. The Panel's work implicates 42 U.S.C. § 289g-2, which forbids the transfer of fetal tissue for valuable consideration.

Section 289g-2 requires that safeguards be in place, including a concern that too close a relationship might be formed between an abortion clinic and researchers. In the course of its inquiry, the Panel uncovered just such a relationship between the University of New Mexico ("UNM") and Southwestern Women's Options ("SWWO"), a clinic located one mile from UNM that provides abortions through all three trimesters of pregnancy. We understand that SWWO is the sole provider of fetal tissue to UNM.

Through its investigation, the Panel has discovered that personnel within UNM's hospital and medical school have aggressively engaged in expanding abortion in New Mexico through the offices, personnel, and resources of UNM. In particular, leadership personnel at UNM: (1) expanded UNM's role in training new abortion doctors; (2) expanded UNM's referral for abortion services to outside clinics, including the clinic from which it obtained fetal tissue; (3) initiated the practice of sending UNM faculty and residents to an abortion clinic during its transition from one owner to another; (4) expanded the faculty of UNM by providing "volunteer faculty" status to local abortionists; (5) supplied residents and fellows to perform abortions for SWWO during the period that UNM was obtaining fetal tissue from that clinic; and (6) leveraged their status to organize UNM

Page 1 of 2

employees and students for partisan political activities. UNM has stated that the fetal tissue transferred from SWWO is of great value to its research department.

Additionally, documentation obtained by the Panel in the course of its investigation reflects that the transfer of fetal tissue from SWWO to UNM for research purposes is a systematic violation of New Mexico's *Jonathan Spradling Revised Uniform Anatomical Gift Act* (*Spradling Act*). **These violations occurred as UNM personnel procured fetal tissue from patients at SWWO for research by UNM entities.**

A detailed report accompanying this letter describes the Panel's discovery that transfers of value to SWWO from UNM occurred within a context of aggressive abortion advocacy. We appreciate your swift attention to the serious and systematic violations of law committed by the University of New Mexico and Southwestern Women's Options. If you have any questions about this request, please contact Frank Scaturro, at (202) 225-2927, Frank.Scaturro@mail.house.gov, or Mary Harned, at (202) 480-7160, Mary.Harned@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chairman
Select Investigative Panel

Attachment(s)

cc:    The Honorable Jan Schakowsky, Ranking Member
       Select Investigative Panel

       The Honorable Susana Martinez
       Governor of New Mexico

       The Honorable John A. Sanchez
       Lieutenant Governor of New Mexico

       The Honorable Steve Pearce
       Second Congressional District, New Mexico

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 Rayburn House Office Building
Washington, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

November 2, 2016

**VIA EMAIL AND FIRST CLASS MAIL**

The Honorable Loretta Lynch
Attorney General
c/o Office of Legislative Affairs
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Dear Attorney General Lynch:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents and received testimony from confidential informants indicating that StemExpress, LLC ("StemExpress"), a firm that procures fetal tissue from abortion clinics and transfers it to research customers, violated various provisions of federal and state law, including but not limited to 42 U.S.C. § 289g-2 and Cal. Penal Code § 367f, which forbid the transfer of fetal tissue for valuable consideration.

**StemExpress' Business Model and Growth Strategy**

StemExpress was founded in 2010 as a for-profit company and continues operations as StemExpress Foundation. Under its business plan, StemExpress recruited and screened clinics that were most likely to perform abortions that could produce saleable tissue to researchers.[1] The company sought information about the number of abortions the clinics performed each week, the gestational age of fetuses scheduled to be aborted, the days the abortions were done, whether

---

[1] StemExpress Website Recruitment Form for Abortion Clinics, attachment 1.

1

digoxin[2] was used (which would taint the tissue and, thus, render the baby useless for obtaining tissue), and, if so, at what age it was used. Researchers ordered tissue using StemExpress' website. The firm initially had a drop-down menu that allowed researchers to obtain various types of tissue.[3] It later switched to another web-based system.

In order to harvest the tissue, StemExpress embedded tissue technicians inside the abortion clinics. Evidence uncovered by the Panel indicates females were recruited as tissue technicians to facilitate the consent process. The technicians' typical work day went as follows:

- At the beginning of the day, the tissue technician received an email from StemExpress including the day's orders for certain baby body parts and the gestation period, letting her know what she needed to harvest that day, and where she would be assigned.

- Once she arrived at the clinic, the tissue technician checked in with the Abortion Clinic Assistant Manager and informed the staff what she would procure that day.

- Then the technician reviewed the private medical files of the patients for that day to learn their names and the gestational ages of their babies. She recorded the gestations on the gestation tracking log provided by StemExpress.

