## Payments from Customers to StemExpress for Fetal Tissue

| CUSTOMER | YEAR | TOTAL PAYMENTS |
|---|---|---|
| All Cells | 2011 | $4,040 |
| Columbia University | 2011 | $540 |
| Colorado State University | 2011 | $2,700 |
| Dartmouth | 2011 | $3,240 |
| Drexel University | 2011 | $3,510 |
| Johns Hopkins | 2011 | $1,950 |
| Ohio State University | 2011 | $235 |
| Stanford University | 2011 | $28,650 |
| University of California – Los Angeles | 2011 | $3,920 |
| University of Connecticut | 2011 | $930 |
| University of Massachusetts Medical School | 2011 | $43,115 |
| Vanderbilt University Medical Center | 2011 | $2,700 |
| Yale College of Medicine | 2011 | $390 |
| Zyagen | 2011 | $3,910 |
| | | |
| All Cells | 2012 | $5,680 |
| Baylor College of Medicine | 2012 | $2,500 |
| Columbia University | 2012 | $2,925 |
| Colorado State University | 2012 | $1,220 |
| Dartmouth | 2012 | $4,160 |
| George Washington University | 2012 | $435 |
| Johns Hopkins | 2012 | $1,680 |
| Massachusetts General Hospital | 2012 | $3,000 |
| Stanford University | 2012 | $32,385 |
| University of California – Los Angeles | 2012 | $9,370 |
| University of Connecticut | 2012 | $1,110 |
| University of Massachusetts Medical School | 2012 | $32,290 |
| Vanderbilt University Medical Center | 2012 | $7,460 |
| Yale College of Medicine | 2012 | $6,825 |
| University of North Carolina | 2012 | $720 |
| University of Illinois at Chicago | 2012 | $250 |
| | | |
| All Cells | 2013 | $3,920 |
| Baylor College of Medicine | 2013 | $1,000 |
| City of Hope | 2013 | $350 |
| Columbia University | 2013 | $750 |
| Colorado State University | 2013 | $2,250 |
| Dartmouth | 2013 | $500 |
| Ganogen, Inc. | 2013 | $6,825 |
| Harvard | 2013 | $6,680 |
| Massachusetts General Hospital | 2013 | $7,125 |
| Rockefeller University | 2013 | $250 |

| Stanford University | 2013 | $16,065 |
| Thomas Jefferson University | 2013 | $500 |
| University of California – Los Angeles | 2013 | $9,000 |
| University of Connecticut | 2013 | $500 |
| University of Illinois at Chicago | 2013 | $16,750 |
| University of North Carolina | 2013 | $1,750 |
| University of Pennsylvania | 2013 | $2,750 |
| Vanderbilt University Medical Center | 2013 | $3,000 |
|  |  |  |
| City of Hope | 2014 | $595 |
| Ganogen, Inc. | 2014 | $795 |
| Medical College of Wisconsin | 2014 | $2,380 |
| Stanford University | 2014 | $42,535 |
| University of Massachusetts Medical School | 2014 | $2,380 |
| Vanderbilt University Medical Center | 2014 | $595 |
|  |  |  |
| Children's Hospital of Philadelphia | 2015 | $1,190 |
| City of Hope | 2015 | $595 |
| Neurona Therapeutics | 2015 | $1,190 |
| Stanford University | 2015 | $20,670 |
| University of Massachusetts Medical School | 2015 | $595 |
| Zyagen, Inc. | 2015 | $3,578 |

A more detailed breakdown of these tissue payments is attached hereto.[11]

Attorneys for StemExpress created several cost estimates that purport to show that StemExpress loses money each time it procures a fetal tissue sample and ships it to a customer, but the Panel's staff conducted an analysis of those estimates. A comparison of invoices, attorney-created accounting documents purporting to state costs, and productions from multiple StemExpress customers shows that the firm likely made a profit when procuring and transferring fetal tissue. Attached hereto[12] is a component of the Panel's analysis, which shows StemExpress overstated some of its labor costs and claimed as expenses shipping, supplies, and infectious disease screenings. These were costs charged to researchers.

**Violation of Applicable Laws**

Under 42 U.S.C. § 289g-2, it is unlawful for any person to "knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce."[13] The term "'valuable consideration' does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue."[14] Anyone who violates this law is subject to a fine "not less than

---

[11] List of StemExpress Fetal Tissue Sales by Customer, 2011-2015, attachment 8.
[12] Select Panel Analysis of StemExpress Statement of Costs, attachment 9.
[13] 42 U.S.C. § 289g-2(a).
[14] 42 U.S.C. § 289g-2(e)(3).

twice the amount of the valuable consideration received" and/or imprisonment for up to ten years.[15]

California state law includes a nearly identical prohibition. Under Cal. Health & Safety Code § 125320(a), a "person may not knowingly, for valuable consideration, purchase or sell embryonic or cadaveric fetal tissue for research purposes." The California statute's definition of "valuable consideration" is virtually identical to that of the federal statute.[16] Similar provisions in the California Penal Code § 367f(a) prohibit the acquisition, sale, or transfer of "any human organ, for purposes of transplantation, for valuable consideration," subject to a fine of up to $50,000 and imprisonment for up to five years.[17]

The foregoing analysis establishes with a high level of probability that StemExpress and the clinics and research institutions with which it contracted routinely violated 42 U.S.C. § 289g-2 and Cal. Health & Safety Code § 125320(a). This is established generally by the company's aggressive growth strategy, which explicitly included the goal of generating profit, and specifically by the transactions involving the transfer of fetal tissue to and from numerous entities for consideration that exceeded statutorily allowable costs. To the extent any of these transactions occurred for purposes of transplantation, StemExpress and any business partners so involved would additionally be in violation of California Penal Code § 367f(a).

