Attachment A:

Letter to Ms. Jocelyn Samuels,

Director, Centralized Case Management Operations

U.S. Department of Health and Human Services

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

**<u>VIA EMAIL</u>**

June 1, 2016

Ms. Jocelyn Samuels, Director
Centralized Case Management Operations
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Room 509F HHS Bldg.
Washington, D.C. 20201

Dear Director Samuels:

On October 7, 2015, the U. S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the business practices of businesses who procure and resell fetal tissue.

The Panel's investigation uncovered a series of business contracts between StemExpress,[1] a tissue procurement business ("TPB"), and several abortion clinics. These contracts included provisions for the payment of fees by StemExpress to the abortion clinics for fetal tissue and maternal blood.  StemExpress then resold the fetal tissue and blood to researchers.

These contracts produced a regime of cooperation between StemExpress and each clinic.  In particular: (1) the day before scheduled abortions, StemExpress received a fax from a clinic with information about the abortions scheduled for the next day; (2) StemExpress employees were granted access to the medical files of individual patients; (3) The clinic's medical employees (doctors and nurses) directed the StemExpress employees to particular patients who were "good candidates" for fetal tissue donations; (4) the StemExpress employees had access to the "patient terminal" inside the abortion clinic; and (5) the StemExpress employees were permitted by the abortion clinic to interview the patients about personal information, including their dates of birth.

---

[1] StemExpress and Stem-Ex are the same company.

In particular, the Panel's investigation has uncovered information indicating that StemExpress and Planned Parenthood Mar Monte ("PPMM"), Planned Parenthood Shasta Pacific ("PPSP") and Family Planning Specialists Medical Group ("FPS") (hereinafter "the abortion clinics") committed systematic violations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") privacy rule from about 2010 to 2015. **These violations occurred when the abortion clinics disclosed patients'** *individually identifiable health information* **to StemExpress to facilitate the TPB'S efforts to procure human fetal tissue for resale.** This complaint is against each of these entities, and we request a swift and full investigation by the Office of Civil Rights in the Department of Health and Human Services.

In addition to this letter, we are submitting a referral to the HHS Office for Human Research Protections indicating that StemExpress violated 45 CFR 46 by using invalid consent forms and failing to have valid Institutional Review Board ("IRB") approval.[2]

## I.   BACKGROUND

The abortion clinics are "covered entities" under HIPAA, while StemExpress is not.[3] StemExpress "procure[s] tissues and isolate[s] cells for researchers' individual needs in its own labs."[4]

From about 2010 to 2015, the abortion clinics permitted StemExpress employees to: enter their clinics and procure human fetal tissue from aborted infants; obtain *individually identifiable health information*, or *protected health information* ("PHI") about their patients; interact with patients; and seek and obtain patient consent for tissue donation.[5] StemExpress embedded tissue procurement technicians inside the abortion clinics whose **work sequence** followed a daily routine:

1.  A researcher / customer placed an order for human fetal tissue using an online business portal provided by StemExpress. The web portal allowed the customer to request a particular gestational range for the fetal tissue.[6]

2.  The abortion clinics from which StemExpress procured fetal tissue faxed the next day's schedule of potential patients directly to the StemExpress tissue procurement technician assigned to the clinic.[7]

---

[2] *See* Attachment A.
[3] *See* 45 CFR Part 160.103 (Covered Entity means: (1) A health plan. (2) A health care clearinghouse. (3) A health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter.) *See also* OCR Privacy Brief, Summary of the HIPAA Privacy Rule, *available at* http://www.hhs.gov/sites/default/files/privacysummary.pdf (last visited May 5, 2016) (used as reference throughout this complaint).
[4] Stemexpress, About Us, *available at* http://stemexpress.com/about/ (last visited Apr. 29, 2016).
[5] *See* Attachment B:  Clinic Procedures & Policies.
[6] *See* Attachment C: Researcher Procurement Record.
[7] *See* Attachment D:  Fax from The Alameda, San Jose [Planned Parenthood clinics] to StemExpress, Jan. 10, 2013.

3.  The day the abortion procedures were scheduled, StemExpress posted the order on a website "task board" (order page) to be accessed by their procurement technician or communicated the order to the tissue technician via email.[8]

4.  The StemExpress procurement technician informed the clinic what they wished to procure (*i.e.*, the type of tissue and gestational range) based on the order page, and the abortion clinic provided the medical files, including PHI, for the patients with abortions scheduled for that day.[9]

5.  The StemExpress procurement technician then sought out particular patients by name and obtained their consent to donate fetal tissue while they were awaiting their procedures. The procurement technician was also permitted to interview patients and obtain their PHI.[10]

6.  StemExpress procurement technicians were paid an hourly wage and a per tissue "bonus" for each item they procured from the order page.[11]

7.  StemExpress paid the abortion clinic for each fetal tissue and each blood sample and then marked up the tissue four to six hundred percent for sale to the researcher.[12]

