The memorandum states that PPFA affiliates "can chose one of two methods to comply with these laws."[18] The methods outlined in the memorandum are:

> One method would be to recover no costs associated with any aspect of participation in a fetal tissue donation program. This would mean that all staff time, clinic space, supplies, etc., would be donated by the affiliate, and the affiliate would receive no payments or in-kind services from the entity to whom the tissue is being donated.
>
> . . . The second method would be to employ an independent auditor to conduct a credible and good-faith analysis of the actual costs incurred by the affiliate in the transportation, implantation, processing, preservation, quality control, or storage of the fetal tissue and, if the research is supported by federal funds, for the removal of the fetal tissue. Under this method, affiliates must maintain careful records of actual tissue donations and of payments received from the researcher or the tissue-gathering entity. Affiliates must be able to demonstrate that the payments do not exceed the actual costs of the actual tissue donations.
>
> Sometimes tissue-gathering entities offer to pay rent for space occupied by one of their employees who would be on-site at a clinic on a regular basis. If an affiliate determines to enter into such an arrangement, then the independent auditor would also conduct a credible and good-faith computation of the actual cost of the space occupied by the tissue-gathering entity employee, in order to determine the amount of rent to be paid by that entity.[19]

The memorandum goes on to "remind affiliates that, in addition to the federal laws outlined above, there are laws in many states governing fetal tissue donation programs. Affiliates must take great care to assure compliance with those laws as well."[20]

January 2011 redistribution of PPFA memo on fetal tissue donation

The April 2001 memorandum was redistributed to PPFA affiliates in January 2011 under the signature of ▮▮▮▮▮▮▮▮▮▮, then then senior PPFA director for clinical services.[21] The memorandum from ▮▮▮▮▮▮▮▮ sought

> . . . to remind affiliates about the federal law relating to payment for participation in such programs. The attached memo was sent almost exactly 10 years ago (yikes!).

---

[18] ▮▮▮ memo [PPFA-HOU_E&C-000150].
[19] *Id.*
[20] *Id.*
[21] Memorandum from ▮▮▮▮▮▮▮▮ Senior Director, Clinical Services, Planned Parenthood Federation of America; [and] ▮▮▮▮▮▮ Director, Clinical Services, Planned Parenthood Federation of America; to Affiliate Medical Directors, [and] Patient Services Directors, Re: Aborted pregnancy tissue donation programs, Jan. 26. 2011, attachment 6 [PPFA-HOU_E&C-000146].

4

> Given the time that has elapsed and that there has likely been staff turnover, we thought it would be helpful to resend it to assure continuing compliance with the statutes."[22]

PPFA affiliates, including PPGC, were, thus, twice put on notice about the steps they would have to undertake in order to participate in a fetal tissue donation program, and ensure that any reimbursable costs they received did not constitute valuable consideration under the applicable federal and state laws.

Despite that knowledge, the Panel has learned that the costs included in PPGC's contract and proposed contract with UTMB were based not on an independent auditor's credible and good-faith analysis of the actual costs it incurred to procure fetal tissue for UTMB. Rather it was based on back-of-the-envelope calculations by a single PPGC official. The fact that PPGC ignored the long-standing advice of PPFA's legal director when it drafted the UTMB contract and proposed amendment goes directly to PPGC's knowledge of the duty to comply with the applicable law and its willful decision to ignore the legal advice of its organization.

**PPGC Interactions with Baylor College of Medicine**

Documents produced by the Baylor College of Medicine ("BCM") show that for more than two years, from November 1, 2014 through November 4, 2015, PPGC entered into negotiations to procure fetal tissue for BCM.[23] Those documents show that PPGC assisted BCM with proposals that would be acceptable to the Institutional Review Board ("IRB") at BCM.

<u>November 1, 2014 email from</u> ▓▓▓ <u>of PPGC to</u> ▓▓▓ <u>BCM, a copy of which was sent to</u> ▓▓▓<u>, PPGC's medical director, and</u> ▓▓▓<u>.</u>

The email states ▓▓▓ was "putting" ▓▓▓ "in touch with our Medical Director ▓▓▓ who oversees all research, as well as our Research Director ▓▓▓ who will be your primary contact person during the IRB approval/coordination phase."[24]

<u>March 24, 2014 email from</u> ▓▓▓ <u>to</u> ▓▓▓

▓▓▓ wrote: "Thank you for speaking with me today, and for your help with the IRB. Attached, please find my original [IRB] submission, the [PPFA] consent form draft, and the response from the IRB. . . .Please feel free to contact me any time with any questions you may have."[25] Later that same day, ▓▓▓ replied, "Yes, we can do that."[26] ▓▓▓ asked, "Would you have time to speak to me on Friday to discuss the IRB comments?"[27] ▓▓▓ stated, "I can be available Monday."[28]

---

[22] *Id.*
[23] Documents produced by Baylor College of Medicine.
[24] Email from ▓▓▓ to ▓▓▓, cc: ▓▓▓ RE: IRB Pediatrics BCM, Nov. 1, 2013, attachment 7.
[25] Email from ▓▓▓ to ▓▓▓, Subject RE: IRB pediatrics BCM, Mar. 2014, attachment 8.
[26] Email from ▓▓▓ to ▓▓▓, May 20, 2014, 4:51 PM, attachment 8.
[27] Email from ▓▓▓ to ▓▓▓, Subject: Re: IRB pediatrics BCM, Jun. 3, 2014, 6:38 PM, attachment 8.
[28] Email from ▓▓▓ to ▓▓▓, Jun. 6, 2014, 3:07 PM, attachment 8.

