# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**PLANNED PARENTHOOD GULF COAST, INC., ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 18-176-JWD-RLB**

**REBEKAH GEE**

## RULING AND ORDER

This matter is before the Court on two motions.  First, Defendant Rebekah Gee moves to dismiss this case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  ("Motion to Dismiss," Doc. 38).  Attached in support of the Motion to Dismiss are, *inter alia*, declarations by Cecile Castello, Director of the Health Standards Section of the Louisiana Department of Health ("LDH"), (Doc. 38-2), and by Patrick Magee, Director of the Criminal Division of the Louisiana Department of Justice, (Doc. 38-14).  Planned Parenthood Gulf Coast, Inc. ("PPGC"), Planned Parenthood Center for Choice ("PPCfC"), and three Jane Doe plaintiffs (collectively, "Plaintiffs"), have filed an Opposition to the Motion to Dismiss, (Doc. 41), supported by a declaration of Melaney Linton, the President and CEO of PPGC and PPCfC, (Doc. 41-1).  Defendant has filed a Reply in further support of the Motion to Dismiss. (Doc. 42).

Second, Plaintiffs move for limited expedited discovery in this action under Rule 26(d). ("Motion for Discovery," Doc. 5).  Defendant has filed an Opposition to this Motion, (Doc. 33), and Plaintiffs have filed a Reply in further support of the Motion for Discovery, (Doc. 36).

Upon the Court's request, both sides have also submitted "timelines" of the events giving rise to this action.  (Docs. 31, 32).

For the reasons set forth below, the Motion to Dismiss is DENIED without prejudice to renewal, and the Motion for Discovery is GRANTED.

I.     **Relevant Background**

       **A.  Introduction and State Regulatory Framework**

This case, brought under 42 U.S.C. § 1983 and the federal Constitution, challenges "the State of Louisiana's unconstitutional attempts to prevent PPGC and PPCfC from providing comprehensive reproductive health care services, including abortion, to their patients in Louisiana who need that care."  (Doc. 1 at 1).  PPGC is a Texas not-for-profit corporation that operates two "health centers" in Louisiana that provide numerous family planning and preventative health services.  (*Id.* at 6).  PPCfC is a Texas not-for-profit corporation that has a "facilities and services agreement with PPGC" permitting PPCfC to lease space, services, and staff from PPGC in order for PPCfC to provide abortions at health centers owned by PPGC.  (*Id.* at 7).  Both PPGC and PPCfC purport to sue "on behalf of [themselves] and [their] Louisiana patients."  (*Id.* at 6-7).  The three Jane Doe plaintiffs are Louisiana residents and Medicaid patients.  (*Id.*).  The sole Defendant is Rebekah Gee in her official capacity as Secretary of LDH, which is the agency responsible for licensing abortion facilities in Louisiana and administering the Louisiana Medicaid program.  (*Id.* at 7).

This case also implicates Louisiana's framework for regulating outpatient facilities that provide abortions.  An outpatient abortion facility may not be established or operated in Louisiana without a license.   La. R.S. § 40:2175.4(A).   LDH has the authority to promulgate rules, regulations, and licensing standards for such facilities.  *See* La. R.S. § 40:2175.5.

State law permits LDH to deny a license, refuse to renew a license, or revoke an existing license if "an investigation or survey determines that the applicant or licensee is in violation of any provision of this Part, in violation of the licensing rules promulgated by the department, or in violation of any other federal or state law or regulation."  La. R.S. § 40:2175.6(G).  An applicant

or licensee has the right to appeal after receiving written notice of such a denial, nonrenewal, or revocation.   La. R.S. § 40:2175.6(G)(1), (G)(2).   State regulations similarly provide that an outpatient abortion facility must be in compliance with the law before it will be issued a license. La. Admin. Code tit. 48, Pt I, § 4403(C) ("An outpatient abortion facility shall be in compliance with all applicable federal, state, and local statutes, laws, rules, regulations, and ordinances, including department rules, regulations, and fees, governing or relating to outpatient abortion facilities, abortion or termination procedures, reporting requirements, ultrasound requirements, informed consent requirements or any other matter addressed by law related to an abortion or abortion procedures before the outpatient abortion facility will be issued an initial license to operate.").

In 2016, the Louisiana legislature passed House Bill 606 ("HB 606"), which provides, with limited exceptions, that "[n]o institution, board, commission, department, agency, official, or employee of the state, or of any local political subdivision thereof, shall contract with, award any grant to, or otherwise bestow any funding upon, an entity or organization that performs abortions, or that contracts with an entity or organization that performs abortions, in this state."   La. R.S. §§ 36:21(B)(1), 40:1061.6(A)(2); (*see also* Doc. 1-3 at 2-4).

### B.  Underlying Events

The Complaint alleges that, starting over a decade ago, PPGC and PPCfC began making plans to open a "new and expanded health center in New Orleans" that would provide comprehensive healthcare services, including abortion.  (Doc. 1 at 2).  According to Plaintiffs, PPGC and PPCfC have been subject to "politically-motivated 'investigations'" of their practices since "at least 2013" as a result of their plans to provide abortions at the proposed center.  (*Id.* at 9).  In that year, the Louisiana legislature passed a resolution directing several state entities to

"review and monitor" the practices of PPGC to determine whether it was in compliance with state and federal laws and regulations.  (Doc. 1 at 9-10; Doc. 1-3 at 6-9; Doc. 32 at 3-4).

The Complaint also maintains that, in 2012, LDH promulgated, with the specific purpose of preventing PPCfC from providing abortions at the proposed center, a "bogus" requirement that new abortion clinics in the state undergo a "facility need review" ("FNR") before receiving a license.  (Doc. 1 at 10; *see also* Doc. 32 at 1).  PPCfC attempted to comply with the requirement by applying for FNR approval in October 2014, appealing from a January 2015 denial of the FNR application, and "supplementing" that application in April 2015.  (Doc. 1 at 10; Doc. 32 at 1-2).  LDH rescinded the FNR requirement by July 2015.  (Doc. 1 at 11; Doc. 32 at 2).

Plaintiffs also claim that, in July 2015, LDH began an investigation of PPGC and PPCfC's fetal tissue disposal practices in response to "deceptively edited YouTube videos," which this Court and the Fifth Circuit subsequently ruled did not provide a valid basis for terminating PPGC's Medicaid contracts because "no misconduct of any kind ha[d] been alleged, let alone shown, as it pertain[ed] to PPGC's operations in Louisiana." (Doc. 32 at 4 (citing *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 649 (M.D. La. 2015), *aff'd sub nom. Planned Parenthood Gulf Coast, Inc. v. Gee,* 862 F.3d 445 (5th Cir. 2017))).  Plaintiffs also generally allege that multiple investigations of Planned Parenthood affiliates in response to the YouTube videos have found no evidence of wrongdoing.  (Doc. 1 at 18-19; Doc. 32 at 4-5).