- Next the technician met with the patients waiting to be prepped for their abortions, after receiving their names from clinic staff. Then she convinced them to consent to donate by saying that the donation will help cure diabetes, Parkinson's, and heart disease.[4]

- After an abortion, the technician collected the baby's remains and procured the body parts that were ordered, using her own supplies.[5] The technician then packed the tissues or body parts, and shipped them directly to the customer via a courier or FedEx.

- She received an hourly wage and a bonus for each tissue, illustrated in the attached pay rate and bonus chart.[6]

StemExpress' stunning revenue growth five years after its formation belies the notion that the firm was not operating for profit. In 2010, its revenue was $156,312; during 2011, that figure more than doubled to $380,000; a year later, in 2012, StemExpress' revenue nearly tripled to $910,000; by 2013, its revenue was $2.20 million; then in 2014, the revenue had once again more than doubled to $4.50 million. Based on its three-year revenue growth of 1,315.9%, *Inc. Magazine* named StemExpress one of the fastest-growing privately held companies in the U.S.[7]

---

[2] Digoxin is a heart medication that sometimes is injected into the amniotic fluid or fetus to cause fetal demise before surgical or induction abortion. *See* Abortion in California: A Medical-Legal Resource, *available at* http://californiaabortionlaw.com/wp/?page_id=135.

[3] StemExpress Drop-Down Ordering Menu, attachment 2.

[4] BioMed IRB Informed Consent to Participate in a Clinical Research Study, Sponsor: StemExpress, LLC, attachment 3.

[5] *See* Standard Operating Procedure, Jan. 24, 2011, at 1 ("The clinic staff will identify donors"), attachment 4.

[6] StemExpress Embedded Technician Pay Rates and Bonuses, attachment 5.

[7] *The 500: Get to know the 500 fastest-growing privately held companies in America*, INC., Sept. 2014, at 137.

2

This revenue growth accompanied an aggressive marketing strategy directed toward abortion clinics. StemExpress distributed its brochure at a conference hosted by the National Abortion Federation (NAF). The brochure promised clinics they would be "[f]inancially profitable" if they allowed StemExpress to procure tissue from the clinics. The brochure also said "By partnering with StemExpress" the clinics will not only help research "but [they] will also be contributing to the fiscal growth of [their] own clinic[s]."[8]

When StemExpress was formed, billing records show the firm was procuring fetal tissue from four clinics. By the end of 2014, the firm had "relationships with more than 30 procurement sites across the country."[9] However, many of those procurement sites had multiple clinics, making the actual number nearly 100. In 2015, StemExpress tried to execute a contract with NAF that would have given the firm potential access to nearly 200 additional clinics. Its overall strategy was to provide on-demand body parts to researchers. In order to do that, the firm needed a ready supply of fetal tissue. The only way to achieve that was to dramatically increase the number of abortion clinics from which it would obtain fetal tissue.

### StemExpress' Profit and Loss

Attached is a sample of a StemExpress invoice to a customer.[10] According to the accounting records obtained by the Panel, StemExpress paid approximately $55 for each fetal tissue sample or Product of Conception (POC) it obtained from abortion clinics and transferred it to researchers for up to $595 to $890 per tissue or body part. The following charts summarize payments StemExpress made to abortion providers to obtain fetal tissue and those it received from its customers for such tissue.

## Payments from StemExpress to Abortion Providers

| CLINIC | DATE | ITEM | COST |
|---|---|---|---|
| Camelback Family Planning | 2015 | [not specified] | $600 |
| Camelback Family Planning | 2015 | [not specified] | $600 |
| | | | **Total: $1,200** |
| Cedar River Clinic | 2015 | Amniotic | $100.00 |
| Cedar River Clinic | 2013 | Blood Samples | $960.00 |
| Cedar River Clinic | 2014 | Blood Samples | $2,600.00 |
| Cedar River Clinic | 2014 | Femur | $125.00 |
| Cedar River Clinic | 2015 | Femur | $75.00 |
| Cedar River Clinic | 2014 | Fetal Indications | $7,250.00 |
| Cedar River Clinic | 2015 | Fetal Indications | $4,250.00 |
| Cedar River Clinic | 2014 | Gift Cards | $10,650.00 |

---

[8] StemExpress Brochure Distributed at NAF Conference, attachment 6 (key text highlighted).
[9] Complaint at para. 17, StemExpress, LLC v. Center for Medical Progress, No. BC-589145 (L.A. Super. Ct. filed Jul. 27, 2015).
[10] Sample StemExpress Invoice to Customer, attachment 7.