The Panel's investigation additionally revealed indicates that StemExpress and Planned Parenthood Mar Monte (PPMM), Planned Parenthood Shasta Pacific (PPSP), and Family Planning Specialists Medical Group (FPS) committed systematic violations of the HIPAA Privacy Rule from about 2010 to 2015. During that time, the aforementioned clinics, which are "covered entities" under HIPAA, permitted employees of StemExpress, a noncovered entity, to enter their clinics and procure human fetal tissue from aborted infants, obtain PHI about their patients, interact with patients, and seek and obtain patient consent for tissue donation. StemExpress did not have a medically valid reason to see, and the abortion clinics did not have a reason to provide, patients' PHI. Instead, the clinics shared patients' PHI with StemExpress in furtherance of contractual agreements that financially benefited both sides of the respective contracts. StemExpress employees were routinely handed a patient's medical chart by her healthcare provider, in blatant violation of the HIPAA privacy rule.

These clinics and StemExpress violated the HIPAA privacy rule because: (a) the disclosures of patients' PHI made by the abortion clinics and received by StemExpress were neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research; (b) the consents for fetal tissue donation ostensibly obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI; (c) the disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants; and (d) StemExpress is not a business associate of the abortion clinics under HIPAA.

---

[15] 42 U.S.C. § 289g-2(d).
[16] Such consideration "does not include reasonable payment for the removal, processing, disposal, preservation, quality control, storage, transplantation, or implantation of a part." Cal. Health & Safety Code § 125320(b).
[17] Cal. Penal Code §§ 367f(a), (g).

8

The abortion clinics could have directly consented their patients for tissue donation and entered an agreement with StemExpress to provide a limited data set regarding the patients they were seeing on a particular day.[18] Instead, they violated the Privacy Rule by permitting StemExpress to view the most intimate information about their patients. These disclosures made by the abortion clinics to StemExpress were intentional and purposeful.[19] The Panel made a referral of each of these entities to the Department of Health and Human Services, and requested a swift and full investigation by the HHS Office of Civil Rights. A copy of this referral detailing the foregoing facts is attached hereto.[20]

Also relevant are the federal regulations governing consent prior to the acquisition of fetal tissue. Under 45 C.F.R. § 46, the Department of Health and Human Services requires investigators to obtain informed consent from each human being used as a research subject.[21] The rule lists several criteria for Institutional Review Board ("IRB") approval, including the requirement that researchers obtain the informed consent from their research subjects. As was demonstrated in the Panel's referral to the Secretary of Health and Human Services, attached hereto,[22] StemExpress' procurement of fetal tissue from abortion clinics and transfer thereof to research customers violated 45 C.F.R. § 46: The company devised the appearance of compliance with the regulations while fraudulently using invalid consent forms and misleading customers to believe it had a valid IRB approval.

Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether StemExpress violated these statutes and regulations, and, if you agree that such violations occurred, to take all appropriate action. If you have any questions about this request, please contact Frank Scaturro, at (202) 225-2927, Frank.Scaturro@mail.house.gov, or Mary Harned, at (202) 480-7160, Mary.Harned@mail.house.gov.

Sincerely yours,

*Marsha Blackburn*

Marsha Blackburn
Chair
Select Investigative Panel

Attachment(s)

---

[18] *See* 45 C.F.R. § 164.514(e).
[19] *See* 45 C.F.R. § 164.502(a)(1)(iii).
[20] Letter from Rep. Marsha Blackburn, Chair, Select Investigative Panel, to Jocelyn Samuels, Director, Centralized Case Management Operations, Department of Health and Human Services, June 1, 2016, attachment 10.
[21] 45 C.F.R. § 46.116.
[22] Letter from Rep. Marsha Blackburn, Chair, Select Investigative Panel, to Jerry Menikoff, Director, Office for Human Research Protections, Department of Health and Human Services, June 1, 2016, attachment 11.

cc:      The Honorable Jan Schakowsky
           Ranking Member
           Select Investigative Panel

           The Honorable Vern Pierson
           El Dorado County District Attorney

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

**<u>VIA EMAIL</u>**

June 1, 2016

Ms. Jocelyn Samuels, Director
Centralized Case Management Operations
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Room 509F HHS Bldg.
Washington, D.C. 20201

Dear Director Samuels:

On October 7, 2015, the U. S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the business practices of businesses who procure and resell fetal tissue.