The work sequence, when combined with supporting documentation, reveals that StemExpress did not have a medically valid reason to see, and the abortion clinics did not have a reason to provide, patients' PHI. Instead, the abortion clinics shared patients' PHI with StemExpress in furtherance of contractual agreements that financially benefitted StemExpress and the clinics.[13]

## II.    THE HIPAA PRIVACY RULE

The HIPAA privacy rule ("Privacy Rule") protects all *individually identifiable health information* held or transmitted by a covered entity or its business associate, and calls this information *protected health information* ("PHI").[14] PHI identifies an individual, or can reasonably be believed to be useful in identifying an individual (*e.g.*, name, address, birth date, Social Security Number), and includes demographic data relating to: an individual's past, present, or future physical or mental health condition; the provision of health care to the individual; or the past, present, or future payment for the provision of health care to the individual.[15]

---

[8] *See* Attachment E: Updated Task Assignment: Procurement Schedule Wednesday, 3/20/13 and Attachment F: Navigating The Task Board.

[9] *See* Attachment G:  StemExpress Emails.

[10] *See* Attachment B, *supra*: Clinic Procedures and Policies and Attachment H:  Consenting Patients.

[11] *See* Attachment I:  Procurement Technician Compensation Policy for Tissue and Blood Procurement.

[12] See Attachment J: StemExpress Services Agreement with Planned Parenthood Shasta Pacific; StemExpress Services Agreement with Planned Parenthood of Santa Barbara, Ventura & San Luis Obispo Counties; Purchase Order No. 60856806; Purchase Order No. 3000014694; Purchase Order No. 60836838; Purchase Order No. 60858758; and StemExpress Invoice # 1439.

[13] *See* Attachment K:  Standard Operating Procedure.

[14] 45 C.F.R. § 160.103.

[15] 45 C.F.R. § 160.103.

A covered entity may not use or disclose an individual's PHI except as the Privacy Rule permits or requires,[16] or as the individual or their representative authorizes in writing (see discussion below).  HHS may impose civil money penalties on covered entities that fail to comply with the Privacy Rule.  Further, both a covered entity that discloses, and any person who knowingly obtains, PHI in violation of the Privacy Rule can face criminal fines or imprisonment.[17]

## III.   THE CONTRACTS BETWEEN STEMEXPRESS AND THE ABORTION CLINICS

Particular language, contained within the four corners of the written contracts between StemExpress and the abortion clinics raises serious concerns that the parties violated the Privacy Rule.

The written contracts between StemExpress and the abortion clinics contain the following language:

> [a]ny information obtained from [the abortion clinics] patients' charts shall be privileged, and [Stem-Ex / StemExpress] will treat the information in order to preserve the confidentiality of the patients.  [Stem-Ex / StemExpress] will not receive any information concerning identity of donors **except as necessary to obtain patients' consent** for use of POCs and maternal bloods (emphasis added).[18]

This admission, on the face of the contracts, that the abortion clinics granted StemExpress access to patients' PHI raises the question whether any HIPAA provision permits or requires such disclosure without patients' express authorization.  This question is compounded by the contracts' admission that StemExpress reviewed PHI **prior to obtaining patients' consent to donate fetal tissue** *or* **patients' authorization to view their PHI.**

## IV.   VIOLATIONS OF THE HIPAA PRIVACY RULE BY STEMEXPRESS AND THE ABORTION CLINICS

This complaint argues that the agreements between StemExpress and the abortion clinics, on their face and in practice, are fundamentally flawed.  A contractual agreement requiring StemExpress to "treat the information obtained from patients' charts in order to preserve the confidentiality of the patients" **cannot trump a law prohibiting the abortion clinics from permitting these disclosures in the first place.**  As discussed below, the abortion clinics— covered entities under HIPAA—were not permitted to disclose or make available to StemExpress any patient's PHI without the patient's express authorization.

The abortion clinics and StemExpress violated the HIPAA privacy rule because:  (A) The disclosures of patients' PHI made by the abortion clinics, and received by StemExpress, were

---

[16] 45 C.F.R. §164.502(a).
[17] Pub. L. 104-191; 42 U.S.C. §§ 1320d-5 – 1320d-6.
[18] *See* Attachments L, M, and N.

neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research; (B) The consents for fetal tissue donation ostensibly obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI; (C) The disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants; and (D) StemExpress is not a *Business Associate* of the abortion clinics under HIPAA.