5

May 20, 2014 email from ▮▮▮▮ to ▮▮▮▮

▮▮▮▮ sent an email to ▮▮▮▮ on May 20, 2014 that stated, "I have received the following response to my IRB submission from BCM, and am wondering if you could comment on the bolded sections."[29]

October 20, 2014 email from ▮▮▮▮ to ▮▮▮▮

In an October 20, 2014 email exchange, ▮▮▮▮ an assistant to ▮▮▮▮ emailed ▮▮▮▮ in which she stated, "I want to follow up once more to see if it would be possible to set [up] a time to touch base over the phone sometime this week. I have spoken to our local IRB and need your approval/guidance before I proceed."[30]

October 20, 2014 email from ▮▮▮▮ to ▮▮▮▮

▮▮▮▮ replied: "Yes, that would be fine. I have some this afternoon at 2pm. Would that work for you?"[31]

October 20, 2014 email from ▮▮▮▮ to ▮▮▮▮ regarding assigned tasks to assist IRB

On October 20, 2014, ▮▮▮▮ again emailed ▮▮▮▮:

> Dear ▮▮▮▮
>
> Thank you so much for the productive phone call. I spoke with ▮▮▮▮ after our phone call ended and she was really excited to know we had made so much progress. I have outlined some of her comments/feedback below in red:
>
> Key Discussion Items (Assigned party):
>
> • Check with PPFA if we can use the generic tissue procurement consent or do we need a site-specific IRB approved consent form ▮▮▮▮ [sic] – Generic Information/Release/Acknowledgement form is acceptable. Please move forward with submission of the attached form to the IRS for approval. [sic]
>
> • Develop a budget/contract describing the scope of work and approximate time/effort it will take to execute the study. ▮▮▮▮ will send us a sample contract she executed with UT Galveston. ▮▮▮▮ [sic] – I can't provide this yet as the details of the project that need to be referenced in the contract are still being negotiated. We will need to make specific reference to the fact no remuneration for specimens will occur. Administrative costs only will be included in a budget. [sic]

---

[29] Email from ▮▮▮▮ to ▮▮▮▮, Subject: Re: IRB pediatrics BCM, May 20, 2014, 11:12 AM, attachment 9.
[30] Email from ▮▮▮▮ to ▮▮▮▮, cc: ▮▮▮▮, Subject: Pediatrics research proposal – ▮▮▮▮ Baylor College of Medicine, Oct. 20, 2014, 8:34 AM, attachment 10.
[31] Email from ▮▮▮▮ to ▮▮▮▮, cc: ▮▮▮▮, Subject: RE: Pediatrics research proposal – ▮▮▮▮ Baylor College of Medicine, Oct. 20, 2014, 8:42 AM, attachment 10.

6

- ▆▆▆▆▆ needs to provide a description of how the tissue should be collected, processed, stored, and transported.

1. RESPONSE [sic]: ▆▆▆▆▆ would like the fetal cadaveric tissue transported on ice to our site. However, she would like to know if Planned Parenthood would be willing to separate out and send the brain, thymus, spleen and liver and how much would this process cost us? PPGC is unable to dissect the tissue per request. It is also important to understand PPGC performs D&E's so that there's disarticulation versus a whole fetus. [sic]

- Discuss the new gestational age calculation per TX state regulations with ▆▆▆▆▆. ▆▆▆▆▆ will provide us with the new gestation age calculation formula. ▆▆▆▆▆ The new state limit is 20 weeks post fertilization so 21.6wks LMP, which is how we calculate and our ultrasound machines are calibrated. Therefore, we could collect samples between 20-21.6wks [sic]
- ▆▆▆▆▆ would like to have ▆▆▆▆▆ and her team over for a meeting before the study is ready to get started. RESPONSE: ▆▆▆▆▆ agrees with the idea. [sic][32]

Draft contract between PPGC and BCM

BCM produced copies of a draft contract with PPGC for the procurement of fetal tissue that were never executed to the Panel. Under the proposed terms, BCM would have been required to pay PPGC $5,700 for 25 executed informed consents, plus "$50 staff time expense involved in obtaining consent and relevant study documentation. This includes consents for which no sample is obtained. Planned Parenthood [Gulf Coast] will consent up to 500 patients,"[33] reimbursement of $100 per-informed consent for sterile procedure room set-up and sample collection, and annual administrative fees of $2,000 for "Surgical Services and Research Management oversight, consent storage, and supply storage. This list is not all inclusive."[34] Had the contract been executed, BCM would have paid PPGC up to $25,000 for 500 consents.

November 17, 2014 email from ▆▆▆▆▆ to ▆▆▆▆▆

On November 17, 2014, ▆▆▆▆▆ sent ▆▆▆▆▆ an email, the subject of which was to "Pediatrics Research Proposal – ▆▆▆▆▆ Baylor College of Medicine – IRB Approval Obtained," that stated: "First, I would like to thank you for your support through our IRB review process . . .. Our IRB proposal for your outlining the study procedures/objectives is also attached for your reference. Lastly, I submitted the clinical consent you provided for tissue donation (attached) to BCM IRB and it was deemed acceptable for use."[35]

---

[32] Email from ▆▆▆▆▆ to ▆▆▆▆▆; ▆▆▆▆▆, Subject: RE: Pediatrics research proposal – ▆▆▆▆▆/Baylor College of Medicine, Oct. 20, 2014, 3:10 PM, attachment 11. (emphasis and red highlights in original).
[33] Tissue Supply and Biological Specimen Agreement between Planned Parenthood Gulf Coast, Inc. and Baylor College of Medicine, attachment 12.
[34] *Id.*
[35] Email from ▆▆▆▆▆ to ▆▆▆▆▆, Subject: RE: Pediatrics research proposal – ▆▆▆▆▆/Baylor College of Medicine – IRB approval obtained, Nov. 17, 2014, 10:31 AM, attachment 13.