Despite this opposition, the New Orleans center opened in July 2016, but it does not provide abortion services because it is not licensed to do so.  (Doc. 1 at 11, 16; Doc. 32 at 2).  Thus, on September 29, 2016, PPCfC submitted an application to LDH for licensure as an outpatient abortion facility, and LDH received the application on October 3, 2016.  (Doc. 1 at 3; Doc. 31 at 1; Doc. 32 at 2).  Over the next several months, LDH and PPCfC engaged in some additional

4

communications concerning the proposed facility, although the parties appear to dispute the extent and nature of these communications.  (*See* Doc. 32 at 3 (according to Plaintiffs, LDH made "a series of requests for additional information and thereby further delay[ed] processing PPCfC's application over a period of about five months"); Doc. 38-1 at 4 (according to Defendant, LDH notified PPCfC of "several deficiencies" in the application on November 16, 2016, and received no response until April 11, 2017, "a five-month delay on PPCfC's part"); Doc. 41-1 at 1-3 (declaration disputing Defendant's account)).  According to Plaintiffs, in late May 2017, LDH confirmed in a telephone call that it considered PPCfC's application "complete."  (Doc. 32 at 3). The proposed facility was inspected in May 2017, although the reason for the inspection is unclear and may also be disputed.  (Doc. 31 at 1; Doc. 41-1 at 2 (inspection was a "routine annual re-inspection" that would have occurred regardless of the application)).

However, in December 2016, while the application was pending, a select investigative committee of the United States House of Representatives released a report identifying potential violations of the law by PPGC in Texas.  (Doc. 38-1 at 5).  The impetus behind the formation of the committee appears to have been the YouTube videos discussed *supra*, (Doc. 38-4 at 21), but the committee reviewed far more evidence and testimony in reaching its conclusions, (*see id.* at 21-46).  The committee observed that PPGC "may have violated both Texas law and U.S. law when it sold fetal tissue to the University of Texas," and it referred PPGC's "potential violations of state law" to the Texas Attorney General for investigation.  (*Id.* at 29, 36; *see also* Doc. 38-1 at 5).

In a letter to PPCfC dated June 13, 2017, LDH stated that, "[p]rior to making a decision on [PPCfC's] licensing application," LDH would conduct an investigation to determine if PPCfC, "either in its own name or through the actions of [PPGC]," was in violation of any federal or state

law or regulation.  (Doc. 38-1 at 6; Doc. 38-3 at 2).  The letter cited the committee's report, the referral of the report's findings to the Texas Attorney General, and Louisiana Revised Statute 40:2175.6(G)'s provision that LDH may deny a license "if an investigation or survey determines that the applicant is in violation of any federal or state law or regulation."  (Doc. 38-3 at 2).  According to the letter, the investigation would "include, among other things," interfacing with the Attorneys General of Louisiana and Texas "and other federal entities."  (*Id.*).  The letter stated that LDH would be "in a position to make a determination on [PPCfC's] application" "[a]fter the conclusion of th[e] investigation."  (*Id.*).  The letter stated that LDH was neither approving or denying the application "[a]t th[at] time."  (*Id.*).

According to Plaintiffs' timeline, they received "no further communication" regarding the status of the application or investigation between June 13, 2017 and February 2018, when this case was filed.  (Doc. 32 at 3).

Defendant's timeline does not discuss any further updates concerning the application.  However, Defendant references an ongoing federal investigation into the activities identified in the report, noting that, in September 2017, eighteen members of the House of Representatives wrote to the U.S. Attorney General to request an update on his review of the report's findings concerning PPGC.  (Doc. 31 at 1; Doc. 38-2 at 3; *see generally* Doc. 38-11).  Additionally, in a March 2018 letter, Texas's Attorney General has confirmed that a state investigation of PPGC is ongoing.  (Doc. 31 at 2; Doc. 38-2 at 3; *see* Doc. 38-13 at 2).  Finally, Defendant claims that, in January 2018, the Louisiana Attorney General received a "confidential complaint" concerning PPGC.  (Doc. 31 at 1; Doc. 38-14 at 1-2).  Defendant maintains that "[c]ertain information" related to the complaint is confidential under state law and subject to a sealing or secrecy order entered by a Louisiana judge, but "[t]o the extent that" the Louisiana Department of Justice is relieved of

the effects of that order "by the judge who entered it," the Department of Justice is prepared to make an *in camera* showing regarding the nature of the complaint and ongoing investigation. (Doc. 38-14 at 3).

### C. Plaintiffs' Claims

Plaintiffs raise five claims for relief challenging the alleged constructive denial of their license, the effects of HB 606, or both.  (Doc. 1 at 30-32).  Claim I alleges that the denial and HB 606 violate PPCfC's patients' due process rights to liberty and privacy as guaranteed by the Fourteenth Amendment because they have the unlawful purpose or effect of imposing an undue burden on women's exercise of their right to an abortion.  (*Id.* at 30).  Claim II alleges that the denial and HB 606 "single out" PPGC, PPCfC, and their patients for unfavorable treatment without justification in violation of the Equal Protection Clause.  (*Id.* at 31).  Claim III alleges that HB 606 violates 42 U.S.C. § 1396a(a)(23) by denying PPGC's Louisiana Medicaid patients the right to choose any willing, qualified provider.  (*Id.*).  Claim IV alleges that HB 606 violates the First Amendment and the Due Process Clause of the Fourteenth Amendment by placing an unconstitutional condition on PPGC's eligibility to participate in Medicaid based on the Plaintiffs' exercise of constitutionally protected activity.  (*Id.*).  Finally, Claim V alleges that the denial violates PPCfC's right to procedural due process by denying PPCfC a license without adequate procedural protections.  (*Id.* at 31-32).

The Complaint seeks declaratory and injunctive relief.  (*Id.* at 32-33).  With respect to the licensing claim, the Complaint seeks an injunction (1) enjoining Defendant from withholding approval of the application; (2) directing Defendant to promptly rule on the application "in accordance with all applicable constitutional requirements"; or (3) directing Defendant to grant the application.  (*Id.* at 32).  Plaintiffs have also filed a motion for a preliminary injunction

"directing Defendant to grant the application" and enjoining Defendant from enforcing HB 606. (Doc. 3-1 at 1).  In support of that request, Plaintiffs allege that irreparable harm has resulted and will continue to result from limiting access to constitutionally protected care.  (Doc. 3-2 at 6-10, 18-19).

## II.     The Instant Motions

### A.  The Motion to Dismiss

#### 1. Defendant's Motion

Defendant moves to dismiss this case for lack of subject matter jurisdiction under Rule 12(b)(1).  (Doc. 38-1 at 7).  Defendant first argues that Plaintiffs' licensing claims are not ripe because the application has not been expressly denied – LDH told PPCfC that no final decision has been made – and the facts do not support a finding of constructive denial.  (*Id.* at 8, 10). Defendant maintains that, under LDH's interpretation of state law, the pending investigations in multiple jurisdictions must "run their course before any licensing decision is appropriate."  (*Id.* at 8-9).  Defendant states that its decision to "pretermit" its ruling based on this interpretation is "neither arbitrary nor capricious," and the Court has no jurisdiction to "second-guess" LDH's interpretation of state law.  (*Id.* at 10 (citing *Pennhurst State School & Hospital v. Halderman*. 465 U.S. 89, 106 (1984))).  Defendant contends that it has provided a "specific benchmark for when it will be able to resolve the application: namely, resolution of pending investigations[,]" and it has "every intention" of "promptly resolv[ing]" the application when the investigations conclude.  (*Id.* at 11).  Defendant argues that waiting will also aid the resolution of this case, whether by mooting it or clarifying the issues to be presented, and "no hardship to Plaintiffs can inure from waiting," as they cannot obtain relief from this Court "as long as [LDH] interprets [S]tate laws to require postponing a decision[.]"  (*Id.*).