3

| | | | |
|---|---|---|---|
| Cedar River Clinic | 2015 | Gift Cards | $10,250.00 |
| Cedar River Clinic | 2015 | Hotel | $92.00 |
| Cedar River Clinic | 2014 | Kit | $625.00 |
| Cedar River Clinic | 2015 | Liver | $125.00 |
| Cedar River Clinic | 2014 | Maternal Blood | $1,400.00 |
| Cedar River Clinic | 2014 | Maternal Blood | $350.00 |
| Cedar River Clinic | 2014 | Maternal Blood | $28,675.00 |
| Cedar River Clinic | 2015 | Maternal Blood | $8,700.00 |
| Cedar River Clinic | 2014 | Maternal Blood | $650.00 |
| Cedar River Clinic | 2015 | Maternal Blood | $100.00 |
| Cedar River Clinic | 2014 | Maternal Blood/Tissue Kit | $35,550.00 |
| Cedar River Clinic | 2015 | Maternal Blood/Tissue Kit | $39,225.00 |
| Cedar River Clinic | 2015 | Maternal Bood | $250.00 |
| Cedar River Clinic | 2015 | Peripheral Blood | $6,350.00 |
| Cedar River Clinic | 2015 | Rental Car | $167.98 |
| Cedar River Clinic | 2015 | Thymus | $75.00 |
| Cedar River Clinic | 2014 | Tissue | $225.00 |
| Cedar River Clinic | 2014 | Tissue | $75.00 |
| Cedar River Clinic | 2015 | Tissue Brain | $75.00 |
| Cedar River Clinic | 2015 | Tissue Liver | $250.00 |
| Cedar River Clinic | 2014 | Tissue Only | $500.00 |
| Cedar River Clinic | 2015 | Tissue Only | $75.00 |
| Cedar River Clinic | 2015 | Tissue Pancreas | $75.00 |
| Cedar River Clinic | 2015 | Triscomy credit | $200.00 |
| Cedar River Clinic | 2014 | Whole Blood | $12,850.00 |
| Cedar River Clinic | 2015 | Whole Blood | $8,400.00 |
| | | | **Total: $181,319.98** |
| Family Planning Specialist | 2011 | Blood Draws | $1,090.00 |
| Family Planning Specialist | 2012 | Blood Draws | $5,325.00 |
| Family Planning Specialist | 2011 | Specimen | $440.00 |
| Family Planning Specialist | 2012 | Specimen | $6600 |
| | | | **Total: $13,455.00** |
| Mar Monte | 2010 | Blood | $1,700 |
| Mar Monte | 2011 | Blood | $33,153 |
| Mar Monte | 2012 | Blood | $31,380 |
| Mar Monte | 2013 | Blood | $16,080 |
| Mar Monte | 2014 | Blood | $14,640 |
| Mar Monte | 2015 | Blood | $3,190 |
| Mar Monte | 2010 | POC | $1,210 |
| Mar Monte | 2011 | POC | $15,235 |

4

| | | | |
|---|---|---|---|
| Mar Monte | 2012 | POC | $43,245 |
| Mar Monte | 2013 | POC | $24,140 |
| Mar Monte | 2014 | POC | $25,990 |
| Mar Monte | 2015 | POC | $13,355 |
| | | | **Total: $223,318.00** |
| Presidential Women's Center | 2014 | Blood | $6,450.00 |
| Presidential Women's Center | 2015 | Blood | $4,455.00 |
| Presidential Women's Center | 2014 | Tissue Liver | $1,425.00 |
| Presidential Women's Center | 2015 | Tissue Liver | $675.00 |
| Presidential Women's Center | 2015 | Tissue Villi | $75.00 |
| Presidential Women's Center | 2015 | Tissue Villi | $150.00 |
| Presidential Women's Center | 2015 | Tissue Villi | $525.00 |
| Presidential Women's Center | 2014 | Tissue Villi | $75.00 |
| Presidential Women's Center | 2015 | Tissue Villi | $1,800 |
| Presidential Women's Center | 2015 | Tissue Villi Twin a | $75.00 |
| Presidential Women's Center | 2015 | Tissue Villi Twin b | $75.00 |
| | | | **Total: $15,780.00** |
| Shasta Pacific | 2012 | Blood | $650.0 |
| Shasta Pacific | 2013 | Blood | $4,470.00 |
| Shasta Pacific | 2014 | Blood | $2,530.00 |
| Shasta Pacific | 2015 | Blood | $100.00 |
| Shasta Pacific | 2012 | POC | $1,870.00 |
| Shasta Pacific | 2013 | POC | $3,960.00 |
| Shasta Pacific | 2014 | POC | $6,160.00 |
| Shasta Pacific | 2015 | POC | $715.00 |
| | | | **Total: $20,455.00** |
| | | | **GRAND TOTAL: $455,527.98** |

5