The Panel's investigation uncovered a series of business contracts between StemExpress,[1] a tissue procurement business ("TPB"), and several abortion clinics. These contracts included provisions for the payment of fees by StemExpress to the abortion clinics for fetal tissue and maternal blood. StemExpress then resold the fetal tissue and blood to researchers.

These contracts produced a regime of cooperation between StemExpress and each clinic. In particular: (1) the day before scheduled abortions, StemExpress received a fax from a clinic with information about the abortions scheduled for the next day; (2) StemExpress employees were granted access to the medical files of individual patients; (3) The clinic's medical employees (doctors and nurses) directed the StemExpress employees to particular patients who were "good candidates" for fetal tissue donations; (4) the StemExpress employees had access to the "patient terminal" inside the abortion clinic; and (5) the StemExpress employees were permitted by the abortion clinic to interview the patients about personal information, including their dates of birth.

---

[1] StemExpress and Stem-Ex are the same company.

In particular, the Panel's investigation has uncovered information indicating that StemExpress and Planned Parenthood Mar Monte ("PPMM"), Planned Parenthood Shasta Pacific ("PPSP") and Family Planning Specialists Medical Group ("FPS") (hereinafter "the abortion clinics") committed systematic violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") privacy rule from about 2010 to 2015. **These violations occurred when the abortion clinics disclosed patients'** *individually identifiable health information* **to StemExpress to facilitate the TPB'S efforts to procure human fetal tissue for resale.** This complaint is against each of these entities, and we request a swift and full investigation by the Office of Civil Rights in the Department of Health and Human Services.

In addition to this letter, we are submitting a referral to the HHS Office for Human Research Protections indicating that StemExpress violated 45 CFR 46 by using invalid consent forms and failing to have valid Institutional Review Board ("IRB") approval.[2]

## I. BACKGROUND

The abortion clinics are "covered entities" under HIPAA, while StemExpress is not.[3] StemExpress "procure[s] tissues and isolate[s] cells for researchers' individual needs in its own labs."[4]

From about 2010 to 2015, the abortion clinics permitted StemExpress employees to: enter their clinics and procure human fetal tissue from aborted infants; obtain *individually identifiable health information*, or *protected health information* ("PHI") about their patients; interact with patients; and seek and obtain patient consent for tissue donation.[5] StemExpress embedded tissue procurement technicians inside the abortion clinics whose **work sequence** followed a daily routine:

1. A researcher / customer placed an order for human fetal tissue using an online business portal provided by StemExpress. The web portal allowed the customer to request a particular gestational range for the fetal tissue.[6]

2. The abortion clinics from which StemExpress procured fetal tissue faxed the next day's schedule of potential patients directly to the StemExpress tissue procurement technician assigned to the clinic.[7]

---

[2] *See* Attachment A.
[3] *See* 45 CFR Part 160.103 (Covered Entity means: (1) A health plan. (2) A health care clearinghouse. (3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.) *See also* OCR Privacy Brief, Summary of the HIPAA Privacy Rule, *available at* http://www.hhs.gov/sites/default/files/privacysummary.pdf (last visited May 5, 2016) (used as reference throughout this complaint).
[4] Stemexpress, About Us, *available at* http://stemexpress.com/about/ (last visited Apr. 29, 2016).
[5] *See* Attachment B: Clinic Procedures & Policies.
[6] *See* Attachment C: Researcher Procurement Record.
[7] *See* Attachment D: Fax from The Alameda, San Jose [Planned Parenthood clinics] to StemExpress, Jan. 10, 2013.

3. The day the abortion procedures were scheduled, StemExpress posted the order on a website "task board" (order page) to be accessed by their procurement technician or communicated the order to the tissue technician via email.[8]

4. The StemExpress procurement technician informed the clinic what they wished to procure (*i.e.*, the type of tissue and gestational range) based on the order page, and the abortion clinic provided the medical files, including PHI, for the patients with abortions scheduled for that day.[9]

5. The StemExpress procurement technician then sought out particular patients by name and obtained their consent to donate fetal tissue while they were awaiting their procedures. The procurement technician was also permitted to interview patients and obtain their PHI.[10]

6. StemExpress procurement technicians were paid an hourly wage and a per tissue "bonus" for each item they procured from the order page.[11]

7. StemExpress paid the abortion clinic for each fetal tissue and each blood sample and then marked up the tissue four to six hundred percent for sale to the researcher.[12]

The work sequence, when combined with supporting documentation, reveals that StemExpress did not have a medically valid reason to see, and the abortion clinics did not have a reason to provide, patients' PHI. Instead, the abortion clinics shared patients' PHI with StemExpress in furtherance of contractual agreements that financially benefitted StemExpress and the clinics.[13]

## II.   THE HIPAA PRIVACY RULE

The HIPAA privacy rule ("Privacy Rule") protects all *individually identifiable health information* held or transmitted by a covered entity or its business associate, and calls this information *protected health information* ("PHI").[14] PHI identifies an individual, or can reasonably be believed to be useful in identifying an individual (*e.g.*, name, address, birth date, Social Security Number), and includes demographic data relating to: an individual's past, present, or future physical or mental health condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual.[15]