**A. The disclosures of patients' PHI made by the abortion clinics, and received by StemExpress, were neither required nor permitted under HIPAA, and in particular did not meet the exceptions for cadaveric organ, eye or tissue transplantation or for research.**

The disclosures of PHI that the abortion clinics made to StemExpress are neither required[19] nor permitted[20] by law. StemExpress was not involved in the treatment of patients, in the payment for treatment, or in clinic operations.[21] **Rather, StemExpress wanted patients' PHI to facilitate the procurement of human tissue from aborted infants for resale to researchers.**

1. Cadaveric organ, eye or tissue transplantation

Importantly, the disclosures to StemExpress do not fall under the provision in law permitting disclosure of PHI to aid organ transplantation. While the contracts reference the "National Organ Transplant Act," 42 U.S.C. 274e(c)(1), the abortion clinics were not facilitating the donation and *transplantation* of cadaveric organs, eyes, and tissue. **Instead, the clinics were facilitating the donation of human fetal tissue from aborted infants for *research*, which is not covered by the cadaveric organ, eye or tissue exception.**[22]

2. Research

Further, the disclosures to StemExpress do not meet the rigorous requirements applicable to PHI disclosures for research purposes. A covered entity is not permitted to disclose an individual's PHI for research purposes without the individual's authorization unless the covered entity (1) obtains verification of approval from an Institutional Review Board ("IRB") for disclosure without authorization; (2) the researcher represents that the use or disclosure of the PHI is solely to prepare research protocol and the PHI will not be removed from the covered entity, and that the PHI is necessary for the research; or (3) the research is on PHI of deceased individuals.[23]

3. Violations Preceding "Consent"

---

[19] 45 C.F.R. § 164.502(a)(2) (The only "required" disclosures are to (1) an individual or their personal representative when they request access to, or an accounting of disclosures of, their protected health information; and (2) to HHS when it is undertaking compliance investigation or review or enforcement action).
[20] *See* 45 C.F.R. § 164.502(a)(1).
[21] *See* 45 C.F.R. § 164.506(c).
[22] *See* 45 C.F.R. § 164.512(h).
[23] 45 C.F.R. § 164.512(i).

Because StemExpress employees actually sought consent for tissue donation from patients, the abortion clinics permitted the employees to view patients' charts. Medical charts are filled with HIPAA-protected PHI, including names, addresses, past and present medical treatment, and more. **Each time that an abortion clinic employee shared a medical chart with a StemExpress employee, both violated the HIPAA privacy rule.**

No evidence suggests the abortion clinics' patients provided authorization for StemExpress staff to view their PHI *prior* to seeking their consent to donate tissue. Therefore, regardless of whether a patient *ultimately* consented to tissue donation and authorized disclosure of her PHI to StemExpress, her privacy was violated.

The abortion clinics could have directly consented their patients for tissue donation, and entered an agreement with StemExpress to provide a limited data set[24] regarding the patients they were seeing on a particular day. Instead, they violated the Privacy Rule by permitting StemExpress to view the most intimate information about their patients.

These disclosures made by the abortion clinics to StemExpress were inarguably direct and intentional—not incidental.[25] StemExpress employees did not merely overhear a patient's name while in the clinic—they were handed her medical chart by her healthcare provider in blatant violation of the HIPAA privacy rule.

### B. The consent for fetal tissue donation obtained by StemExpress from the abortion clinics' patients did not constitute sufficient authorizations for the disclosure of PHI.

While StemExpress purportedly obtained consents from patients prior to procuring human fetal tissue from their aborted infants, the forms that they used were insufficient to authorize the disclosure of PHI under the HIPAA privacy rule.

The Privacy Rule requires a covered entity to obtain an individual's written authorization for any use or disclosure of PHI that is not permitted or required by law.[26] Such authorization must be in plain language and contain specific information regarding the information to be disclosed or used, the person(s) disclosing and receiving the information, expiration, right to revoke in writing, and other data.[27]

Neither the consent form provided by StemExpress ("SE form") nor the consent form provided by Planned Parenthood ("PP form") to obtain patient consent for the donation of human fetal tissue of aborted infants met these stringent requirements.[28] The statement in the SE form that a patient's "health information will be protected at all times" is ironic given that StemExpress's possession of the patient's PHI already placed the abortion clinics and StemExpress in violation of the HIPAA privacy rule.

---

[24] *See* 45 C.F.R. § 164.514(e).

[25] *See* 45 C.F.R. §§ 164.502(a)(1)(iii).

[26] 45 C.F.R. § 164.508.

[27] 45 C.F.R. § 164.508(c).

[28] *See* Attachments O: StemExpress Consent Form and P: Planned Parenthood Consent Form.

The SE form also stated that "[i]n accordance with federal laws (HIPAA), your personal identifying information will be protected . . . health information . . . may be used or disclosed . . . [but] will NOT be connected to your name or any other personal identifier."[29]

Like the privacy provision in the contracts between Stem Express and the abortion clinics, this nod towards HIPAA requirements failed to meet the requirements of the HIPAA privacy rule. The SE form did not describe the specific patient information that will be disclosed or used, but rather provided a generic, nonexclusive list of information that *may* be disclosed. The SE form did not state who will disclose or use the patient's PHI. It also did not state when the patient's authorization will expire, or that the patient can withdraw her authorization for the use of her PHI (it mentioned that the patient cannot withdraw her consent to the tissue donation after she leaves the clinic).

The PP form, purportedly used to obtain patient consent for human fetal tissue donation at PPMM and PPSP,[30] was grossly insufficient. The form did not address privacy at all, with no information regarding: PHI that may be disclosed or used; the person(s) disclosing and receiving the PHI; any expiration on the availability of the patient's PHI to researchers or others; or the patient's right to revoke her authorization in writing.