7

November 17, 2014 email from ▮▮▮▮ to ▮▮▮▮

▮▮▮▮ replied "Thank you!"[36]

Emails demonstrating PPGC knew that BCM IRB approved the fetal tissue research proposal

Multiple email exchanges between ▮▮▮▮ and persons at BCM show that PPGC knew the BCM IRB had approved the proposal. For example: On July 7, 2015, ▮▮▮▮ sent an unknown document to ▮▮▮▮;[37] ▮▮▮▮ replied, "Just to clarify, you would like me to insert specifics on the experiments we plan to perform and replace the highlighted text with that corrected version of our experimental plans?"[38] ▮▮▮▮ stated, "Yes, please insert any language that is pertinent to the project – this was meant to be a reference only."[39]

Center for Medical Progress videotapes

On July 14, 2015, the Center for Medical Progress ("CMP") began its release of videotapes obtained during the course of its 30-month long investigation into the sale of fetal tissue by PPFA affiliates to tissue procurement companies.[40] The release of the videos prompted several congressional investigations, and led to the Panel's creation by the U.S. House of Representatives.[41] The timing behind the start of CMP's release of its videotapes is relevant in light of how PPGC ended its negotiations with BCM.

October 13, 2015 email from ▮▮▮▮ to ▮▮▮▮

On October 13, 2015, ▮▮▮▮ sent ▮▮▮▮ an email in which she stated:

> Hello ▮▮▮▮ I hope that you are well and had a great weekend.
>
> In light of recent events, do we need to make a change to our contract?
>
> I still very much believe in the value of my NIH funded studies, and would very much like to proceed it this is possible.[42]

November 4, 2015 email from ▮▮▮▮ to ▮▮▮▮

▮▮▮▮ did not reply until November 4, 2015, when she stated:

---

[36] Email from ▮▮▮▮ to ▮▮▮▮ Nov. 17, 2014, 12:01 PM, attachment 13.
[37] Email from ▮▮▮▮ to ▮▮▮▮, Jul. 7, 2015, 4:32 PM, attachment 14.
[38] Email from ▮▮▮▮ to ▮▮▮▮ Subject: RE: Pediatrics research proposal – ▮▮▮▮ Baylor College of Medicine – IRB approval obtained, Jul. 7, 2015, 4:40 PM, attachment 15.
[39] Email from ▮▮▮▮ Jul. 7, 2015, 4:43 PM, attachment 15.
[40] *See* Center for Medical Progress website, http://www.centerformedicalprogress.org/human-capital/ (last visited Nov. 2, 2016).
[41] *Supra* note 1.
[42] Email from ▮▮▮▮ to ▮▮▮▮, Subject: RE: Pediatrics research proposal – ▮▮▮▮ Baylor College of Medicine – IRB approval obtained, Oct. 13, 2015, 2:59 PM, attachment 16.

8



> To clarify: we do not have a valid contract, and I did not offer you a contract. I previously provided some exemplar language that should have been included in any contract regarding fetal tissue with the expectation that BCM Grants and Contracts or a BCM attorney would draft a complete contract for both parties to review.
>
> PPGC will not commit to engage in any fetal tissue research endeavors at this time.
>
> I encourage all academic researchers to escalate their need for donated fetal tissue to their department chair, IRB chairs, chancellors, etc. Academic institutions in Texas cannot remain publically silent regarding their need for donated fetal tissue in research, yet have expectations that research collaboration with Planned Parenthood will remain intact.[43]

October 22, 2015 visit by Texas law enforcement to PPGC

On October 22, 2015, nearly a year after PPGC learned that BCM's IRB had given its approval[44] and ▉▉▉▉ sent her email to ▉▉▉▉ in which she stated that PPGC would not commit to engage in any fetal tissue research endeavors at this time,[45] representatives of the Texas Department of Public Safety Texas Ranger Division, the House Police Department homicide division, and the Harris County district attorney's office visited PPGC headquarters to investigate allegations that PPGC may have violated Tex. Penal Code 48.02[46] The report refers to PPGC as GCPP.

During the course of this visit, PPGC's attorney introduced the law enforcement representatives to ▉▉▉▉, who the attorney described as being a "Long time Baylor employee" who "had been instrumental in building the current research program."[47] The Texas Department of Public Safety Texas Ranger Division report stated that:

> [PPGC's attorney] advised that the last collected fetal tissue specimen collected by GCPP for a scientific study was on 07-26-2011, for the University of Texas Medical Branch. GCPP was recently approached by the Baylor College of Medicine and Rice University for fetal tissue studies. **The Institutional Review Board had not yet given approval for the Baylor or Rice studies.**[48]

The emails cited above demonstrate that ▉▉▉▉ and potentially other PPGC officials knew that BCM's IRB had approved the research project, despite representations of PPGC's attorney to Texas law enforcement officials that no IRB approval had been obtained by BCM. In addition,

---

[43] Email from ▉▉▉▉ to ▉▉▉▉, Subject: RE: Pediatrics research proposal – ▉▉▉▉ Baylor College of Medicine – IRB approval obtained, Nov. 4, 2015, 2:59 PM, attachment 17.
[44] Attachments 14, 15, 16, 17.
[45] Attachment 17.
[46] *See* Tex. Dept. of Pub. Safety Tex. Ranger Div., Report of Investigation, attachment 18.
[47] *Id.* at 2, paragraph 3.5.
[48] *Id.* at 4, paragraph 3.17. (emphasis added).