Next, Defendant argues that application claims would call for the Court to "supervise an ongoing State-law licensing process," such that *Burford v. Sun Oil Company* counsels abstention and dismissal.  (*Id.* at 8 (citing *Burford*, 319 U.S. 315 (1943)).  According to Defendant, *Burford* counsels abstention by a federal court sitting in equity when state court relief is available and where (1) there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  (*Id.* at 12).  Defendant first observes that Plaintiffs' requests are equitable in nature and that, assuming that Plaintiffs' claims are ripe, state court review is available (and that, unlike a federal court, state courts may also review whether LDH has correctly interpreted state law).  (*Id.* at 12 (citing *Pennhurst*, 465 U.S. at 106)).

Defendant further argues that the Fifth Circuit has set forth five factors for evaluating whether abstention is warranted under *Burford*: (1) whether a cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or "local facts"; (3) the importance of the state interests involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a "special state forum" for judicial review.  (*Id.* at 13 (citing *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993)).  According to Defendant, the first two factors evaluate whether a plaintiff's claim is "entangled in a skein of state law that must be untangled before the federal case can proceed."  (*Id.* at 13 (citing *Sierra Club v. City of San Antonio*, 112 F.3d 789, 795 (5th Cir. 1997)).  Defendant argues that two such "skeins" are present here: the state licensing regime itself and state confidentiality rules applicable to state licensing and investigative processes.  (*Id.* at 13-14).  With respect to the next two factors, Defendant cites

Louisiana's interest in protecting the health and safety of its citizens and expressing respect for unborn human life and the need for a coherent licensing regime to protect those interests. (*Id.* at 14-15). Finally, Defendant argues that state law provides its own "specific procedures and channels" for reviewing licensing decisions. (*Id.* at 15).

Defendant also argues that the relief Plaintiffs seek concerning the licensing claims, *i.e.*, to require that LDH issue a license, would require the Court to override LDH's interpretation of state law in violation of *Pennhurst*. (*Id.* at 8 (citing *Pennhurst*, 465 U.S. at 106). Defendant argues that any claimed right to a license under state law is a creation of state law, and this Court is without power to compel LDH to comply with this Court's own interpretation of state law. (*Id.* at 15-16 (citing *Pennhurst*, 465 U.S. at 106)). Defendant observes that, although a woman's right to an abortion is constitutionally protected, no particular abortion provider has the federal constitutional right to a license. (*Id.* at 16).

Finally, Defendant contends that Plaintiffs' HB 606 claims are "not even arguably ripe" because they are "premised on the theory that *if* PPCfC receives a license, then PPGC's State Medicaid funding would be threatened." (*Id.* at 8). That is, without a license to provide abortions, PPCfC is unaffected by HB 606. (*Id.* at 17-18). Defendant reiterates the obstacles set forth *supra* concerning whether PPCfC might receive a license in the future and whether the Court may order LDH to provide a license. (*Id.* at 18). Defendant also notes that the implementation of HB 606 may be affected by the result of a challenge pending before another section of this Court, in the course of which Louisiana has agreed to stay implementation of HB 606, other related cases, or legislative action.[1] (*Id.* at 4, 18-19).

---

[1] The case before another section of this Court questions the constitutionality of several state statutes and regulations concerning abortion, including HB 606. *June Med. Svcs. v. Gee*, CV 16-cv-00444-BAJ-RLB, Doc. 88 at 2-3 (M.D. La. Dec. 8, 2017) (Second Amended Complaint). The HB 606 challenges in that action arise under the Due Process and Equal Protection Clauses. (*Id.* at 37-39). The parties agreed to stay enforcement of HB 606 during the pendency

## 2. Plaintiffs' Opposition

Plaintiffs oppose the Motion to Dismiss, first arguing that their claims are ripe.  (Doc. 41 at 2-6).  Per Plaintiffs, the "key considerations" of ripeness are the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  (*Id.* at 2 (citing *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008)).  With respect to the "fitness of the issues for judicial decision," Plaintiffs argue that Defendant has confirmed that, "so long as *any* authority is investigating *any* provider associated with Planned Parenthood for *any* reason," a license will not issue (*Id.* at 2 (emphasis in original)).  Plaintiffs contend that the "pretextual and unjustified nature" of the delay is demonstrated by the fact that (1) the only pending Louisiana investigation concerns PPGC, not PPCfC; (2) LDH has no way of controlling how long investigations in other jurisdictions will last and, in some cases, does not know what the allegations in other investigations are; and (3) the investigations involve mere allegations of wrongdoing, rather than the findings of violations contemplated by La. R.S. § 40:2175.(G).  (*Id.* at 3).  With respect to the hardships that waiting will cause, Plaintiffs argue that Defendant's "indefinite delay" is causing PPCfC's patients "serious hardship" by blocking their access to constitutionally protected care.  (*Id.* at 3-4).  Plaintiffs also contend that the Motion to Dismiss generally is directed at Plaintiffs' substantive due process claims, and that Plaintiffs will continue to suffer violations of their equal protection and procedural due process rights absent this Court's action.  (*Id.* at 4).  Plaintiffs also note that the Motion to Dismiss states that LDH has decided to "pretermit" the licensing decision, thereby suggesting that it has been suspended "indefinitely." (*Id.* at 5).

---

of the case.  *Id.* at Doc. 14-1 at 1-2 (Stipulation).  In November 2017, Chief Judge Jackson ruled that certain HB 606 claims in that action were justiciable despite being based on "future injuries," but others (pertaining to relationships with third-party contractors) were not.  *Id.* at Doc. 84 at 17-21, 38 (Ruling and Order).

Plaintiffs also argue that *Burford* abstention is not appropriate.  (*Id.* at 6-8).  First, they argue that state court review of a licensing decision requires a final decision or denial, so it is not clear that state court review is available.  (*Id.* at 6-7).  With respect to the five *Burford* factors set forth by the Fifth Circuit, Plaintiffs first argue that their claims arise under federal law.  (*Id.* at 7).  Next, Plaintiffs argue that this case does not require inquiry into unsettled issues of state law, as they do not contest LDH's general authority to regulate abortion providers or issue licenses, and that the state's interest in regulating abortion providers does not override Plaintiffs' interest in vindicating their federally protected rights.  (*Id.* at 7-8).  Next, Plaintiffs argue that "review of a single licensing decision" would not undermine any coherent state policy, and most state abortion regulations are not at issue in this case.  (*Id.* at 8).  Finally, Plaintiffs reiterate that there is no "special state forum for judicial review of LDH's non-decision."  (*Id.* at 8).