---

[8] *See* Attachment E: Updated Task Assignment: Procurement Schedule Wednesday, 3/20/13 and Attachment F: Navigating The Task Board.
[9] *See* Attachment G: StemExpress Emails.
[10] *See* Attachment B, *supra*: Clinic Procedures and Policies and Attachment H: Consenting Patients.
[11] *See* Attachment I: Procurement Technician Compensation Policy for Tissue and Blood Procurement.
[12] See Attachment J: StemExpress Services Agreement with Planned Parenthood Shasta Pacific; StemExpress Services Agreement with Planned Parenthood of Santa Barbara, Ventura & San Luis Obispo Counties; Purchase Order No. 60856806; Purchase Order No. 3000014694; Purchase Order No. 60836838; Purchase Order No. 60858758; and StemExpress Invoice # 1439.
[13] *See* Attachment K: Standard Operating Procedure.
[14] 45 C.F.R. § 160.103.
[15] 45 C.F.R. § 160.103.

A covered entity may not use or disclose an individual's PHI except as the Privacy Rule permits or requires,[16] or as the individual or their representative authorizes in writing (see discussion below). HHS may impose civil money penalties on covered entities that fail to comply with the Privacy Rule. Further, both a covered entity that discloses, and any person who knowingly obtains, PHI in violation of the Privacy Rule can face criminal fines or imprisonment.[17]

### III.  THE CONTRACTS BETWEEN STEMEXPRESS AND THE ABORTION CLINICS

Particular language, contained within the four corners of the written contracts between StemExpress and the abortion clinics raises serious concerns that the parties violated the Privacy Rule.

The written contracts between StemExpress and the abortion clinics contain the following language:

> [a]ny information obtained from [the abortion clinics] patients' charts shall be privileged, and [Stem-Ex / StemExpress] will treat the information in order to preserve the confidentiality of the patients. [Stem-Ex / StemExpress] will not receive any information concerning identity of donors **except as necessary to obtain patients' consent** for use of POCs and maternal bloods (emphasis added).[18]

This admission, on the face of the contracts, that the abortion clinics granted StemExpress access to patients' PHI raises the question whether any HIPAA provision permits or requires such disclosure without patients' express authorization. This question is compounded by the contracts' admission that StemExpress reviewed PHI **prior to obtaining patients' consent to donate fetal tissue *or* patients' authorization to view their PHI.**

### IV.  VIOLATIONS OF THE HIPAA PRIVACY RULE BY STEMEXPRESS AND THE ABORTION CLINICS

This complaint argues that the agreements between StemExpress and the abortion clinics, on their face and in practice, are fundamentally flawed. A contractual agreement requiring StemExpress to "treat the information obtained from patients' charts in order to preserve the confidentiality of the patients" **cannot trump a law prohibiting the abortion clinics from permitting these disclosures in the first place.** As discussed below, the abortion clinics—covered entities under HIPAA—were not permitted to disclose or make available to StemExpress any patient's PHI without the patient's express authorization.

The abortion clinics and StemExpress violated the HIPAA privacy rule because: (A) The disclosures of patients' PHI made by the abortion clinics, and received by StemExpress, were

---

[16] 45 C.F.R. §164.502(a).
[17] Pub. L. 104-191; 42 U.S.C. §§ 1320d-5 – 1320d-6.
[18] *See* Attachments L, M, and N.

neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research; (B) The consents for fetal tissue donation ostensibly obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI; (C) The disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants; and (D) StemExpress is not a *Business Associate* of the abortion clinics under HIPAA.

### A. The disclosures of patients' PHI made by the abortion clinics, and received by StemExpress, were neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research.

The disclosures of PHI that the abortion clinics made to StemExpress are neither required[19] nor permitted[20] by law. StemExpress was not involved in the treatment of patients, in the payment for treatment, or in clinic operations.[21] **Rather, StemExpress wanted patients' PHI to facilitate the procurement of human tissue from aborted infants for resale to researchers.**

1. Cadaveric organ, eye or tissue transplantation

Importantly, the disclosures to StemExpress do not fall under the provision in law permitting disclosure of PHI to aid organ transplantation. While the contracts reference the "National Organ Transplant Act," 42 U.S.C. 274e(c)(1), the abortion clinics were not facilitating the donation and *transplantation* of cadaveric organs, eyes, and tissue. **Instead, the clinics were facilitating the donation of human fetal tissue from aborted infants for *research*, which is not covered by the cadaveric organ, eye or tissue exception.**[22]

2. Research

Further, the disclosures to StemExpress do not meet the rigorous requirements applicable to PHI disclosures for research purposes. A covered entity is not permitted to disclose an individual's PHI for research purposes without the individual's authorization unless the covered entity (1) obtains verification of approval from an Institutional Review Board ("IRB") for disclosure without authorization; (2) the researcher represents that the use or disclosure of the PHI is solely to prepare research protocol and the PHI will not be removed from the covered entity, and that the PHI is necessary for the research; or (3) the research is on PHI of deceased individuals.[23]

3. Violations Preceding "Consent"

---

[19] 45 C.F.R. § 164.502(a)(2) (The only "required" disclosures are to (1) an individual or their personal representative when they request access to, or an accounting of disclosures of, their protected health information; and (2) to HHS when it is undertaking compliance investigation or review or enforcement action).
[20] *See* 45 C.F.R. § 164.502(a)(1).
[21] *See* 45 C.F.R. § 164.506(c).
[22] *See* 45 C.F.R. § 164.512(h).
[23] 45 C.F.R. § 164.512(i).