C. **The disclosures of patients' PHI made by the abortion clinics to StemExpress were not the minimum necessary disclosures to facilitate the procurement of human fetal tissue from aborted infants.**

The abortion clinics and StemExpress violated a central aspect of the Privacy Rule by disclosing/obtaining more than the "minimum necessary" PHI to facilitate the procurement of human fetal tissue from aborted infants.[31] StemExpress employees did not need to know the names of patients, and they certainly did not need to directly obtain the patients' consent in order to procure fetal tissue. Instead, these deeply private activities could have been performed by the abortion clinics.

As addressed above, the abortion clinics could have established a relationship with StemExpress that did not require or result in the disclosure of any PHI. Instead, the Planned Parenthood affiliates permitted StemExpress to use PHI to directly encourage patients to donate human fetal tissue—tissue that would later be sold by StemExpress to researchers at a huge mark-up.

D. **StemExpress is not a *Business Associate* of the abortion clinics under HIPAA.**

A *Business Associate* under HIPAA is a person or organization, other than a member of a covered entity's workforce, that performs certain functions or activities on behalf of, or provides certain services to, a covered entity that involve the use or disclosure of individually identifiable health information. *Business Associates* are generally involved in claim processing, data analysis, utilization review, and billing. Their services are limited to legal, actuarial, accounting,

---

[29] Attachment O, *supra*.
[30] Attachment P, *supra*.
[31] 45 C.F.R. §§ 164.502(b) and164.514(d).

consulting, data aggregation, management, administrative, accreditation, or financial services, where the provision of the services involves the disclosure of PHI.[32]

Clearly, StemExpress did not perform one of these services for the abortion clinics, and is therefore not a *Business Associate* permitted to obtain the PHI of the abortion clinics' patients.

## CONCLUSION

We appreciate your swift attention to the serious and systematic violations of the HIPAA privacy rule committed by StemExpress, Planned Parenthood Mar Monte, Planned Parenthood Shasta Pacific, and Family Planning Specialists Medical Group. If you have any questions about this request, please contact Mary Harned, Investigative Counsel at (202) 480-7160, or by email at Mary.Harned@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chair
Select Investigative Panel

Attachment(s)

cc:     The Honorable Jan Schakowsky, Ranking Member
        Select Panel on Infant Lives

---

[32] 45 C.F.R. § 160.103.

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 Rayburn House Office Building
Washington, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

November 2, 2016

**<u>VIA EMAIL</u>**

The Honorable Leslie Carol Rutledge
Attorney General
State of Arkansas
323 Center Street, Suite 200
Little Rock AR 72201

Dear Attorney General Rutledge:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents and received testimony from confidential informants indicating that StemExpress, LLC ("StemExpress"), a firm that procures(d) fetal tissue from abortion clinics and transfers it to research customers,[1] violated state law, including but not limited to the Arkansas Anatomical Gift Act ("A.C.A.") § 120-17-802 (2)(c), which forbid the transfer of fetal tissue for valuable consideration.

Among the abortion clinics from which StemExpress sought to procure fetal tissue was Little Rock Family Planning Services,[2] which is located at ██████████ ███████████████████████.[3]

The A.C.A. makes it a five-year felony if a person "for valuable consideration, knowingly purchases or sells a part for transplantation or therapy if removal of a part from an individual is

---

[1] *See* Select Investigative Panel of the H. Comm. on Energy and Commerce, Interim Update to the U.S. House of Representatives, Jul. 14, 2016,
https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/analysis/2016 0714Interim_Update.pdf.
[2] *See* Letter from ████████████████, counsel for Little Rock Family Planning Services, to Matthew Tallmer, Investigator, Select Investigative Panel on Infant Lives [sic], Oct. 10, 2016.
[3] Little Rock Family Planning Services Website, https://lrfps.com/, last accessed Oct. 11, 2016.



1

intended to occur after the individual's death . . ."[4] The A.C.A. goes on to state that an individual "may charge a reasonable amount for the removal, processing, preservation, quality control, storage, transportation, implantation, or disposal of a part."[5]

Another section of the A.C.A., however, states that: "A person shall not buy, sell, give, exchange, or barter or offer to buy, sell, give, exchange, or barter any fetus born dead as a result of a legal abortion or any organ, member, or tissue of fetal material resulting from a legal abortion."[6]

In a letter to the Panel, the counsel for Little Rock Family Planning Services ("LRFPS") wrote: "In 2015, LRFPS entered into a contract with StemExpress . . . . In June 2015, LRFPS collected two fetal tissue samples pursuant to appropriate written patient consents. Both samples were sent to StemExpress."[7]

Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether StemExpress violated these statutes and regulations, and, if you agree that such violations occurred, to take all appropriate action. If you have any questions about this request, please contact T. March Bell at (202) 226-9027, March.Bell@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chair
Select Investigative Panel

Attachment

cc:    The Honorable Jan Schakowsky
       Ranking Member
       Select Investigative Panel

---

[4] A.C.A. § 20-17-1216 (a).
[5] A.C.A. § 20-17-1216 (b).
[6] A.C.A. § 20-17-802(c)
[7] *Supra* note 2.