9

the Panel has learned that the release of the CMP videotapes was the reason that ▇ cancelled the negotiations with BCM, and sent her November 4, 2015 email.

**Potential Violations of Texas Law**

Prohibition of the Purchase and Sale of Human Organs

The Texas Penal Code makes it a misdemeanor if anyone "**knowingly or intentionally offers to buy, offers to sell, acquires, receives, sells, or otherwise transfers** any human organ for valuable consideration."[49] Under the statute, "valuable consideration" does not include "a fee paid to a physician or to other medical personnel for services rendered in the usual course of medical practice or a fee paid for hospital or other clinical services," "reimbursement of legal or medical expenses incurred for the benefit of the ultimate receiver of the organ;" or "reimbursement of expenses of travel, housing, and lost wages incurred by the donor of a human organ in connection with the donation of the organ."[50]

The statute defines a human organ as "the human kidney, liver, heart, lung, pancreas, eye, bone, skin, **fetal tissue**, or any other human organ or tissue, but does not include hair or blood, blood components (including plasma), blood derivatives, or blood reagents."[51]

False Report to Peace Officer, Federal Special Investigator, or Law Enforcement Employee

The Texas Penal Code likewise makes it a misdemeanor for a person to lie to a law enforcement officer. The law states:

> A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to: . . . a peace officer or federal special investigator conducting the investigation; or . . . any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation.[52]

---

[49] Tex. Penal Code § 48.02(b). (emphasis added).
[50] Tex. Penal Code § 48.02(c).
[51] Tex. Penal Code § 48.02(a). (emphasis added).
[52] Tex. Penal Code Title 8, § 37.08.

10

Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether PPGC violated these statutes, and, if you agree that such violations occurred, to take all appropriate action. If you have any questions about this request, please contact T. March Bell at (202) 226-9027, March.Bell@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chairman
Select Investigative Panel

Attachment

cc: The Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel

11

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

November 30, 2016

**VIA EMAIL**

Mr. Michael Hestrin
District Attorney
County of Riverside
3960 Orange Street
Riverside, CA 92501

Dear District Attorney Hestrin:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion providers and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents and received testimony from confidential informants indicating that Advanced Bioscience Resources (ABR) allegedly violated state law, including but not limited to the Cal. Health & Safety Code § 125320(a) and the California Penal Code § 367f(a), which forbid the transfer of fetal tissue for valuable consideration.

Among the abortion clinics from which ABR procured fetal tissue was Planned Parenthood of the Pacific Southwest,[1] located at ███████████████████████████████████, which has clinics throughout the region, including Planned Parenthood – Riverside Family Planning Center, located at ███████████████████████████████.[2]

---

[1] Planned Parenthood Federation of America, Production to the Subcommittee on Oversight and Investigations of the US House of Representatives Energy and Commerce Committee, Aug. 20, 2015 (PPFA-HOU_E&C-000162).
[2] Planned Parenthood of the Pacific Southwest Website, https://www.plannedparenthood.org/planned-parenthood-pacific-southwest, last accessed Oct. 25, 2016.

1

## Background on ABR

ABR, a non-profit organization, obtains fetal tissue from abortion clinics and offers it for resale to researchers. It pays the clinics "a flat fee for services on a product of conception (POC) basis, regardless of how many, or what type, of specimens are procured . . . ."[3] The fees range from $45 to $60, depending upon the year and the clinic.[4] The tissue is obtained by ABR tissue technicians who work in the abortion clinics; the technicians harvest, package, and ship the tissue to the researchers.[5] The abortion clinic staff obtains consent from the patients for fetal tissue donations.[6]

## ABR's Interactions with Planned Parenthood Affiliates

ABR had contractual relationships with Planned Parenthood of San Diego and Riverside Counties (now called Planned Parenthood of the Pacific Southwest):

> Planned Parenthood of San Diego and Riverside Counties entered into an agreement with a TPO in June 1999 to facilitate fetal tissue donation by its patients. That affiliate changed its name to Planned Parenthood of the Pacific Southwest, and renewed the tissue donation agreement, in October 2010. The affiliate's participation in the program is ongoing. Planned Parenthood of San Diego and Riverside Counties also received approval for a research program involving fetal tissue donation in October 2008. That program is ongoing through Planned Parenthood of the Pacific Southwest as well.[7]

## ABR Payments to the Abortion Clinics, Including Planned Parenthood Affiliates

During 2015, ABR made nearly $80,000 in payments to its top five abortion clinic sources from which it procured human fetal tissue. ABR claims that it paid the clinic for the "costs for clinical staff obtaining consents, maintaining records, transferring fetal tissue, clinical space, and utilities."[8]

ABR paid Planned Parenthood of Riverside $23,460 in 2015.[9] Furthermore, starting in January 2012, ABR paid Planned Parenthood Pacific Southwest for rented space two days a week for $1,000; if ABR only used the space for one day, it paid $500.[10]