Next, Plaintiffs argue that the appropriate scope of injunctive relief may be deferred until the merits of this case are adjudicated.  (*Id.* at 8).  Plaintiffs also note that federal courts "routinely award injunctive relief in similar circumstances," and "many of our country's most important decisions have required state officials to comply with federal law, even when doing so was inconsistent with state law."  (*Id.* at 8-9 (citing *Brown v. Board of Educ.*, 347 U.S. 483 (1954)).  Plaintiffs emphasize that their claims are "rooted in the federal Constitution" and that they have not asserted state law claims.  (*Id.* at 9).

With respect to HB 606, Plaintiffs argue that "threatened injury" can be sufficient to establish standing and that HB 606 will apply "[t]he moment" PPCfC receives a license, the issuance of which has been delayed only by Defendant's unconstitutional conduct.  (*Id.* at 9).  Plaintiffs contend that Defendant has already attempted to terminate PPGC's Medicaid provider agreements and the Louisiana legislature tailored HB 606 to target PPGC.  (*Id.* at 10 (citing *Gee*,

862 F.3d 445)). "Forcing Plaintiffs to wait until PPCfC succeeds on its license-related claims before PPGC and the Patient Plaintiffs can pursue their Medicaid-defunding claims will only result in relitigation of overlapping legal issues and needless delay in the resolution of the case." (*Id.* at 10). Plaintiffs also argue that other pending cases present distinct legal issues and that there is accordingly no basis to stay or transfer this action, particularly given Plaintiffs' allegations of "ongoing and irreparable harm" and request for a preliminary injunction. (*Id.* at 10).

### 3. Defendant's Reply

Defendant's Reply reiterates and reemphasizes the arguments set forth in the Motion to Dismiss. First, Defendant states that the Court lacks jurisdiction to change LDH's interpretation of state law, and that this interpretation requires it to wait before "deciding" the application. (Doc. 42 at 1 (citing *Pennhurst*, 465 U.S. at 106)). According to Defendant, "Plaintiffs seek no other relief on their licensing claims, as they do not challenge the licensing laws." (*Id.* at 1-3). Defendant also argues that *Pennhurst* "covers" all of the licensing claims, regardless of the federal legal theory on which they are premised. (*Id.* at 2 n.1). Defendant argues that this issue should be decided now, as it is jurisdictional, and deferring decision will waste the resources of the parties and the Court. (*Id.* at 2-3). Defendant further maintains that Plaintiffs *presume* a constructive denial but have not shown one, and that no hardship can result from waiting for further factual development. (*Id.* at 4 (emphasis in original)).

Defendant also reiterates that *Burford* abstention is appropriate, arguing that: (1) Plaintiffs cite no authority preventing them from bringing federal claims in state court; (2) this case "unquestionably" involves complex state law issues; (3) it is immaterial that Plaintiffs' causes of action arise under federal law, as the same was true in *Burford* itself; (4) Plaintiff's argument that abstention is unwarranted simply because "a license is at issue" is a strawman; and (5) Plaintiffs

13

"fail to grapple with the consequences" of federal intervention in individual state licensing decisions. (*Id.* at 4-5).

Finally, Defendant argues that Plaintiffs' HB 606 claims are unripe, as "[n]obody can do more than guess" when PPCfC might be issued a license and the issuance of a license depends on a series of contingent hypothetical events. (*Id.* at 5).

### B.  The Motion for Limited Expedited Discovery

Plaintiffs move for leave to conduct limited expedited discovery pursuant to Rule 26(d) prior to this Court's ruling on their request for a preliminary injunction. (Doc. 5 at 1; Doc. 5-2 at 1). In particular, Plaintiffs seek leave to propound upon Defendant eight interrogatories and six document requests, with responses due within 30 days, and to conduct within 45 days limited four-hour depositions of Gee and Castello. (Doc. 5-1 at 1; Doc. 5-2 at 1, 4). The instructions for completing the interrogatories and requests for production state that, if Defendant objects based on a claim of privilege, Defendant should prepare a privilege log, make a claim of privilege expressly, and describe the information. (Doc. 5-3 at 4).

Plaintiffs argue that there is good cause to order expedited discovery because, absent discovery on the denial of the application, Plaintiffs will be unable to develop the record for preliminary injunction proceedings. (Doc. 5-2 at 2-3). Plaintiffs emphasize that Defendant has provided "no reason" for the alleged denial of the application or any information about its investigation. (*Id.* at 3). Accordingly, Plaintiffs request leave to conduct limited written discovery regarding Defendant's evaluation of the application, the processes Defendant "typically follows" in evaluating or denying a licensing application, and the investigation. (*Id.* at 3). Plaintiffs also request leave to conduct depositions because the deponents have "critical information" concerning the treatment of the application and the legitimacy of the investigation. (*Id.* at 3). Plaintiffs also

argue that Defendant will be only minimally inconvenienced by the grant of this Motion, as the information sought should be "readily accessible" and Plaintiffs' requests are "narrowly tailored" to seek only "necessary documents that will be minimally burdensome for Defendant to produce[.]"  (*Id.* at 3-4).

In opposition, Defendant first argues that jurisdictional questions, now raised in the Motion to Dismiss,[2] should be resolved before any discovery is ordered.  (Doc. 33 at 1, 5).  Defendant does state, however, that "some mutual discovery" may be necessary before a preliminary injunction hearing if any part of the Complaint survives the pleading stage.  (*See id.* at 1).

Defendant next observes that expedited discovery is "not the norm," agreeing with Plaintiffs that "good cause" must be shown.  (*Id.* at 1-2).  Defendant argues that the "potential prejudice" of expedited discovery is significant because it would be extensive in scope, costly for Defendant, and in conflict with important state evidentiary privileges.  (*Id.* at 2).

First, Defendant argues that the discovery sought "covers the entirety of Plaintiffs' merits case," characterizing the interrogatories as demanding that Defendant review "every application" for "every kind of licensable facility" submitted to LDH over several years and producing any responsive licensing file.  (*Id.* at 2).  Second, Defendant argues that expedited discovery will infringe on state sovereignty and especially on state privileges protecting information concerning state investigations.  (*Id.* at 3-4).  Third, Defendant maintains that, if Plaintiffs are permitted to conduct discovery, Defendant will need to conduct discovery of her own concerning PPCfC and PPGC's cooperation during the licensing process and compliance with laws and licensing standards.  (*Id.* at 4).  Defendant characterizes such discovery as "indispensable" at the preliminary

---

[2] The Motion for Discovery was filed before the Motion to Dismiss.  As a result, portions of the briefing on the Motion for Discovery are addressed to arguments that had not been made at that time but were later raised in the Motion to Dismiss.

injunction stage.  (*Id.*).  Finally, Defendant argues that Plaintiffs' claims will likely be dismissed on jurisdictional and prudential grounds, obviating the need for early discovery.  (*Id.* at 5).