Because StemExpress employees actually sought consent for tissue donation from patients, the abortion clinics permitted the employees to view patients' charts. Medical charts are filled with HIPAA-protected PHI, including names, addresses, past and present medical treatment, and more. **Each time that an abortion clinic employee shared a medical chart with a StemExpress employee, both violated the HIPAA privacy rule.**

No evidence suggests the abortion clinics' patients provided authorization for StemExpress staff to view their PHI *prior* to seeking their consent to donate tissue. Therefore, regardless of whether a patient *ultimately* consented to tissue donation and authorized disclosure of her PHI to StemExpress, her privacy was violated.

The abortion clinics could have directly consented their patients for tissue donation, and entered an agreement with StemExpress to provide a limited data set[24] regarding the patients they were seeing on a particular day. Instead, they violated the Privacy Rule by permitting StemExpress to view the most intimate information about their patients.

These disclosures made by the abortion clinics to StemExpress were inarguably direct and intentional—not incidental.[25] StemExpress employees did not merely overhear a patient's name while in the clinic—they were handed her medical chart by her healthcare provider in blatant violation of the HIPAA privacy rule.

### B. The consent for fetal tissue donation obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI.

While StemExpress purportedly obtained consents from patients prior to procuring human fetal tissue from their aborted infants, the forms that they used were insufficient to authorize the disclosure of PHI under the HIPAA privacy rule.

The Privacy Rule requires a covered entity to obtain an individual's written authorization for any use or disclosure of PHI that is not permitted or required by law.[26] Such authorization must be in plain language and contain specific information regarding the information to be disclosed or used, the person(s) disclosing and receiving the information, expiration, right to revoke in writing, and other data.[27]

Neither the consent form provided by StemExpress ("SE form") nor the consent form provided by Planned Parenthood ("PP form") to obtain patient consent for the donation of human fetal tissue of aborted infants met these stringent requirements.[28] The statement in the SE form that a patient's "health information will be protected at all times" is ironic given that StemExpress's possession of the patient's PHI already placed the abortion clinics and StemExpress in violation of the HIPAA privacy rule.

---

[24] *See* 45 C.F.R. § 164.514(e).
[25] *See* 45 C.F.R. §§ 164.502(a)(1)(iii).
[26] 45 C.F.R. § 164.508.
[27] 45 C.F.R. § 164.508(c).
[28] *See* Attachments O: StemExpress Consent Form and P: Planned Parenthood Consent Form.

The SE form also stated that "[i]n accordance with federal laws (HIPAA), your personal identifying information will be protected . . . health information . . . may be used or disclosed . . . [but] will NOT be connected to your name or any other personal identifier."[29]

Like the privacy provision in the contracts between Stem Express and the abortion clinics, this nod towards HIPAA requirements failed to meet the requirements of the HIPAA privacy rule. The SE form did not describe the specific patient information that will be disclosed or used, but rather provided a generic, nonexclusive list of information that *may* be disclosed. The SE form did not state who will disclose or use the patient's PHI. It also did not state when the patient's authorization will expire, or that the patient can withdraw her authorization for the use of her PHI (it mentioned that the patient cannot withdraw her consent to the tissue donation after she leaves the clinic).

The PP form, purportedly used to obtain patient consent for human fetal tissue donation at PPMM and PPSP,[30] was grossly insufficient. The form did not address privacy at all, with no information regarding: PHI that may be disclosed or used; the person(s) disclosing and receiving the PHI; any expiration on the availability of the patient's PHI to researchers or others; or the patient's right to revoke her authorization in writing.

### C. The disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants.

The abortion clinics and StemExpress violated a central aspect of the Privacy Rule by disclosing/obtaining more than the "minimum necessary" PHI to facilitate the procurement of human fetal tissue from aborted infants.[31] StemExpress employees did not need to know the names of patients, and they certainly did not need to directly obtain the patients' consent in order to procure fetal tissue. Instead, these deeply private activities could have been performed by the abortion clinics.

As addressed above, the abortion clinics could have established a relationship with StemExpress that did not require or result in the disclosure of any PHI. Instead, the Planned Parenthood affiliates permitted StemExpress to use PHI to directly encourage patients to donate human fetal tissue—tissue that would later be sold by StemExpress to researchers at a huge mark-up.

### D. StemExpress is not a *Business Associate* of the abortion clinics under HIPAA.

A *Business Associate* under HIPAA is a person or organization, other than a member of a covered entity's workforce, that performs certain functions or activities on behalf of, or provides certain services to, a covered entity that involve the use or disclosure of individually identifiable health information. *Business Associates* are generally involved in claim processing, data analysis, utilization review, and billing. Their services are limited to legal, actuarial, accounting,

---

[29] Attachment O, *supra*.
[30] Attachment P, *supra*.
[31] 45 C.F.R. §§ 164.502(b) and 164.514(d).