2

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

November 2, 2016

**VIA EMAIL**

The Honorable Tony Rackauckas
District Attorney, County of Orange
401 Civic Center Drive West
Santa Ana, California 92701

Dear District Attorney Rackauckas:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents that indicate DV Biologics, LLC ("DaVinci"), DaVinci Biosciences, LLC ("DVB"), two related firms that procured fetal tissue from a Planned Parenthood affiliate that performs abortions and transferred it to research customers, and Planned Parenthood Orange and San Bernardino Counties ("PPOSBC"), violated various provisions of state law, including but not limited to the California Sales and Use Tax Law.

**History & Business Models of DaVinci & DVB**

DaVinci Biosciences, LLC, was founded as a for-profit corporation. DaVinci filed its incorporation papers with the California Secretary of State on December 19, 2007.[1] It originally was located at ██████████████████████[2] As of this August 2016, however, it had moved to ██████████████████████[3] DVB was also founded as a for-profit

---

[1] California Secretary of State, Business Entity Detail, http://kepler.sos.ca.gov (last visited Oct. 21, 2016).
[2] Id.
[3] Letter from ██████████████, Vice President of Operations, DaVinci Biosciences, LLC, to Panel staff, Aug. 10, 2016.

1

corporation and filed its incorporation papers with the California Secretary of State on March 16, 2009.[4] DVB was originally located at the same Yorba Linda location as DaVinci.[5] The counsel for both entities informed the Panel that "DVB is a subsidiary of DaVinci Biosciences, LLC."[6]

Both entities received aborted fetal tissue from the same source. The counsel for both told the Panel, "DVB received fetal tissue exclusively from its parent company, DaVinci. DaVinci itself received fetal tissue exclusively from Planned Parenthood of Orange and San Bernardino Counties. At this time, the Panel has not evidence that DaVinci paid money to Planned Parenthood for the donated tissue."[7]

Documents produced to the Panel from other firms in the fetal tissue industry pursuant to subpoenas demonstrate that the industry norm is for companies, be they for-profit or non-profit, to pay California-based abortion clinics for fetal tissue. For example, StemExpress, LLC, another for-profit tissue procurement firm, paid Planned Parenthood affiliates in California an average of $50 per-specimen obtained.[8] Advanced Bioscience Resources, Inc., a non-profit tissue procurement business, paid facility fees of $55 or $60 per month (depending upon the year) to the Planned Parenthood affiliates and clinics from which it obtained fetal tissue.[9] From 2010 through 2015, StemExpress paid a total of $135,880 to California-based Planned Parenthood affiliates for fetal tissue specimens.[10] Over the same time period, Advanced Biosciences Resources, Inc. paid a total of $328,225 to California-based Planned Parenthood affiliates for fetal tissue specimens.[11]

The contractual agreement between DVB and PPOSBC show that the firm provided PPOSBC "with a sterile container, including storage media, for each" fetal tissue specimen the Planned Parenthood affiliate obtained.[12] On each day DVB was scheduled to obtain fetal tissue, PPOSBC workers would, "following retrieval, store each [fetal tissue] Specimen in a separate container" and "notify DVB's "designated contact. . . that Specimen is ready for pick-up . . . ."[13]

Documents produced by DVB show that PPOSCB workers performed the following tasks:

- Discussed tissue donation with women awaiting abortions

---

[4] California Secretary of State, Business Entity Detail, http://kepler.sos.ca.gov (last visited Oct. 21, 2016).
[5] *Id.*
[6] Letter from R. Joseph Burby, IV, Bryan Cave LLP, to Rep. Marsha Blackburn, Chair, Select Investigative Panel, Jan. 29, 2016, at 1 [hereinafter Burby letter].
[7] *Id.* at 3.
[8] *See* Services Agreement between StemExpress, LLC, and Planned Parenthood Mar Monte, Apr. 1, 2010, at 1 [STEM_HOUSE.SELECT_0167 – STEM_HOUSE.SELECT_0169]; Services Agreement between StemExpress, LLC, and Planned Parenthood Shasta Pacific, May 15, 2012, at 1 [STEM.HOUSE.SELECT_0170 – STEM.HOUSE.SELECT_0172]; Services Agreement between StemExpress, LLC, and Planned Parenthood of Santa Barbara, Ventura & San Luis Obispo Counties, Oct, 23, 2013, at 1.
[9] Advanced Bioscience Resources, Inc., "Statement of Facility Fees, Jan. 2010 – Oct. 2015."
[10] Panel analysis of invoices from Planned Parenthood Mar Monte and Planned Parenthood Shasta Pacific to Stem Express, LLC.
[11] Panel analysis of invoices from Planned Parenthood San Jose, Planned Parenthood Riverside, and Planned Parenthood to Advance Bioscience Resources, Inc.[date?]
[12] Specimen Donation Agreement between DaVinci Biosciences, LLC, and Planned Parenthood of Orange and San Bernardino Counties, Sep. 23, 2008, at 1, attachment # **TK** . [hereinafter DVB Agreement] [DVB_00001613].
[13] *Id.* at 2 [DVB-00001614].