---

[3] Advanced Bioscience Resources, Inc., "ABR Overview: Key Points," at 5 (SP000752).
[4] Advanced Bioscience Resources, Inc., Production to the Subcommittee on Oversight and Investigations of the US House of Representatives Energy and Commerce Committee, Sept. 3, 2015 (HCEC000028 – 41).
[5] Advanced Bioscience Resources, at 7 (SP000754).
[6] Advanced Bioscience Resources, at 5 (SP000752).
[7] Planned Parenthood Federation of American (PPFA-HOU_E&C-000162). *See* Advanced Bioscience Resources, Inc., (HCEC000028 – 41).
[8] ABR Overview: Key Points, at 5 (SP000752).
[9] Advanced Bioscience Resources, Production to the Select Investigative Panel of the US House of Representatives Energy and Commerce Committee, June 7, 2016 (SP000817-826).
[10] Advanced Bioscience Resources (HCEC000039).

2

**Potential Violations of Law**

Under 42 U.S.C. § 289g-2, it is unlawful for any person to "knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce." The term valuable consideration "does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue." Anyone who violates this law is subject to a fine "not less than twice the amount of the valuable consideration received" and/or imprisonment for up to ten years.

California state law includes a nearly identical prohibition. Under Cal. Health & Safety Code § 125320(a), a "person may not knowingly, for valuable consideration, purchase or sell embryonic or cadaveric fetal tissue for research purposes." Virtually identical to the abovementioned federal statute, the California statute states that "'valuable consideration' does not include reasonable payment for the removal, processing, disposal, preservation, quality control, storage, transplantation, or implantation of a part."[11]

Similar provisions in the California Penal Code § 367f(a) prohibit the acquisition, sale, or transfer of "any human organ, for purposes of transplantation, for valuable consideration," subject to a fine of up to $50,000 and imprisonment for up to five years.

To the extent any of payments to the Planned Parenthood affiliates or the other abortion clinics occurred for purposes of transplantation, ABR and any of its business partners so involved would additionally be in violation of California Penal Code § 367f(a).

Based on the facts outlined above and the supporting documentation, I urge your office to conduct a thorough investigation into whether Advanced Bioscience Resources violated these statutes and regulations, and, if you agree that such violations occurred, to take all appropriate action. If you have any questions about this request, please contact T. March Bell at (202) 226-9027, March.Bell@mail.house.gov.

Sincerely yours,

Marsha Blackburn
Chair
Select Investigative Panel

Attachment(s)

cc:   The Honorable Jan Schakowsky
      Ranking Member
      Select Investigative Panel

---

[11] Cal. Health & Safety Code § 125320(b).

3

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115
Majority (202) 225–2927
Minority (202) 225–3641

November 30, 2016

**Via Email**

The Honorable Pam Bondi
Attorney General
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Dear Attorney General Bondi:

On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Investigative Panel (the "Panel") and empowered it to conduct a full and complete investigation regarding the medical practices of abortion businesses and the practices of entities that procure and transfer fetal tissue.

Over the course of our investigation, we have uncovered documents and received information indicating that Presidential Women's Center, Inc. ("PWC"), at least in part through its relationship with StemExpress, LLC ("StemExpress"), a firm that procures fetal tissue from abortion businesses and transfers it to research customers, violated various provisions of federal and state law, including but not limited to 42 U.S.C. § 289g-2 and Fla. Stat. § 873.05, which forbid the transfer of fetal tissue for valuable consideration.

**StemExpress's Business Model and Growth Strategy**

StemExpress was founded in 2010 as a for-profit company and continues operations as StemExpress Foundation. Under its business plan, StemExpress recruited and screened businesses that were most likely to perform abortions that could produce saleable tissue to researchers.[1] The company sought information about the number of abortions the businesses performed each week, the gestational age of fetuses scheduled to be aborted, the days the abortions were done, whether

---

[1] StemExpress Website Recruitment Form for Abortion Clinics, attachment 1.

1

digoxin[2] was used (which would taint the tissue and, thus, render the baby useless for obtaining tissue), and, if so, at what age it was used. Researchers ordered tissue using StemExpress's website. The firm initially had a drop-down menu that allowed researchers to obtain various types of tissue.[3] It later switched to another web-based system.

In order to harvest the tissue at PWC, a typical work day for PWC staff went as follows:

- At the beginning of the day, PWC staff logged into the StemExpress Daily Task Page website, which included the day's orders for certain baby body parts and the gestation period, letting PWC staff know what they needed to harvest that day.[4]

- Next PWC staff met with the patients waiting to be prepped for their abortions, and convinced them to consent to donate by saying that the donation will help cure diabetes, Parkinson's, and heart disease.[5]

- After an abortion, PWC staff collected the baby's remains and procured the body parts that were ordered.[6] PWC staff then packed the tissues or body parts, and shipped them directly to the customer via FedEx.[7]

- Throughout the day, PWC staff updated the StemExpress Daily Task Page website, informing both StemExpress and all other participating abortion businesses' staff of certain patient details via their responses to certain requests.[8]

- PWC staff further shared details from patients' private medical files with StemExpress via forms such as the StemExpress form "Patient and Sample Information Form for Research Study," which asks for the following patient information: name or kit ID, mother's date of birth, mother's ethnicity, date collected (i.e., date of abortion), and gestational age at time of blood draw.[9] The form admonishes, "Please fill out and return with the samples to ensure timely compensation!"[10] Other information appearing on StemExpress Researcher Procurement Forms includes patient height, patient weight, patient smoking history,[11] and