In reply, Plaintiffs generally reiterate arguments in the Motion for Discovery.  (Doc. 36 at 1-5).  Particularly, they argue that their requests are narrowly tailored to "test Defendant's claim that LDH's investigations into Plaintiffs are a routine and non-discriminatory part of the application process."  (*Id.* at 2).  Plaintiffs note that they have sought no discovery on their HB 606 claims and state that Defendant's characterization of the scope of the discovery requests is incorrect, as they only seek information concerning "similarly-situated license applications."  (*Id.*).  Plaintiffs also observe that Defendant appears to agree that discovery is needed to test certain claims in this case.  (*Id.* at 3).  Next, Plaintiffs argue that Defendant cannot make a "proclamation of a blanket privilege" to prevent discovery and offers "no reason" why she cannot log privileged or protected information as contemplated by the discovery requests and by the Federal Rules of Civil Procedure. (*Id.* at 4).  Finally, Plaintiffs argue that Defendant improperly "presumes that her [Motion to Dismiss] will be granted," and that Plaintiffs have alleged irreparable harm warranting expedited discovery.  (*Id.* at 5).

### III.     Relevant Standards

Defendant moves for dismissal under Rules 12(b)(1), while Plaintiffs move for expedited discovery under Rule 26(d).  The Court addresses each standard in turn.

#### A.  Rule 12(b)(1) Standard

Concerning the standard for Rule 12(b)(1) motions, the Fifth Circuit has explained:

Motions filed under Rule 12(b)(1) . . . allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's

16

resolution of disputed facts. *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996).

The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *McDaniel v. United States,* 899 F.Supp. 305, 307 (E.D. Tex. 1995). Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980).

When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977) (per curiam). . . .

In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir. 1998).

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.  Rule 26(d) Standard

Under Rule 26(d), a party may not generally seek discovery before the parties have conferred, but the Court may issue an order authorizing expedited discovery.  As this Court has set forth:

Although the Fifth Circuit has not explicitly adopted a standard to determine whether a party is entitled to expedited discovery, several district courts within the Fifth Circuit . . . have expressly utilized the "good cause" standard when addressing the issue.  The good cause analysis takes into consideration such factors as the breadth of the discovery requests, the purpose for requesting expedited discovery, the burden on the defendants to comply with the requests, and how far in advance of the typical discovery process the request was made.

In a good cause analysis, a court must examine the discovery request on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances. Good cause typically exists where the need for expedited discovery outweighs the prejudice to the responding party.  The party seeking expedited discovery has the burden of establishing good cause and the scope of the requests must be narrowly tailored to the necessary information they seek.

> Irrespective of the standard applied, expedited discovery is not the norm.  However, in limited circumstances, district courts have allowed expedited discovery when there is some showing of irreparable harm that can be addressed by limited, expedited discovery.  Courts have also allowed limited, expedited discovery when failing to do so would have substantially impacted the case from progressing on the court's docket.  Courts also look to whether evidence would be lost or destroyed with time and whether the proposed discovery is narrowly tailored.

*ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 61–62 (M.D. La. 2016) (citations and quotation marks omitted).

## IV.   Analysis

### A.  Motion to Dismiss

#### 1. Licensing Claims - Ripeness

Ripeness is "a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).  It generally incorporates consideration of two elements: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.  *Id.* at 808.

"In evaluating ripeness, the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1250 (10th Cir. 2011) (quotation marks omitted)).  "[A] case is generally ripe if any remaining questions are purely legal ones," *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010), and this principle holds even if the application of a disputed rule remains "within the [agency's] discretion." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).  *See also Ohio Forestry Ass'n v.*

*Sierra Club*, 523 U.S. 726, 733 (1998) (no hardship where challenged land management plan did not "grant, withhold, or modify any formal legal license"); *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) (no hardship where there was no indication that challenged action "could be said to be felt immediately by those subject to it in conducting their day-to-day affairs").

The Complaint alleges that, by indicating that it will not rule on PPCfC's application until one or more ongoing investigations are complete, LDH has constructively denied the application. (Doc. 1 at 17, 19).  Defendant's argument to the contrary essentially asks the Court to find in her favor on this issue, *i.e.*, to accept Defendant's representation that it has suspended consideration of PPCfC's application only until the pending investigation or investigations are complete and that the application is still "under review," (Doc. 38-1 at 10-12), and reject Plaintiffs' representation that this explanation is "pretextual" and that LDH "intends to continue to refuse to make a decision on PPCfC's application anytime soon (and possibly ever)," (Doc. 41 at 3).  In footnotes, Defendant states that she acknowledges Plaintiffs' "constructive denial" theory but believes that Plaintiffs "have no basis to allege such a denial," citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), (Doc. 42 at 4 n.3), and that she has never contended that this Court "cannot act until LDH formally denies PPCfC's application," (*Id.* at 4 n.4 (quotation marks and citation omitted)).  That is, the central question on ripeness is whether Plaintiffs' claims are adequately pled and supported at this stage.

Rule 12(b)(1) motions are evaluated somewhat differently than Rule 12(b)(6) motions, insofar as, under Rule 12(b)(1), the Court is permitted to consider the complaint supplemented by undisputed facts and the Court's resolution of disputed facts.  *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (in considering challenge to subject matter jurisdiction, court can "resolve disputed issues of fact to the extent necessary to determine jurisdiction;" by contrast, "disputed questions of fact are anathema to Rule 12(b)(6) jurisprudence, unless those disputed

facts are immaterial to the outcome"); *see also* Fed. R. Civ. P. 12(d) (listing only motions under Rules 12(b)(6) and 12(c) as requiring conversion to summary judgment motions if considered on matters outside the pleadings).

The inquiries are similar, however, insofar as the plaintiff bears the overall burden of demonstrating the existence of subject matter jurisdiction or a viable claim but well-pleaded factual allegations may be accepted as true and, at least at the pleading stage, a "plausible" showing is all that is required.  For example, in *Lane v. Halliburton*, a district court had granted a Rule 12(b)(1) motion on the grounds that the complaint raised nonjusticiable political questions.  529 F.3d 548, 555-57 (5th Cir. 2008).  The Fifth Circuit characterized the central question as whether, "viewing the allegations in the most favorable light, . . . the [p]laintiffs c[ould] prove any plausible set of facts that would permit recovery . . . without compelling the court to answer a nonjusticiable political question."  *Id.* at 557.  The Fifth Circuit remanded, ruling that it "may be possible" to resolve the claims without answering a political question.  *Id.* at 568.  However, it was also "conceivable that further development of the facts on remand w[ould] again send this case toward the political question barrier," and permitting the matter to proceed did not "preclude the possibility that the district court w[ould] again need to decide whether a political question inextricably arises in this suit."  *Id.*  That said, the case was "not there yet, if it ever w[ould] be."  *Id.*

Here, Plaintiffs have plausibly alleged that this action is ripe.  They have provided extensive allegations spanning many years that, when taken in the light most favorable to them, suggest that Defendant's current proffered interpretation of state law is the latest in a series of largely pretextual decisions made to indefinitely prevent the center from providing abortions.  Plaintiffs also plausibly allege that the suspension of the application may continue as long as

virtually any jurisdiction is investigating PPGC, regardless of LDH's level of knowledge concerning or control over the investigation, with effectively no end in sight. So characterized, Plaintiffs' allegations may support a finding that the application has been constructively denied and this this action is ripe. Defendant's arguments to the contrary essentially ask the Court to resolve the merits of the claims in this case, which the Court declines to do at this stage. *Cf. Gee*, 862 F.3d at 455 (rejecting attempt to "bootstrap" resolution of the sole substantive issue into standing inquiry); *see also Freeman v. United States*, 556 F.3d 326, 341-42 (5th Cir. 2009) (limited discovery prior to final ruling on jurisdictional issues appropriate where party alleges specific facts demonstrating need for discovery).