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON ENERGY AND COMMERCE
2125 Rayburn House Office Building
Washington, DC 20515–6115
Majority (202) 225–2927
Minority (202) 225–3641

**VIA EMAIL**

June 1, 2016

Mr. Jerry Menikoff
Director, Office for Human Research Protections
Department of Health and Human Services
Office for Human Research Protections
1101 Wootton Parkway, Suite 200
Rockville, MD 20852

Dear Director Menikoff:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel and empowered the panel to conduct a full and complete investigation regarding the medical practice of abortion providers and the business practices of firms that procure and resell fetal tissue.

During the course of our investigation, we have uncovered documents and received testimony from confidential informants indicating that StemExpress, LLC ("StemExpress"), a for-profit firm which procures fetal tissue from abortion clinics and transfers it to research customers, violated 45 CFR 46 by using the appearance of compliance with the regulations, while fraudulently using invalid consent forms, and misleading customers to believe it had a valid Institutional Review Board ("IRB") approval.

In addition to this letter, I have included as Attachment A another referral to the U.S. Department of Health and Human Services, Centralized Case Management Operations.

consulting, data aggregation, management, administrative, accreditation, or financial services, where the provision of the services involves the disclosure of PHI.[32]

Clearly, StemExpress did not perform one of these services for the abortion clinics, and is therefore not a *Business Associate* permitted to obtain the PHI of the abortion clinics' patients.

## CONCLUSION

We appreciate your swift attention to the serious and systematic violations of the HIPAA privacy rule committed by StemExpress, Planned Parenthood Mar Monte, Planned Parenthood Shasta Pacific, and Family Planning Specialists Medical Group. If you have any questions about this request, please contact Mary Harned, Investigative Counsel at (202) 480-7160, or by email at Mary.Harned@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chair
Select Investigative Panel

Attachment(s)

cc:    The Honorable Jan Schakowsky, Ranking Member
       Select Panel on Infant Lives

---

[32] 45 C.F.R. § 160.103.

## Background

StemExpress was founded in 2010 as a for-profit company and continues operations as StemExpress Foundation. Through its corporate existence, StemExpress' activities were obtaining contractual relationships with abortions clinics for the purpose of embedding a StemExpress company employee inside the clinic. The employees had access to confidential patient medical records, which they used to obtain consent and procure fetal tissue. StemExpress then resold that tissue to researchers. StemExpress pays the abortion clinic a per-specimen fee and then marks up the specimen four to six hundred percent for sale to a research institution.

Stem Express' tissue procurement technicians embedded inside the abortion clinics had the following daily **work sequence**:

- A researcher / customer placed an order for human fetal tissue using an online business portal provided by StemExpress. The web portal allowed the customer to request a particular gestational range for the fetal tissue. (See Attachment B, "Researcher Procurement Record.").

- When it first began operations, the abortion clinics from which StemExpress procured fetal tissue faxed the next day's schedule of potential patients directly to the StemExpress tissue procurement technician assigned to the clinic. (See Attachment C, "Fax from The Alameda, San Jose [Planned Parenthood clinics] to StemExpress, Jan. 10, 2013.").

- The day the abortion procedures were scheduled, StemExpress emailed the procurement schedule to its tissue technicians. (See Attachment D, "Updated Task Assignment: Procurement Schedule Wednesday, 3/30/13.").

- Emails produced by StemExpress demonstrate that its employees knew beforehand protected health information, including gestation periods of fetuses. For example: On January 6, 2015, a StemExpress employee emailed a customer that: "There are no patients that qualify for your request today. You will be on the schedule again for tomorrow, but the cases are all low gestation." On January 14, 2015, at 12:40 p.m., a StemExpress employee emailed a researcher: "Unfortunately, there is nothing within your gestational requirements today. There will be some potentials tomorrow, would you like to be on the schedule?" Hours later, the customer emailed: "Yes, please put me on the schedule for tomorrow." On April 14, 2015, a StemExpress employee emailed a researcher: We have a trisomy patient scheduled for this week and could try to procure a brain sample for you . . . ." (See Attachement E, "Emails.").

- As the firm became more computerized, tissue procurement technicians logged into a Website. (See Attachement F, "Navigating The Task Board.").

- The StemExpress procurement technician then sought out particular patients by name and obtained their consent to donate fetal tissue while they were awaiting their procedures. (See Attachment G, "Clinic Procedures and Policies.").

- StemExpress procurement technicians were paid an hourly wage and a per tissue "bonus" for each item they procured from the order page. (See Attachment H, "Procurement Technician Compensation Policy for Tissue and Blood Procurement.").

- StemExpress paid the abortion clinic a per tissue fee and then marked up the tissue four to six hundred percent for sale to the researcher. (See Attachment I, "StemExpress Services Agreement with Planned Parenthood Shasta Pacific," "StemExpress Services Agreement with Planned Parenthood of Santa Barbara, Ventura & San Luis Obispo Counties;" and Attachment J, "Purchase Order No. 60856806," "Purchase Order No. 3000014694," "Purchase Order No. 60836838," "Purchase Order No. 60858758," and "StemExpress Invoice # 1439.").