2

- Obtained consent from the patients to donate human fetal tissue

- Procured fetal tissue of between a gestational period of 5-20 weeks

- Stored the signed consent forms

- Collected the fetal tissue samples, washed the samples, and transferred them to a sterile container with the gestational age written on the container, and

- Stored the samples on wet ice[14]

DaVinci and DVB sold the fetal tissue to researchers, educational institutions, and pharmaceutical companies. DaVinci "focused on the research and development of cell-based therapeutics targeting neurodegenerative and autoimmune diseases, while DVB supplied human biological tools to academic institutions and pharmaceutical companies for research purposes."[15]

DVB has an online catalog through which researchers can select from among 338 different types of cells and add the desired product to their "cart."[16]  The prices range dramatically: bone marrow mononuclear cells sell online for $50;[17] cardiomyocytes for $850;[18] skeletal muscle progenitor cells for $900;[19] glioblastoma multiforme cell (uncultured) FFPE block for $1,200;[20] and synovial tissue FFPE block for $1,750.[21]

The DVB Website catalogue states that customers can "Order anytime, 24 hours a day, 365 days a year by email or fax. If your order arrives outside our normal business hours, it will be quickly processed at the beginning of the next business day."[22] All orders to North America "are shipped from DV Biologics headquarters in Southern California and freight is pre-paid and added to your invoice as a separate item unless customers references their own separate shipping account and vendor."[23] International orders are shipped from DV Biologics headquarters in Southern California every Monday unless specially requested to be shipped on another date.[24]

---

[14] DaVinci Biosciences, LLC, "Characterization of Human Fetal Stem Cells and Determination of Research and Therapeutic Tool Potential," undated.
[15] *Id.*
[16] *See:* DV Biologics, LLC, "LIFEbank Products," http://www.dvbiologics.com/products (last visited Oct. 21, 2016).
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] DV Biologics, LLC, Website, http://www.dvbiologics.com/ordering-information (last visited Oct. 25, 2016).
[23] *Id.*
[24] *Id.*

3

**Potential Criminal Violations on the Part of DaVinci & DVB**

California Revenue and Tax Code

A provision of the California Revenue and Tax Code states:

> [E]very retailer engaged in business in this state and making sales of tangible personal property for storage, use, or other consumption in this state, not exempted . . . shall, at the time of making the sales or, if the storage, use, or other consumption of the tangible personal property is not then taxable hereunder, at the time the storage, use, or other consumption becomes taxable, collect the tax from the purchaser and give to the purchaser a receipt therefor in the manner and form prescribed by the [California State Equalization Board].[25]

A publication put out by the State Board of Equalization ("SBE") states that provision applies to corporations, individuals, Limited Liability Companies, Limited Liability Partnerships, Limited Partnerships, partnerships, married co-owners, registered domestic partnerships, and organizations.[26]

The law defines a "retailer engaged in business in" California as "Any retailer maintaining, occupying, or using, permanently or temporarily, directly or indirectly, or through a subsidiary, or agent, by whatever name called, an office, place of distribution, sales or sample room or place, warehouse or storage place, or other place of business."[27]

There is an exemption for the sale of human blood and human body parts.[28] DVB is not a tissue or blood bank rather it sells fetal tissue cells, cell lines, and other products directly to customers. SBE recently collected nearly $82,000 for unpaid sales taxes for a non-profit organization that saves dogs, draws blood from those dogs, and sells the white blood cells, plasma, and red blood cells for transfusions into other canines.[29]

The statute defines tangible personal property as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses."[30] Thus, cells and cell lines are tangible personal property under the California Sales and Use Tax.

The SBE publication further states that California companies can pass along the amount of sales tax to customers, provided the business lists a separate amount for sales tax reimbursement on its receipts or invoices, or if the sales agreement "specifically calls for the addition of sales tax

---

[25]Cal. Rev. & Tax Code § 6203.

[26] Cal. State Bd. of Equalization, "Your California Seller's Permit: Your Rights and Responsibilities under the Sales and Use Tax Law," Pub. 72, May 2014, at 1. [hereinafter Pub.. 72].

[27] Cal. State Bd. of Equalization, "Laws, Regulations & Annotations, Sales and Use Tax Law, Chapter 3. The Tax," https://www.boe.ca.gov/lawguides/business/current/btlg/vol1/sutl/6203.html (last visited Oct. 25, 2016).

[28] Cal. Rev. & Tax Code § 33 ("Human whole blood, plasma, blood products, and blood derivatives, or any human body parts held in a bank for medical purposes, shall be exempt from taxation for any purpose.").