---

[2] Digoxin is a heart medication that sometimes is injected into the amniotic fluid or fetus to cause fetal demise before surgical or induction abortion. *See* Abortion in California: A Medical-Legal Resource, *available at* http://californiaabortionlaw.com/wp/?page_id=135.
[3] StemExpress Drop-Down Ordering Menu, attachment 2.
[4] PWC00046, PWC00023-PWC00024.
[5] BioMed IRB Informed Consent to Participate in a Clinical Research Study, Sponsor: StemExpress, LLC, attachment 3; *see also* PWC00023.
[6] PWC00023-PWC00024, PWC00040-PWC00042, PWC00054-PWC00057.
[7] PWC00029-PWC00030, PWC00032-PWC00034, PWC00040-PWC00042, PWC00050-PWC00052. FedEx is the primary shipping method for StemExpress samples. FedEx pickups were scheduled every Tuesday and Thursday for Lab #1 specimens, and tissue samples were dropped off directly with FedEx. For each package, the weight was always listed as 4 lbs. *See* PWC00029-PWC00031, PWC00032. One document stated that the declared value should always be $1,250 per sample, PWC00030, and another form indicated that the declared value of blood specimens should be $500 and of tissue specimens, $750. PWC00033.
[8] PWC00046-PWC00048.
[9] PWC00026.
[10] PWC00026.
[11] PWC00027.

fetal sex.[12] PWC staff further disclosed information from patient data sheets with StemExpress.[13]

StemExpress's stunning revenue growth five years after its formation belies the notion that the firm was not operating for profit. In 2010, its revenue was $156,312; during 2011, that figure more than doubled to $380,000; a year later, in 2012, StemExpress's revenue nearly tripled to $910,000; by 2013, its revenue was $2.20 million; then in 2014, the revenue had once again more than doubled to $4.50 million. Based on its three-year revenue growth of 1,315.9%, *Inc. Magazine* named StemExpress one of the fastest-growing privately held companies in the U.S.[14]

This revenue growth accompanied an aggressive marketing strategy directed toward abortion businesses. StemExpress distributed its brochure at a conference hosted by the National Abortion Federation (NAF). The brochure promised businesses they would be "[f]inancially profitable" if they allowed StemExpress to procure tissue from the businesses. The brochure also said "By partnering with StemExpress" the businesses will not only help research "but [they] will also be contributing to the fiscal growth of [their] own clinic[s]."[15]

When StemExpress was formed, billing records show the firm was procuring fetal tissue from four businesses. By the end of 2014, the firm had "relationships with more than 30 procurement sites across the country."[16] However, many of those procurement sites had multiple locations, making the actual number nearly 100. In 2015, StemExpress tried to execute a contract with NAF that would have given the firm potential access to nearly 200 additional locations. Its overall strategy was to provide on-demand body parts to researchers. In order to do that, the firm needed a ready supply of fetal tissue. The only way to achieve that was to dramatically increase the number of abortion businesses from which it would obtain fetal tissue.

**Presidential Women's Center, Inc.'s Contract with StemExpress**

On February 14, 2014, PWC signed a contract with StemExpress providing:

> Presidential Women's Center will provide, and StemExpress will pay the reasonable costs for, services and facilities . . . associated with . . . the removal of fetal organs from POCs [(products of conception)]; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which StemExpress representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining maternal blood; seeking consent for donation of fetal organs and maternal blood from appropriate donors[;] and . . . maintaining records of such consents so that verification of consent can be supported.[17]

---

[12] PWC00029.
[13] *See* PWC00029.
[14] *The 500: Get to know the 500 fastest-growing privately held companies in America*, INC., Sept. 2014, at 137.
[15] StemExpress Brochure Distributed at NAF Conference, attachment 6 (key text highlighted).
[16] Complaint at para. 17, StemExpress, LLC v. Center for Medical Progress, No. BC-589145 (L.A. Super. Ct. filed Jul. 27, 2015).
[17] PWC0001.

3

In return, StemExpress contracted to pay PWC $50.00 per 60ccs of maternal blood and $75.00 for the collection of fetal tissue, if the collection was handled solely by PWC staff. If StemExpress staff participated in the collection, these payments were reduced. PWC agreed to invoice StemExpress monthly by number of tissue and number of maternal bloods procured.[18]

PWC agreed to allow StemExpress access to patients' charts and identity of donors "as necessary to obtain patients' consent for use of POCs and maternal bloods."[19]

### **Presidential Women's Center, Inc.'s Profit**

PWC billed StemExpress for the following amounts, and indicated that it was paid for the total amount, other than $300.00 related to the 1/5/2016 invoice. Based on both the invoices and the "Protocol for Stem Express Research,"[20] it appears that PWC provided only fetal livers and villi to StemExpress.[21]

---

[18] PWC0001.
[19] PWC0002: "StemExpress will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods."
[20] PWC00024.
[21] It may also have provided placenta at some point. *See* PWC00029.