Of course, Plaintiffs' allegations in support of ripeness may not ultimately prove to be true, or to have any factual support, and it is also certainly "conceivable that further development of the facts" will establish that this Court lacks subject matter jurisdiction. *See Lane*, 529 F.3d at 568. The Court has an ongoing obligation to determine whether subject matter jurisdiction exists. *See* Fed. R. Civ. P. 12(h)(3). Therefore, the Court's ruling on this issue is without prejudice to the Court revisiting its ruling at a later time.

### 2. Licensing Claims – *Burford* Abstention

The *Burford* abstention doctrine permits a court sitting in equity, in an "exercise of [its] discretion," to conclude that a state's interests in adjudicating an action are "paramount" and that the dispute would therefore be best adjudicated in a state forum. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996). This decision "balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem and retaining local control over difficult questions of state law bearing on policy problems of substantial public

import." *Id.* (citations and quotation marks omitted); *see also Clark v. Fitzgibbons*, 105 F.3d 1049, 1051 (5th Cir. 1997) (*Burford* doctrine provides for abstention "in deference to complex state administrative procedures").  The balance "only rarely favors abstention," and *Burford* abstention "represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it."  *Quackenbush*, 517 U.S. at 728 (citations and quotation marks omitted).

For *Burford* abstention to apply, "timely and adequate state-court review" must be available.  *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*").  In deciding whether to abstain under *Burford*, courts in this circuit consider five factors: (1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.  *Romano v. Greenstein*, 721 F.3d 373, 380 (5th Cir. 2013). The Court now turns to the various *Burford* requirements and factors.

### a.   Court Sitting in Equity

As set forth *supra*, Plaintiffs seek declaratory and injunctive relief and no damages. Therefore, this Court is sitting in equity.

### b.   Availability of State Court Review

It is unclear whether state court review is available at this stage.  As Plaintiffs note, under the terms of applicable statutes, state court review is generally available for final agency decisions; certain intermediate "action[s]" and "ruling[s];" and/or where a license is denied, revoked, suspended, or not renewed.   (Doc. 41 at 6 (citing La. R.S. §§ 40:2175.6(G); 49:964; 49:992(D)(2)(b)(vi))).  The parties have not addressed in any detail the extent to which Louisiana

courts might recognize or apply a doctrine of constructive denial under those circumstances: Plaintiffs suggest that they do not, (Doc. 41 at 7 n.4), while Defendant generally observes that Louisiana courts might grant relief "under the federal constitution or under Louisiana's own due process and equal protection doctrines," (Doc. 38-1 at 12).

### c.   Source Of Cause of Action and Inquiry into State Law Issues

Plaintiffs' licensing claims are grounded in the federal constitution, *i.e.*, in the Due Process and Equal Protection clauses and the First Amendment.  (Doc. 1 at 30-32).  However, as Defendant correctly observes, *Burford* abstention "turns" less on the particular provision of law under which relief is sought and more on whether a plaintiff's claims are "entangled in a skein of state law that must be untangled before the federal case can proceed," and the claim in *Burford* itself was brought under federal law.  *Sierra Club v. City of San Antonio*, 112 F.3d 789, 795 (5th Cir. 1997).

The Fifth Circuit has recently discussed these elements of *Burford* abstention:

> The first prong—whether the cause of action arises under federal or state law—is straightforward. This cause of action arises under the federal [Endangered Species Act]. The first factor thus weighs in favor of not abstaining but does not settle the issue.

> Regarding the second prong, "*Burford* abstention does not so much turn on whether the plaintiff's cause of action is alleged under federal or state law, as it does on whether the plaintiff's claim may be in any way entangled in a skein of state law that must be untangled before the federal case can proceed." *City of San Antonio,* 112 F.3d at 795 (citation omitted). Of primary concern in *Burford* was the involvement of the federal courts in deciding issues of essentially state law and policy. Federal courts were interpreting and applying state law in oil-well disputes, which "created a constant task for the Texas Governor" and forced the Texas Railroad Commission to "adjust itself to the permutations of the law as seen by the federal courts." *Burford,* 319 U.S. at 329–30.

> In *Wilson,* 8 F.3d at 315, we stated that this factor turns in part on whether the court will be forced to weigh competing local interests and mostly review an agency's decision in an area in which that agency is arguably an expert.  Abstention would be proper if "applying the seemingly clear legal standard ... would involve the federal court in an open-ended 'fairness' inquiry into predominantly local matters." *Id.* What would amount to review of state agency action in a state law framework

would be grounds for abstention: A "claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors" might disrupt the state's programs and would immerse the court in local law and facts. *NOPSI,* 491 U.S. at 362. This court thus required abstention in *City of San Antonio,* 112 F.3d at 794, where an injunction under the ESA would have entangled the court in issues of state law in part by forcing the administrative bodies to violate other state laws.

On balance, this factor weighs against abstention. The state defendants do not argue, as did the defendant in *City of San Antonio,* that they would be forced to violate state law by complying with the injunction. Additionally, the district court, to render a decision, did not, engage complex issues of state law or weigh state policy decisions. Instead, the court decided that (1) the ESA prohibits "takes"; (2) [the Texas Commission on Environmental Quality] causes takes; and (3) the court enjoins the actions that cause takes unless they are "approved" by the [U.S. Fish and Wildlife Service]. On its face, the formula does not require, as in *Burford,* examining individual permits and rendering decisions in favor of individual permittees. One key difference between this case and *City of San Antonio* is that the injunction there required the state to distribute or not distribute water in a certain fashion, whereas here the injunction is primarily focused on the [incidental-take permit] process and future permitting actions. Abstention is not required "merely because resolution of a federal question may result in the overturning of a state policy." *NOPSI,* 491 U.S. at 363.

*Aransas Project v. Shaw,* 775 F.3d 641, 649–50 (5th Cir. 2014) (parallel citations omitted).