Documents produced to the Panel prove that StemExpress' tissue procurement technicians knew in advance of the abortion schedules, the clinics assisted them with obtaining consent, and the entire work flow was designed to maximize the firm's profits. For example instructions to the tissue procurement technicians (See Attachment K, "Standard Operating Procedure") states:

> The day before [the abortion] surgery: Check WebOffice [apparently an earlier version of the Task Board] for research requests; Determine your location for the next day; Call the clinic to verify how many surgeries are scheduled . . . .
>
> The clinic staff will identify donors. It is the procurement technician's responsibility to retrieve the tissue and package it appropriately for the given researcher. It is also the procurement technician's responsibility to update WebOffice so everyone is aware what tissue has been obtained and for whom.
>
> . . . On the day of the surgery, the following steps are taken to procure tissue from POC [Products Of Conception; i.e., fetal tissue] . . . Print a copy of the day's Procurement Schedule. Following along the chart flow so you know what gestations to expect.
>
> . . . Keep track of [the] time [of procurement], gestation [age], fetal foot size or sono[gram] report and date.
>
> . . . If you have an excellent sample with no researcher listed on today's schedule, please contact ▓▓▓▓ Stem Express' President and CEO] immediately, and

Page 3 of 7

they will work to call researchers who may be interested even though they are not currently scheduled.

The work sequence, when combined with the supporting documents reveals that StemExpress did not have a medically valid reason to see, and the abortion clinics did not have a reason to provide, patients' protected health information ("PHI"). Instead, the abortion clinics shared patients' PHI with StemExpress in furtherance of contractual agreements that financially benefitted StemExpress and the clinics.

**Informed Consent**

HHS requires investigators to obtain informed consent from each human being used as a research subject.[1] The "basic elements of informed consent" include the following information:

> (1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental; . . . [and]

> (3) A description of any benefits to the subject or to others which may reasonably be expected from the research . . .[2]

Documents produced by StemExpress to the Select Panel indicate the firm did not follow those regulations. One of those documents is Attachment L, "A Form for Informed Consent To Participate In A Clinical Research Study, involving the donation of aborted pregnancy tissue for medical research, education, or treatment." It states:

> Research using donated tissue and blood is currently underway to uncover the causes of and ultimately find cures for things like: Heart Disease, Diabetes, Parkinson's Disease, Sickle Cell Anemia, Leukemia, Lymphoma, Cancer, Spinal Cord Disease, and more. . . .

> The benefits of consenting to donation today include furthering medical research in finding cures for disease like diabetes, leukemia, lymphoma, Parkinson's disease and more.

The Panel notes that the StemExpress consent form specifically does not conform to the General requirements for informed consent mandated under 45 CFR 46 §116. Witnesses at a recent Select Panel hearing agreed that forms similar to the one StemExpress used apparently do not conform to the HHS regulations on informed consent.[3]

---

[1] 45 CFR 46 §116.
[2] *Id.*
[3] See generally House of Reps., Select Investigative Panel on Infant Lives, *Hearing on Bioethics and Human Tissue*, Mar. 2, 2016.

Page 4 of 7

**Coercion or Undue Influence**

The requirements for informed consent further state that investigators "shall seek such consent only under circumstances that provide the prospective subject with . . . sufficient opportunity to consider whether or not to participate and that **minimize the possibility of coercion or undue influence**." [emphasis added].[4]

The regulations further state: "When some or all of the subjects are likely to be vulnerable to coercion or undue influence, such as . . . pregnant women . . . additional safeguards" are included.[5] Documents produced by StemExpress indicate the firm only obtained fetal tissue from women who had undergone abortions at abortion clinics, and the company's employees were the ones obtaining consent. It is unclear whether such consent occurred before or after the procedures was conducted.

Additional documents produced by StemExpress demonstrate that tissue procurement technicians engaged in real-time email correspondence with researchers while abortions were taking place - presumably before they obtained informed consent to procure fetal tissue - and yet StemExpress employees already were promising to deliver products of conception. (See Attachment M, "Emails regarding PO # 60858758."). The emails reveal that a customer had placed an order for a skull and limbs.

On January 22, 2015, at 12:26 p.m., the customer emailed a StemExpress employee stating: "Just wanted to check in and see if there are any cases within our gestation range for today? Need to book some time on the equipment if so." Within minutes, at 12:30:11 p.m., the StemExpress employee replied: "There is one case currently in the room, I will let you know how the limbs and calvarium [skull] look to see if you are able to take them in about fifteen minutes." Less than two minutes later, the customer wrote: "Great thank you so much." At 1:20:32 p.m., the StemExpress employee informed the customer: "The calvarium is mostly intact, with a tear up the back of the suture line, but all pieces look to be there. The limbs, one upper and one lower, are totally intact, with one upper broken at the humerus, and one lower broken right above the knee. Please let me know if these are acceptable. I have set them aside and will await your reply." Approximately five minutes later, the customer replied: "That sounds great we would like both of them. Please send them our way. Thanks again . . ." The StemExpress employee responded: "Limbs and calvarium will be there between 3:30 and 4:00."