[29] Chris Haire, "Greyhound Dog Rescue Hemopet Fights to Stay Open after $82,000 Tax Bill," *Orange County Register*, Oct. 10, 2016, http://www.ocregister.com/articles/blood-731674-hemopet-greyhounds.html (last visited Oct. 27, 2016).

[30] Cal. Rev. & Tax Code § 6016.

4

reimbursement."[31] If the business includes sales tax reimbursement in its prices, companies "must inform the buyer that tax is included" by making one of the following statements on a price tag or in an advertisement: "All prices of taxable items include sales tax reimbursement computed to the nearest mill," or "The price of this item includes sales tax reimbursement to the nearest mill."[32] Neither of those statements are on DVB's website.

Under the California Revenue and Tax Code,

> Internet sales are treated just like sales made at retail stores, by sales representatives, over the telephone, or by mail order. If your business is located in California, retail sales of tangible personal property that you make over the Internet to California customers are generally taxable unless the sales qualify for a specific tax exemption or exclusion . . . and you are required to register for a permit and report and pay tax to the same extent as any other retailer in California.[33]

As previously noted, DVB sold its products through the Internet. It should, therefore, have collected tax on sales made to California customers. Ten invoices produced by DVB show the firm did not charge tax to Applied StemCell, Inc., a California-based company ("Applied StemCell"). Applied StemCell filed its incorporation papers with the California Secretary of State on February 13, 2008.[34] Applied StemCell "is a leading stem cell and gene editing company . . ."[35] The invoices are listed in the chart below, and copies are attached to this letter.

| DATE | INVOICE NUMBER | TOTAL COST | SALES TAX CHARGED |
|---|---|---|---|
| February 12, 2013 | 437 | $    82.00 | $   0.00 |
| October 1, 2013 | 618 | $   450.00 | $   0.00 |
| October 7, 2013 | 622 | $1,570.00 | $   0.00 |
| March 6, 2014 | 754 | $4,016.99 | $   0.00 |
| August 13, 2014 | 869 | $   592.99 | $   0.00 |
| August 18, 2014 | 871 | $   856.99 | $   0.00 |
| November 24, 2014 | 954 | $   410.00 | $   0.00 |
| December 22, 2014 | 999 | $    82.00 | $   0.00 |
| January 12, 2015 | 1021 | $  114.00 | $   0.00 |
| February 24, 2015 | 1077 | $1,250.00 | $   0.00 |

---

[31] Pub. 72 at 5.
[32] *Id.*
[33] Cal. State Bd. of Equalization, "Publication 109 Internet Sales," https://www.boe.ca.gov/formspubs/pub109/ (last visited Oct. 26, 2016).
[34] Online at http://kepler.sos.ca.gov/ (last visited Oct. 27, 2016).
[35] Applied StemCells, Inc. website, http://www.appliedstemcell.com/ (last visited Oct. 27, 2016).

5

Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether DVB violated the statute, and, if you agree that such violations occurred, to take all appropriate action. If you have any questions about this request, please contact T. March Bell at (202) 226-907, March.Bell@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chair
Select Investigative Panel

Attachment(s)

cc:    The Honorable Jan Schakowsky
       Ranking Member
       Select Investigative Panel

       The Honorable Vern Pierson
       El Dorado County District Attorney

6

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 Rayburn House Office Building
Washington, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

December 1, 2016

**VIA EMAIL**

The Honorable Ken Paxton
Attorney General
State of Texas
300 W. 15th Street
Austin, TX 78701

Dear Attorney General Paxton:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents and received testimony that indicates that Planned Parenthood Gulf Coast ("PPGC"), an abortion facility that procured fetal tissue and transferred it to researchers,[1] allegedly violated state law, including but not limited to the Tex. Penal Code § 48.02, and Tex. Penal Code Title 8 § 37.08.

---

[1] *See* Select Investigative Panel of the H. Comm. on Energy and Commerce, Interim Update to the U.S. House of Representatives, Jul. 14, 2016,
https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/analysis/2016
0714Interim_Update.pdf.

1

**Background on Planned Parenthood Gulf Coast**

PPGC has a research department[2] that conducted studies for pharmaceutical companies,[3] the medical device industry,[4] and academic institutions, mostly in Texas.[5] PPGC procured fetal tissue for the University of Texas Medical Branch, Galveston.[6] PPGC bought its headquarters in 2010 largely because it met the needs of the research department.[7]

PPGC conducts in-house fetal tissue extraction, processing, storage, and shipping.[8] PPGC also ships tissue, but it requires the study sponsors to set up a FedEx account. PPGC prints the air bill, puts the air bill on the container, places the shipment on dry ice, and either has FedEx pick up the shipments or a PPGC staffer will drop it off.[9] PPGC bills customers for any sterile supplies needed for tissue procurement.[10]

Despite those costs incurred by PPGC, there are indications that PPGC made money from its sales of fetal tissue. ▮▮▮▮▮▮▮▮, PPGC's director of research, stated "this research department generates more revenue than the entire OB GYN research program at Baylor [College of] Medicine. . . .multiple, multiple times more revenue."[11]

**PPGC Interactions with University of Texas Medical Branch**

From 2010 through 2011, PPGC procured fetal tissue for the University of Texas Medical Branch, Galveston ("UTMB").[12] While PPGC personnel generally obtained consent from patients to donate fetal tissue, and procured the tissue, emails produced by UTMB indicate that its personnel also obtained consent from patients and procured the fetal tissue.