4

| INVOICE DATE | ITEM | COST PER ITEM | TOTAL INVOICE AMOUNT |
|---|---|---|---|
| 4/25/2014 | POC x3 (2 livers and 1 villi) Maternal blood x18 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,125.00 |
| 5/9/2014 | POC x3 (3 livers) Maternal blood x16 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,025.00 |
| 5/23/2014 | POC x3 (3 livers) Maternal blood x8 | POC @ $75.00 each Maternal blood @ $50.00 each | $625.00 |
| 6/12/2014 | POC x1 (1 liver) Maternal blood x6 | POC @ $75.00 each Maternal blood @ $50.00 each | $375.00 |
| 6/20/2014 | Maternal blood x6 | Maternal blood @ $50.00 each | $300.00 |
| 7/19/2014 | Maternal blood x14 | Maternal blood @ $50.00 each | $700.00 |
| 8/1/2016 | POC x2 (2 livers) Maternal blood x10 | POC @ $75.00 each Maternal blood @ $50.00 each | $650.00 |
| 8/28/2014 | Maternal blood x13 | Maternal blood @ $50.00 each | $650.00 |
| 9/9/2014 | POC x1 (1 liver) Maternal blood x11 | POC @ $75.00 each Maternal blood @ $50.00 each | $625.00 |
| 10/31/2014 | POC x6 (6 livers) Maternal blood x12 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,050.00 |
| 11/26/2014 | POC x1 (1 liver) Maternal blood x14 | POC @ $75.00 each Maternal blood @ $50.00 each | $775.00 |
| 1/13/2015 | Maternal blood x10 | Maternal blood @ $50.00 each | $500.00 |
| 1/31/2015 | Maternal blood x15 | Maternal blood @ $50.00 each | $750.00 |
| 3/5/2015 | unknown[22] | | $1,450.00 |
| 4/30/2015 | POC x12 (4 livers and 8 villi) Maternal blood x18 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,800.00 |
| 7/3/2015 | POC x16 (4 livers and 12 villi) Maternal blood x28 | POC @ $75.00 each Maternal blood @ $50.00 each | $2,600.00 |
| 8/3/2015 | POC 11 (1 liver and 10 villi) Maternal blood x14 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,525.00 |
| 9/2/2015 | POC x12 (3 livers and 9 villi, including that from twins) Maternal blood x11 | POC @ $75.00 each Maternal blood @ $50.00 each | $1,450.00 |
| 1/5/2016 | unknown[23] | | $2,625.00 |
| **TOTAL** | | | **$20,600.00** |

---

[22] PWC did not provide this invoice in response to the Panel's Request No. 2.
[23] PWC did not provide this invoice in response to the Panel's Request No. 2.

5

Unsurprisingly, PWC indicated that they "prefer patients consent to both" blood and tissue donation, though they indicate that they would accept consent for blood only.[24]

**StemExpress's Profit and Loss**

StemExpress paid $75.00 for each fetal tissue sample it obtained from abortion businesses, and then transferred them to researchers for $595 to $910 per tissue or body part.

### Payments from Customers to StemExpress

| Customer | Date | Item | Cost |
|---|---|---|---|
| Redacted by StemExpress | September 25, 2014 | Human Fetal Tissue | $5,950.00 |
| Redacted by StemExpress | September 25, 2014 | Packaging- Gel Pack or Wet Ice | $150.00 |
| Redacted by StemExpress | September 25, 2014 | Local Delivery Flat Rate | $2,250.00 |
| | | Estimated Tax | $730.64 |
| **TOTAL:** | | | **$9,080.64** |
| | | | |
| Redacted by StemExpress | November 14, 2014 | Human Fetal Brains | $3,340.00 |
| | | Estimated Tax | $292.25 |
| **TOTAL:** | | | **$3,632.25** |
| | | | |
| Redacted by StemExpress | December 16, 2014 | Human Fetal Tissue (upper and lower limbs with hands and feet) | $890.00 |
| Redacted by StemExpress | December 16, 2014 | Human Fetal Tissue (calvarium matched to upper and lower limbs) | $595.00 |
| | | Estimated Tax | $129.95 |
| **TOTAL:** | | | **$1,614.95** |
| | | | |
| Yale University | January 19, 2012 | Fetal Brain Procurement | $2,860.00 |
| Yale University | January 19, 2012 | FedEx Priority Overnight | $85.00 |
| Yale University | January 19, 2012 | FedEx Priority Overnight | $85.00 |
| Yale University | January 19, 2012 | Fetal Brain Procurement | $2,145.00 |
| Yale University | January 19, 2012 | Credit for samples | -$2860.00 |
| Yale University | January 19, 2012 | Credit for FedEx | -$85.00 |

---

[24] PWC00023.

6

| Customer | Date | Item | Cost |
|---|---|---|---|
| TOTAL: | | | $2,230.00 |

Attached is a sample of a StemExpress invoice to a customer.[25] A comparison of invoices, attorney-created accounting documents, and productions from multiple StemExpress customers shows that the firm may have made a profit when procuring and transferring fetal tissue, and passed a portion of that profit along to the businesses from which it obtained its tissue and blood specimens. The Panel's cost analysis shows StemExpress overstated some of its labor costs, and claimed as expenses shipping, supplies, and infectious disease screenings. These were costs charged to researchers.

---

[25] Sample StemExpress Invoice to Customer, attachment 7.