Here, unlike in *Aransas Project,* Defendant alleges that Plaintiffs seek an injunction that would require it to violate its own interpretation of state law.  However, unlike in *Burford* and *City of San Antonio,* it does not appear that this Court's adjudication of the federal issues raised in this action would result in its ongoing, open-ended supervision of a complicated regulatory scheme involving uniquely local issues.  *See City of San Antonio,* 112 F.3d at 792 (challenged injunction incorporated water management plan providing for "comprehensive regulation of pumping" from an aquifer); *Burford,* 319 U.S. at 328 (federal court was "called upon constantly to determine whether the Railroad Commision ha[d] acted within the scope of statutory authority, while the important constitutional issues ha[d] . . . been fairly well settled from the beginning").  Indeed, *Aransas Project* went so far as to observe that abstention is not required simply because resolving

a federal question might "result in the overturning of a state policy." *Aransas Project*, 775 F.3d at 650 (citing *NOPSI*, 491 U.S. at 363)).  In this case, the contours and extent of any state "policy" that might be "overturned" by a decision in this case are extremely unclear.  Therefore, the foregoing factors are, at most, ambiguous.

### d.   Importance of State Interest and Need for Coherent Policy

The Court agrees with Defendant that Louisiana has legitimate interests in regulating abortion, and particularly in protecting the health of its citizens, including the life of the fetus that may become a child.  *See, e.g., Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992).  However, Plaintiffs also have a strong interest in the vindication of their federal rights. *See Romano*, 721 F.3d at 380 (in evaluating *Burford* factors, that "the interest in proper application of federal Medicaid law [was] paramount"); *see also Aransas Project*, 775 F.3d at 651 ("water management" was "important state interest," but, unlike in *Burford* and *City of San Antonio*, there was also a strong, countervailing federal interest in managing interstate species).  Similarly, although the Court recognizes as a general matter Louisiana's need for a coherent policy in this area, Defendant has not shown the extent to which this policy is implicated by Plaintiffs' claims that their licensing application has been singled out for unconstitutional treatment.  *See NOPSI*, 491 U.S. at 362 (*Burford* is "concerned with protecting complex state administrative processes from undue federal interference," but it does not "require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy"); *see also BT Inv. Managers, Inc. v. Lewis*, 559 F.2d 950, 955 (5th Cir. 1977) (reversing dismissal on *Burford* grounds because "[a]lthough the challenged statutes [we]re part of a large and perhaps complex regulatory scheme . . . appellants focus[ed] their attack upon a single statute whose possible invalidation could scarcely be expected to disrupt Florida's entire system of

banking regulation" (footnote omitted)).   Therefore, the effects of these factors are similarly ambiguous.

### e.   Availability of "Special State Forum" and Conclusion

For reasons discussed *supra*, the extent to which state court review is currently available is unclear, much less whether any available channels of review constitute a "special state forum" within the meaning of *Burford* jurisprudence.   *Cf. Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 363 (7th Cir. 1998) (*Burford* abstention at issue required not only the availability of a forum for litigating claims but also that the forum be "special," *i.e.*, that it "stand in a special relationship of technical oversight or concentrated review to the evaluation of those claims").

As the Court previously observed, *Burford* balancing "only rarely favors abstention," and *Burford* abstention "represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it."   *Quackenbush*, 517 U.S. at 728.   Defendant's ambiguous showing is presently insufficient to meet the high standards of *Burford*, and the Motion for Dismissal on this basis will be denied.   As was the case previously, however, the Court reserves the right to revisit this ruling as the case proceeds.

### 3.   Licensing Claims – Relief Sought / *Pennhurst*

Defendant also argues that the relief Plaintiffs seek concerning the licensing application, *i.e.*, to require that LDH issue a license, would require the Court to override LDH's interpretation of state law in violation of *Pennhurst*.   (Doc. 38-1 at 8 (citing *Pennhurst*, 465 U.S. at 106).   Preliminarily, as Plaintiffs correctly observe, the Complaint seeks an injunction doing one of three things: (1) enjoining Defendant from withholding approval of the application; (2) directing Defendant to promptly rule on the application "in accordance with all applicable constitutional requirements"; or (3) directing Defendant to grant the application.   (Doc. 41 at 8 n.7; Doc. 1 at 32).

The second of these options would require a "prompt" ruling to the extent that one is required by federal law, vitiating any *Pennhurst* problem.

Moreover, the relevant language from *Pennhurst* states that, "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law," and "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst*, 465 U.S. at 106.  *Pennhurst* interpreted the *Ex Parte Young* exception to Eleventh Amendment immunity, and the Fifth Circuit has read this portion of *Pennhurst* fairly narrowly where a cause of action arises under federal law, even if it implicates state law issues or seeks review of a state's laws or decisions.  *See Cox v. City of Dallas, Tex.*, 256 F.3d 281, 308 (5th Cir. 2001) ("Plaintiffs are also alleging violations of federal law . . . and not state law. The regulations, requirements, and standards that Plaintiffs seek to enforce . . . are federal statutory and regulatory provisions[.] Although the state plan provides that the State will comply with these federal provisions, Plaintiffs are not seeking to enforce the plan itself and therefore do not run afoul of *Pennhurst*'s admonition regarding state law claims." (citations omitted)); *Am. Bank & Tr. Co. of Opelousas v. Dent*, 982 F.2d 917, 921 (5th Cir. 1993) ("[T]he Commissioner seeks to escape the reach of *Young* by arguing that this case falls within the group excluded from the *Young* doctrine by *Pennhurst, i.e.,* those seeking prospective injunctive relief on the basis of state law. This argument is utterly without merit, however, because American Bank is alleging that sections 6:121(B)(2) and 6:242(A)(6) deny it the equal protection of the laws guaranteed by the Fourteenth Amendment. As is common in *Young* cases, it is a state law that is *challenged* as unconstitutional, but this does not mean that American Bank's cause of action arises under state

law; American Bank does not, like the *Pennhurst* plaintiff, rely on an alleged violation of the state statute." (citations omitted)).

Defendant's Reply suggests that this Court "could potentially address an unadorned, arbitrary refusal to act on a valid application," but not a decision to hold an application "pursuant to an interpretation of otherwise constitutional [S]tate laws." (Doc. 42 at 3). However, as Plaintiffs have repeatedly suggested, they do not challenge LDH's "authority to regulate abortion providers or issue licenses" or "interpretation of state law or regulations[,]" but only whether "the application of those laws and regulations is constitutional." (Doc. 41 at 7). It also cannot seriously be argued that, by regulating the exercise of a federally-protected right, a state may transform that right into a creature of state law entirely immune from protection in federal court. *See also Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 851 (5th Cir. 1991) (plaintiff's claims were not barred by *Pennhurst*, in part because, although protected liberty interest was "defined at least in part by state law," plaintiff's Fourteenth Amendment claim was not "merely one for enforcement of state law but for the enforcement of a federal constitutional right"); *Young v. Hosemann*, 598 F.3d 184, 189 (5th Cir. 2010) ("Finally, the election officials argue that, even if the appellants' federal claims are sufficiently cognizable to support federal question jurisdiction, the Eleventh Amendment nonetheless bars them. This argument is premised on *Pennhurst*[.] *Pennhurst* . . . is inapplicable here. The Eleventh Amendment may be relevant to the appellants' state law claim, but it has no relevance to their claims seeking to vindicate federal rights and thereby the supremacy of federal law." (citation omitted)); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 406–07 (5th Cir. 2013) ("The state officials rely heavily on the Supreme Court's decision in *Pennhurst*[.] . . . Here, by contrast, the law to be enforced is not state law but federal law, embodied in a federal consent decree and desegregation order that was entered to implement

28

the Fourteenth Amendment of the U.S. Constitution as interpreted by *Brown* and its progeny. This is the federal law which the State Officials have been enjoined from frustrating or threatening to dismantle.").