The fact that StemExpress was attempting to interest a customer in fetal body parts **before an abortion had taken place** raises serious concerns that there may have been coercion or undue influence upon the patient to consent to procurement. Both Members and witnesses at our recent hearing raised the same question.[6]

---

[4] 45 CFR 46 §110(4) and (7)(b).
[5] *Id.*
[6] See generally House of Reps., Select Investigative Panel on Infant Lives, *Hearing on Bioethics and Human Tissue*, Mar. 2, 2016.

## IRB

Documents produced by StemExpress violated 45 CFR 46 by misleading customers into believing it had a valid IRB approval. StemExpress obtained approval for its "study" from BioMed IRB (Seen Attachment N, "Informed Consent To Participate In A Clinical Research Study," and "BioMed IRB Continual Approval Notification.").

In fact, one of StemExpress' marketing materials advertises the firm provides clinics with "IRB Certified Consents," and that "Our IRB approved **protocols** and **consents** protect you as well as donor's privacy in accordance with HIPAA guidelines." (Attachment O, StemExpress marketing brochure.).

At our recent hearing, Dr. G. Kevin Donovan, the senior clinical scholar at the Kennedy Institute of Ethics at Georgetown University, and director of the Pellegrino Center for Clinical Bioethics at Georgetown University, said actions such as those undertaken by StemExpress "would never pass muster for an IRB."[7] Yet StemExpress purportedly had the approval of an IRB.

HHS regulations require IRBs to "prepare and maintain adequate documentation" of its activities, including:

> (1) Copies of all research proposals reviewed, scientific evaluations, if any, that accompany the proposals, approved sample consent documents, progress reports submitted by investigators, and reports of injuries to subjects.
>
> (2) Minutes of IRB meetings which shall be in sufficient detail to show attendance at the meetings; actions taken by the IRB; the vote on these actions including the number of members voting for, against, and abstaining; the basis for requiring changes in or disapproving research; and a written summary of the discussion of controverted issues and their resolution.
>
> (3) Records of continuing review activities.
>
> (4) Copies of all correspondence between the IRB and the investigators . . . .[8]

On March 29, 2016, the Panel issued a subpoena to BioMed IRB which required it to produce documents sufficient to show BioMed IRB's ongoing oversight, within the definition of Title 45 Code of Federal Regulations Part 46, of any entity involved with fetal research or transplantation of fetal tissue for which it issued an IRB approval.[9]

---

[7] House of Reps., Select Investigative Panel on Infant Lives, *Hearing on Bioethics and Human Tissue*, Mar. 2, 2016, at. P. 91.
[8] 45 CFR § 46.115 (a).
[9] House of Representatives, Select Investigative Panel on Infant Lives, Subpoena to Biomedical Research Institute of America, Mar. 29, 2016.

Page 6 of 7

BioMed IRB's executive director informed the Panel on April 4, 2016 that, in regards to those records, "there are none."[10] This apparently is a direct violation of 45 CFR 46.

While regulation of IRBs does not fall under the auspices of OHRP, it may interest you to know that, in March of 2012, the Food and Drug Administration ("FDA") issued a warning letter to BioMed IRB, citing: A failure to fulfill membership requirements; failure to prepare, maintain, and follow adequate written procedures for conducting the review of research, including initial and continuing review; and keeping minutes that were not sufficient to show attendance at the meetings, actions taken by the IRB, the vote on these actions including the number of members voting for, against, and abstaining, the basis for requiring changes in or disapproving research, and a written summary of the discussion of controverted issues and their resolution. As a result, the FDA ruled it "will withhold approval of all new studies subject to 21 CFR Part 56 and reviewed by the IRB; and [n]o new subjects are to be enrolled in any ongoing studies subject to 21 CFR Part 56 and approved by the IRB."[11] That ban was lifted in January 2013.[12]

Given the facts outlined above, and the supporting documentation, I urge your office to conduct a thorough investigation into whether StemExpress violated 45 CFR 46, and, if OHRP agrees that such violations occurred, to take all appropriate actions.

Respectfully yours,

Marsha Blackburn
Chair, Select Investigative Panel

cc:   Rep. Jan Schakowsky
      Ranking Member

---

[10] Email from Fred Fox, Executive Director, Biomedical Research Institute of America, to Select Panel staff, Apr. 4, 2016.
[11] Letter from Mary A. Malarkey, Director, Office of Compliance and Biologics Quality, Center for Biologics Evaluation and Research, U.S. Food and Drug Administration, to Fred Fox, Executive Director, Biomedical Research Institute of America dba BioMed IRB, Mar. 29, 2012.
[12] Letter from Mary A. Malarkey, Director, Office of Compliance and Biologics Quality, Center for Biologics Evaluation and Research, U.S. Food and Drug Administration, to Fred Fox, Executive Director, Biomedical Research Institute of America dba BioMed IRB, Jan. 16, 2013.