October 20, 2010 email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In an October 10, 2010 email to ▮▮▮▮▮▮▮▮▮▮ at UTMB, ▮▮▮▮▮ wrote:

> We need to renegotiate the budget for both studies based on feedback from [PPGC staff] . . . . here is their proposal:
>
> $50 enrollment/consent process (consent per PPGC SOP, physician statements)[.]

---

[2] *See* Center for Medical Progress, "Transcript, Meeting with ▮▮▮▮▮▮ Director of Research, Planned Parenthood Gulf Coast; ▮▮▮▮▮▮, Ambulatory Surgery Director, Planned Parenthood Gulf Coast; ▮▮▮▮▮▮, Physician, Planned Parenthood Gulf Coast; Medical Assistant, Planned Parenthood Gulf Coats; [and] Two Actors posing as fetal tissue procurement company," Apr. 9, 2015, attachment 1. [hereinafter CMP].
[3] *Id.* at 5.
[4] *Id.* at 6.
[5] *Id.* at 35.
[6] Documents produced by University of Texas Medical Branch.
[7] CMP at 96.
[8] *Id.* at 9, 14, 19-20, 29; 31, 40.
[9] *Id.* at 19-20.
[10] *Id.* at 90.
[11] *Id.*
[12] *Id.* at 7.

2

$100 room set up/collection (strip machines, sterile equipment, rinse hosing with sterile water, biological sample collection) [.]

$50 enrollment/consenting fee if tech leaves without tissue (staff performed the work and tech didn't/couldn't stay to collect sample).

$2000 annual admin fee (new or retraining staff . . . and Research Mgmt oversight, consent storage, supply storage).

It would also be preferable if we amended the contracts to provision $Xamount/yr for a spend-down grant. PPGC is paid in advance for a set number of samples/yr, and then you collect at will . . ..[13]

UTMB invoices and proposed amended contract

UTMB produced invoices to the Panel from PPGC that show PPGC billed UTMB a total of $21,424.98 in annual administrative fees, consent payments, staff training, and supplies.[14]

An unexecuted amended contract between PPGC and UTMB would have provided for the college to pay PPGC $150 for each executed informed consents of patients (up to 500 patients), plus $2,000 in annual administrative fees, and $1,500 for training UTMB staff.[15] Had the contract been executed as drafted, PPGC would have received $75,000 solely for consent forms signed by patients.

April 2011 Planned Parenthood Federation of America memo on fetal tissue donations

On April 4, 2011, Planned Parenthood Federation of America ("PPFA")'s senior director for public policy litigation and law sent a memorandum to affiliate chief executives, affiliate medical directors, and patient service directors, on federal regulations for participation in fetal tissue donation programs.[16] The memorandum notes that applicable federal laws "forbid the payment or receipt of valuable consideration for fetal tissue. However, they permit 'reasonable payments associated with the transportation, implantation, processing, perseveration, quality control, or storage' of fetal tissue."[17]

---

[13] Email from ███████ to ███████, Re: Study, Oct. 1, 2010, attachment 2. [UTMB 321-322].
[14] Invoice from Planned Parenthood Gulf Coast to University of Texas Medical Branch, Nov. 11, 2010 [UTMB 328]; Invoice from Planned Parenthood Gulf Coast to University of Texas Medical Branch, Nov. 11, 2010 [UTMB 329]; Invoice from Planned Parenthood Gulf Coast to University of Texas Medical Branch, Jun. 11, 2011 [UTMB 344]; Invoice from Planned Parenthood Gulf Coast to University of Texas Medical Branch, Sep. 29, 2011 [UTMB 252], attachment 3.
[15] Tissue Supply and Biological Specimen Agreement, Amended No. 2, between Planned Parenthood Gulf Coast, Inc. and ███████ of University of Texas Medical Branch, Jul. 26, 2011, attachment 4. [UTMB 299-301].
[16] Memorandum from ███████, Public Policy Litigation and Law, Planned Parenthood Federation of America; ███████ Acting Vice President for Medical Affairs, Planned Parenthood Federation of America; and ███████, Vice President for Medical Services, Planned Parenthood Federation of America; to Affiliate Chief Executives, Affiliate Medical Directors, [and] Patient Service Directors, Re: Federal regulations for aborted pregnancy tissue donation programs, Apr. 4, 2001, attachment 5. [PPFA-HOU_E&C-000148 – 000150] [hereinafter ███████ memo].
[17] ███████ memo [PPFA-HOU_E&C-000149].

3