7

## COMPARISON OF STEMEXPRESS COST ANALYSIS WITH GENERALLY ACCEPTED INDUSTRY STANDARDS FOR ONE UNIT OF FETAL TISSUE IN 2013

- ▓ COST ITEMS AND ESTIMATE PRODUCED BY STEMEXPRESS
- ▓ ADJUSTED BASED ON REASONABLE INDUSTRY STANDARDS
- ▓ COSTS ALLOCATED TO MATERNAL BLOOD ESTIMATED AT 50%

| Cost Item | Description | Estimated Time | Estimated Cost/Expense | Recalculated Time | Recalculated Cost/ Expenses | ½ Costs for Maternal Blood |
|---|---|---|---|---|---|---|
| Procurement Management Labor | Receive and evaluate purchase order, enter into Computer system and task board, assign to clinics. | 1 hour x $35 | $25.00 | .5 hour x $35 | $12.50 | $ 6.25 |
| Packaging Supplies Labor | Packaging all supplies needed for procurement. | 1 hour x $10 | $10.00 | .5 hour x $10 | $5.00 | $2.50 |
| Shipping | Supplies to Clinic | N/A | $15.00 | | $15.00 | $7.00 |
| Mileage | Mileage paid to technician (.56/mile) | N/A | $75.00 | | $75.00 | $35.00 |
| Supply cost | Box, conical tube, media, petri dish, labels, biohazard bag, gel packs, etc. | N/A | $30.00 | | $30.00 | $15.00 |
| Technician Base Labor | Patient consent, procurement, paperwork packaging. | 8 hour x $10 | $80.00 | 1 hour x $10 | $10.00 | $5.00 |
| Technician Supplemental Compensation | Technician Supplemental Compensation | N/A | $30.00 | | $0.00 | $0.00 |
| Clinic Reimbursement | Technician space, storage of supplies, blood draw chair usage, consent space | N/A | $55.00 | | $55.00 | $27.50 |
| Infectious Disease Draw | Supplies: tubes, labels, needle, biohazard bag, etc. | N/A | $15.00 | | $15.00 | $7.50 |
| Infectious Disease Screening | Screening for HIV, HepB, HepC, LCMV | N/A | $70.00 | | $70.00 | $35.00 |
| Shipping | Average Shipment cost to the Lab (blood and/or tissue) | N/A | $20.00 | | $20.00 | $10.00 |
| Procurement Management Labor | Review paperwork, communications with courier, communications with researcher | 1 hour x $35 | $35.00 | | $35.00 | $5.00 |
| Product Receipt | Receipt of product at front desk, check into Sage, check into log | 1 hour x $15 | $15.00 | .25 hour x $15 | $4.00 | $2.00 |
| Inventory & Supply Management | Prorated stores management | 1 hour x $20 | $20.00 | .25 hour x $20 | $5.00 | $2.50 |
| | | | $495.00 | | $351.50 | 175.75 |

8

Attorneys for StemExpress created several cost estimates (orange numbers) that purport to show that Stem Express loses money each time it procures a fetal tissue sample and ships it to a customer. Shown in orange, the cost estimates produced by the attorneys are inconsistent with accounting records produced by StemExpress itself. For example, StemExpress lists **Clinic Reimbursement** which the Panel found was **not** an actual payment made by StemExpress. Also, the costs associated with shipping and infectious disease are passed on to the customer and thus are **not** a cost to StemExpress. Finally, management labor costs at one hour per item ordered, which are counted twice, are dramatically inconsistent with the number of orders actually handled by StemExpress. Similarly, StemExpress estimates do **not** allocate any costs (such as mileage) to maternal blood which is harvested at the abortion business at the same time the human fetal tissue is harvested.

Sample review of a sale of fetal tissue to customer Baylor per invoice #1940 of 1/12/2013
Sale price for Tissue $250.00
Disease screening charged to client $125.00
Shipping charged to client $85.00
Total Revenue obtained from this sale $460.00
Estimated cost of Tissue (per above) $175.75
Excess of revenue over cost $217.00

Sample review of a sale of fetal tissue to customer Baylor per invoice #1940 of 1/12/2013
Sale price for Tissue $250.00
Disease screening charged to client $125.00
Shipping charged to client $85.00
Total Revenue obtained from this sale $460.00
Estimated cost of Tissue (per above) $351.00
Excess of revenue over cost $108.50

### Violation of Applicable Laws

Under 42 U.S.C. § 289g-2, it is unlawful for any person to "knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce."[26] The term "'valuable consideration' does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue."[27] Anyone who violates this law is subject to a fine "not less than twice the amount of the valuable consideration received" and/or imprisonment for up to ten years.[28]

Florida state law includes a nearly identical prohibition. Under Fla. Stat. § 873.05, a "person may not knowingly advertise or offer to purchase or sell, or purchase, sell, or otherwise transfer, a human embryo for valuable consideration," and further, "may not advertise or offer to purchase, sell, donate, or transfer, or purchase, sell, donate, or transfer, fetal remains obtained from an abortion."

The Florida statute's definition of "valuable consideration" is virtually identical to that of the federal statute.[29] Fla. Stat. § 873.05(3) provides that this activity is a felony of the second degree, and is subject to a fine of up to $10,000 and/or imprisonment for up to 15 years for a first offense.[30]

---

[26] 42 U.S.C. § 289g-2(a).
[27] 42 U.S.C. § 289g-2(e)(3).
[28] 42 U.S.C. § 289g-2(d).
[29] Such consideration "does not include the reasonable costs associated with the removal, storage, and transportation of a human embryo." Fla. Stat. § 873.05(1). It may include such costs as associated with a fetus, as well as the other activities for which StemExpress set a flat fee for payment to PWC.
[30] Fla. Stat. § 775.082-083; *see also* Fla. Stat. § 775.084 for sentencing of repeat offenders.