Relatedly, while Defendant is correct that "*particular abortion providers do not have a federal constitutional right to a license*," (Doc. 38-1 at 16 (emphasis in original)), to parse the federal constitutional right as issue as simply the right to "a license" under state law reads the issue too narrowly, at least at this early stage. *Cf. Green Valley Special Util. Dist. v. Walker*, ___ F.R.D. ___, 2018 WL 814245, at *3 n.4 (W.D. Tex. Feb. 9, 2018) (defendants argued that the Court should define plaintiff's federal right "with extreme particularity" during *Young* analysis, *i.e.*, that federal statute "may provide [plaintiff] with a federal right to protect its territory from encroachment but does not apply to decertification under [state law]"; *Young* did not apply, "most obviously," because *Young* merely required plaintiff to assert a federal right, as opposed to a state right, as a basis for relief). The Court also notes that Plaintiffs include three Jane Doe plaintiffs who undoubtedly have a federally-protected right to abortion, (Doc. 1 at 6-7), and it is also well established that third parties may sometimes sue to protect the abortion rights of others. *See Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (physician plaintiffs had third-party standing to assert abortion rights of their plaintiffs).

Plaintiffs have plausibly pled claims rooted in federal law. The claims may implicate state law, but the Court cannot conclude at this time that granting relief in this action will run afoul of *Pennhurst* or related cases. The Motion to Dismiss is therefore denied on this basis, without prejudice to renewal of these arguments following the development of the record.

#### 4. HB 606 Claims

As the Court discussed *supra*, the ripeness doctrine generally incorporates consideration of two elements: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.  *Nat'l Park Hospitality*, 538 U.S. at 808.  The central focus is on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Tarrant Reg'l Water Dist.*, 656 F.3d at 1250.

However, the ripeness test is met where "an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention" or "when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010).  That is, a future injury may be sufficient to satisfy Article III if either "the injury is certainly *impending*" or "there is substantial *risk* that the harm will occur." *Susan B. Anthony List v. Driehaus*, __ U.S. __, 134 S. Ct. 2334, 2341 (2014) (emphasis added).  Thus, "ripeness is seldom an obstacle to a pre-enforcement challenge . . . where the plaintiff faces a credible threat of enforcement," and the plaintiff is typically not required to await and undergo enforcement as the sole means of seeking relief.  *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 907 (10th Cir. 2012); *see also id.* at 905 (stating that federal courts have "consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement").

"Predominantly legal questions" like a statute's plain meaning and whether a person's conduct contravenes its unambiguous command are nearly always ripe. *See, e.g.*, *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) (challenge to statute was ripe where enforcement was "automatic" for all new voter registrants; "[t]he Supreme Court has long . . . held that where the enforcement of a statute is certain, a preenforcement challenge will not be

rejected on ripeness grounds."); *Nat'l Ass'n of Home Builders*, 417 F.3d at 1282 ("[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues."); *cf. LeClerc v. Webb*, 419 F.3d 405, 414 (5th Cir. 2005) (noting that "actions for declaratory relief . . . by design permit pre-enforcement review" and applying two exceptions).

Under these authorities, and for some of the same reasons that applied to Plaintiffs' licensing claims, Plaintiffs' pre-enforcement challenge to HB 606 is ripe.  Defendant's challenge is based in significant part on its argument that this Court is completely unable to afford Plaintiffs any relief on their other claims.  (*See* Doc. 42 at 5).  As discussed *supra*, this Court does not fully accept that argument.  Regardless, Plaintiffs have plausibly alleged a substantial risk that HB 606 will apply to them, particularly given the predominantly legal issues of statutory and constitutional interpretation that underlie their claims.  Therefore, the Motion to Dismiss the HB 606 claims will be denied without prejudice to renewal.

## B.  Motion for Discovery

As many courts have ruled, and as the parties in this case agree, the appropriateness of expedited discovery is evaluated under a "good cause" standard, and "good cause" is generally present where the need for expedited discovery outweighs the prejudice to the responding party. *See ELargo Holdings, LLC*, 318 F.R.D. at 61; (*see also* Doc. 5-2 at 2, Doc. 33 at 2).

Many of Defendant's arguments in opposition to expedited discovery were based on the likelihood that their Motion to Dismiss would be granted or the need to resolve jurisdictional questions before permitting discovery.  (*See* Doc. 33 at 1, 3, 5).  Since the Court has denied the Motion to Dismiss at this time, these arguments have generally fallen away.  Defendant even suggested that, "if any part of Plaintiffs' case survives the pleading stage," "some mutual discovery" would be "necessary" and "indispensable."  (*Id.* at 1, 4).  Therefore, the extent to which

a dispute remains is unclear, at least with respect to discovery generally rather than the scope of individual requests.

Regardless, the Court concludes that Plaintiffs have generally shown good cause for expedited discovery. The discovery sought is addressed to topics central to their request for declaratory and injunctive relief, *i.e.*, the progress and status of their licensing application and the investigation that is allegedly preventing it from progressing, particularly as compared to the treatment of similar applications in the recent past.

The Court also agrees with Plaintiffs that, although some information sought in discovery may ultimately prove privileged or confidential, such issues are better dealt with in the context of specific claims of privilege or confidentiality as to specific requests or questions rather than via blanket assertion completely forestalling discovery. *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001) (party claiming privilege bears burden of demonstrating its applicability, and Rule 26(b)(5) requires that party "expressly" make the claim and "describe the nature of" information not disclosed such that other parties may assess the claim).

For the foregoing reasons, Plaintiffs' Motion for Discovery will be granted as a general matter: that is, limited expedited discovery shall occur prior to the Court's ruling on the request for a preliminary injunction. However, many issues concerning discovery remain unresolved. For example, the Court believes that good cause also exists to permit Defendant to perform some limited discovery, but the scope of Defendant's requests is unknown. The nature and extent of the privilege or confidentiality provisions that Defendant will seek to invoke is also unclear. Rather than order the discovery that Plaintiffs request and address these other issues piecemeal, the Court believes it appropriate to first hold a status conference concerning the scope and schedule of expedited discovery in this action. Until the overall contours of expedited discovery in this action

are better established, the Court similarly defers ruling on whether any individual request in the Motion for Discovery is not properly tailored to the need for expedited discovery.

**V.      Conclusion**

**IT IS ORDERED** that Defendant's Motion to Dismiss, (Doc. 38), is **DENIED**.  This ruling is without prejudice to the renewal of jurisdictional arguments following further proceedings.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Discovery, (Doc. 5), is **GRANTED** insofar as limited expedited discovery shall occur prior to the Court's ruling on the request for a preliminary injunction.  The Court shall set a status conference concerning the scope and schedule of discovery.  The Magistrate Judge may also be present at the conference.

Signed in Baton Rouge, Louisiana, on <u>May 23, 2018</u>.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**